# EXHIBIT

# 1

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA


In re WELLS FARGO LOAN    )
PROCESSOR OVERTIME PAY    )
LITIGATION                )
                          )
                          )    MDL Docket No. 1841
This Document Relates     )
to All Cases.             )


VIDEOTAPED DEPOSITION OF BRENDA McMILLIAN,

produced, sworn, and examined on Wednesday, the 19th
day of December, 2007, commencing at 9:13 a.m. and
concluding at 12:12 p.m., at the law offices of Stueve
Siegel Hanson LLP, 460 Nichols Road, Suite 200, in the
City of Kansas City, County of Jackson, State of
Missouri, before:

                ANN M. HAMILTON, RPR
              Certified Court Reporter
                        of
        JAY E. SUDDRETH & ASSOCIATES, INC.
                   Suite 100
              10104 West 105th Street
            Overland Park, Kansas 66212-5755

a Certified Shorthand Reporter within and for the
State of Kansas and a Certified Court Reporter within
and for the State of Missouri.

Taken on behalf of Defendant pursuant to Notice to
Take Depositions.

Brenda McMillian
December 19, 2007

Page 13

1          A.    134.

2          Q.    Yeah, it's quite a bit down the stack of

3    documents.

4          A.    Uh-huh.

5          Q.    Okay.  And am I correct in reading that

6    you state -- or that the letter of resignation is

7    dated June 19 of 2006?

8          A.    Yes.

9          Q.    Okay.  And it states that you are

10   resigning from your position as a client relations

11   representative with Wells Fargo Real Estate Tax

12   Services effective July 7, 2006; is that correct?

13         A.    Yes.

14         Q.    Now, when you started with Wells Fargo

15   Home Mortgage on October 28, 2002, you started out as

16   a mortgage loan specialist; is that correct?

17         A.    That's correct.

18         Q.    Okay.  And what location did you start

19   working at as a mortgage loan specialist?

20         A.    In the Charlotte Map, also known as the

21   Fulfillment Center.

22         Q.    And is that North Carolina Fulfillment

23   Center, at the time was it located at 2550 West Tyvola

24   Road?

25         A.    Yes.

2bb7cb5f-456b-4c71-9a92-fdf8d5cdf4af

Brenda McMillian
December 19, 2007

Page 14

1    Q.    Okay.  And when you were a mortgage loan
2    specialist, was that the only location that you worked
3    at for Wells Fargo Home Mortgage?
4        A.    Yes.
5        Q.    And how long did you hold the position of
6    mortgage loan specialist with Wells Fargo Home
7    Mortgage?
8            A.    Through March of 2004.
9        Q.    And what did you do -- did you transfer
10   positions as of March 2004?
11           A.    No, I was laid off, and I went to work
12   for Wells Fargo Real Estate Tax Services.
13           Q.    In that stack of documents if you'll turn
14   to what is labeled -- and it will be just a little bit
15   up in the stack of documents -- WF010107.
16               MR. DIRKS:  Can you say that one
17   more time?
18               MR. KELLY:  WF010107.
19       A.    107?
20       Q.    (By Mr. Kelly)  That's right.
21       A.    Okay.
22       Q.    This appears to be a transfer form that
23   indicates a transfer of positions.  Do you agree with
24   that?
25           A.    Do I agree if this is a transfer form?

Brenda McMillian
December 19, 2007

1    answers that you gave me are accurate, do you have

2    anything that you need to change about any of the

3    answers that you gave to me for the questions that

4    I've asked thus far in the deposition?

5         A.    None that I can think of at this time.

6         Q.    Okay.  If -- that's something I wanted to

7    remind you of, if at any point you think that a prior

8    answer that you gave to me is not accurate or

9    incomplete because something came up, or you

10   remembered something that you didn't previously,

11   please feel free to interrupt the deposition and

12   correct that.  We want to make sure that the answers

13   that we have on the record are as clear as possible;

14   okay?

15        A.    Okay.

16        Q.    I'm handing you what has previously been

17   marked as Deposition Exhibit Number 2.  I'll represent

18   to you that this is -- this includes portions of the

19   employee handbook that was effective as of April of

20   2001 for employees of Wells Fargo Home Mortgage.  Do

21   you recognize that document?

22        A.    Yes.

23        Q.    Okay.  If you would turn to Exhibit

24   Number 37, which is your personnel file, if you would

25   turn to WF010035.

2bb7cb5f-456b-4c71-9a92-fdf8d5cdf4af

Page 42

1     A.    10035?

2     Q.    Right.

3     A.    Okay.

4     Q.    Do you recognize that document?

5     A.    I do.

6     Q.    Okay.  And that's your signature at the

7  bottom?

