# EXHIBIT 4

Page 1

```
              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA

In re WELLS FARGO LOAN PROCESSOR
OVERTIME PAY LITIGATION

This Document Relates to:      MDL Docket No. 1841
Bowne v. Wells Fargo Home
Mortgage (transferred from
D. Kan., No. 06-2020)
N.D. Cal., No. 07-4013 MHP



              DEPOSITION OF TRUDY BOWNE,

produced, sworn and examined on Saturday, the 1st day
of December, 2007, between the hours of 10:09 a.m. and
11:38 a.m. of that day, at the law offices of Stueve
Siegel & Hanson, L.L.P., 460 Nichols Road, Suite 200,
in the City of Kansas City, in the County of Jackson,
and the State of Missouri, before:

       NAOLA C. VAUGHN, RPR, CRR, KS CSR #0895
            Certified Realtime Reporter
                         of
          JAY E. SUDDRETH & ASSOCIATES, INC.
                     Suite 100
              10104 West 105th Street
         Overland Park, Kansas  66212-5746
a Certified Shorthand Reporter within and for the State
of Missouri.

Taken on behalf of Defendant pursuant to Notice to Take
Deposition.
```

Page 36

```
1       Q.      Who were the ones that were usually there?
2       A.      Usually Sheila and Gloria.
3       Q.      Have you ever heard the expression "brew
4   crew"?
5       A.      No.  I can't say I've ever heard that.
6       Q.      You haven't heard the group of people going
7   out referred to as the brew crew?
8       A.      No.
9       Q.      During the time that you were a loan
10  processor, did anyone ever talk to you about recording
11  the time that you were working?
12      A.      Jason Moxness asked us to start recording
13  our time.
14      Q.      When did he ask you to start recording your
15  time?
16      A.      I don't know the exact date.  It was
17  sometime into when I started working there.  Maybe six
18  to nine months after I started working there.
19      Q.      Did he say why he wanted you to start
20  recording your time?
21      A.      He just said that he wanted to keep track of
22  the hours we were working.
23      Q.      Did he tell you that that information was
24  going to be used for anything?
25      A.      No.
```

1   Q.   How was it that you were to be recording
2   your time?
3   A.   He showed us the web site for Webtime. And
4   we would go in, enter in when we came in, when we left
5   for lunch, if we left for a break. And it was done
6   daily.
7   Q.   How would you go about doing that? When was
8   the first time during the course of the day that you
9   would access this web site and make an entry?
10  A.   I would come in in the morning and put what
11  time I came in. And then if I left for any reason,
12  lunch, errands, whatever, I would go in and clock out.
13  And when I got back, I'd clock back in, and then when I
14  left, I would clock out.
15  Q.   So it sounds like you did these as they were
16  happening?
17  A.   Correct.
18  Q.   It's not like at the end of the day that you
19  would go in and fill in all the entries?
20  A.   No. Occasionally I would forget. So there
21  might have been one or two days I did that. But I put
22  in there as accurately as I could.
23  Q.   So it was possible, for example, that it got
24  to be 5:00 o'clock and you were ready to leave and you
25  realized you hadn't made any entries yet for the day --

1  it was possible for you to go back and do all of the
2  entries for the day as you were leaving?
3       A.   Yes.
4       Q.   And I realize we could actually get a copy
5  of the screen, but, explain for us, if you would, what
6  keystrokes you'd actually do to enter the time?  Is it
7  you're actually saying -- you're typing in, for
8  example, 7:30?
9       A.   It would have -- if I remember correctly, it
10 had a drop down box that gave you the times.
11      Q.   And you'd select one of the times from the
12 drop down?
13      A.   Correct.
14      Q.   Did you do your best to make accurate time
15 entries?
16      A.   Yes.
17           MR. BOATRIGHT:  We need to take a break
18 to change our tape.
19           THE WITNESS:  Okay.
20           THE VIDEOGRAPHER:  This concludes
21 videotape number 1.  Off record at 11:08.
22           (Recessed from 11:08 a.m. to 11:12 a.m.)
23           THE VIDEOGRAPHER:  Back on record
24 beginning videotape No. 2 at 11:12.
25      Q.   (BY MR. BOATRIGHT)  We were talking before

Page 48

1  company?
2       A.    Yes.
3       Q.    Was he the one who talked to you about
4  coming over to his company?
5       A.    He and Scott Madsen.
6       Q.    Who is Scott Madsen?
7       A.    He is also one of the owners of the company
8  I currently work for.  And he was a former loan officer
9  at Wells Fargo.
10      Q.    Did you meet him at Wells Fargo?
11      A.    Yes.
12      Q.    I think the records indicate that you left
13 Wells Fargo in February of 2005.  Does that sound
14 right?
15      A.    I believe that's correct.
16      Q.    At any time prior to February of 2005, did
17 you ever complain to anyone at Wells Fargo about the
18 way you were being paid?
19      A.    No.
20      Q.    At any time prior to February of 2005 did
21 you ever have any concerns about the way you were being
22 paid?
23      A.    No.
24      Q.    I've just handed you what's been marked as
25 Exhibit 31.  Is that your signature near the bottom

1  there?
2  A.  Yes, it is.
3  Q.  And it's dated September 9 of 2002. Do you
4  see that?
5  A.  Yes.
6  Q.  Looks like this is something you signed when
7  you first started at Wells Fargo, correct?
8  A.  I must have, yes.
9  Q.  And the first section of this, you see where
10 it says Handbook for Wells Fargo Team Members?
11 A.  Yes.
12 Q.  And it says, "I have received the handbook."
13 Do you see that?
14 A.  Yes.
15 Q.  Did you receive a handbook?
16 A.  I believe I did.
17 Q.  Do you know whether or not you reviewed the
18 handbook?
19 A.  I don't think I ever looked at it.
20     THE VIDEOGRAPHER:  Off record just a
21 second.  It's 11:26.
22     (Brief interruption.)
23     THE VIDEOGRAPHER:  Back on record.
24 11:27.
25 Q.  (BY MR. BOATRIGHT)  We had a brief break

1   there to adjust a microphone.  Now we're back.
2           Exhibit No. 32 looks to be a similar kind of
3   an acknowledgment.  This one appears to be dated
4   September of 2003.  Do you see that?
5       A.   Yes.
6       Q.   Do you know why you had another
7   acknowledgment in September of 2003?
8       A.   I don't recall.
9       Q.   This one also makes reference to the
10  handbook.  Do you see that?
11      A.   Yes.
12      Q.   Do you recall receiving a second handbook?
13      A.   I don't recall receiving one.
14      Q.   Do you remember hearing at any point that
15  you could access the handbook online?
16      A.   I believe so.
17      Q.   Is that something that you ever did?
18      A.   No.
19      Q.   Exhibit No. 33 is your declaration, correct?
20  That's the statement that you referred to earlier?
21      A.   Yes.
22      Q.   And that's your signature on the last page
23  of that?
24      A.   That is correct.
25      Q.   Did you prepare this document?