# EXHIBIT

# 7

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In re WELLS FARGO LOAN PROCESSOR

OVERTIME PAY LITIGATION

This Document Relates to

Bowne v. Wells Fargo Home Mortgage

(transferred from D. Kan., No. 06-2020)

N.D. Cal., No. 07-4013 MHP

MDL Docket No. 1841

VIDEOTAPED DEPOSITION OF AMIE LOVRIEN

MARCH 14, 2008

1   portions of two different versions of the Wells
2   Fargo handbook for team members.
3           Do you generally recognize these
4   documents?
5       A.  Yes.
6       Q.  And when you started your employment in
7   2001 with Wells Fargo, did you receive a copy of the
8   handbook for team members?
9       A.  I believe I did, yes.
10      Q.  And just to confirm, if you will turn back
11  to what I marked as Exhibit No. 80, the very first
12  one that we were looking at, and if you will turn to
13  what is marked WF000516, and they are in numerical
14  order.
15          I will represent that this is a team
16  member acknowledgment form.  If you will look at the
17  top of it, it indicates a handbook for Wells Fargo
18  Team Members.
19          And is that your name and signature at the
20  bottom of the page?
21      A.  Yes, it is.
22      Q.  Okay.  So you do recall receiving a copy
23  of the handbook when you started?
24      A.  Yes.
25      Q.  The -- what is marked as Exhibit No. 2,

Page 48

1  the first page indicates that this handbook is for
2  employment policies in effect as of April 1st of
3  2001.
4         Did I read that correctly?
5     A.  Yes.
6     Q.  Okay.  If you will turn to the first page
7  of the handbook, it's WF000725.  It's after the
8  table of contents.
9         If you look about midway through the page
10 it says, Online version.  It says, You'll find an
11 online version of this Handbook on Teamworks, Wells
12 Fargo's intranet site.  The online version contains
13 the same information as this printed version plus
14 links to updated policy information as it becomes
15 available.
16        As a Wells Fargo employee and in
17 particular when you held the positions of mortgage
18 sales associates, did you have access to Teamworks?
19    A.  Yes.
20    Q.  Okay.  And if you will look to
21 Exhibit No. 3, it indicates that this book describes
22 employment policies in effect as of June 1st, 2004.
23        Did I note that correctly?
24    A.  Yeah.
25    Q.  And at that time -- after that time you

1  August 7, 2004.  And if you move over to the right
2  under the hours column you see 13.
3        Do you see that?
4    A.  Yes.
5    Q.  Were you recording your time?  And by --
6  and I mean, are you personally recording your time
7  at this particular time in August of 2004?
8    A.  No, I don't believe so.
9    Q.  And at that time, were you aware of
10 whether anyone else was recording your time?
11   A.  Not that I'm aware of.
12   Q.  And do you have any ex- -- any basis or
13 explanation for why it would indicate 13 hours?
14   A.  Again, I can only assume it was another
15 Des Moines trip.
16   Q.  And what do you base that assumption on?
17   A.  Because that's the only time that we were
18 told that we may be able to get overtime.
19   Q.  So you were told that you were able to get
20 overtime in certain circumstances?
21   A.  For Des Moines trips, yes.
22   Q.  Who told you that?
23   A.  Julie Adam.
24   Q.  Do you know when she -- approximately when
25 she told you that you could record overtime for

1  Des Moines, Iowa, trips?
2      A.   I don't recall.  It was probably sometime
3  when I complained that it was so late when we would
4  get back, and --
5      Q.   What position did you hold?  And this was
6  at the time you held the mortgage sales associate
7  position?
8      A.   Yes.
9      Q.   And you just mentioned that you complained
10 about getting back late from Des Moines; is that
11 correct?
12     A.   Yes.
13     Q.   And who did you complain to?
14     A.   Julie Adam.
15     Q.   Did you complain to anyone else?
16     A.   Anyone else that would listen, yes.
17     Q.   Were these people other people within the
18 office at Terra Centre?
19     A.   Yes.
20     Q.   Can you recall anyone else that would have
21 heard your complaint?
22     A.   Everybody because everybody was
23 complaining.  Peggy Slump, Rhonda Mohrhauser, Mark
24 Roos, Christie LeGrand.
25     Q.   Can you say that last name?

1   A.   Christie LeGrand.
2   Q.   Oh, okay.
3        And what did Ms. Adam do in response to
4   your complaint?
5   A.   Nothing that I was aware of.  Just
6   listened to me.
7   Q.   And was your complaint simply that you
8   were getting back from trips to Des Moines late?
9   A.   My complaint was we were getting back at
10  sometimes 7 or 8 o'clock at night, and then we were
11  expected back at the office at 8 o'clock the next
12  morning.
13  Q.   And do you -- was that your -- was there
14  anything else that you complained about?
15  A.   No.
16  Q.   And you don't recall what Ms. Adam did in
17  response?
18  A.   No.
19  Q.   You had mentioned the other folks that you
20  believe heard your complaint.  Did they all hold the
21  position of HMC?
22  A.   Yes.
23  Q.   If you will go back to Exhibit No. -- I
24  believe we were at 82.
25       MR. DIRKS:  Yeah.