# EXHIBIT

# 10

Jason Moxness
December 21, 2007

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

In re: WELLS FARGO      )
LOAN PROCESSOR          )
OVERTIME PAY            )
LITIGATION              )
                        )
                        ) MDL Docket No. 1841
This Document Relates   )
to Bowne v. Wells       )
Fargo Home Mortgage     )
(transferred from D.    )
Kan., No. 06-2020)      )
N.D. Cal., No. 07-4013  )
MHP                     )

VIDEOTAPED DEPOSITION OF JASON MOXNESS,

produced, sworn, and examined on Friday, the 21st day of December, 2007, commencing at 9:48 a.m. and concluding at 11:46 a.m., at the law offices of SPENCER, FANE, BRITT & BROWNE, 40 Corporate Woods, in the City of Overland Park, County of Johnson, State of Kansas, before:

CHRISTINE M. MASSEY, CSR
Certified Shorthand Reporter
of
JAY E. SUDDRETH & ASSOCIATES, INC.
Suite 100
10104 West 105th Street
Overland Park, Kansas 66212-5755

a Certified Shorthand Reporter within and for the State of Kansas.

Taken on behalf of the Defendant pursuant to Notice to Take Depositions.

1    Q.    But you don't know?
2    A.    No.
3    Q.    Did anyone in management, meaning anyone
4    above you in the chain of command, ever talk to you
5    about any expectation for the number of hours that
6    loan processors should be working?
7    A.    No.
8    Q.    Did anyone in management talk to you
9    about loan processors recording the time that they
10   were working?
11   A.    Yes.
12   Q.    When did that -- when did one of those
13   conversations take place?
14   A.    Again, I don't recall the exact date.  It
15   was probably a year into my tenure there, so let's
16   just say fall of '02 is when the salaried
17   individuals, meaning the processors, were required
18   to keep their time on Webtime.
19   Q.    How did that communication come to you?
20   A.    Through Pat Verkamp and his assistant,
21   Jean.
22   Q.    And what were you told about the use of
23   webcam -- or Webtime?
24   A.    Just to have your processors on a daily
25   basis log in to Webtime to record the hours that

1   they worked.
2       Q.   Were you told that you had any
3   responsibility with respect to Webtime?
4       A.   No.  That was managed by Jean
5   Scheckenger, which is Pat Verkamp's assistant.
6       Q.   Do you know how to spell Scheckenger?
7       A.   I can -- it's like S-c-h-e-c-k-e-n-g-e-r.
8       Q.   And what was your understanding of what
9   Jean would be doing with that Webtime?
10      A.   Passing it up to corporate.  Jean was
11  basically the manager of the processors.  When
12  there would be processor conference calls or
13  processor offsite meetings, Jean would run those,
14  so she was the one that tracked their time, the
15  number of loans closed, and would manage their
16  bonus, if there was one for a month.
17      Q.   Jean is J-e-a-n?
18      A.   Uh-huh.
19      Q.   Yes?
20      A.   Yes.
21      Q.   When you were first advised that your
22  processors would begin using the Webtime in roughly
23  the fall of 2002, were you told that you had any
24  responsibility for reviewing the time or doing
25  anything at all with the time?

1    A.    No.
2    Q.    When this was rolled out in the fall of
3 2002, were both Ms. Bowne and Ms. Hesterberg
4 working for you at the time?
5    A.    As much as I recall, yes.
6    Q.    What conversation did you have with them
7 about Webtime?
8    A.    It was merely, "Please log on to Webtime
9 and record the times, the hours that you're
10 working."
11    Q.    I know you've said that you didn't have
12 any responsibility for reviewing that time, but did
13 you ever review that time --
14    A.    I.
15    Q.    -- that they were recording?
16    A.    I did not have access to Webtime, so I
17 never saw what hours they were recording.  It went
18 right to Jean Scheckenger.
19    Q.    So if I were to hand you a record of
20 either Ms. Hesterberg's or Ms. Bowne's time
21 entries, you wouldn't be able to tell me one way or
22 another if those were accurate?
23    A.    No.
24    Q.    Is that correct?
25    A.    Correct.

1    Q.    When you had a conversation with
2    Ms. Bowne and Ms. Hesterberg about Webtime, did you
3    advise them one way or another as to whether their
4    time entries should be accurate?
5    A.    Yes.  I encouraged accuracy on everything
6    they did and honesty.  You know, "Please record the
7    exact hours that you worked," and they were both
8    great employees and I trusted them.  And they had
9    no issues with that.
10   Q.    Do they both work for you now?
11   A.    No.
12   Q.    Just Ms. Bowne?
13   A.    Yes.
14   Q.    And she works out in western Kansas?
15   A.    Yeah, she moved this summer.
16   Q.    What does she do for you out there?
17   A.    She is more of an administrative help to
18   us, helps with state licensing and secretarial
19   items.
20   Q.    Other than this time in the fall of 2002
21   when you were told about Webtime, did you have any
22   other conversations with anyone in -- on the
23   management side of the company about loan
24   processors recording their time?
25   A.    No.

Jason Moxness
December 21, 2007

Page 62

1   A.   That is correct.
2   Q.   Do you know whether or not your loan
3   processors were receiving overtime pay?
4   A.   I do not. I was not involved in that.
5   Q.   Did anyone ever explain to you why
6   Webtime was being started in the fall of 2002?
7   A.   No, other than they wanted to keep
8   accurate time of when the processors worked. I was
9   under the assumption they wanted to make sure that
10  they were at least working 40 hours a week.
11  Q.   Did anyone from the management side ever
12  share with you their perception that the loan
13  processors were not working 40 hours a week?
14  A.   No.
15  Q.   Mr. Laffey never said that to you?
16  A.   No.
17  Q.   Prior to the use of Webtime beginning in
18  the fall of 2002, were loan processors, as far as
19  you know, recording their time in any way?
20  A.   No.
21  Q.   They were not?
22  A.   No, they were not.
23  Q.   As I understand it at Wells Fargo, there
24  were a number of different in-house training
25  programs that were available?

JAY E. SUDDRETH & ASSOCIATES, INC.
Toll Free: (800) 466-2580   Local: (913) 492-0111 or (816) 471-2211

b1001a5c-7584-47e7-841c-87330fd5c36b