# EXHIBIT

# 15

```
                IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA




     IN RE:                      )
                                 )
     WELLS FARGO LOAN PROCESSOR  )MDL Docket No. 1841
     OVERTIME PAY LITIGATION.    )
```

         RULE 30(b)(6) DEPOSITION OF WELLS FARGO THROUGH
ITS DESIGNATED REPRESENTATIVE, TERESA SWANSON,
produced, sworn and examined on the part of the
Plaintiffs, pursuant to Notice, on Thursday, the
31st of January, 2008, at law firm of Spencer Fane
Britt & Browne, 1000 Walnut, Suite 1400, in the
City of Kansas City, in the County of Jackson, and
State of Missouri, before me,

              STACY L. DECKER, CCR No. 858
                          of
              JOHN M. BOWEN & ASSOCIATES

a Certified Court Reporter, in a certain cause now
pending in the United States District Court for the
Northern District of California, In Re:  Wells
Fargo Loan Processor Overtime Pay Litigation.


                   APPEARANCES:

For Plaintiffs:

     STUEVE SIEGEL HANSON, L.L.P.
     460 Nichols Road, Suite 200
     Kansas City, Missouri  64112
     By:  Mr. George Hanson
     and  Ms. Ashlea Schwarz

Page 17

1    Q.   And would that include loan processors?

2    A.   Yes.

3    Q.   How far back would the WebTime detail and

4         WebTime summary reports be available?

5    A.   Well, we in our system have records from 1999

6         when we started using this system.  It would

7         then be dependent on when that individual began

8         using WebTime.

9    Q.   Is it that WebTime, as a timekeeping

10        application, came into effect at Wells Fargo in

11        1999?

12   A.   No.  It was created in 1999 and rolled out in

13        phases to groups over a period of time.

14   Q.   I understand.  So it first made an appearance,

15        WebTime did, for Wells Fargo in 1999, and then

16        gradually was phased into use for all nonexempt

17        employees?

18   A.   Yes.

19   Q.   And as of today, it's used for all nonexempt

20        employees?

21   A.   Since 1/1/2006, all nonexempt team members must

22        use WebTime.

23   Q.   And January 1, 2006, is the date where a

24        conversion to WebTime was complete for all

25        nonexempt employees?

Page 20

1    A.  There were some fields in the detail where it's

2        that internal calculation part that we don't

3        see, that I wanted to make sure that I

4        understood what -- that that's what that was;

5        that that wasn't something that was germane to

6        the whole process of how they got paid.

7    Q.  And you concluded it was not germane?

8    A.  It's, yeah, system calculations used by HBS

9        that we don't know or understand why they --

10       how they calculate -- what systems they are

11       taking to calculate it.  We can verify that it

12       becomes the right amount on the summary.

13   Q.  What is HBS?

14   A.  Huntington Business Systems.

15   Q.  And what is that?

16   A.  They are the owners of what we call WebTime, or

17       that we purchase WebTime from.

18   Q.  Other than the WebTime detail and WebTime

19       summary reports, what other documents did you

20       review in preparation for today's testimony?

21   A.  Yesterday I was shown a pay voucher, which I am

22       aware of, so I didn't really need any review of

23       that.  And then there were also some handbooks,

24       some different timings of the Wells Fargo

25       corporate handbook that I was shown.

Page 34

1   A.  Yes.

2   Q.  You are, just out of fairness, then limited to

3       corporate compensation, so let me just ask what

4       is corporate compensation's role in ensuring

5       wage and hour compliance at Wells Fargo?

6   A.  From our perspective in HR data services, that

7       is to ensure that all of our systems and our

8       payments to team members follow wage and hour

9       laws.

10  Q.  And, again, just so I can make sure our

11      terminology is correct, you mentioned HRDS, and

12      I understand that that is the human resource

13      data systems.  Is that what that stands for?

