# EXHIBIT C

1  George A. Hanson
   Norman E. Siegel
2  Eric L. Dirks
   Ashlea G. Schwarz
3  STUEVE SIEGEL HANSON LLP
   460 Nichols Road, Suite 200
4  Kansas City, MO 64112
   Telephone:    (816) 714-7100
5  Facsimile:    (816) 714-7101
   ATTORNEYS FOR PLAINTIFFS

6

7

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

8

9  | IN RE WELLS FARGO LOAN PROCESSOR OVERTIME PAY LITIGATION | MDL Docket No. 1841 |
   |---|---|
   | | **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' § 17200 CLAIMS** |
   | THIS DOCUMENT RELATES TO ALL CASES | **REDACTED** |
   | | **Date: April 28, 2008**<br>**Time: 2:00 PM**<br>**Dept: 15**<br>**Judge: Hon. Marilyn Hall Patel** |

10

11

12

13

14

15

16

## MEMORANDUM OF POINTS AND AUTHORITY

17

Plaintiffs, individually and behalf of the class, by and through their undersigned counsel,

18

for their response to Defendants' Motion to Dismiss Plaintiffs' Bus. & Prof. Code §17200 claims

19

against Wells Fargo state as follows:

20

## INTRODUCTION

21

This MDL proceeding brings together two actions brought against Wells Fargo on behalf

22

of current and former non-exempt "Team Members" seeking restitution, including backpay for

23

unpaid overtime and other wages.  The first case was captioned *Bowne v. Wells Fargo Home*

24

*Mortgage*, D. Kan., No. 06-2020, and involved a limited class of 68 plaintiffs who joined a Fair

25

Labor Standards Act ("FLSA") collective action.  The second case was captioned *Basore v.*

26

27

28

*Wells Fargo Home Mortgage, et al.,* N.D. Cal. No. 07-0461. In the *Basore* action, Plaintiffs claimed that Wells Fargo's compensation practices violate various California Labor Code sections, the FLSA, and Cal. Bus. & Prof. Code § 17200. The *Basore* Plaintiffs further alleged that Wells Fargo's unlawful compensation policies and practices emanated from the State of California. As a result, the Plaintiffs brought, among other things, a nationwide class action pursuant to § 17200 for failure to pay overtime in violation of the FLSA.

Wells Fargo moved for transfer and consolidation of both cases for pretrial purposes pursuant to 28 U.S.C. § 1407, and on June 22, 2007, the Judicial Panel on Multidistrict Litigation transferred *Bowne* and *Basore* to this Court. Plaintiffs, pursuant to this Court's November 13, 2007 Case Management Order, recently filed a Consolidated Complaint. The Consolidated Complaint consolidates the claims brought in *Bowne* and *Basore*, and incorporates the facts learned through the initial stage of discovery. Importantly, Plaintiffs have recently discovered that they and all other non-exempt Team Members employed by Wells Fargo were subject to an illegal compensation policy called "Standard Hours." As a result of this recent revelation, Plaintiffs amended the class definition to include:

> All current and former Wells Fargo Bank, N.A. Team Members who were classified as non-exempt but who were subject to Wells Fargo's "Standard Hours" policy since January 2003.

## I.    SUMMARY OF FACTS

1.    Wells Fargo & Company is a California corporation with its corporate headquarters and principal place of business in San Francisco, California. *See* Deposition of Christine Meuers (hereafter "Meuers Dep.") at 7:2-7, 8:10-12[1].

---

[1] Wells Fargo cites to the record of *In re Wells Fargo Home Mortgage Litigation*, No. MDL 06-1770 MHP, for support for its Motion to Dismiss Plaintiffs' 17200 Claims. Therefore, Plaintiffs do the same here

2.      Wells Fargo Bank, N.A. is a national association, and incorporated in the United States of America, with its corporate offices and headquarters in San Francisco, California. *See id.* at 8:15-9:1.

3.      All of Wells Fargo's most senior executives and all the company's ultimate decision-makers work out of company headquarters in San Francisco. *See* Deposition of James M. Strother (hereafter "Strother Dep."), at 32:18-33:10; *see also* Meuers Dep., at 168:19-170:2.

4.      All non-exempt Wells Fargo Team Members (including loan processors, mortgage loan specialists, mortgage sales assistants, mortgage sales associates, receptionists, customer sales representatives are employed by the legal entity Wells Fargo Bank, N.A. *See id.* at 53:21-23; *see also* Deposition of Elise Reiser (hereafter "Reiser 30(b)(6) Dep."), at 91:5-92:7; *see also* Deposition of Todd Hauer (hereafter "Hauer 30(b)(6) Dep."), at 67:12-69:15.

5.      Wells Fargo's corporate legal department and corporate human resources departments are responsible for compliance with the Fair Labor Standards Act ("FLSA") and other wage and hour laws. *See* Deposition of Teresa Swanson (hereafter "Swanson (30(b)(6) Dep."), at 33:20-34:1; *see also* Reiser 30(b)(6) Dep., at 112:24-113:2; Cahalan 30(b)(6) Dep. at 51:13-23, 81:25-82:5, 89:16-21, 157:4-11, 159:3, 196:15-19, 199:12-16.