8     A.    It is.

9     Q.    Okay.  And it's dated October 16 of 2002.

10  Do you see that?

11     A.    Yes, it is.

12     Q.    Okay.  And do you agree that this was

13  filled out prior to you actually starting your

14  position as a mortgage loan specialist?

15     A.    Yes, it was.

16     Q.    And you agree that this shows an

17  acknowledgment that you received the handbook, as well

18  as a code of ethics and business conduct, as well as

19  an information security policy, and as well as a human

20  resources systems authorization; is that correct?

21     A.    This was the paperwork I was asked to

22  fill out in conjunction with the background check for

23  the position.  I did not receive any of those things

24  at that time.

25     Q.    Okay.  But do you -- you do recognize the

Brenda McMillian
December 19, 2007

Page 43

1  employee handbook that's in front of you that's
2  Exhibit Number 2?
3         A.    Yes.
4         Q.    Okay.  And did you receive a copy of that
5  employee handbook when you were a mortgage loan
6  specialist at Wells Fargo Home Mortgage?
7         A.    I did sometime in 2003.
8         Q.    Would that have been early 2003?
9         A.    Mid to late 2003.
10        Q.    Did you have access to the employee
11 handbook online on a web page or something of that
12 nature before receiving a hard copy of the handbook?
13        A.    I wasn't aware that it was made
14 available online.
15        Q.    As a mortgage loan specialist, earlier in
16 this deposition you described yourself as a loan
17 processor; is that correct?
18        A.    Uh-huh.
19        Q.    Okay.  And you've also testified that you
20 worked in a Map Center or Fulfillment Center; is that
21 correct?
22        A.    That's correct.
23        Q.    Okay.  And when you were a mortgage loan
24 specialist you've also testified that you worked at
25 2550 West Tyvola Road in Charlotte, North Carolina;

2bb7cb5f-456b-4c71-9a92-fdf8d5cdf4af

Brenda McMillian
December 19, 2007

Page 64

1    Q.    Was that when you were in training?

2    A.    It was during and after training.

3    Q.    You said it was sometime after that.  Are

4  you able to estimate about how long it was before you

5  started making entries into Web Time?

6    A.    Maybe late November or December.  Like I

7  said, I can't remember.  It just took awhile for them

8  to get the profile set up and the desktop and

9  everything.

10    Q.    So it was sometime in the tail end of

11  2002 is what it sounds like?

12    A.    Yes, uh-huh.

13    Q.    Did you accurately record all of your

14  hours worked in Web Time when you were a mortgage loan

15  specialist?

16    A.    Yes, I did.  But I was also asked to

17  back out time that was not pre-approved for overtime;

18  in other words, to remove overtime hours.

19    Q.    Who asked you to back out time?

20    A.    Sarah Froedge and Sonya Moore.

21    Q.    When did they tell you that?

22    A.    Sarah Froedge from the beginning of

23  employment to -- I think Sonya came on about April and

24  May of 2003, she came on like early summer of 2003,

25  she then became our supervisor, so then it was

Brenda McMillian
December 19, 2007

Page 68

1    could send it forward she would say, "Okay, I'll

2    approve these -- I'll approve three hours for this,"

3    or "I'll approve two hours for this."

4        Q.   Did you ever seek approval to work

5    overtime before working it?

6        A.   No.  I didn't think it was necessary

7    because she would come through there and see that we

8    were working.

9        Q.   Who else was present during these

10   conversations where you allege that Sarah Froedge

11   instructed you to back out overtime entries?

12       A.   Lisa Bing.  And Sarah Froedge and I, we

13   had those discussions quite a bit.

14       Q.   Anybody else?

15       A.   I discussed with who I thought at the

16   time was a HR representative, Lori, she worked there,

17   that I had not gotten overtime, and she said that she

18   would talk to HR at corporate about it and get back to

19   me, and nothing ever happened.

20       Q.   Is that Lori Hooper?

21       A.   Yes.

22       Q.   And she was actually in HR at the

23   Fulfillment Center?

24       A.   That's what she said.

25       Q.   So Miss Hooper was actually present for

Page 72

1          A.    I think she was district or maybe

2     regional.  I can't recall her name.  But she did not

3     work in Charlotte, I know that.

4          Q.    Do you know where she worked?

5          A.    No.  Sometimes we had calls, like

6     different types of calls for whatever reason, and

7     there would be individuals on those calls from

8     California and both Iowa.

9          Q.    Do you recall any of the individuals that

10    you believe were from California?

11         A.    I don't recall.

12         Q.    How do you know they were in California?

13         A.    Because our calls were typically set up

14    to accommodate those individuals in California, so

15    there would be some times we'd have to work late.  If

16    the call was -- you know, they would schedule a call

17    for 3:00 California time, then we would have to work

18    late to accommodate their time zone.