14  A.  HR data services.  Sorry.  Not systems.

15  Q.  I'm going to write that out so I say it right.

16      And would it be HR data services -- that

17      department's responsibility to ensure that the

18      actual systems in place are compliant with the

19      wage and hour law?

20  A.  Correct.

21  Q.  And let me give you an example.  You tell me if

22      I'm wrong.  You understand that overtime, at

23      least under the federal law, starts at 40 hours

24      a week, correct?

25  A.  Correct.

Page 35

1   Q.   And you understand that if people are recording

2        time into a timekeeping system and that time

3        exceeds 40 a week, they need to be paid for

4        that overtime, that time and a half?

5   A.   Correct, if they have worked over 40.

6   Q.   So there has to be a system in place, whether

7        it's a computer application or a manual system,

8        that accurately tracks time and then ensures

9        that overtime is paid, right?

10  A.   Correct.

11  Q.   And that responsibility falls under HRDS?

12  A.   Correct.

13  Q.   I understand that Ms. White has ultimate

14       responsibility for HRDS as the highest ranking

15       human resources manager, correct?

16            MS. DRAKE:  Objection to form.

17  A.   Correct.

18  Q.   (By Mr. Hanson)  And prior to Ms. White, it was

19       Avid, correct?

20            MS. DRAKE:  Same objection.

21  A.   Correct.

22  Q.   (By Mr. Hanson)  I just want to make sure.

23       Prior to Ms. White, Avid was the highest

24       ranking HR manager at Wells Fargo, correct?

25  A.   Correct.

Page 36

1   Q.  And HR data services would have reported in to
2       Avid, correct?
3   A.  Correct.
4   Q.  Give me an example of just some of the systems
5       that are in place to ensure that there is wage
6       and hour compliance.
7   A.  Currently team members use WebTime to record
8       their hours, and that system does the
9       calculation of overtime and pay.  And then we
10      would then move it to our PeopleSoft system,
11      which is where a team member would actually get
12      their pay generated from.
13  Q.  We have spoken a little bit earlier about this,
14      but we can get into some more detail now.
15      WebTime is the actual mechanical timekeeping
16      system used by Wells Fargo for all nonexempt
17      team members, correct?
18  A.  Correct.
19  Q.  And that system is a product of a company
20      called HBS, correct?
21  A.  Correct.
22  Q.  And at least since January of 2006, all
23      nonexempt team members, including loan
24      processors, were required to use WebTime,
25      correct?

Page 37

1    A.   Correct.

2    Q.   And you told me earlier that WebTime first came

3         into use at Wells Fargo in 1999, correct?

4    A.   Late 1999 was when we first finished it, yes.

5    Q.   As of the January 1st, 2006, policy change --

6         and I understand you went to a biweekly pay

7         period, correct?

8    A.   Correct.

9    Q.   And instituted a system called positive pay,

10        correct?

11   A.   Correct.

12   Q.   Prior to January 1, 2006, which nonexempt team

13        members were not using WebTime?

14             MS. DRAKE:  Objection, form.

15   A.   I wouldn't be able to identify individually.

16        We feel that by -- at that point in time we

17        probably had, I would say, about 95 percent of

18        team members using WebTime.  We just had a few

19        groups that were not able to use it for various

20        reasons or chose not to use it.

21   Q.   (By Mr. Hanson)  Can you identify which of

22        those groups were --

23   A.   The majority of those groups would have been

24        our -- we have a large insurance company that

25        we purchased several years ago that does not

64a7706a-5c32-4561-9f31-6ed5fc8d14ce

Page 45

1   Q.   Okay, that clarifies something for me.  So
2        WebTime does more than just calculate hours; it
3        actually calculates the pay?
4   A.   It calculates the nonexempt pay that's
5        attributable to the time in it.  It doesn't
6        calculate all pay.  There is a distinction.
7        But the piece that it's responsible for, the
8        piece of hours worked and pay, which would be
9        overtime, double-time pay, it calculates and
10       sends directly to PeopleSoft.
11  Q.   So essentially what WebTime tells PeopleSoft is
12       how much nonexempt team members, including loan
13       processors, should be paid?
14  A.   Correct.
15  Q.   And it's been doing that since 2003?
16  A.   Yes, it has.
17  Q.   Is your department responsible for managing
18       PeopleSoft as well as WebTime?
19  A.   Yes, it is.
20  Q.   Speaking about WebTime in a little more detail,
21       has the application itself changed since
22       January of 2003?
23  A.   Yes, it has.
24  Q.   Explain to me how it's changed.
25            MS. DRAKE:  Objection to form.