6.      Wells Fargo's corporate legal department is headquartered in San Francisco, California. During the entire relevant class period, Wells Fargo's General Counsel and highest

1  ranking legal officer with ultimate supervisory responsibility for the corporate legal department

2  has worked in Wells Fargo's corporate headquarters in San Francisco, California.  *See* Strother

3  Dep., at 11:25-12:3, 19:20-21:1, 24:25-25:1.

4       7.     Wells Fargo's corporate human resources department is headquartered in San

5  Francisco, California.  During the class period, the highest ranking member of Wells Fargo's

6  human resources department worked out of Wells Fargo's headquarters in San Francisco,

7  California.  *See* Swanson 30(b)(6) Dep., at 28:24-29:4, 143:25-144:15.

8

9       8.     Until January 1, 2006, all non-exempt Wells Fargo Team Members were subject

10  to and paid pursuant to a uniform compensation policy called "Standard Hours."  Notable

11  features of the Standard Hours policy include:

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9.     The Standard Hours policy effectively paid all Team Members on a salary basis and not on an hourly basis. In fact, Plaintiffs believed they were paid on a salary and not entitled to overtime pay. *See, e.g.,* Deposition of Mary Basore (hereafter "Basore Dep.") at 48:14-49:6; Deposition of Trudy Bowne (hereafter "Bowne Dep.") at 23:3-5, 24:15-25:4; Deposition of Jeni Fisher (hereafter "Fisher Dep.") at 15:18-21; Deposition of Elisha Hesterberg (hereafter "Hesterberg Dep.") at 35:16-36:14.

10.    The Standard Hours policy required a two-step "exception" and "approval" process that in effect guaranteed underpayment of overtime loans. A Team Member could only be paid for his or her actual hours worked above and beyond Standard Hours, if (1) an "exception" was submitted and (2) the exception was "approved" by his or her manager. *See* Swanson 30(b)(6) Dep., at 84:12-16. If a manager, for any reason, (i.e. intending to reduce payroll costs or through mere oversight) did not approve his or her Team Member's actual time worked, the Team Member only received pay for his or her Standard Hours. *See* Swanson 30(b)(6) Dep. at 117:21-118:20, 174:8-14; *see also* 30(b)(6) Reiser 30(b)(6) Dep., at 135:11-136:3. Team Members consistently worked additional hours, including overtime, that were not routinely paid because "exceptions" to Standard Hours were not "approved." *See* Plaintiffs' Consolidated Complaint at ¶ 27 (Docket No. 31).

11.    Wells Fargo's management made no compliance efforts to ensure that Team Members were paid for all their time. *See generally* Swanson 30(b)(6) Dep. at 83:9-13. Wells Fargo had no training, policy, or procedure in place to oversee whether Team Members were recording all hours worked, whether managers were approving all hours worked, or even whether Team Members were being paid for all hours recorded. *See* Reiser 30(b)(6) Dep. at

136:12-138:9; *see also* Swanson 30(b)(6) Dep. at 86:12-15. Wells Fargo conducted no self-audits or reviews of branch managers to ensure they were approving overtime hours. *See* Swanson 30(b)(6) Dep. at 87:8-12. Instead, Wells Fargo's policy was that it was an employee's responsibility to make sure his or her supervisor approved exceptions to Standard Hours in order to be paid his or her actual hours worked. *See Id.*

The Standard Hours compensation policy did not comply with applicable federal and state wage and hour law.

1
2
3
4
5
6
7
8
9
10
11
12
13
14   14.    The actual decision to move from Standard Hours to Positive Pay was made by

15   Wells Fargo's former CEO Dick Kovacevich, on the recommendation of corporate human

16   resources.   The head of corporate human resources at the time of the recommendation to

17   transition to Positive Pay was Pat Callahan.   Towards the end of the transition project from

18   Standard Hours to Positive Pay, Ms. Callahan was replaced by Avid Modjtabai as head of

19   corporate human resources.  Mr. Kovacevich, Ms. Callahan, and Ms. Modjtabai all worked at

20   Wells Fargo's corporate headquarters in San Francisco, California.  *See* Swanson 30(b)(6) Dep.,

21   at 142:20-144:17; *see also* Cahalan 30(b)(6) Dep., at 91: 15-19.

22   15.    As a result of this litigation, Wells Fargo has acknowledged that the Standard

23   Hours compensation policy resulted in at least 583 loan processor Team Members having

24   recorded overtime that has never been paid.  Wells Fargo claims that all Team Members who

25

26

were victims of the non-compliant Standard Hours policy will be paid all overtime they are owed. However, even though Wells Fargo's has acknowledged it non-compliance for several years, no payments have been made to those Team Members to whom Wells Fargo recognizes an obligation. The decision whether, how and when to pay Team Members their owed overtime was made by Wells Fargo executives in California. *See* Reiser 30(b)(6) Dep., at 30:1-2, 38:23-25, 57:6-58:11.

## I.    LEGAL ARGUMENT

### A.    STANDARD OF REVIEW.

On this motion to dismiss, even one premised on the Rule 23 standards for class certification, the Court must accept Plaintiffs' allegations as true so long as they are sufficiently specific to permit an informed assessment as to whether the requirements of Rule 23 have been satisfied. *In re Wells Fargo Home Mortgage Overtime Litigation,* No. MDL 06-1770 MHP (Aug. 16, 2007) (citing *Blackie v. Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975)). Furthermore, it is inappropriate for this Court to consider the merits of the substantive claims at this stage. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974); *Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 480 (9th Cir. 1983); *In re Wells Fargo Home Mortgage Overtime Litigation,* No. MDL 06-1770 MHP. Thus, the Court should look to Plaintiffs' Consolidated Complaint and to the facts herein asserted and should not weigh the disputed merits at this stage. The facts stated herein are more than sufficient for this Court to find the nationwide application of California's Unfair Competition Law is proper.