19         Q.    But you don't recall who any of those

20    individuals were?

21         A.    No.

22         Q.    Who did Sonya Moore report to?

23         A.    Sarah Froedge.

24         Q.    Am I correct that Sarah Froedge had the

25    title of production operations manager?

Page 73

1        A.    That's correct.

2        Q.    Okay.  And Sonya Moore, was she a team

3    leader, or what was her title?

4        A.    She was a supervisor.

5        Q.    You said you had these calls

6    periodically.  What were these calls about?

7        A.    Employee meetings, meetings about --

8    what do you call the term -- documents that were

9    missing in the closing or settlement statement that

10   was related to processing.  I forget.  It was a term

11   they called for it.  It just totally skips my mind.

12       Q.    What do you mean by employee meetings?

13       A.    Like, for example, when they was rolling

14   out a new process for how we would originate and

15   process loan files, they would have all employee

16   meetings to first introduce these are the changes that

17   are going to take place, and then they would break it

18   down into teams and regions, and then you would

19   actually get on that call and go through the training

20   via phone.  And it was like a presentation like you

21   would just go through the Power Point presentation and

22   go through the training on those changes.

23       Q.    So it sounds like these calls were

24   related to processes and procedures and training and

25   bringing you up to speed on new products or new

2bb7cb5f-456b-4c71-9a92-fdf8d5cdf4af

Brenda McMillian
December 19, 2007

Page 74

1   procedures and processes that you had to follow as

2   mortgage loan specialists; is that fair?

3           A.    Yes.

4           Q.    Okay.  Did you ever complain to anyone

5   besides Ms. Lori Hooper regarding your allegation that

6   you weren't paid for overtime?

7           A.    Yes, to Sarah as well as Sonya.

8           Q.    Anyone else besides those three people?

9           A.    No, I did not, because I was under the

10  impression that Lori was actually an HR

11  representative.

12          Q.    Okay.  I'm sorry to be jumping around

13  here, but let's talk about the conversations that you

14  had with Sonya Moore where she would tell you to back

15  out, or she would say that she wasn't going to approve

16  overtime, the things that you've already testified to.

17               Who else was present during those

18  conversations besides you and Ms. Moore?

19          A.    Well, we worked in a cubicle community,

20  again, so the conversations were typically one-on-one

21  between Sonya and I, but I cannot confirm that they

22  were not heard by anyone else there.

23          Q.    Who was closest by?

24          A.    I think Lamar, Lisa Bing, Carmen Perez,

25  just some of the same individuals I listed before.

Brenda McMillian
December 19, 2007

Page 76

1     her for any issues regarding pay.

2              Q.    Did you ever follow up with Miss Hooper?

3              A.    No, not after we had that -- Sarah and I

4     had that conversation.

5              Q.    So after you complained to Miss Hooper

6     you said Sarah returned?

7              A.    Yes, she was --

8              Q.    What do you mean by that?

9              A.    She was out of the office when Lori had

10    gotten back to me on the overtime pay, and so I went

11    and I followed up with Sarah because it actually

12    turned out that Sarah had not approved it.  And she

13    asked me why did I have that conversation with Lori?

14    And I told her because Lori is the HR rep.  And she

15    said, "No, she's here to assist me, and I make the

16    decisions on the pay."

17              THE VIDEOGRAPHER:  Counsel, five

18    minutes.

19              Q.    (By Mr. Kelly)  In terms of the hours

20    that you worked, were there specific times of the

21    month that you normally worked longer hours than other

22    times of the month?

23              A.    Not during that time.  They were all

24    long hours during that time; because, like I said, we

25    were in the refi boom, but I do think it kind of

Brenda McMillian
December 19, 2007

Page 106

1    Q.    The last thing I'd like to talk about

2    today, before we close today, is if you'll turn to

3    what was previously marked as Exhibit Number 2.

4    A.    What was Exhibit Number 2?

5    Q.    That was the employee handbook.  If you

6    would please turn to the page labeled WF000774.

7    A.    Okay.

8    Q.    At the top of that page there is a line

9    labeled "Reporting Overtime."  Do you see that?

10    A.    Yes.

11    Q.    And if I'm reading correctly it reads,

12    "If you're in a nonexempt position you must report all

13    hours worked."  Did I read that correctly?

14    A.    Yes.

15    Q.    And did you understand that to be the

16    policy of Wells Fargo when you were a mortgage loan

17    specialist?

18    A.    Yes.

19    MR. KELLY:  And with that, I want to

20    take a very quick break just to make sure that I don't

21    have anything further, but give me just five minutes

22    and then we can close up.  Thanks.

23    THE VIDEOGRAPHER:  Off record at 12

24    noon.

25    (Recess taken.)