64a7706a-5c32-4561-9f31-6ed5fc8d14ce

Page 68

1    Q.   But just, again, when a nonexempt team member

2         like a loan processor sits down, they have

3         access to a Wells Fargo computer, right?

4    A.   Correct.

5    Q.   And then is there like an icon on the screen

6         that they would click to pull up the WebTime

7         application?

8    A.   There is a link on a web page, the home web

9         page for all of Wells Fargo, called Team Works,

10        there is a link right there for them to get to

11        WebTime.  Most people have it saved in their

12        favorites.

13   Q.   Does the WebTime application reside locally on

14        the computer at all, you know, after January

15        '06 and the WebTime application came into

16        being?

17   A.   No.  It's hosted on servers in -- actually the

18        WebTime servers are in Minneapolis.

19   Q.   That's what I was going to ask.  So the WebTime

20        servers reside in Minneapolis?

21   A.   Yes.  Everything connected with WebTime has

22        always been -- it was a Norwest product.  It's

23        always been in Minneapolis.

24   Q.   Where in Minneapolis?

25   A.   Actually they are in the Wells Fargo Tower.

Page 69

1      They are across the street from us, the WebTime

2      servers.  Because the PeopleSoft servers are

3      elsewhere, but the WebTime servers are across

4      the street from us.

5  Q.  And the time period in question, January of

6      2003 until the present, the WebTime application

7      and its servers have always resided in

8      Minneapolis?

9  A.  Correct.

10 Q.  And that's true for loan processors nationwide?

11 A.  Yes.  There are no others.  I mean, there is a

12     backup server, but there are no servers ever

13     used other than Minneapolis.

14 Q.  But all loan processors from east coast to west

15     coast are logging in to the WebTime application

16     onto a server that's housed in Minneapolis?

17 A.  Correct.

18 Q.  Let's talk about the WebTime application as it

19     existed in '03, '04, and then in '05 before

20     that period of transition to the new web-based

21     application.

22          Am I correct in assuming that it did

23     not have -- it was not on a server that was

24     accessed through the web, but it was a locally

25     residing application?

1    and XTML and that type of stuff.  So the

2    technology was a little bit different.  For the

3    team members, it was the same.  They logged on

4    through Team Works, same steps, same process.

5    Q.  (By Mr. Hanson)  And we don't have to go

6    through this in all that graphic detail, but

7    was it similarly that it was a manual time

8    system, right?

9    A.  Correct.

10    Q.  And I'm talking now about the pre-September '05

11    WebTime application.  Okay?

12    A.  Okay.

13    Q.  So a manual system, correct?

14    A.  Yes.

15    Q.  It recorded in and out times, correct?

16    A.  Yes, but they did have the ability to opt out

17    of that, the managers did have the ability to

18    opt and have it presented a different way until

19    September of 2005.

20    Q.  And they could have presented it as just a

21    single number for a day?

22    A.  Correct.

23    Q.  Rather than an in and out time that would

24    cumulate to a number?

25    A.  Correct.  The default was always in and out.

Page 72

1    And it was up to an individual manager if they

2    made that change.

3 Q. Was WebTime, from January of 2003 to the

4    present, ever prepopulated with time?

5 A. For retail banking, we do have a different

6    system that we use, but not for home and

7    consumer mortgage or insurance.