Discovery in this case is ongoing and far from complete. Defendant continues to produce documents that Plaintiffs requested months ago. Indeed, Plaintiffs initially served discovery

about Wells Fargo's compensation policies in August of 2006 and again in September of 2007. Only several weeks ago did Plaintiffs receive documentation or testimony about the Standard Hours policy that affected all non-exempt Team Members. Wells Fargo's most recent document production occurred last week and included additional documents relevant to the Standard Hours policy and Wells Fargo's transition to its Positive Pay policy in 2006. Plaintiffs still anticipate taking several additional fact-based depositions once this case proceeds to the merits that will provide more insight into the exact decisions and other conduct that occurred within California. As made apparent by the Consolidated Complaint, Defendants did not, until very recently, provide responsive documents and testimony regarding the Standard Hours policy that is at the heart of this litigation. In fact, Plaintiffs are still waiting for Defendants to supply a witness who can testify on behalf of Wells Fargo as to the facts surrounding many of the remaining issues pertaining to the Standard Hours policy. *See* Reiser 30(b)(6) Dep. at 118:21-119:12. Plaintiffs will also file their class certification brief in a few short days. Thus, this Court should consider the facts and arguments contained in the class certification briefing to guide its decision with regard to the issue now before the court. *Accord Silverman v. Smithkline Beecham Co.*, No. 06-7272, 2007 WL 3072274, *3 (C.D. Cal. Oct. 16, 2007) (finding motion to dismiss before ruling on certification issues premature).

Under Rule 12(b)(6) and Rule 23, the question before this Court is whether Plaintiffs have alleged sufficient conduct emanating from California, and they have. All other issues are factual and should be addressed at a later stage.

**B.    CALIFORNIA BUS. & PROF. CODE § 17200 APPLIES TO THE NATIONWIDE CLASS BECAUSE WELLS FARGO'S RELEVANT CONDUCT EMANATED FROM CALIFORNIA.**

The evidence on the record shows that all of the relevant policy choices and wage and hour compliance authority came from California. *See* Summary of Facts. Of particular importance, Wells Fargo's Standard Hours policy was maintained and authorized from California and ultimately revised in California. *See id.*

The issue before the Court is whether Plaintiffs have made sufficient allegations that the illegal conduct forming the predicate for Plaintiffs' § 17200 claims emanated from California to injure non-resident Plaintiffs. Wells Fargo correctly states part of the controlling rule established by the case of *Norwest Mortgage v. Superior Court,* 72 Cal. App. 4th 214, 223 (1999), which holds, "the UCL does not apply to claims arising **solely** from extraterritorial conduct." (Emphasis added). Differently, the UCL does apply when "some" or all of the defendant's challenged conduct emanates from California. *Wershba v. Apple Computer,* 91 Cal. App. 4th 224, 243(2001) ("a California court may properly apply the same California statutes at issue here to non-California members of a nationwide class where the defendant is a California corporation and **some** or all of the challenged conduct emanates from California") (emphasis added). Here, all, or at least most, of the conduct related to Wells Fargo's illegal Standard Hours policy emanated from California. *See Clothesrigger, Inc. v. GTE Corp.,* 191 Cal. App. 3d 605, 612-613 (1987).

The well-established California case law is controlling here. *See, e.g., Wershba v. Apple Computer,* 91 Cal.App.4th 224 (2001) (holding that brochures prepared in California and distributed nationwide created sufficient contact with California to support a UCL claim by a

class of non-residents). The circumstances in *Wershba* are similar here. Whether **some** of Wells Fargo's challenged conduct occurred in California and injured non-residents is unquestionable. Even at this early stage, there is ample evidence that the challenged illegal conduct occurred in California. Wells Fargo has its headquarters in California. Wells Fargo's Chief Executive Officer who had ultimate authority to change the company-wide policy from Standard Hours to Positive Pay also resided in California. *See* Swanson 30(b)(6) Dep. at 142:20-143:12. Wells Fargo's highest ranking Human Resources manager in charge of pay policies was headquartered in California. *See* Swanson 30(b)(6) Dep. at 28:24-29:4; 143:15-22. The Corporate Compensation, Corporate Human Resources, and Corporate Legal teams, which were responsible for ensuring wage and hour compliance, were all located in California. *See* Swanson 30(b)(6) Dep. at 33:20-34:1. Even Wells Fargo's decisions regarding whether to pay the class members in this case emanate from California. *See* Reiser 30(b)(6) Dep. at 30:1-2, 38:23-25.

Most importantly in this case, Wells Fargo's own documentation reveals that the authority over the Standard Hours policy resided in California. This is exemplified by the decision to move from Standard Hours to Positive Pay in January of 2006. This decision, driven by the knowledge that Standard Hours was illegal, was developed by Corporate Human Resources, spearheaded by Avid Modjtabai and Pat Callahan (heads of Corporate Human Resources), presented to the Board of Directors and Chief Executive Officer, and ultimately adopted by Dick Kovacevich (the then Chief Executive Officer of Wells Fargo) – all in California. *See* Swanson 30(b)(6) Dep. at 142:20-143:7.

Wells Fargo has not yet provided discovery regarding where the Standard Hours policy originated. But, regardless of where the policy originated, this Court has previously found that

*leaving* an illegal policy in place can itself amount to conduct. *See In re Wells Fargo Home Mortgage Litigation*, MDL 06-1770 MHP August 16, 2007 Order, at 7 ("WFHM argues that a change in exemption status is necessary for liability to attach. WFHM is incorrect. Plaintiffs have adduced evidence that a *decision* was made as to HMC classification, even if no *change* was made. This conduct is sufficient to state a claim for the purpose of this action.") (emphasis in original). In fact, a passive decision to do nothing is evidence of Wells Fargo's affirmative willful conduct under the law. Case law is clear that when an employer does not ensure wage and hour compliance, the conduct is nevertheless willful. *See Alvarez v. IBP, Inc.*, 339 F.3d 894, 908 (9th Cir. 2003) (conduct is willful "where an employer disregarded the very 'possibility' that it was violating the statute;" employer was on notice of its FLSA requirements, yet took no affirmative action to assure compliance with them); *Doo Nam Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 338 (S.D.N.Y. 2005) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988)) ("[Defendant] knew what the law required of him, and he chose to disregard it. Such conduct defines a willful violation."); *Local 246 Util. Workers Union of Am. v. S. Cal. Edison Co.*, 83 F.3d 292 (9th Cir. 1996) (defendant has the obligation to show that it actively ascertained and followed the dictates of the FLSA, leading it to reasonably believe that it was in compliance with the law). Wells Fargo had an affirmative duty to ensure it was in compliance with the FLSA, other federal laws, and state laws. *See Young v. Cooper Cameron Corp.*, No. 04 Civ. 56968 (LTS)(GWG), 2006 WL 1562377 (S.D.N.Y. June 6, 2006); *Dingwall v. Friedman Fisher Assocs., P.C.* 3 F. Supp. 2d 215, 223 (N.D.N.Y. 1998) (ruling that despite the temptation to avoid the costs of complying with the law, it is well-established that an employer has an affirmative obligation to ensure that its policies and practices comply with the FLSA). A defendant must