8 Q. In other words, in other cases sometimes there

9    will be -- time sheets will already have like a

10    default time entry of eight hours a day or a

11    set scheduled shift which the --

12 A. No.  We --

13 Q. -- the team member will modify?

14 A. No, that has never been -- we have never had

15    that.

16 Q. For the loan processors we're dealing with in

17    this case, their WebTime has always been blank

18    until they filled something in?

19 A. Correct.

20 Q. The default in the pre-September 2005 WebTime

21    application was in and out times just like the

22    web-based application, correct?

23 A. Correct.

24 Q. Was it also true in the earlier application

25    that you could only enter an in time when you

64a7706a-5c32-4561-9f31-6ed5fc8d14ce

Page 75

1       easier to run a payroll shop if you have a

2       little bit more consistent schedule.

3               At the point in time, it was too soon

4       after the merger and nobody wanted to undertake

5       such a project.  A few years later we -- it

6       became decided that, to help the team members

7       ease the confusion and to make it a little bit

8       more streamline, we would switch to biweekly

9       pay and pay them on a positive pay for time

10      worked versus just assuming that they were

11      going to work their standard hours.  You know,

12      to save money.

13  Q.  The merger between Norwest and Wells Fargo,

14      when did that occur?

15  A.  Officially to us it occurred in '99.  July of

16      '99 is when we brought the Wells Fargo people

17      on to the existing Norwest PeopleSoft and

18      timekeeping systems.

19  Q.  And this may be a question that's outside the

20      scope, so I'm not going to hold you to a

21      corporate representative tag on this, but let

22      me ask you if you know.  The loan processors

23      that we're talking about in this case that are

24      under the home mortgage business unit, was the

25      predecessor of that business unit with Norwest

1    or Wells Fargo?

2  A.  Yeah.  It was Norwest Mortgage, correct.

3  Q.  Do you know whether at the time of the merger

4      Wells Fargo employed home mortgage loan

5      processors?

6  A.  I don't know.  I assume so, but I don't know as

7      fact.  But they did have a mortgage business

8      that merged into our mortgage business.

9  Q.  But the larger one was Norwest's?

10  A.  Correct.

11  Q.  Substantially larger?

12  A.  Yes.  Wells Fargo was more of the retail branch

13      banks, and the Norwest was the bigger -- they

14      had a definite bigger presence in the mortgage

15      area.

16  Q.  But at least by January of 2003, there weren't

17      any historical distinctions between the way

18      nonexempt loan processors from the Wells Fargo

19      side or the Norwest side were being treated?

20  A.  None whatsoever.

21  Q.  Positive pay, and that's the term used to

22      describe the change from what previously had

23      been paying on standard hours?

24  A.  Correct.

25  Q.  Did the standard hours policy apply to all

1    nonexempt team members at Wells Fargo?

2    A.  Did all team members have standard hours?

3    Q.  Yes.

4    A.  No.  We have some team members that have zero

5        standard hours, the casual type team members.

6    Q.  I don't know what that means.

7    A.  There are -- they make a determination on how

8        many hours a person is going to work on a

9        weekly basis, and that's what they assign as

10       their standard hours.

11              There are some people that work on a

12       very occasional basis.  They would be assigned

13       zero standard hours.  You can have anywhere

14       from zero to 40 standard hours.

15   Q.  Let me go at it this way.  The positive pay

16       system that's in place now and has been since

17       January of 2006 pays on all hours actually

18       recorded in WebTime, correct?

19   A.  Correct.

20   Q.  And that positive pay system applies to all

21       loan processor nonexempt employees?

22   A.  All nonexempt.

23   Q.  Before the positive pay system came into

24       effect, were all nonexempt loan processors paid

25       under the standard hours system?

1    A.    Correct.

2    Q.    And we touched on this a little bit earlier,

3          but let me ask some more specific questions.

4          Standard hours was determined by the manager of

5          a nonexempt loan processor?

6    A.    Yes.

7    Q.    And standard hours was the assumed hours that

8          would be worked in a standard work week?