take active steps to ensure compliance. *Drywall,* 3 F. Supp. 2d at 223. Wells Fargo, like every other employer, was required to actively comply with the FLSA and state laws.

It is apparent the decision to do nothing to come into compliance with the FLSA until at least four years after learning that its conduct was illegal, emanated from Wells Fargo's corporate headquarters in California.

### C.   WELLS FARGO'S ATTEMPTS TO IDENTIFY NON-CALIFORNIA CONTACTS ARE IRRELEVANT AND UNCONVINCING.

Wells Fargo makes several unavailing arguments in its attempt to avoid the Unfair Competition laws of its home state. First, Wells Fargo refuses to take responsibility for its non-compliance and instead attempts to pin any blame for underpayment on local branch managers and the injured individuals themselves. But Wells Fargo's compensation problems were not localized, they resulted from Wells Fargo's uniform Standard Hours policy.

These problems were corporate-wide. And the Standard Hours policy led to additional problems across the country. For example, many Team Members, believing they were on salary and not entitled to overtime pay, did not record the actual amount of hours they worked. *See* Basore Dep. at 48:4-23; Fisher Dep. at 14:13:24-14:24; 22:2-9, 24:7-17; Deposition of Nichole Gering (herein "Gering Dep.") at 18:8-11,; Deposition of Jamie Hejlik (herein "Hejlik Dep.") at 28:23-29:20; Deposition of Amie Lovrien (herein "Lovrein Dep.") at 52:1-10; Deposition of Brenda McMillian at 64:13-67:13. And even Wells Fargo admits that hundreds of loan processors in the Home Mortgage Division (let alone the thousands of other Team Members who were not loan processors in the Home Mortgage Division) recorded overtime that was never paid. All of these problems resulted from Wells Fargo's California-based Standard Hours policy. Wells Fargo's attempt to sell out its own managers and employees by pointing the finger of blame at them demonstrates its failure to take responsibility for its widespread non-compliance. But even assuming some relevant conduct occurred outside California, the rule requires that some of the illegal conduct occurred in California, not all. *See, e.g., Wershba* 91 Cal. App. 4th at 243 ("even though transactions may have occurred outside California, the representations upon which the causes of action rested . . . emanated from California"). Here, even though local managers did not approve certain overtime hours, it was the Standard Hours policy which emanated from California that caused the pervasive non-compliance

Wells Fargo also cites to its many versions of the company's handbook as proof that it has a policy of paying for all hours worked. *See* Defendant's Motion to Dismiss Plaintiffs' 17200 Claims. This handbook, however, exemplifies the corporate-wide problems that led to the

failure of Standard Hours. The handbook's language that Wells Fargo pays for all hours worked is immediately followed by language requiring Team Members to obtain **pre-approval** for any overtime. *See, e.g.,* Exhibits 2-6 of Wells Fargo's Motion to Dismiss. This language is a clear message that only pre-approved overtime hours were compensable. And some versions of the handbook expressly told Team Members that failure to get pre-approval could result in corrective action. *See* Exhibit 5 of Wells Fargo's Motion to Dismiss, at 50; Exhibit 6 of Wells Fargo's Motion to Dismiss, at 75. Team Members could actually be punished, or potentially terminated, for asking to be paid for the time they worked. *See id.* In any event, the record is clear that Team Members understood they were on salary and didn't understand they were entitled to overtime pay except in the most unique circumstances, if at all. Even Wells Fargo's own corporate representative believed Team Members were confused about how the Standard Hours policy worked. *See* Swanson 30(b)(6) Dep. at 74:21-25. Wells Fargo's reliance on an obscure and internally-conflicting handbook simply does nothing to shed light on where Wells Fargo's illegal conduct occurred.

In a similar vein, Wells Fargo argues that Plaintiffs and their Branch Managers knew and understood Wells Fargo's pay policy. This claim is belied by the factual record in this case. *See, e.g., id.* Wells Fargo relies heavily on the deposition of Jason Moxness – a branch manager for Plaintiffs Hesterberg and Bowne. Mr. Moxness testified that he told Hesterberg and Bowne to record their hours accurately – which for the most part they did. This fact is insignificant since Bowne and Hesterberg were not paid for their overtime hours. They thought they were on salary and not eligible for overtime. *See, e.g.,* Bowne Dep. at 23:3-5, 24:15-25:4, 51:15-16; Hesterberg Dep. at 34:16-19, 35:16-36:14. *Even Mr. Moxness thought Bowne and Hesterberg were on*

1    *salary*. *See* Deposition of Jason Moxness (herein "Moxness Dep.") at 45:23-46:5. When asked

2    whether he had knowledge of whether Bowne and Hesterberg were entitled to overtime pay, he

3    responded "*I do not. I was not involved with that*." *Id.* at 62:2-4. Mr. Moxness also understood

4    he had no responsibilities with regard to his employees' time sheets or Webtime. *Id.* at 58:2-

5    59:1. Mr. Moxness testified he did not even have access to his employees' time records.