9    A.    Correct.

10   Q.    And if no exception was entered by a manager,

11         the nonexempt loan processor would be paid

12         their standard hours, correct?

13               MS. DRAKE:    Objection, form.

14   A.    Yes, they would.

15   Q.    (By Mr. Hanson)   And was that standard hours

16         system in place going back to January of 2003?

17   A.    Yes.

18   Q.    You mentioned that the range of standard hours

19         could be zero to 40?

20   A.    Correct.

21   Q.    Could it be more than 40?

22   A.    No, it could not.

23   Q.    So a manager that expected a nonexempt loan

24         processor to work 45 hours a week would be

25         required to add five hours of time every week,

1    correct?

2         MS. DRAKE:  Objection to form.

3  A.  They would be required to enter the time, and

4       we would pay the overtime, correct.

5  Q.  (By Mr. Hanson)  But an exception would be

6       required every week?

7  A.  Yes.

8         MS. DRAKE:  Same objection.

9  A.  Yes.

10 Q.  (By Mr. Hanson)  Where did Wells Fargo record

11      or keep track of what the standard hours was

12      for a given nonexempt employee like a loan

13      processor?

14 A.  PeopleSoft.  It's always been PeopleSoft.  It

15      does send that information to WebTime, but the

16      official record keeper is PeopleSoft.

17 Q.  So just using some of our what we call class

18      representatives as an example, Trudy Bowne, who

19      is one of our lead plaintiffs, you would -- and

20      I think she was employed before January of '06.

21      But just assuming with me that she was,

22      PeopleSoft would be able to show for her what

23      her standard hours were during her pre-January

24      '06 employment?

25         MS. DRAKE:  Objection, form.

64a7706a-5c32-4561-9f31-6ed5fc8d14ce

Page 80

1   A.  Her entire employment -- we still use standard

2       hours for other purposes.  So it's there now

3       and it's always been there.

4   Q.  (By Mr. Hanson)  I appreciate that.  I didn't

5       know that.  So the designation of standard

6       hours still exists?

7   A.  Right.

8   Q.  What do you use it for now if you're not paying

9       off it?

10  A.  Disability payments, insurance payments, all

11      require us to know what their category and

12      their standard hours are.

13  Q.  And is the standard hours designation for

14      nonexempt team members like loan processors

15      subject to change?

16  A.  Yes.  The requirement is that that is an

17      accurate picture of what they are working and

18      should change at any -- if their schedule

19      should change, that number should change as

20      well.

21  Q.  So if someone goes from a 40-hour-a-week

22      standard schedule to 32 hours, maybe they are

23      only working four days a week, PeopleSoft would

24      reflect a change from 40 to 32 and what work

25      week that change occurred in, correct?

Page 81

1            MS. DRAKE:  Objection, form.

2  A.  The effective date of it, if the manager made

3      it at the beginning of a work week, but it's an

4      effective date.

5  Q.  (By Mr. Hanson)  And those are records that

6      Wells Fargo has maintained and would be able to

7      produce, and I'm referring to standard hours by

8      a nonexempt team member as they changed over

9      time, we would be able to see what those

10     standard hours were designated as going back

11     from January of 2003 to the present, correct?

12  A.  Yeah.  From 1993 to the present.

13  Q.  1993?

14  A.  1993.  You would be able to tell that.

15  Q.  You were using standard hours as far back as

16     1993?

17  A.  On PeopleSoft, yes.

18  Q.  WebTime in 1999; PeopleSoft has been around

19     longer, correct?

20  A.  March of 1993.

21  Q.  Would you be able to run a report, for example,

22     if I gave Wells Fargo a list or a job

23     classification -- or let's just say a list of

24     100 employees and asked, you know, show me the

25     standard hours that have been designated for

Page 83

1    a loan processor who worked in Overland Park,

2    Kansas, let's assume that her standard hours

3    were 40 for whatever given time period.  Okay?

4    That was the schedule she was expected to work,

5    right?