6    Moxness Dep. at 59:11-18.

7
8    Wells Fargo also argues that its managers instructed their employees to record all time

9    worked. But the record shows that many Team Members were instructed the very opposite.

10    Fisher Dep. at 25:2-4, 27:9-13; Gering Dep. at 18:23-19:4, 24:19-21; Hejlik Dep. at 28:23-29:20;

11    Lovrien Dep. at 49:25-50:4; McMillian Dep. at 70:20-71:2.

12
13                                                                                    Simply put, it

14    was the Standard Hours policy that led to widespread violations of state and federal law.

15    Finally, Wells Fargo, attempting to find non-California contacts, refers to its Human

16    Resources Data Services ("HRDS") unit as a non-California business unit in charge of the pay

17    issues in this case. But Wells Fargo admits HRDS' function was not to make policy or decisions

18    about Standard Hours or any compensation policies. HRDS was merely responsible for the *data*

19    *collection systems* – it had no authority over Standard Hours or how Team Members were paid.

20    *See* Swanson 30(b)(6) Dep. at 25:6-18.

21    None of Wells Fargo's arguments lend support to its claim that the relevant conduct

22    occurred outside of California. This case is about the Standard Hours policy, and that policy

23    emanated from California.

24
25
26
27
28

---

**D.     WELLS FARGO'S "DUE PROCESS" ARGUMENT IGNORES WELL-SETTLED CASE LAW.**

Wells Fargo, one of California's largest and most successful corporate residents argues that California law should not apply to its current and former employees.  Ignoring the overwhelming wealth of case law, Wells Fargo suggests that it violates Due Process to apply § 17200 to a nationwide class.  But the test set out in the California case law – that some or all of the challenged conduct must emanate from California before it is appropriate to apply § 17200 to non-Californians – is specifically rooted in a Due Process analysis.  It is the conduct that occurs in California that permits a court to apply California law to non-residents in compliance with Due Process.  *See, e.g., Wershba,* 91 Cal. App. 4th at 241-43 (expressly addressing *Phillips Petroleum Co v. Shutts* and finding the California contacts "satisfy constitutional concerns and support certification of a nationwide class") ("a California court may properly apply the same California statutes at issue here to non-California members of a nationwide class where the defendant is a California corporation and some or all of the challenged conduct emanates from California").

Wells Fargo apparently misunderstands the well-reasoned rules regarding the application of California law to a nationwide class.  In particular, Wells Fargo argues that certifying a nationwide class based on § 17200 is contrary to the Supreme Court's ruling in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985).  But *Shutts* specifically contemplated nationwide class actions – it simply found that under the circumstances of that case, Kansas law could not apply due to a paucity of Kansas connections to the issues.  *See Shutts,* 472 U.S. at 811 ("we hold a forum State may exercise jurisdiction over the claim of an absent class-action plaintiff even though that plaintiff may not possess the minimum contacts with the forum which would

support personal jurisdiction over a defendant"). In *Shutts*, the Court noted that there were nearly no Kansas contacts with the case whatsoever such that Kansas had no interest in the litigation. *Id.* at 821-22. Here, there is a significant nexus with the state of California such that the application of California law survives Due Process scrutiny. *Wershba,* 91 Cal.App.4[th] at 241-43. California has an undeniable interest in regulating the illegal conduct of one of its most prominent corporate residents. Wells Fargo's so-called Due Process argument is an attempt to circumvent the well-established Due Process jurisprudence that makes clear § 17200 may be applied nationwide so long as some of the conduct at issue in the case took place in California. *Id.*

### E. THE FLSA DOES NOT PREEMPT PLAINTIFFS' CAL. BUS. & PROF. § 17200 CLAIMS.

Absent an express dictate, it is "presumed that Congress does not cavalierly pre-empt state-law causes of action." *See Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996). Since states traditionally regulated the employee-employer relationship, preemption analysis must start with "the assumption that the historic powers of the States were not to be superseded by [the FLSA] unless that was the clear and manifest purpose of Congress." *See Medina v. Chas Roberts Air Conditioning, Inc.*, No. 05-4214, 2006 WL 2091665 at *3 (D. Ariz. July 24, 2006) (*citing Chevron U.S.A., Inc. v. Hammond,* 726 F.2d 483, 488 (9th Cir. 1984)). "There is a presumption against implied preemption of State law in areas traditionally regulated by the States." *Bahramipour v. Citigroup Global Markets, Inc.*, No. 04-4440, 2006 WL 449132 (N.D. Cal. Feb. 22, 2006).

Wells Fargo's preemption argument flouts the well-settled authority rejecting its identical

arguments. Both California state and federal courts have uniformly held that the FLSA does **not** preempt § 17200 claims for restitution for unpaid wages. *See, e.g., Takacs v. A.G. Edwards & Sons, Inc.*, 444 F. Supp. 2d 1100 (S.D. Cal. 2006); *Bahramipour.*, 2006 WL 449132; *Barnett v. Washington Mutual Bank*, No. 03-00753, 2004 WL 2011462 (N.D. Cal. Sep. 9, 2004); and *Harris v. Investor's Business Daily*, 138 Cal.App.4[th] 28 (2006). As this Court has previously noted, the "UCL incorporates other laws and treats violations of those laws as unlawful business practices independently actionable under State law." *Bahramipour*, 2006 WL 449132 at * 2. A violation of federal law may serve as a basis for a UCL claim. *Id.*