6  A.  Uh-huh.

7  Q.  In a given work week, due to an unusual number

8    of loan applications and closings, she works 45

9    hours.  Who is responsible for making sure that

10   her paycheck for that week reflects five hours

11   of overtime as opposed to standard time?

12       MS. DRAKE:  Objection to form.

13  A.  I would say her and her manager.

14  Q.  (By Mr. Hanson)  So what would Ms. Bowne's

15    responsibility be?

16  A.  To accurately enter her time into the system

17    and complete the time card and to follow up

18    that it had been paid.

19  Q.  And what would the manager's responsibility be?

20  A.  Prior to 2005, they would have had to approve

21    that time card.

22  Q.  Prior to -- sorry.  What time?

23  A.  September of 2005.  They would have had to

24    approve that time card.

25  Q.  So prior to September '05, Ms. Bowne's manager

1      would be required to affirmatively approve

2      those extra hours, correct?

3   A.  Correct.

4   Q.  What about a week in which Ms. Bowne, due to

5      whatever circumstances, worked 35 hours; how

6      would the exception work so she is not

7      overpaid?

8   A.  She would fill out the time card, complete it.

9      It would -- the manager would approve it, and

10     then we would then dock her pay for those five

11     hours.

12  Q.  Again, a deviation, whether it's hours in

13     excess of the standard or hours under the

14     standard, both required manager approval,

15     correct?

16  A.  Correct.

17  Q.  Will PeopleSoft allow us to identify when

18     managers approved exceptions for nonexempt team

19     members like loan processors?

20  A.  PeopleSoft, no.  WebTime.

21  Q.  WebTime would, all right.  So the exception

22     process is a function of WebTime?

23  A.  Correct.

24  Q.  Or at least it used to be before September of

25     '05?

Page 114

1   Q.   Now, after January of 2006 there is no approval

2        process required at all?

3   A.   No.  After September 2005 there is no approval,

4        Labor Day weekend of 2005.

5   Q.   So you removed, as part of what you said

6        earlier, the bridge between the prior system

7        and the new positive pay biweekly program,

8        which was final as of January 1 of 2006, the

9        manager approval requirement was removed as of

10       Labor Day 2005, correct?

11  A.   Correct.

12  Q.   So anyone who recorded overtime after Labor Day

13       of 2005 would have it paid automatically,

14       correct?

15  A.   Anybody who recorded time that resulted in

16       overtime and submitted that to us would have it

17       paid, correct.

18  Q.   So I take it that none of the overtime worked

19       but unpaid for this group of 293 could have

20       occurred after September of 2005, correct?

21            MS. DRAKE:  Objection, form.

22  A.   Assuming that they completed their time card,

23       correct.

24  Q.   (By Mr. Hanson)  Right.  And I think this is

25       our understanding and stipulation.  There is a

1    time is recorded as more than 40 in a week, but

2    she is not paid for that overtime.  Okay?

3  A.  Okay.

4  Q.  So what is the explanation for how that

5    happened?

6  A.  Prior to 2005 -- September of 2005?

7  Q.  Well, I suppose so, since what you're telling

8    me is it could not have happened after

9    September of 2005.

10  A.  Correct.

11  Q.  Because the system was fully automated such

12    that any recorded time that was more than 40 in

13    a work week -- any work time --

14  A.  Any completed time sheets.  They can record

15    time and not complete it at the end of the

16    week.

17  Q.  I understand.  Any completed time sheets that

18    reflect more than 40 hours a week is

19    automatically going to be paid, correct?

20  A.  Correct.

21  Q.  So I'm now understanding that we're talking

22    about solely before September of 2005, right?

23  A.  Yes.

24  Q.  By definition that's where this error would

25    have occurred, correct?

Page 117

1    A.    Correct.

2    Q.    So how could the error have occurred prior to

3          September of 2005?

4    A.    The manager did not complete the approval

5          process.