Wells Fargo's primary argument is that there is a direct conflict or incompatibility between (1) the FLSA's statute of limitations and opt-in nature, and (2) § 17200's longer limitations period and opt-out nature. These identical arguments have been rejected by California state and federal courts. For example, noting that the purpose of the FLSA is to protect employees, the court in *Bahramipour* found that there is no conflict between the FLSA and § 17200 because § 17200 merely furthers the central purpose of the FLSA. *Id.* at *3-6. Similarly in *Takacs*, 444 F. Supp. 2d at 1117, the California federal court recently ruled that the FLSA does not preempt concurrent § 17200 wage and hour claims. The court rejected the defendant's arguments that (1) the FLSA provides the exclusive remedy to recover lost wages and (2) application of § 17200 on an opt-out basis would frustrate congressional intent for opt-in FLSA claims. *Id.* Likewise in *Barnett*, 2004 WL 2011462, this Court held that the additional remedies of § 17200 were not in conflict with the FLSA and that nothing about applying § 17200 to a wage and hour lawsuit premised on the FLSA would result in a finding of preemption. And in *Harris*, 138 Cal.App.4[th] 28, the court, looking to the "weight of federal authority" specifically

1   rejected the same preemption and incompatibility arguments. *Id.* at 33-34. Similarly, this Court

2   recently certified an "opt-in" FLSA claim alongside an "opt-out" § 17200 claim in another case

3   involving Wells Fargo. In *In Re Wells Fargo Home Mortgage Overtime Litigation*, MDL 1770,

4   this Court rejected Wells Fargo's incompatibility argument, stating that it saw "no reason not to

5   certify both actions." October 18, 2007 Order at 22. Similarly, outside California, Wells Fargo's

6   argument that the FLSA is incompatible and in conflict with § 17200 has been rejected time-and-

7   again and should be rejected here.[2]

8

9       In addition to ignoring the controlling case law, Wells Fargo also misrepresents the

10  congressional intent of the FLSA's opt-in requirement. Congress never contemplated the result

11  that Defendants now urge, *i.e.* that employees may never bring a state law wage and hour class

12

13  ---

[2] "[C]ourts routinely certify FLSA opt-in classes and Rule 23 opt-out classes in the same action. . . . . Nothing in the
14  [FLSA] limits available remedies under state law. " *See Frank v. Gold'n Plump Poultry, Inc.*, 2005 WL 2240336, at
    *5 (D. Minn. Sep. 14, 2005); *see also Salazar v. Agriprocessors, Inc.*, No. 07-1006, 2007 WL 3102158 (N.D. Iowa,
15  Oct. 22, 2007); *Scholtisek v. The Eldre Corp.*, 229 F.R.D. 381 (W.D.N.Y. 2005) (certifying a state law class action
    in a case with an FLSA collective action); *Sjoblom v. Charter Commc'ns, LLC*, No. 3:07-cv-0451-bbc, 2007 WL
16  4560541 (W.D. Wis. Dec. 19, 2007) (overruling motion to dismiss and/or strike Rule 23 state-law class allegations
    due to argued incompatibilities); *Freeman v. Hoffmann-Laroche, Inc.*, No. 07-1503 (JLL), 2007 WL 4440875 (D.
17  N.J. Dec. 18, 2007) (same); *Westerfield v. Washington Mut. Bank*, No. 06-2817, 2007 WL 2162989 (E.D.N.Y.
    July 26, 2007) (same); *Bamonte v. City of Mesa*, No. CV 06-01860, 2007 WL 2022011 (D. Ariz. July 10, 2007)
18  (overruling motion to dismiss and allowing FLSA opt-in and Rule 23 claims to proceed simultaneously); *Cryer v.
    Intersolutions, Inc.*, No. 06-2032 (EGS), 2007 WL 1191928 (D.D.C. April 20, 2007) (overruling motion to dismiss
19  premised on incompatibility between FLSA and Rule 23 claims); *Marquez v. PartyLite Worldwide, Inc.*, No. 07 C
    2024, 2007 WL 2461667 (N.D. Ill. Aug. 27, 2007) (denying defendants' motion to dismiss and/or strike class
20  claims); *Lehman v. Legg Mason Inc.*, No. 06-2484, 2007 WL 2768519 (M.D. Pa. 2007) (concluding that procedural
    differences were not a bar to FLSA and Rule 23 class actions to proceed together); *Farhy v. Janney Montgomery
21  Scott*, No. Civ.A. 06-3202, Civ.A. 06-3969, 2007 WL 1455764 (E.D. Pa. 2007) (allowing state law class action
    claim to proceed alongside a FLSA claim); *Jiminez-Orozco v. Baker Roofing Co.*, No. 5:05-CV-34-FL,, 2007 WL
22  4568972 (E.D.N.C. 2007) (certifying both a Rule 23 class and a FLSA class); *Lindsay v. Gov't Employees Ins. Co.*,
    448 F.3d 416 (D.C. Cir. 2006) (allowing state law class action claim to proceed alongside a FLSA claim); *Noble v.
23  University Place Corp.*, 224 F.R.D. 330 (S.D.N.Y. 2004) (allowing a Rule 23 class action along side a FLSA
    action); *McLaughlin v. Liberty Mut. Ins. Co.*, 224 F.R.D. 304, 313 (D. Mass. 2004) (certifying state law Rule 23
24  class action claims after the case's FLSA opt-in collective action notices had already been issued); *Beltran-Benitez v.
    Sea Safari, Ltd.*, 180 F. Supp. 2d 772 (E.D.N.C. 2001) (overruling motion to dismiss Rule 23 claims because of an
25  FLSA opt-in class action claim in the same action); *Trotter v. Perdue Farms, Inc.*, No. Civ. A.99-893, 2001 WL
    1002448 (D. Del. Aug.16, 2001) (certifying FLSA collective action and Rule 23 action, where the Rule 23 class
26  would include plaintiffs who were not included in the FLSA action).