6    Q.    Meaning the manager simply didn't approve --

7          meaning there was overtime recorded and

8          presented to the manager for approval, and the

9          manager didn't click the approval button?

10              MS. DRAKE:  Objection to form.

11   A.    The manager would have a list of all their team

12         members, and it would have the time recorded,

13         and it would show then a recap of what would be

14         generated exception-pay-wise.  They didn't go

15         in and approve the time sheet, whether it had

16         overtime or not or dock or anything.  They

17         simply didn't approve the time.

18   Q.    (By Mr. Hanson)  Managers before September of

19         '05 were required to approve all time, correct?

20   A.    Correct.

21   Q.    If a manager failed to approve a time sheet or

22         a time record by a nonexempt team member like a

23         loan processor, that loan processor would just

24         be paid their standard hours?

25   A.    Correct.

Page 118

1    Q.    So the manager's approval was not required to

2          issue a paycheck?

3    A.    Correct.  It was -- right.

4    Q.    So that then leads me to ask what was the

5          manager approval required for?  Is that simply

6          for an exception?

7    A.    We required them to approve all time cards so

8          that they were approving all time team members

9          recorded.  At that point in time, if there was

10         exception pay, that was also needed to push it

11         forward.  But the requirement was not to go out

12         and only approve time cards that say overtime

13         or dock that need pay.  The requirement was to

14         go in and approve all time cards.

15   Q.    So managers who just failed to approve time

16         cards, the impact of that is nonexempt team

17         members like loan processors would be paid

18         their standard time but wouldn't be paid

19         exceptions like overtime, correct?

20   A.    At that point in time, yes, on their paycheck.

21   Q.    Right, because that's before September of '05?

22   A.    Well, no, but I mean -- the majority of team

23         members get their paycheck, and since they know

24         what they are supposed to be getting on the

25         exception hours, if the manager doesn't approve

64a7706a-5c32-4561-9f31-6ed5fc8d14ce

Page 126

1    Q.   But what you're describing as the likely cause

2         of this identified group of 293 loan processors

3         who were not paid for the hours that they --

4         for the overtime hours that they recorded,

5         you're saying that that could not have happened

6         after September of 2005?

7    A.   Correct.

8    Q.   Just because the system was changed, correct?

9    A.   Correct.

10   Q.   One of my questions was, well, how are we

11        ensuring that that same error is not repeated

12        or won't be repeated.  And what you're saying

13        is the system of going to positive pay, which

14        no longer requires manager approval for

15        exceptions such as overtime, has solved that

16        problem?

17   A.   By default.  We recognize the inefficiency in

18        having the managers approve it long before we

19        changed it.  So when we were making changes to

20        the WebTime system to get ready for biweekly,

21        we dropped that requirement so that we would

22        not be delaying pay, especially given the fact

23        that we would be going to positive pay and

24        people would be missing substantially a greater

25        majority of their pay.  But it wasn't -- it was

Page 127

1       one of a factors of why we did it.

2   Q.  But whatever the cause was, that problem cannot

3       repeat now?

4   A.  Correct.  Now the problem is solely in the

5       hands of the team member not doing their job.

6   Q.  Now it's a team member -- a team member who

7       records overtime is going to automatically be

8       paid overtime, correct?

9   A.  The team member who submits a time card that

10      generates overtime will get paid.  They don't

11      record overtime.

12  Q.  So just back to Topic 20, it's now pretty clear

13      to me, we're not talking about a computer

14      glitch that caused the 293 loan processors not

15      to be paid; it's a manager failing to fulfill

16      their responsibility to approve exception time,

17      correct?

18          MS. DRAKE:  Objection to form.

19  A.  Yes.

20  Q.  (By Mr. Hanson)  When did Wells Fargo become

21      aware that there were these 293 people out

22      there who hadn't been paid their overtime?

23  A.  May of 2006.

24  Q.  And what made Wells Fargo aware?

25  A.  We were notified of the -- I don't know if it

64a7706a-5c32-4561-9f31-6ed5fc8d14ce