27  ---
    PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
28  PLAINTIFFS' PLAINTIFFS' § 17200 CLAIMS

1   action in federal court under Rule 23. To the contrary, when enacting the opt-in requirements of

2   the FLSA, Congress fully intended that state law claims for wages would also be available and

3   pursued as a remedy. *See Barnett*, 2004 WL 2011462, *6 (the "Portal to Portal Act was enacted

4   in response to judicial interpretations of the FLSA — not in response to a proliferation of state

5   wage claims."). As recently as 2005, Congress fully considered state law Rule 23 wage and hour

6   cases in connection with the Class Action Fairness Act ("CAFA"). Congress not only

7   acknowledged the coexistence of federal FLSA and Rule 23 state law wage and hour claims, but

8   did it not object to these cases on the grounds of preemption by the FLSA. *See* 2005 U.S. Code

9   Cong. & Adm. News, Senate Report No. 109-14, at 64-66. Further, Congress insisted such state

10  law wage and hour claims be litigated in federal court rather than state court. In fact, an

11  amendment to exclude state law wage and hour claims from CAFA was squarely rejected. *See*

12  *Id.* at 80.

13

14      Given the significant weight of authority, Plaintiffs need not expound on these cases

15  except to say that courts consistently reject the arguments Defendants proffer here and allow

16  Plaintiffs to simultaneously pursue an FLSA collective and a Rule 23 class action in the same

17  litigation.[3]

18

19  _____

20  [3] Wells Fargo also makes a superiority-like argument that Plaintiffs should be "masters of their own claims" and as a
    result opt-out certification is inappropriate. This argument is more appropriate for class certification and appears to
21  have nothing to do with whether Wells Fargo's conduct emanated from California. In any event, similar superiority
    arguments are routinely rejected. *See, e.g., In Re Wells Fargo Home Mortgage Overtime Litigation*, MDL 1770,
22  where this Court certified an "opt-out" § 17200 class action alongside a conditional "opt-in" § 17200 collective
    action. October 18, 2007 Order at 16-18. In support of its argument, Wells Fargo states that there are other state's
23  laws that may also apply to the claims of residents of those states. First, California courts have noted that the
    existence of other state statutes do not preclude class certification. *See Wershba*, 91 Cal.App.4th at 244. Finally, and
24  most importantly, Wells Fargo ignores the fundamental right of all class members to receive notice and opt-out of
    the litigation. The right to opt-out protects any individual who wishes to seek relief under another state's law. *See*
25  *Shutts*, 472 U.S. at 812.

26  _____

**F.    CALIFORNIA'S UNFAIR COMPETITION LAWS DO NOT VIOLATE THE COMMERCE CLAUSE.**

A California statute that regulates California conduct does not violate the Commerce Clause. *Diamond Multimedia Systems, Inc. v. Superior Court of Santa Clara County*, 968 P.2d 539, 556 (1999). *See also Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 993-94 (9th Cir. 2000) (because part of the unlawful conduct occurred in California, it was consistent with the Commerce Clause to apply California's antitrust and unfair competition statutes). In *Diamond*, the California Supreme Court held that California has a "clear and substantial interest in preventing fraudulent practices in this state which may have an effect both in California and **throughout the country**." 968 P.2d at 556 (emphasis added). Furthermore, California has a legitimate interest in discouraging unlawful conduct that has a potential to harm California residents as well as those in other states. *Id.* Like the statute at issue in *Diamond*, the UCL regulates only manipulative conduct **in California**.[4] *See Hayley v. Parker*, No. Civ. 01-0069, 2002 WL 925322 (C.D. Cal. March 15, 2002) (in determining whether conduct occurred in the state, court reasoned that the stock need not be purchased in California or by a California resident, but only the unlawful behavior, the act of market manipulation, must have taken place in California). Wells Fargo fails to recognize that the UCL does not purport to regulate conduct which occurs outside the state and does not discriminate against interstate commerce. *Diamond*, 968 P.2d at 556.    Further, because it affords a remedy to persons who are the victims of

---

[4] Wells Fargo inappropriately assumes in its brief that Plaintiffs would argue "that California has an interest in regulating the affairs of Wells Fargo Home Mortgage, as a division of Wells Fargo Bank, because Wells Fargo Bank, is incorporated in California." *See* Motion to Dismiss Plaintiffs' 17200 Claims, p. 30. Wells Fargo is wrong in this assertion. Wells Fargo Home Mortgage is not a legal entity and therefore, its principal place of business is irrelevant. Plaintiffs' assert that California has an interest in prohibiting the fraudulent activities of Wells Fargo Bank, N.A., which is headquartered in California and which is responsible for the illegal conduct, the Standard Hours policy, which occurred in this case. Plaintiffs are in no way limiting their claims as against Wells Fargo Home Mortgage alone.

manipulative conduct emanating from California, the UCL stimulates commerce. *Id.*

Wells Fargo's entire Commerce Clause argument is conclusory. Wells Fargo argues that because the alleged unlawful conduct at issue took place outside of California, § 17200 cannot apply. But whether the conduct emanated from California *is the issue* before the Court. Plaintiffs agree that if Wells Fargo's illegal conduct had occurred wholly outside California, then § 17200 cannot apply to non-California residents. But since the conduct occurred in California, § 17200 may apply because California may regulate the illegal conduct of its residents occurring in California. Wells Fargo's citation of *Healy v. Beer Institute*, 491 U.S. 324 (1989), is therefore inapposite. In *Healy*, the Supreme Court laid down the principle that the Commerce Clause "precludes the application of a state statute to commerce that takes place **wholly outside of the State's borders.**" *Id* at 336 (emphasis added). Further, *Healy* specifically focused on the Commerce Clause's prohibition against state laws controlling retail prices in other states. In *RLH Industries, Inc. v. SBC Communications, Inc.*, a California appeals court adamantly rejected *Healy's* application beyond the extraterritorial pricing context. 133 Cal.App.4[th] 1277, 1289 (2006). The court in *RLH* went on to note that unlike in *Healy,* the conduct that was prohibited by California's state laws was also prohibited by the Sherman Act. *Id.* at 1290. Likewise, the application of § 17200 is consistent with the FLSA because it seeks to prohibit the same unlawful conduct.

### G. THE RULES ENABLING ACT DOES NOT PRECLUDE SIMULTANEOUS LITIGATION OF PLAINTIFFS' STATE LAW CLAIM UNDER RULE 23 AND PLAINTIFFS' FLSA CLAIMS.

Wells Fargo also argues that the Rules Enabling Act, 28 U.S.C. § 2072(b), prohibits Plaintiffs' UCL claim. Wells Fargo's argument deserves little response as courts have squarely

rejected it. *See Neary v. Metro. Prop. & Cas. Ins. Co.*, 472 F. Supp. 2d 247, 251 (D. Conn. 2007) (rejecting the Rules Enabling Act argument because "the Second Circuit has explicitly held that the FLSA does not preempt state wage and hour statutes."); *Lehman v. Legg Mason, Inc.*, 532 F. Supp. 2d 726, 732 (M.D. Pa. 2007).[5] "[T]he differences between a collective action under FLSA and a state class action under Rule 23 are procedural." *Lehman*, 532 F. Supp. 2d at 732. Moreover, these procedural differences will not "abridge, enlarge or modify" any substantive rights of the Plaintiffs or Wells Fargo under either statute.[6] *Id.* In *Westerfield v. Washington Mutual Bank*, the Eastern District of New York, made clear that the FLSA's § 216(b) was procedural, not substantive, stating: "It establishes the procedure to be followed to establish party plaintiff status in an FLSA action." No. 06-CV-2817, 2007 WL 2162989, *1 (E.D.N.Y. July 26, 2007). The court went on to hold that even if the right to opt-in was substantive, it is in no way modified or abridged by permitting a state law opt-out class to proceed alongside the opt-in class. *Id.*

Wells Fargo's Rules Enabling Act argument also misses the important point that the UCL action could proceed separately in state court, or separately from the FLSA, under CAFA jurisdiction in federal court. *Id.* The FLSA's collective action mandate applies only to actions

---

[5] *See also Freeman v. Hoffmann-LaRoche, Inc.*, No. 07-1503 (JLL), 2007 WL 4440875 (D.N.J. Dec. 18, 2007) (holding that allowing an FLSA opt-in and Rule 23 opt-out actions to proceed simultaneously did not violate the REA) ; *Farhy v. Janney Montgomery Scott, LLC*, No Civ.A. 06-3969, 2007 WL 1455764 (E.D. Pa. April 26, 2007) (same); *Klein v. Ryan Beck Holdings, Inc.*, No. 06-Civ. 3460(WCC), 2007 WL 2059828, *5 (S.D.N.Y. July 20, 2007) (same); *Sjoblom v. Charter Commc'ns, Inc., LLC*, No. 07-Civ-0451, 2007 WL 4560541 (W.D. Wis. Dec. 19, 2007) (same).

[6] Wells Fargo cites to an amicus letter submitted by the Department of Labor ("DOL") in *Long John Silver's Restaurants, Inc. v. Cole*, 409 F. Supp. 2d 682 (D.S.C. 2006). Even a cursory review of the letter reveals that it has no bearing on this proceeding because it dealt with an entirely different issue. Not only is the letter irrelevant, but neither the district court, nor the Fourth Circuit, adhered to the DOL's position in the letter, thereby undermining its persuasive value. *See Long John Silver's Restaurants, Inc. v. Cole*, __ F.3d __, 2008 WL 217137 (4th Cir. 2008) ("it is far from clear that the "opt-in" provision is such a nonwaivable substantive right.").

brought pursuant to the FLSA.  It does not apply to employment law actions in general.  *Klein v. Ryan Beck Holdings, Inc.*, No. 06-Civ. 3460(WCC), 2007 WL 2059828, *5 (S.D.N.Y. July 20, 2007).  "The FLSA contains no provision preempting other methods of prosecuting *state law* employment litigation."  *Id.*  Congress's intent to allow state regulation to co-exist with the FLSA is plainly visible in § 218(a), which explicitly allows states to mandate greater overtime benefits.  *See* 29 U.S.C. § 218(a).  "The FLSA guarantees merely that all collective actions brought *pursuant* to *it* be affirmatively opted into.  It does not guarantee that employers will never face traditional class actions pursuant to state employment law."  *Klein*, 2007 WL 2059828, at *6 (emphasis in original).

## CONCLUSION

For the reasons stated above, Wells Fargo's Motion to Dismiss should be denied in its entirety.

**Dated: April 7, 2008**

Respectfully submitted,

**STUEVE SIEGEL HANSON LLP**

By:_____/s/ George A. Hanson_____
George A. Hanson
hanson@stuevesiegel.com
Norman E. Siegel
siegel@stuevesiegel.com
Eric L. Dirks
dirks@stuevesiegel.com
Ashlea G. Schwarz
ashlea@stuevesiegel.com
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone:    (816) 714-7100
Facsimile:    (816) 714-7101

**LEAD COUNSEL FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies on the 7th day of April, 2008, I emailed the foregoing to the following:

> Denise K. Drake
> ddrake@spencerfane.com
> Eric P. Kelly
> ekelly@spencerfane.com
> Spencer Fane Britt & Browne
> 1000 Walnut, Suite 1400
> Kansas City, MO 64106
> PH:   816-474-8100
> FAX:  816-474-3216

ATTORNEYS FOR DEFENDANT

/s/ George A. Hanson
Attorney for Plaintiffs