# EXHIBIT D
# 1 of 2

1  George A. Hanson, Esq.
   Norman E. Siegel, Esq.
2  Eric L. Dirks, Esq.
   STUEVE SIEGEL HANSON LLP
3  460 Nichols Road, Suite 200
   Kansas City, MO 64112
4  816-714-7115 tel
   816-714-7101 fax
5  Email: hanson@stuevesiegel.com
   Email: siegel@stuevesiegel.com
6  Email: dirks@stuevesiegel.com
   LEAD COUNSEL FOR PLAINTIFFS

7

8              UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA

9

10 In re:                              MDL-1841

11                                     DECLARATION OF GEORGE HANSON IN
                                       SUPPORT OF PLAINTIFFS' MEMORANDUM
12 WELLS FARGO LOAN PROCESSOR          IN OPPOSITION TO DEFENDANTS' MOTION
   OVERTIME PAY LITIGATION             TO DISMISS PLAINTIFFS § 17200 CLAIMS

13
                                       Date: April 28, 2008         REDACTED
14 This document relates to ALL CASES  Time: 2:00 P.M.
                                       Dept: 15
15                                     Judge: Hon. Marilyn Hall Patel

16      I, George A. Hanson, declare as follows:

17      1.      I am an attorney with the law firm of Stueve Siegel Hanson LLP, counsel of

18 record to the Plaintiffs in this action. This declaration is based on my own personal knowledge

19 and if called to testify I could and would testify to the matters stated herein.

20      2.

21

22      3.      Attached hereto is a true and correct copy of deposition excerpts of Mary

23 Basore's Deposition.

24      4.      Attached hereto is a true and correct copy of deposition excerpts of Trudy

25 Bowne's Deposition.

26

27

28

1      5.    Attached hereto is a true and correct copy of deposition excerpts of Jeni Fisher's

2  Deposition.

3      6.    Attached hereto is a true and correct copy of deposition excerpts of Elisha

4  Hesterberg's Deposition.

5      7.    Attached hereto is a true and correct copy of deposition excerpts of Teresa

6  Swanson's Deposition.

7      8.    Attached hereto is a true and correct copy of deposition excerpts of Elise Reiser's

8  Deposition.

9      9.    Attached hereto is a true and correct copy of deposition excerpts of Christine

10  Meuers' Deposition.

11      10.    Attached hereto is a true and correct copy of deposition excerpts of James M.

12  Strother's Deposition.

13      11.    Attached hereto is a true and correct copy of deposition excerpts of Patrick

14  Cahalan's Deposition.

15      12.    Attached hereto is a true and correct copy of deposition excerpts of Nichole

16  Gering's Deposition.

17      13.    Attached hereto is a true and correct copy of deposition excerpts of Jamie Hejlik's

18  Deposition.

19      14.    Attached hereto is a true and correct copy of deposition excerpts of Amie

20  Lovrien's Deposition.

21      15.    Attached hereto is a true and correct copy of deposition excerpts of Brenda

22  McMillian's Deposition.

23      16.    Attached hereto is a true and correct copy of deposition excerpts of Jason

24  Moxness' Deposition.

25      I declare under penalty of perjury under the laws of the United States and pursuant to

26  28 U.S.C. § 1746 that the foregoing is true and correct.

27

28

DECLARATION OF GEORGE HANSON IN SUPPORT OF PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS PLIANTIFFS § 17200 CLAIMS

2

1   Executed on this 7th day of April, 2008.

2                                       /s/ George A. Hanson

3                                    George A. Hanson

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2       The undersigned hereby certifies that on this 7th Day April, 2008, a true and correct copy

3   of the foregoing was served by electronic mail to the following:

4       Denise K. Drake
        Ddrake@spencerfane.com
5       Spencer Fane Britt & Browne
        1000 Walnut, Suite 1400
6       Kansas City, MO 64106
        PH: 816-474-87100
7       FAX: 816-474-3216

8   **ATTORNEYS FOR DEFENDANT**

9

10                          _/s/ George A. Hanson_____
                            an attorney for Nationwide Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF GEORGE HANSON IN SUPPORT OF PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS PLIANTIFFS § 17200 CLAIMS

4

# EXHIBIT A

# REDACTED

# Deposition Excerpts of Mary Basore's Deposition

Mary G. Basore
November 13, 2007

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

In re WELLS FARGO LOAN     )
PROCESSOR OVERTIME PAY     )
LITIGATION                 )
                           )
                           )   MDL Docket No. 1841
This Document Relates      )
to Basore v. Wells         )
Fargo Home Mortgage        )
N.D. Cal., No. 07-0461     )
MHP                        )

VIDEOTAPED DEPOSITION OF MARY G. BASORE,

produced, sworn, and examined on Tuesday, the 13th day
of November, 2007, commencing at 10:27 a.m. and
concluding at 12:50 p.m., at the law offices of Stueve
Siegel Hanson LLP, 460 Nichols Road, Suite 200, in the
City of Kansas City, County of Jackson, State of
Missouri, before:

ANN M. HAMILTON, RPR
Certified Court Reporter
of
JAY E. SUDDRETH & ASSOCIATES, INC.
Suite 100
10104 West 105th Street
Overland Park, Kansas 66212-5755

a Certified Shorthand Reporter within and for the
State of Kansas and a Certified Court Reporter within
and for the State of Missouri.

Taken on behalf of Defendant pursuant to Notice to
Take Depositions.

Mary G. Basore
November 13, 2007

Page 46

1    Q.  Earlier you mentioned that at the end of
2  every month it was a little bit more busy; correct?
3    A.  (Witness nods head).
4    Q.  Can you tell me what you mean by the end
5  of every month?  Is that the last week, the last
6  couple of days?  What does that mean?
7    A.  Last week.  Mortgage -- most mortgage
8  offices work a month-to-month, so needs to close by
9  the end of the calendar month.  It's like the stock
10  market.  It's got to close.
11    Q.  Who were your direct supervisors and
12  managers while you worked at Wells Fargo?
13    A.  Alisha Taylor.
14    Q.  Anyone else?
15    A.  Robert Borstelmann.
16    Q.  Anyone else?
17    A.  No.
18    Q.  What position did Robert Borstelmann hold
19  while you worked at Wells Fargo Home Mortgage?
20    A.  I believe he was the manager of the
21  whole -- between the two offices upstairs and
22  downstairs, he was the manager of both.  I don't know
23  what level of management he was.
24    Q.  Did you report directly to Mr.
25  Borstelmann?

Page 47

1    A.  No.
2    Q.  And what was Alisha Taylor responsible
3  for?
4    A.  She was manager of Wells Fargo Home
5  Mortgage, the group that I worked with.
6    Q.  Who is Michael Weisberg?
7    A.  I don't know what his position -- I know
8  he was in management, but I believe he was on the bank
9  side, if that makes sense.  He's not directly
10  affiliated with what I did.
11    Q.  How about E. Holliman?  Does that ring a
12  bell?
13    A.  The first name is?
14    Q.  E.
15    A.  No.
16    Q.  How about Anthony Petsco?
17    A.  He was my manager after Alisha Taylor.
18    Q.  And was Anthony Petsco also the manager
19  of the Wells Fargo Home Mortgage group that you worked
20  with?
21    A.  Yes.
22    Q.  Do you feel you had a good relationship
23  with Robert Borstelmann?
24    A.  Yeah.  Yes.
25    Q.  How about with Alisha Taylor?

Page 48

1    A.  Yes.
2    Q.  And with Anthony Petsco?
3    A.  Yes.
4    Q.  Did you accurately record all of the
5  hours you worked when you were at Wells Fargo Home
6  Mortgage?
7    A.  No.
8    Q.  Why not?
9    A.  I was -- it was my understanding that
10  the -- what do you call -- the Webtime was like a
11  housekeeping thing, we just needed to fill it in.
12    Q.  How did you come to have that
13  understanding?
14    A.  When I got hired it was -- I got offered
15  a monthly salary.  Approximately eight months into my
16  employment I believe my manager told me, "You're
17  supposed to be going online and filling in a time
18  sheet."
19        And I just had the common knowledge
20  that, you know, they're not paying overtime and they
21  just need for their records something on paper, and so
22  I just would go in and just put, you know, my blocks
23  of time.
24    Q.  When you say "common knowledge," what do
25  you mean by that?

Page 49

1    A.  Let me think.  I don't know who told me.
2  I think it was just a known fact.  I can't recall one
3  particular person telling me they're not going to pay
4  for overtime.  It was just I was on the assumption I
5  was on salary.  So I didn't think the time sheet
6  really mattered because I was getting paid anyway.
7    Q.  Which manager told you that you were
8  supposed to be filling in time sheets?
9    A.  To the best of my knowledge, Alisha
10  Taylor.
11    Q.  Did you have any discussions with Alisha
12  Taylor, Robert Borstelmann or Anthony Petsco about how
13  you were to be filling in your time sheets?
14    A.  No.
15    Q.  Did you ever ask anyone how you were
16  supposed to be filling in your time sheets?
17    A.  No.
18    Q.  I assume that none of those three
19  individuals ever told you that you were not supposed
20  to record all of your hours; is that correct?
21    A.  Repeat that.
22    Q.  Sure.  Did any of those individuals ever
23  tell you that you were not supposed to record all of
24  your hours?
25    A.  No.

13  (Pages 46 to 49)

Deposition Excerpts of Trudy Bowne's Deposition

Trudy Bowne
December 1, 2007

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

In re WELLS FARGO LOAN PROCESSOR
OVERTIME PAY LITIGATION

This Document Relates to:          MDL Docket No. 1841
Bowne v. Wells Fargo Home
Mortgage (transferred from
D. Kan., No. 06-2020)
N.D. Cal., No. 07-4013 MHP


DEPOSITION OF TRUDY BOWNE,

produced, sworn and examined on Saturday, the 1st day
of December, 2007, between the hours of 10:09 a.m. and
11:38 a.m. of that day, at the law offices of Stueve
Siegel & Hanson, L.L.P., 460 Nichols Road, Suite 200,
in the City of Kansas City, in the County of Jackson,
and the State of Missouri, before:

NAOLA C. VAUGHN, RPR, CRR, KS CSR #0895
Certified Realtime Reporter
of
JAY E. SUDDRETH & ASSOCIATES, INC.
Suite 100
10104 West 105th Street
Overland Park, Kansas  66212-5746
a Certified Shorthand Reporter within and for the State
of Missouri.

Taken on behalf of Defendant pursuant to Notice to Take
Deposition.

Trudy Bowne
December 1, 2007

Page 22

1  litigation, but I don't recall talking to him really
2  about it since.
3      Q.  When you say he referred you to the
4  litigation, what do you mean?
5      A.  He's the one I -- he gave me the number for
6  the attorney to call and inquire about it.
7      Q.  And was that somebody here at the Stueve
8  Siegel firm?
9      A.  Yes.  I believe it was George Hanson.
10     Q.  How did the topic come up in conversation
11 with Jason?
12     A.  I had been on vacation.  When I got back, he
13 had -- I don't know how he had gotten in contact with
14 the attorneys, but he had a number for me, because he
15 knew I had worked overtime, and he thought I might be
16 interested in calling.
17     Q.  Do you have any reason to distrust Jason for
18 any reason?
19     A.  Not --
20     Q.  That's sort of a compound question there to
21 say reason twice.  Let me ask the question again.
22         Do you have any reason to distrust Jason
23 Moxner -- Moxness?
24     A.  Moxness.  Not to my knowledge.
25     Q.  Do you have any reason to distrust

Page 23

1  Harry Brewer?
2      A.  Not to my knowledge.
3      Q.  When you began as a loan processor in 2002,
4  how were you paid?
5      A.  I was paid a salary plus bonus.
6      Q.  Do you know how your bonus was calculated?
7      A.  It was calculated per loan that I processed.
8      Q.  There was some sort of a formula?
9      A.  Yeah.
10     Q.  During the time that you were interviewing
11 for first starting, did anyone describe for you how
12 your compensation worked?
13     A.  They described to me the bonus structure.
14     Q.  When you say they, who is they?
15     A.  I'm sorry.  Jason.
16     Q.  What did Jason tell you about the bonus
17 structure?
18     A.  He described how it worked based on how much
19 was paid per loan.  And I don't know what the structure
20 was.  But I know it was based on units of loans.  And
21 he told me what my base salary would be.
22     Q.  At that time when you were beginning
23 employment, did he tell you any expectations with
24 regard to how much you would be working, how many hours
25 per week?

Page 24

1      A.  No.
2      Q.  Did he say anything about what your salary
3  was intended to cover in terms of the hours that you
4  worked?
5      A.  No.
6      Q.  At that time when you were first hiring on,
7  did anyone talk with you about overtime work?
8      A.  No.
9      Q.  Did anyone talk with you about overtime
10 compensation?
11     A.  No.
12     Q.  At any time that you worked at Wells Fargo
13 did anyone talk with you about overtime compensation?
14     A.  No.
15     Q.  I was asking you about your compensation
16 system when you first began in September 2002.  During
17 the times that you were a loan processor, was it that
18 same basic compensation structure?
19     A.  Yes.
20     Q.  Salary plus bonus?
21     A.  Correct.
22     Q.  That's true both before and after you were a
23 loan officer?
24     A.  Correct.
25     Q.  When you were a loan officer, how were you

Page 25

1  paid?
2      A.  We were paid a draw.  And then commission
3  based on loan volume.
4      Q.  Is it your understanding that this lawsuit
5  concerns only the period of time that you worked as a
6  loan processor?
7      A.  Yes.
8      Q.  And that you're not seeking compensation for
9  the time you worked as a loan officer?
10     A.  I am involved in the other HMC case for the
11 loan officer portion, but this lawsuit is just the
12 processor.
13     Q.  So the loan officer part is a separate
14 piece?
15     A.  Yes.
16     Q.  What were your duties as a loan officer?
17     A.  To sell loans.
18     Q.  How would you go about doing that?
19     A.  We would do mailers, where people called in.
20 We would buy leads that we called.  Cold call people.
21 We would have call nights to where we'd have a company
22 send direct phone calls into us for a short period of
23 time.  We were also referred loans from the prime side,
24 the A side of Wells Fargo.  And we would solicit
25 realtors to send us loans.

JAY E. SUDDRETH & ASSOCIATES, INC.
Toll Free:   (800) 466-2580   Local:   (913) 492-0111 or (816) 471-2211

a90ade87-d320-4dd5-947c-ca58a168b72c

Deposition Excerpts of Jeni Fisher's Deposition

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In re WELLS FARGO LOAN     )   MDL Docket 1841
PROCESSOR OVERTIME         )   VIDEOTAPE DEPOSITION
PAY LITIGATION             )   OF JENI FISHER


THE VIDEOTAPE DEPOSITION OF JENI FISHER,

taken before Connie Overberg, Certified Shorthand

Reporter and Notary Public of the State of Iowa,

commencing at 1:22 p.m., Thursday, November 29,

2007, at 666 Walnut, Suite 2000, Mason City, Iowa.


A P P E A R A N C E S

Plaintiffs by:      ERIC L. DIRKS
                    Attorney at Law
                    460 Nichols Road
                    Suite 200
                    Kansas City, MO 64112

Defendants by:      DENISE K. DRAKE
                    Attorney at Law
                    9401 Indian Creek Parkway
                    Suite 700
                    Building 40
                    Overland Park, KS 66210

Videographer:       Video Specialties, David Hellberg




Reported by:        Connie Overberg, RPR, CSR

Page 14

1   in which I was not required to record any hours that
2   I worked, so once I did start recording those hours,
3   I did realize that the overtime that I was working
4   was being paid.
5   Q.      And this is throughout your employment you
6   understood you were entitled to overtime pay. Why
7   didn't you record the hours that you were working in
8   order to receive the overtime pay?
9   A.      I wasn't required to nor was I ever showed
10  a system to record hours on.
11  Q.      Did anyone ever affirmatively tell you
12  that you should not record hours accurately?
13  A.      No.
14  Q.      That you were not entitled to overtime
15  pay?
16  A.      Nobody specifically told me, no.
17  Q.      And did anyone ever specifically tell you
18  that you should record your hours accurately?
19  A.      That I should record my hours accurately,
20  yes. Up until 2004, I was not told any hours that
21  should be recorded.
22  Q.      Okay. After that?
23  A.      After that then I was informed of the
24  system to record my hours.
25  Q.      Who told you about that?

Page 15

1   A.      My manager.
2   Q.      Who was that?
3   A.      Denise Smithson at that time.
4   Q.      And Denise Smithson was your branch
5   manager in Pella; is that right?
6   A.      Yes.
7   Q.      Was it when you started in Pella that Ms.
8   Smithson told you you needed to record your hours
9   accurately?
10  A.      Yes.
11  Q.      If you will look at Number 6 with me, it
12  says, "As a Wells Fargo mortgage sales associate, I
13  am paid an hourly wage for each hour worked." Do
14  you see that?
15  A.      Yes.
16  Q.      Was that your understanding throughout the
17  time you were employed at Wells Fargo?
18  A.      Up until 2004. Honestly I wasn't sure if
19  I was hourly or salary since I wasn't ever asked to
20  record my hours, so after 2004 I did understand that
21  it was an hourly wage.
22  Q.      And that would be the June 2004?
23  A.      You are correct.
24  Q.      Did you ever ask anyone before June of
25  2004?

Page 16

1   A.      No, not that I can recall.
2   Q.      Did you have other mortgage sales
3   associates working with you in the Clive location?
4   A.      Yes. Not on my particular management
5   team. They were working with a different manager.
6   Q.      Do you have any idea if they were
7   accurately recording hours?
8   A.      I am not sure. We didn't really talk
9   about it.
10  Q.      Who were those individuals?
11  A.      Heather Bishop.
12  Q.      Anyone else?
13  A.      Soraha Khan.
14  Q.      How do you spell that?
15  A.      S-o-r-a-y-a -- a-h-a.
16  Q.      Anyone else?
17  A.      Shelby Greensley.
18  Q.      Anyone else?
19  A.      Those were the only associates I worked
20  with at that time.
21  Q.      And then on Number 7, it says, "Throughout
22  my employment at Wells Fargo as a mortgage sales
23  associate, I have been paid overtime whenever I have
24  worked more than 40 hours per week as approved." Do
25  you see that?

Page 17

1   A.      Uh-huh.
2   Q.      And so would that be essentially
3   consistent with the fact that in June 2004, you
4   understood that you were supposed to be recording
5   your hours accurately?
6   A.      Correct.
7   Q.      You started doing that?
8   A.      Correct.
9   Q.      And you were paid?
10  A.      Most of them, yes.
11  Q.      Okay. Are you aware of any hours that you
12  recorded after June of 2004 as overtime that you
13  were not compensated for?
14  A.      No.
15  Q.      Under Number 10C, you initialed, "My
16  duties have varied depending on the mortgage
17  consultant with whom I worked at the time." Do you
18  see that?
19  A.      Yes.
20  Q.      How did your duties vary?
21  A.      When working at the Clive location, I
22  worked for only one mortgage consultant. When I
23  moved to the Pella location, I was working for two
24  mortgage consultants.
25  Q.      And how did your duties differ?

Deposition Excerpts of Elisha Hesterberg's Deposition

Elishia A. Hesterberg
November 14, 2007

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA


In re WELLS FARGO LOAN    )
PROCESSOR OVERTIME PAY    )
LITIGATION                )
                          )
                          )    MDL Docket No. 1841
This Document Relates     )
to Bowne v. Wells         )
Fargo Home Mortgage       )
(transferred from D.      )
Kan., No. 06-2020)        )
N.D. Cal., No. 07-4013    )
MHP                       )


VIDEOTAPED DEPOSITION OF ELISHIA A. HESTERBERG,

produced, sworn, and examined on Wednesday, the 14th
day of November, 2007, commencing at 1:01 p.m. and
concluding at 2:06 p.m., at the law offices of Stueve
Siegel Hanson LLP, 460 Nichols Road, Suite 200, in the
City of Kansas City, County of Jackson, State of
Missouri, before:

ANN M. HAMILTON, RPR
Certified Court Reporter
of
JAY E. SUDDRETH & ASSOCIATES, INC.
Suite 100
10104 West 105th Street
Overland Park, Kansas 66212-5755

a Certified Shorthand Reporter within and for the
State of Kansas and a Certified Court Reporter within
and for the State of Missouri.

Taken on behalf of Defendant pursuant to Notice to
Take Depositions.

Elishia A. Hesterberg
November 14, 2007

Page 34

1 through the time I was employed.
2   Q.  Okay.  With regard to the marketing, when
3 you took the things home to address envelopes, what
4 have you, about how much time on those three different
5 occasions did you spend time completing that task?
6   A.  I'd say two to three hours maybe.
7   Q.  And how about on the call nights?
8   A.  Call nights were usually from 7 to 9 two
9 nights a week, so maybe three hours at the most.
10   Q.  Okay.  So eight times you spent about
11 three hours on the phones doing the calls?
12   A.  Right.
13   Q.  Anything else you can think of when you
14 aren't sure whether you logged your hours?
15   A.  No.
16   Q.  Okay.  You note that even though you
17 regularly worked and recorded overtime hours, you were
18 not paid for it; right?
19   A.  Right.
20   Q.  Did you ever call anyone to complain
21 about that?
22   A.  I did not.  I guess I took it as I was
23 salary and was not entitled to that.
24   Q.  And, in fact, there were some weeks where
25 you didn't necessarily work all 40 hours, or what have

Page 35

1 you?
2   A.  Right.
3   Q.  But you still got the same amount of
4 money; is that right?
5   A.  Right.  And that -- I marked it on my
6 time sheet as leaving.  That would have also been my
7 sick or vacation pay.  The reason mostly we did
8 Webtime was for Jason, since he was out of the office,
9 we started, you know, just so he would know when we
10 were there.  I really didn't use my vacation and sick
11 time.  I would just log out for my doctor's
12 appointments, or, you know -- and I was actually using
13 that time.  It wasn't marked on there as that time.
14   Q.  Okay.
15   A.  And Jason was aware of that.
16   Q.  And you say that you were told you were
17 not eligible for overtime pay; is that right?
18   A.  Right.
19   Q.  Who told you that?
20   A.  I believe Jason was under that
21 impression.
22   Q.  Well, I know that you can't really speak
23 for what his impression was, but is he the one that
24 told you that?
25   A.  I think so.  I don't know --

Page 36

1   Q.  Did he specifically -- I mean, did he
2 specifically say it to you?
3   A.  Maybe not in those words; but, yes, that
4 we're salaried, this is what we will be paid, and this
5 is our bonus if we close a certain amount of loans.
6 There was never mention of --
7   Q.  So I just want to make sure I have the
8 right flavor of it.  You don't remember him
9 specifically saying you're salaried exempt, or what
10 have you, it's just that that was sort of the
11 understanding?
12   A.  Well, yeah.  I mean, we were working
13 overtime, he saw our overtime and didn't -- we didn't
14 get compensated for it, so --
15   Q.  Did he ever do anything to explain to you
16 why he didn't compensate you for the overtime or
17 anything at all other than you just kind of understood
18 that?
19   A.  I'm not sure.  Not that I recall.  I
20 mean --
21   Q.  Okay.  Okay.
22       (Whereupon, Hesterberg Deposition
23       Exhibit Number 12 was marked for
24       identification by the reporter.)
25   Q.  (By Ms. Drake)  Okay.  Now I'm going to

Page 37

1 hand you what's been marked Deposition Exhibit Number
2 12.  And I will represent to you that that appears to
3 be, or it is a printout of the time in and time out
4 computer records that we have.
5   A.  Uh-huh.
6   Q.  If you look at the first line there it
7 appears that the workday of May 27, 2003 is the first
8 computer record that Wells Fargo has to track your
9 time.
10       Would that be consistent with your
11 thought that it started about the time when the Blue
12 Springs office opened?
13   A.  It might be.  It opened earlier than
14 this, but that might be when Jason started having to
15 go out there.
16   Q.  Had you been tracking your hours in any
17 way before May 27 of 2003?
18   A.  Not that I recall, no.
19   Q.  No time handwritten cards or anything
20 like that?
21   A.  No.
22   Q.  How about even a time sheet where you'd
23 put in a total or anything along those lines?
24   A.  I don't think so.
25   Q.  Okay.  Before this May 27 of 2003, let's

10  (Pages 34 to 37)

JAY E. SUDDRETH & ASSOCIATES, INC.
Toll Free:  (800) 466-2580   Local:  (913) 492-0111 or (816) 471-2211

833aad39-c3e0-420d-9055-ea313ae80617

Deposition Excerpts of Teresa Swanson's Deposition

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA


IN RE:                          )
                                )
WELLS FARGO LOAN PROCESSOR      )MDL Docket No. 1841
OVERTIME PAY LITIGATION.        )


        RULE 30(b)(6) DEPOSITION OF WELLS FARGO THROUGH
ITS DESIGNATED REPRESENTATIVE, TERESA SWANSON,
produced, sworn and examined on the part of the
Plaintiffs, pursuant to Notice, on Thursday, the
31st of January, 2008, at law firm of Spencer Fane
Britt & Browne, 1000 Walnut, Suite 1400, in the
City of Kansas City, in the County of Jackson, and
State of Missouri, before me,

            STACY L. DECKER, CCR No. 858
                      of
            JOHN M. BOWEN & ASSOCIATES

a Certified Court Reporter, in a certain cause now
pending in the United States District Court for the
Northern District of California, In Re: Wells
Fargo Loan Processor Overtime Pay Litigation.


                   APPEARANCES:

For Plaintiffs:

        STUEVE SIEGEL HANSON, L.L.P.
        460 Nichols Road, Suite 200
        Kansas City, Missouri  64112
        By:  Mr. George Hanson
        and  Ms. Ashlea Schwarz

Page 22

1  A. Correct.
2  Q. Do you remember whose pay voucher you looked
3     at?
4  A. No, I do not.
5  Q. Did you look at it just to familiarize yourself
6     with the content?
7  A. I believe it was just shown to me that it could
8     be something I could ask to be talked about.
9     And since I designed the pay voucher, I didn't
10    need any prep on it.
11 Q. Very good. Is the pay voucher -- does Wells
12    Fargo use that pay voucher for all its
13    nonexempt employees?
14 A. All nonexempt team members who are on direct
15    deposit would get a pay voucher that looked
16    like that. We have a small population that
17    would get a check that are similar, but not
18    identical, because they are a check.
19 Q. But the same type of information would be
20    included?
21 A. Yes.
22 Q. So all team members have basically the same
23    type of pay voucher information available to
24    them, all nonexempt team members?
25 A. Yes, all team members.

Page 23

1  Q. The corporate handbook, what did you look at in
2     the corporate handbook?
3  A. I just kind of paged through them to -- the
4     different years and iterations of them. Again,
5     my sections I'm very well aware of, and other
6     sections I did not look at. I just paged
7     through them.
8  Q. What sections are you aware of?
9  A. Things concerning pay and payroll.
10 Q. Is it Chapter 5 or Section 5? That's the one
11    that strikes my recollection.
12 A. Yeah, I'm not aware of which chapters they are.
13    When I get them, it's here is the pieces that
14    talk about payroll, please review them.
15 Q. Have we talked about all the documents that you
16    reviewed in preparation for today's deposition?
17 A. Yes.
18    MS. DRAKE: I'll just mention for the
19    record there were a couple of others, but -- I
20    mean, there was a stack. So some policy
21    emails, some things like that. I think you
22    even referenced one earlier about the roll-out
23    of the WebTime and what have you, but just to
24    be thorough.
25 Q. (By Mr. Hanson) If we mark something and show

Page 24

1     it to you and you have seen it, just let me
2     know that that's something you reviewed. Okay?
3  A. All right.
4  Q. Let me quickly get a summary of your current
5     job responsibilities, Ms. Swanson.
6  A. Currently I manage a staff of individuals who
7     are -- their main responsibilities are the
8     functional support of our payroll, HR,
9     relocation, stock option, tax filing, systems
10    and software, so things like WebTime and
11    PeopleSoft fall under my domain.
12        We're also the project people, so all
13    projects involving those groups I just
14    mentioned. We also are, you know, the
15    acquisition -- mergers and acquisition team,
16    and we bring those on to our payroll. And
17    various other things.
18 Q. Are you more on the side of the kind of
19    technical, technology compliance as opposed to
20    the policy areas of HR?
21 A. No. My job probably crosses more -- both of
22    them more than other jobs. I'm not in the
23    systems area, I'm not a technology person, or
24    the functional side, but we work very closely
25    with the systems area in developing whatever we

Page 25

1     do. And then I also work on the other side
2     with employee relations or whomever on the
3     policy to make sure that what we create is also
4     the policy. So I guess you could call me the
5     bridge between the two.
6  Q. And for purposes of the company representative
7     deposition, it just appeared to me that your
8     topics were more weighted towards systems
9     technology, like the application of WebTime,
10    rather than what I would call the more generic
11    HR policies regarding how hours should be kept
12    or responding to HR complaints regarding pay
13    issues, those kinds of things.
14 A. Correct. I mean, I -- my job is to know the
15    policies. My job is not to make the policies.
16    My job is to make sure that whatever systems we
17    create are consistently following HR corporate
18    policies.
19 Q. I'm going to quickly make an org chart that
20    shows me who your direct reports are and then
21    who you report up to. Okay?
22 A. Okay.
23 Q. So I'm going to put you in the middle of this
24    page. And how many people report to you, Ms.
25    Swanson?

Page 30

1    mortgage would have their own, retail banking
2    would have their own, and they are held within
3    those business lines.
4    Q. So within the HR group, there are individuals
5        tasked with compensation responsibilities, but
6        the term corporate compensation actually refers
7        to smaller groups within each actual business
8        unit?
9    A. That's what I would commonly refer to them as,
10       yes.
11   Q. If Ms. White is currently the head of HR, what
12       are the different business units within HR that
13       report in to her?
14   A. There would be HRDS. There would be a -- there
15       is the HRIS systems department. There is
16       employee relations. There is benefits. There
17       would be corporate communications, team member
18       experience, EAC, employee assistance
19       counseling, executive compensation, regular
20       compensation. Those would be the majority of
21       the ones that I'm familiar with.
22           There is probably other groups that
23       report in through her. It's probably about a
24       thousand-person organization, corporate HR,
25       maybe 800. 800 to a thousand.

Page 31

1           (Deposition Exhibit No. 61 was marked
2        for identification.)
3    Q. (By Mr. Hanson) Your counsel produced to us
4        last evening an organizational chart that I
5        think -- well, before I tell you what I think,
6        I'll let you look at it and you can tell me
7        what you think. Do you recognize what I have
8        marked as Exhibit 61?
9    A. Yes, I do.
10   Q. What is it?
11   A. This would be off of our team work site, a list
12       of the organizational structure of -- Sharon
13       Wong is the head of home and consumer financial
14       compensation, and then her organization.
15   Q. Now, is Ms. Wong within the human resources
16       department?
17   A. She would be considered human resources, but
18       part of the more -- home and consumer financial
19       resources, not corporate HR.
20   Q. So when we earlier made this distinction
21       between corporate compensation as being within,
22       for example, a business unit like the mortgage
23       division, Exhibit 61 is a snapshot of that comp
24       department?
25   A. Right, for home and consumer financial.

Page 32

1    Q. So the list of business units that report up to
2        Ms. White, Ms. Wong is not part of that
3        directly; is that right?
4    A. Correct.
5    Q. Do you know who Ms. Wong reports to?
6    A. I do not know. I would assume it would be the
7        head of human -- or human and consumer
8        financial, but I do not know that. There could
9        be several other layers in there that I'm not
10       aware of.
11   Q. You said human and consumer --
12   A. I'm sorry. Home and consumer financial.
13   Q. Because we have other cases with Wells Fargo, I
14       have been to Des Moines and I spoke with I
15       believe the president of home and consumer,
16       Kara Heiden and Mike Hyde are the two people
17       who come to my mind as maybe the head of the
18       mortgage division.
19   A. I don't believe they currently would be the top
20       person. I can't recall. They have actually
21       switched over recently, and those names do not
22       sound familiar to me.
23   Q. But in any case, the compensation manager, Ms.
24       Wong, is part of the home and consumer finance
25       group?

Page 33

1    A. Correct.
2    Q. And not specifically under Ms. White's HR
3        business unit?
4    A. Correct. They would -- you know, all HR areas
5        have a dotted line, in theory, relationship to
6        Julie White, and she is the head HR person, but
7        they are not in her business lines.
8    Q. Well, let's pull out your notice and start
9        moving through some of these topics. Okay?
10           Topic 2 is the first one that you have
11       been designated for, and it relates to the
12       business units responsible for wage and hour
13       compliance. Do you see that?
14   A. Correct.
15   Q. Who at Wells Fargo is responsible for wage and
16       hour compliance?
17           MS. DRAKE: Objection, form.
18   A. I guess I would need more specifics as in what
19       regards.
20   Q. (By Mr. Hanson) Well, do you consider -- for
21       example, we have identified human resources
22       corporate compensation and legal as potential
23       business units responsible for wage and hour
24       compliance. Do those business units have such
25       responsibility?

Page 34

1  A. Yes.
2  Q. You are, just out of fairness, then limited to
3     corporate compensation, so let me just ask what
4     is corporate compensation's role in ensuring
5     wage and hour compliance at Wells Fargo?
6  A. From our perspective in HR data services, that
7     is to ensure that all of our systems and our
8     payments to team members follow wage and hour
9     laws.
10 Q. And, again, just so I can make sure our
11    terminology is correct, you mentioned HRDS, and
12    I understand that that is the human resource
13    data systems. Is that what that stands for?
14 A. HR data services. Sorry. Not systems.
15 Q. I'm going to write that out so I say it right.
16    And would it be HR data services -- that
17    department's responsibility to ensure that the
18    actual systems in place are compliant with the
19    wage and hour law?
20 A. Correct.
21 Q. And let me give you an example. You tell me if
22    I'm wrong. You understand that overtime, at
23    least under the federal law, starts at 40 hours
24    a week, correct?
25 A. Correct.

Page 35

1  Q. And you understand that if people are recording
2     time into a timekeeping system and that time
3     exceeds 40 a week, they need to be paid for
4     that overtime, that time and a half?
5  A. Correct, if they have worked over 40.
6  Q. So there has to be a system in place, whether
7     it's a computer application or a manual system,
8     that accurately tracks time and then ensures
9     that overtime is paid, right?
10 A. Correct.
11 Q. And that responsibility falls under HRDS?
12 A. Correct.
13 Q. I understand that Ms. White has ultimate
14    responsibility for HRDS as the highest ranking
15    human resources manager, correct?
16       MS. DRAKE: Objection to form.
17 A. Correct.
18 Q. (By Mr. Hanson) And prior to Ms. White, it was
19    Avid, correct?
20       MS. DRAKE: Same objection.
21 A. Correct.
22 Q. (By Mr. Hanson) I just want to make sure.
23    Prior to Ms. White, Avid was the highest
24    ranking HR manager at Wells Fargo, correct?
25 A. Correct.

Page 36

1  Q. And HR data services would have reported in to
2     Avid, correct?
3  A. Correct.
4  Q. Give me an example of just some of the systems
5     that are in place to ensure that there is wage
6     and hour compliance.
7  A. Currently team members use WebTime to record
8     their hours, and that system does the
9     calculation of overtime and pay. And then we
10    would then move it to our PeopleSoft system,
11    which is where a team member would actually get
12    their pay generated from.
13 Q. We have spoken a little bit earlier about this,
14    but we can get into some more detail now.
15    WebTime is the actual mechanical timekeeping
16    system used by Wells Fargo for all nonexempt
17    team members, correct?
18 A. Correct.
19 Q. And that system is a product of a company
20    called HBS, correct?
21 A. Correct.
22 Q. And at least since January of 2006, all
23    nonexempt team members, including loan
24    processors, were required to use WebTime,
25    correct?

Page 37

1  A. Correct.
2  Q. And you told me earlier that WebTime first came
3     into use at Wells Fargo in 1999, correct?
4  A. Late 1999 was when we first finished it, yes.
5  Q. As of the January 1st, 2006, policy change --
6     and I understand you went to a biweekly pay
7     period, correct?
8  A. Correct.
9  Q. And instituted a system called positive pay,
10    correct?
11 A. Correct.
12 Q. Prior to January 1, 2006, which nonexempt team
13    members were not using WebTime?
14       MS. DRAKE: Objection, form.
15 A. I wouldn't be able to identify individually.
16    We feel that by -- at that point in time we
17    probably had, I would say, about 95 percent of
18    team members using WebTime. We just had a few
19    groups that were not able to use it for various
20    reasons or chose not to use it.
21 Q. (By Mr. Hanson) Can you identify which of
22    those groups were --
23 A. The majority of those groups would have been
24    our -- we have a large insurance company that
25    we purchased several years ago that does not

Page 74

1  Q. (By Mr. Hanson) Were the deadlines the same?
2  A. Not exactly. Because we were on a semi-monthly
3     schedule, so we pulled that data at different
4     points in time.
5  Q. So the deadlines were different, but the
6     requirement that a nonexempt team member like a
7     loan processor complete and authorize and
8     submit their time was the same?
9  A. Correct.
10 Q. Let's talk about the change in January of '06,
11    in addition to the change to a web-based kind
12    of different looking WebTime application, let's
13    talk about the change to biweekly and the
14    change to positive pay. Okay?
15       Just first, what motivated the change
16    to biweekly?
17 A. Well, my department, HRDS, had actually
18    proposed several years before it was done to
19    switch to biweekly. And it's mainly for -- to
20    eliminate all the number of volumes of people
21    we overpay. It was to simplify things. The
22    biggest number of phone calls that people do
23    was they didn't understand their pay. They
24    didn't understand standard hours and exception
25    pay. So the confusion factor. Plus, it's

Page 75

1     easier to run a payroll shop if you have a
2     little bit more consistent schedule.
3        At the point in time, it was too soon
4     after the merger and nobody wanted to undertake
5     such a project. A few years later we -- it
6     became decided that, to help the team members
7     ease the confusion and to make it a little bit
8     more streamline, we would switch to biweekly
9     pay and pay them on a positive pay for time
10    worked versus just assuming that they were
11    going to work their standard hours. You know,
12    to save money.
13 Q. The merger between Norwest and Wells Fargo,
14    when did that occur?
15 A. Officially to us it occurred in '99. July of
16    '99 is when we brought the Wells Fargo people
17    on to the existing Norwest PeopleSoft and
18    timekeeping systems.
19 Q. And this may be a question that's outside the
20    scope, so I'm not going to hold you to a
21    corporate representative tag on this, but let
22    me ask you if you know. The loan processors
23    that we're talking about in this case that are
24    under the home mortgage business unit, was the
25    predecessor of that business unit with Norwest

Page 76

1     or Wells Fargo?
2  A. Yeah. It was Norwest Mortgage, correct.
3  Q. Do you know whether at the time of the merger
4     Wells Fargo employed home mortgage loan
5     processors?
6  A. I don't know. I assume so, but I don't know as
7     fact. But they did have a mortgage business
8     that merged into our mortgage business.
9  Q. But the larger one was Norwest's?
10 A. Correct.
11 Q. Substantially larger?
12 A. Yes. Wells Fargo was more of the retail branch
13    banks, and the Norwest was the bigger -- they
14    had a definite bigger presence in the mortgage
15    area.
16 Q. But at least by January of 2003, there weren't
17    any historical distinctions between the way
18    nonexempt loan processors from the Wells Fargo
19    side or the Norwest side were being treated?
20 A. None whatsoever.
21 Q. Positive pay, and that's the term used to
22    describe the change from what previously had
23    been paying on standard hours?
24 A. Correct.
25 Q. Did the standard hours policy apply to all

Page 77

1     nonexempt team members at Wells Fargo?
2  A. Did all team members have standard hours?
3  Q. Yes.
4  A. No. We have some team members that have zero
5     standard hours, the casual type team members.
6  Q. I don't know what that means.
7  A. There are -- they make a determination on how
8     many hours a person is going to work on a
9     weekly basis, and that's what they assign as
10    their standard hours.
11       There are some people that work on a
12    very occasional basis. They would be assigned
13    zero standard hours. You can have anywhere
14    from zero to 40 standard hours.
15 Q. Let me go at it this way. The positive pay
16    system that's in place now and has been since
17    January of 2006 pays on all hours actually
18    recorded in WebTime, correct?
19 A. Correct.
20 Q. And that positive pay system applies to all
21    loan processor nonexempt employees?
22 A. All nonexempt.
23 Q. Before the positive pay system came into
24    effect, were all nonexempt loan processors paid
25    under the standard hours system?

Page 78

1  A. Correct.
2  Q. And we touched on this a little bit earlier,
3     but let me ask some more specific questions.
4     Standard hours was determined by the manager of
5     a nonexempt loan processor?
6  A. Yes.
7  Q. And standard hours was the assumed hours that
8     would be worked in a standard work week?
9  A. Correct.
10 Q. And if no exception was entered by a manager,
11    the nonexempt loan processor would be paid
12    their standard hours, correct?
13       MS. DRAKE: Objection, form.
14 A. Yes, they would.
15 Q. (By Mr. Hanson) And was that standard hours
16    system in place going back to January of 2003?
17 A. Yes.
18 Q. You mentioned that the range of standard hours
19    could be zero to 40?
20 A. Correct.
21 Q. Could it be more than 40?
22 A. No, it could not.
23 Q. So a manager that expected a nonexempt loan
24    processor to work 45 hours a week would be
25    required to add five hours of time every week,

Page 79

1     correct?
2        MS. DRAKE: Objection to form.
3  A. They would be required to enter the time, and
4     we would pay the overtime, correct.
5  Q. (By Mr. Hanson) But an exception would be
6     required every week?
7  A. Yes.
8        MS. DRAKE: Same objection.
9  A. Yes.
10 Q. (By Mr. Hanson) Where did Wells Fargo record
11    or keep track of what the standard hours was
12    for a given nonexempt employee like a loan
13    processor?
14 A. PeopleSoft. It's always been PeopleSoft. It
15    does send that information to WebTime, but the
16    official record keeper is PeopleSoft.
17 Q. So just using some of our what we call class
18    representatives as an example, Trudy Bowne, who
19    is one of our lead plaintiffs, you would -- and
20    I think she was employed before January of '06.
21    But just assuming with me that she was,
22    PeopleSoft would be able to show for her what
23    her standard hours were during her pre-January
24    '06 employment?
25       MS. DRAKE: Objection, form.

Page 80

1  A. Her entire employment -- we still use standard
2     hours for other purposes. So it's there now
3     and it's always been there.
4  Q. (By Mr. Hanson) I appreciate that. I didn't
5     know that. So the designation of standard
6     hours still exists?
7  A. Right.
8  Q. What do you use it for now if you're not paying
9     off it?
10 A. Disability payments, insurance payments, all
11    require us to know what their category and
12    their standard hours are.
13 Q. And is the standard hours designation for
14    nonexempt team members like loan processors
15    subject to change?
16 A. Yes. The requirement is that that is an
17    accurate picture of what they are working and
18    should change at any -- if their schedule
19    should change, that number should change as
20    well.
21 Q. So if someone goes from a 40-hour-a-week
22    standard schedule to 32 hours, maybe they are
23    only working four days a week, PeopleSoft would
24    reflect a change from 40 to 32 and what work
25    week that change occurred in, correct?

Page 81

1        MS. DRAKE: Objection, form.
2  A. The effective date of it, if the manager made
3     it at the beginning of a work week, but it's an
4     effective date.
5  Q. (By Mr. Hanson) And those are records that
6     Wells Fargo has maintained and would be able to
7     produce, and I'm referring to standard hours by
8     a nonexempt team member as they changed over
9     time, we would be able to see what those
10    standard hours were designated as going back
11    from January of 2003 to the present, correct?
12 A. Yeah. From 1993 to the present.
13 Q. 1993?
14 A. 1993. You would be able to tell that.
15 Q. You were using standard hours as far back as
16    1993?
17 A. On PeopleSoft, yes.
18 Q. WebTime in 1999; PeopleSoft has been around
19    longer, correct?
20 A. March of 1993.
21 Q. Would you be able to run a report, for example,
22    if I gave Wells Fargo a list or a job
23    classification -- or let's just say a list of
24    100 employees and asked, you know, show me the
25    standard hours that have been designated for

Page 82

1   this individual for the entire tenure of their
2   employment, that's something that PeopleSoft
3   could run for me?
4        MS. DRAKE: Objection to form.
5   A. Yeah. I mean, it would be a report they could
6   generate. They load that information to
7   Oracle. We do Oracle reporting. So they would
8   be able to generate that report, yes.
9   Q. (By Mr. Hanson) Oracle would be able to
10  generate it?
11  A. It's just a system we use that generates it,
12  but it's PeopleSoft data.
13  Q. You wouldn't have to go outside the company to
14  get that information?
15  A. Oh, no. No.
16  Q. The exception process, in other words, if a
17  nonexempt team member such as a loan processor
18  in a given work week deviated from their
19  standard hours, who is responsible for ensuring
20  that an accurate record is produced for hours
21  actually worked?
22        MS. DRAKE: Objection to form.
23  A. To produce a record after the fact or to
24  generate it being paid?
25  Q. (By Mr. Hanson) Just an example, Trudy Bowne,

Page 83

1   a loan processor who worked in Overland Park,
2   Kansas, let's assume that her standard hours
3   were 40 for whatever given time period. Okay?
4   That was the schedule she was expected to work,
5   right?
6   A. Uh-huh.
7   Q. In a given work week, due to an unusual number
8   of loan applications and closings, she works 45
9   hours. Who is responsible for making sure that
10  her paycheck for that week reflects five hours
11  of overtime as opposed to standard time?
12        MS. DRAKE: Objection to form.
13  A. I would say her and her manager.
14  Q. (By Mr. Hanson) So what would Ms. Bowne's
15  responsibility be?
16  A. To accurately enter her time into the system
17  and complete the time card and to follow up
18  that it had been paid.
19  Q. And what would the manager's responsibility be?
20  A. Prior to 2005, they would have had to approve
21  that time card.
22  Q. Prior to -- sorry. What time?
23  A. September of 2005. They would have had to
24  approve that time card.
25  Q. So prior to September '05, Ms. Bowne's manager

Page 84

1   would be required to affirmatively approve
2   those extra hours, correct?
3   A. Correct.
4   Q. What about a week in which Ms. Bowne, due to
5   whatever circumstances, worked 35 hours; how
6   would the exception work so she is not
7   overpaid?
8   A. She would fill out the time card, complete it.
9   It would -- the manager would approve it, and
10  then we would then dock her pay for those five
11  hours.
12  Q. Again, a deviation, whether it's hours in
13  excess of the standard or hours under the
14  standard, both required manager approval,
15  correct?
16  A. Correct.
17  Q. Will PeopleSoft allow us to identify when
18  managers approved exceptions for nonexempt team
19  members like loan processors?
20  A. PeopleSoft, no. WebTime.
21  Q. WebTime would, all right. So the exception
22  process is a function of WebTime?
23  A. Correct.
24  Q. Or at least it used to be before September of
25  '05?

Page 85

1   A. The calculation of pay has always resided -- I
2   mean, as long as we have had WebTime, has
3   resided in WebTime.
4   Q. Except now there is not an exception process or
5   manager approval required for a deviation off
6   standard hours, correct?
7   A. Correct, because now we're paying the entire
8   payment for that week, but that calculation is
9   still done in WebTime.
10  Q. There is still a calculation, but if the loan
11  processor records 45 hours it is going to be
12  paid as 45 hours without the need for an
13  exception or manager approval, correct?
14  A. Correct.
15  Q. But the record of in which work weeks
16  exceptions were approved by managers, those
17  records will be available in WebTime?
18  A. Correct.
19  Q. And you could run a report, for example, of
20  which work weeks a given nonexempt team member
21  had an exception approved, correct?
22  A. Correct.
23  Q. Will you be able to show examples of where
24  there is an exception in WebTime that was not
25  approved?

Page 86

1  A. If I had -- I mean, if they could run a report
2     and if it wasn't approved, you would be able to
3     tell that.
4  Q. So in other words, if there is an example of a
5     loan processor like Ms. Bowne who worked 45
6     hours in a week and put that time down in
7     WebTime, but the manager, for whatever reason,
8     did not approve it, you would be able to see
9     that there are extra hours being reported but
10    not approved?
11 A. Correct.
12 Q. Was there a process at a systems level to flag
13    or identify situations where exceptions were
14    not receiving manager approval?
15 A. No.
16 Q. To your knowledge, has Wells Fargo ever gone
17    back and looked to see whether managers were
18    approving exceptions for nonexempt team members
19    like loan processors?
20       MS. DRAKE: Objection, form.
21 A. On an individual level, every day we would be
22    working with the team member as they called us
23    and said they didn't get paid hours, and we
24    would go back and look at the system and say
25    your manager didn't approve it, and then we

Page 87

1     would get them paid.
2  Q. (By Mr. Hanson) But that would require a
3     nonexempt team member to complain to you,
4     correct?
5  A. It would -- they would have to call the service
6     center, yes.
7  Q. I'm speaking of just going on a routine basis.
8     Did Wells Fargo review or perform audits to see
9     how often exceptions for nonexempt team members
10    were being approved or disapproved by managers?
11       MS. DRAKE: Object to the form.
12 A. No. As I say, our assumption is it was the
13    team member and the manager's responsibility,
14    and that they called us, and they do.
15 Q. (By Mr. Hanson) For a nonexempt team member
16    like a loan processor whose standard hours was
17    40, are they still keeping time in WebTime?
18       MS. DRAKE: Objection to form.
19 A. They could have been. We did not require it
20    until 2006. So if they kept another time
21    record, we -- I'm not aware of that. I'm sure
22    there were individual managers that may have
23    had people keep different records, but they
24    could have used the system.
25 Q. (By Mr. Hanson) But not required to before

Page 88

1     September '05 -- or before January of '06?
2       MS. DRAKE: Same objection.
3  A. Correct.
4  Q. (By Mr. Hanson) So for a nonexempt team member
5     like a loan processor, before January of '06,
6     who was not keeping time in WebTime, they are
7     getting paid out their standard hours, correct?
8  A. Correct.
9  Q. Will your records show prior to January of '06
10    which nonexempt team members like loan
11    processors are using WebTime to record their
12    time and which are not?
13 A. No. I can't show you who did not use the
14    system. I can produce records of who used the
15    system.
16 Q. Well, could we line up those who used versus
17    those employed and identify by process of
18    elimination who was not?
19 A. Is it possible? Yeah. Practical? No. I
20    mean, the sheer volume of team members and
21    trying to pinpoint who was employed at a given
22    week and whether they used the system, you
23    could not come up with a useful list of who did
24    not use the system.
25 Q. Well, let's just test that a little bit. You

Page 89

1     could tell me who did use the system prior to
2     January of 2006, correct?
3       MS. DRAKE: Objection to form.
4  A. Correct.
5  Q. (By Mr. Hanson) So you can tell me which --
6     and I'll just stay with the loan processor
7     classification. You could tell me prior to
8     January of 2006 which loan processors were
9     using WebTime to record time?
10       MS. DRAKE: Same objection.
11 A. If I knew who the loan processors were. I
12    mean, I would have to be told that this
13    employee used it. Could I tell you whether
14    they used it, yes.
15 Q. (By Mr. Hanson) Right. I'm not suggesting
16    that you would be the custodian of the list of
17    who was employed as a loan processor. But if
18    somebody was able to give you that list of
19    names and employee ID numbers, you would be
20    able to tell which of those individuals on the
21    loan processor list were using WebTime to
22    record time, correct?
23 A. I could tell you which weeks they did and which
24    weeks they didn't. I mean, again, because it
25    wasn't required, they could have used it for

23 (Pages 86 to 89)

Page 114

1  Q. Now, after January of 2006 there is no approval
2     process required at all?
3  A. No. After September 2005 there is no approval,
4     Labor Day weekend of 2005.
5  Q. So you removed, as part of what you said
6     earlier, the bridge between the prior system
7     and the new positive pay biweekly program,
8     which was final as of January 1 of 2006, the
9     manager approval requirement was removed as of
10    Labor Day 2005, correct?
11 A. Correct.
12 Q. So anyone who recorded overtime after Labor Day
13    of 2005 would have it paid automatically,
14    correct?
15 A. Anybody who recorded time that resulted in
16    overtime and submitted that to us would have it
17    paid, correct.
18 Q. So I take it that none of the overtime worked
19    but unpaid for this group of 293 could have
20    occurred after September of 2005, correct?
21    MS. DRAKE: Objection, form.
22 A. Assuming that they completed their time card,
23    correct.
24 Q. (By Mr. Hanson) Right. And I think this is
25    our understanding and stipulation. There is a

Page 115

1     whole nother issue about whether people were
2     accurately recording all of their time, all
3     right, and I'm just going to leave that aside
4     for the purpose of the present questions.
5     We're talking about a group of people who
6     submitted time cards or submitted time, maybe
7     through WebTime, maybe through time cards, that
8     add up to more than 40 hours in a given work
9     week, but that time was not paid to them as
10    overtime. Okay?
11 A. Work time. We have to be very clear. Work
12    time? People would not get overtime if they
13    didn't work 40 hours, so I'm just trying to
14    clarify.
15 Q. Help me out. That was the deal. I'm not
16    talking about PTO or vacation time. That's
17    what you mean, right? We're talking about they
18    worked and recorded more than 40 hours in a
19    given work week and were not paid for that
20    time. So I'm removing all of the variables
21    that you're hypothesizing, okay?
22 A. Okay.
23 Q. So Trudy Bowne, and this is not even a
24    hypothetical, this is what happened, but there
25    are weeks, more than one, where her actual work

Page 116

1     time is recorded as more than 40 in a week, but
2     she is not paid for that overtime. Okay?
3  A. Okay.
4  Q. So what is the explanation for how that
5     happened?
6  A. Prior to 2005 -- September of 2005?
7  Q. Well, I suppose so, since what you're telling
8     me is it could not have happened after
9     September of 2005.
10 A. Correct.
11 Q. Because the system was fully automated such
12    that any recorded time that was more than 40 in
13    a work week -- any work time --
14 A. Any completed time sheets. They can record
15    time and not complete it at the end of the
16    week.
17 Q. I understand. Any completed time sheets that
18    reflect more than 40 hours a week is
19    automatically going to be paid, correct?
20 A. Correct.
21 Q. So I'm now understanding that we're talking
22    about solely before September of 2005, right?
23 A. Yes.
24 Q. By definition that's where this error would
25    have occurred, correct?

Page 117

1  A. Correct.
2  Q. So how could the error have occurred prior to
3     September of 2005?
4  A. The manager did not complete the approval
5     process.
6  Q. Meaning the manager simply didn't approve --
7     meaning there was overtime recorded and
8     presented to the manager for approval, and the
9     manager didn't click the approval button?
10    MS. DRAKE: Objection to form.
11 A. The manager would have a list of all their team
12    members, and it would have the time recorded,
13    and it would show then a recap of what would be
14    generated exception-pay-wise. They didn't go
15    in and approve the time sheet, whether it had
16    overtime or not or dock or anything. They
17    simply didn't approve the time.
18 Q. (By Mr. Hanson) Managers before September of
19    '05 were required to approve all time, correct?
20 A. Correct.
21 Q. If a manager failed to approve a time sheet or
22    a time record by a nonexempt team member like a
23    loan processor, that loan processor would just
24    be paid their standard hours?
25 A. Correct.

Page 118

1  Q. So the manager's approval was not required to
2     issue a paycheck?
3  A. Correct. It was -- right.
4  Q. So that then leads me to ask what was the
5     manager approval required for? Is that simply
6     for an exception?
7  A. We required them to approve all time cards so
8     that they were approving all time team members
9     recorded. At that point in time, if there was
10    exception pay, that was also needed to push it
11    forward. But the requirement was not to go out
12    and only approve time cards that say overtime
13    or dock that need pay. The requirement was to
14    go in and approve all time cards.
15 Q. So managers who just failed to approve time
16    cards, the impact of that is nonexempt team
17    members like loan processors would be paid
18    their standard time but wouldn't be paid
19    exceptions like overtime, correct?
20 A. At that point in time, yes, on their paycheck.
21 Q. Right, because that's before September of '05?
22 A. Well, no, but I mean -- the majority of team
23    members get their paycheck, and since they know
24    what they are supposed to be getting on the
25    exception hours, if the manager doesn't approve

Page 119

1     it, it's not on their paycheck, but they call
2     us and we get it rectified.
3  Q. So these loan processors did not call and get
4     it rectified?
5  A. They must not have called. I don't have the
6     Call Tracker records here, but I -- the
7     assumption is they did not, because we would
8     have rectified it.
9  Q. So team members who did call to get things like
10    this rectified, there is a record of that
11    through what you call Call Tracker?
12 A. There is either a record through Call Tracker
13    or our Habitual Offenders. We just have the
14    email that they know now where to go get it and
15    we --
16 Q. Where are nonexempt team members -- who are
17    they supposed to call to get it rectified?
18    What's the process?
19 A. Well, the first process is they are supposed to
20    go to their manager, but a lot of team members,
21    if they won't go to their managers, either the
22    team member or the manager is supposed to call
23    the service center. We have two -- well, we
24    have several service centers. We have a 1-800
25    number that they call, but then there is

Page 120

1     options. They pick that, they then get
2     connected to somebody who then handles the
3     situation.
4        Currently now, because of the -- it's
5     usually the team member didn't fill out the
6     time card, so they are then directed towards a
7     website where they submit us an email so that
8     we can rectify it.
9  Q. But let's say from January of 2003 to the
10    present for individuals who have recognized an
11    error or who believe their pay doesn't
12    accurately reflect the hours they worked, there
13    is a documented mechanism for them to get
14    rectified?
15 A. Oh, definitely.
16 Q. And Wells Fargo maintains those documents?
17 A. Yes.
18 Q. Whether it's in a phone call that's logged or
19    in an email that's kept?
20 A. To actually generate pay, we would have to have
21    a written document. We would not take that
22    over the phone. But whether that's an email
23    from the manager or them saying there is a
24    WebTime record or whatever. If we generate
25    pay, we have a written record of it.

Page 121

1  Q. Well, for me to ask to have those documents
2     produced, what am I going to ask for? You
3     mentioned call directory.
4  A. Call Tracker.
5  Q. Or Call Tracker. I'm sorry.
6  A. Call Tracker is a system that our HR service
7     centers use which are part of corporate HR. We
8     also use it for -- we have a small customer
9     service staff, and then they forward Call
10    Tracker tickets, but they can produce reports
11    of team members and what their phone -- you
12    know, that type of stuff. That's not my system
13    that I own.
14       If we paid something to a team member,
15    we would -- normally we would be talking an off
16    cycle check. So prior, when it was only
17    exception pay, if it was a couple hours, we
18    would ask the team member if we could place it
19    on the next paycheck. So it would either be on
20    the next paycheck or on an off cycle. We would
21    have the written documentation in the rep's
22    input, the person who keyed it. You know, by
23    day we have all the pieces of paper that we put
24    into the system.
25 Q. But what are they called when the rectification

31 (Pages 118 to 121)

64a7706a-5c32-4561-9f31-6ed5fc8d14ce

Page 142

1   A. Yes.
2   Q. Regular hourly pay rate?
3   A. Yes.
4   Q. Total daily or weekly straight time earnings?
5   A. Gross earnings, yes.
6   Q. Total overtime earnings for the work week?
7   A. Yes.
8   Q. All additions or deductions from the employee's
9      wages?
10  A. Yes.
11  Q. Total wages paid each pay period?
12  A. Yes.
13  Q. Date of employment and pay period covered by
14     the payment?
15  A. Yes.
16  Q. And those records you have testified would be
17     available going back to January of 2003 at
18     least, and probably more?
19  A. Yes.
20  Q. Going back to the transition in January of 2006
21     to a biweekly work week and positive pay, which
22     department of Wells Fargo or departments were
23     responsible for that decision?
24        MS. DRAKE: Objection to form.
25  A. Generally speaking, I would say corporate HR

Page 143

1   would have been the driver of it. There might
2   have been -- I mean, it was a huge project with
3   several different areas all participating in
4   it. But the actual decision to become biweekly
5   would have -- well, it would have been signed
6   off by Dick Kovacevich at the time, but on the
7   recommendation of corporate HR.
8   Q. (By Mr. Hanson) And Dick Kovacevich is whom?
9   A. He is our chairman of the board now. Our
10     former CEO at the time.
11  Q. Of Wells Fargo?
12  A. Of Wells Fargo.
13  Q. At the recommendation of corporate HR?
14  A. Correct.
15  Q. Who would have been the top head of HR at that
16     time?
17        MS. DRAKE: Objection to form.
18  A. At that time it would have been Pat Callahan.
19  Q. (By Mr. Hanson) He would have been --
20  A. She would have been the head of corporate HR at
21     the time we submitted the project to go
22     biweekly.
23  Q. Are there two Pat Callahans?
24  A. Yes, there are.
25  Q. Okay. Well, I have met and deposed one Pat

Page 144

1      Callahan that's spelled Cahalen (ph).
2   A. He would be the mortgage compensation
3      consultant. At the time that the project
4      started to go biweekly, Pat Callahan was the
5      head of corporate HR replaced by Avid right
6      kind of -- at the end of the project as we went
7      live.
8   Q. Was part of the project also moving from
9      standard hours to positive pay?
10  A. Part of the biweekly project, yes.
11  Q. And Ms. Callahan was the head of corporate HR,
12     correct?
13  A. Yes.
14  Q. Do you know where she was, where she worked?
15  A. She was based in San Francisco.
16  Q. And Mr. Kovacevich was based in San Francisco?
17  A. At that time, yes, he would have been.
18  Q. You mentioned that it was a significant project
19     to go to biweekly pay, including the change to
20     positive -- is it positive pay?
21  A. Yeah.
22  Q. Is there anything else that describes that
23     concept, moving from standard hours to pay for
24     actual hours?
25  A. Individually people could have different terms

Page 145

1      for it. I mean, it's being paid for what you
2      worked versus being paid what you were assumed
3      to have worked.
4   Q. But the label positive pay, is that just an
5      internal kind of brand for the changing
6      concept?
7   A. It's just probably a slang term that's used in
8      our department.
9   Q. Were you involved in that project?
10  A. Yes, I was.
11  Q. Could you identify for me whom you believe to
12     be the key personnel or the primary architects
13     at Wells Fargo for that move to the biweekly
14     pay and positive pay system?
15        MS. DRAKE: Objection to form.
16  A. Certainly it would have been myself and my
17     boss, Roger Saucerman, representing the HR and
18     the payroll piece of it. We would have had
19     strong representation from the HRIS systems
20     people located in Minneapolis that would have
21     had to implement it. We had representation
22     from employee relations.
23        Each area that might have been
24     affected, corporate benefits from Minneapolis,
25     the service centers in Phoenix and Minneapolis,

Page 146

1    we would have had legal people on the team, we
2    would have had HR consultants throughout the
3    corporation in the field on the team.
4    Q. (By Mr. Hanson)  were there documents that were
5    created and shared among the project team as
6    you got ready to make your recommendation to
7    the people who needed to sign off?
8    A. Yes, I'm sure there were documents prepared,
9    you know, a presentation.
10   Q. Were you part of a presentation that was made
11   to high level executives regarding the
12   suggested change?
13   A. No.  That would have been at my boss' boss'
14   level.  At that time that position was filled,
15   and he would have presented that to him, in
16   conjunction with Pat Callahan, and probably
17   somebody in employee relations would have
18   presented it to the senior HRL and the
19   executive committee.
20   Q. Would have presented it to the senior?  Sorry.
21   A. HRL.  HR leadership.
22   Q. Who is senior HRL?
23   A. There is a senior group of HR people from each
24   division, retail banking, home and consumer
25   mortgage, just a committee, so to speak, of the

Page 147

1    top HR people that are not part of corporate
2    HR, but they are the head HR people of each of
3    their divisions.
4    Q. You're aware that that kind of formal
5    presentation and recommendation was made, but
6    you yourself were not part of it?
7    A. When it gets to that level, no.  We help create
8    the presentation.  We help flesh out the
9    details of it.  We do not give the
10   presentation.
11   Q. And do you know roughly when that presentation
12   was made?
13   A. The project itself kicked off late 2004, so I
14   would have to say early on 2004 the decision
15   was made and the presentation, you know.  But I
16   could not -- I don't remember an exact date.
17   Q. And what you said you would have been involved in
18   the preparation of the presentation materials
19   but not in the presentation itself?
20   A. Correct.  There would have been many people
21   giving their input analysis on what it would
22   take to accomplish it.  And HR and payroll
23   being a huge chunk of those, you know, I headed
24   three separate pieces of the project.
25   Q. So if I made a request for materials related to

Page 148

1    the presentation and recommendation to move to
2    biweekly pay and positive pay, that would --
3    you would know what I was talking about?
4    A. I would know what you're talking about.  I
5    would not have it.
6    Q. Two steps.  So we know what I'm asking for, who
7    would have it?
8    A. I am not sure.  The presentation would have
9    probably been at a final point collated and put
10   together by Mike Bracco, who was at that point
11   in time my boss' boss.  And he has left the
12   company, and I do not know -- I'm sure there
13   are people that have it, but I don't know who
14   that is.
15   Q. I was looking at your business card.  You're
16   employed by Wells Fargo Bank NA?
17   A. Correct.
18   Q. I have a stack of records that were previously
19   marked by Wells Fargo's counsel in depositions
20   of a number of our clients.  All right?  And so
21   I don't need to remark the deposition sticker,
22   I don't have to renumber them, but I'm going to
23   hand you copies and just have you walk through
24   with me a couple of things.  And my guess is
25   this will look fairly familiar.

Page 149

1        First let me hand you what's been
2    previously marked as Deposition Exhibit 6.  And
3    I apologize for the quality of the copy.  I
4    don't know if that's how they were originally
5    or later.
6        MS. DRAKE:  Clearly your law firm's
7    fault.  Kidding.
8        MR. HANSON:  I won't confirm or deny.
9    Q. (By Mr. Hanson)  Do you recognize just
10   generally this form document?
11   A. Yeah.  This would be the WebTime summary
12   record.
13   Q. As opposed to the WebTime detail?
14   A. Correct.
15   Q. So let's just quickly run kind of left to right
16   on the column heads and make sure we kind of
17   know what these terms are.
18        On the far left, it appears to list
19   employee ID number?
20   A. Correct.
21   Q. And is it accurate that Wells Fargo assigns all
22   of its nonexempt team members an employee ID
23   number that does not change?
24   A. Correct.  All team members have a unique
25   employee ID.

38 (Pages 146 to 149)

Page 174

1   eight, ten hours a day in a five-day period,
2   and then submitted the time sheet -- or I think
3   you said completed the time sheet, and the
4   manager then for the first time picks it up and
5   looks at it, that manager can't go back and
6   change the ten hours a day to eight?
7   A. Correct.
8   Q. But the manager -- hypothetically, if the
9     manager didn't want that overtime to be paid,
10    the manager would not approve it, correct?
11  A. Correct.
12  Q. And that person would be paid just their
13    standard hours, correct?
14  A. Correct.
15  Q. If the manager did approve it, that team member
16    would be paid for ten hours of overtime?
17  A. Correct.
18  Q. Before the team member hits the complete
19    button, the manager could change a ten to an
20    eight, correct?
21  A. Correct.
22  Q. But the team member would still have to go and
23    hit approve or complete, correct?
24  A. Correct.
25  Q. Could the team member go back and change the

Page 175

1   eight back to a ten and then hit complete?
2   A. Yes, of course they could.
3   Q. So the override -- what you're saying is that
4     the team member had control over the time
5     record before the complete button was
6     submitted, correct?
7   A. Yes.
8   Q. But the manager had control over whether he or
9     she approved it?
10  A. Correct.
11  Q. Just explain the codes on the next page. The
12    type code J, it says miscellaneous paid
13    absence.
14  A. That's just time out of the office. It does
15    not fall under a holiday or PTO.
16  Q. But it's paid?
17  A. It's paid.
18  Q. H is a holiday?
19  A. Correct.
20  Q. And is that paid?
21  A. Yes, it is.
22  Q. What about unpaid absences, are they reflected?
23  A. No. If you record the three types of absences
24    we have, those are all paid time, holiday,
25    miscellaneous absence, or PTO.

Page 176

1   Q. Did you have a PTO policy?
2   A. Yes.
3   Q. If you were out of paid time off and took a day
4     off, what would happen?
5   A. You would leave that day blank on your time
6     card.
7   Q. And wouldn't be paid?
8   A. Well, standard hour time, if you worked 32 and
9     you were supposed to, we would send eight and
10    you would get docked. Now if you work 32, we
11    send 32 and you get paid 32.
12  Q. But out of PTO, you don't work a day, you
13    wouldn't be paid for that day?
14  A. Manager's discretion, like everything. So if
15    they wanted you to put in a PTO day or
16    miscellaneous absence, they could pay you. But
17    if you don't record it as such, then I don't
18    pay it to you.
19  Q. Wouldn't the policy have been not to pay hourly
20    employees for time not worked when PTO is not
21    available?
22          MS. DRAKE: Objection to form.
23  A. The policy is that you get paid your PTO hours.
24    Managers are able to decide that's something
25    that they can go into their next year's PTO,

Page 177

1     they can decide that it's a situation that they
2     feel like they would like to pay them, so --
3   Q. (By Mr. Hanson) And I understand that a
4     manager might have some discretion to give some
5     extra PTO or carry it over. But in terms of
6     just Wells Fargo's policy regarding its
7     nonexempt team members, if a nonexempt team
8     member has exhausted their paid time off and
9     they don't come to work on a given day, there
10    is no requirement to pay them on that given
11    day, correct?
12  A. Correct.
13  Q. The only other codes I see here on the third
14    page, there is an MA?
15  A. On the third page?
16  Q. At the bottom of Page 3.
17  A. That's miscellaneous absence again.
18  Q. Well, there is a J, which is miscellaneous paid
19    absence, and then there is an MA, which is just
20    miscellaneous absence?
21  A. Again, that's the -- you know, when a team
22    member went out online, they selected
23    miscellaneous absence. This is the
24    interpretation of what WebTime thinks it is and
25    how they assign -- or HBS thinks it is for

Page 222

1  Q. But is there anything that documents how it's
2     been customized for Wells Fargo?
3  A. My group has a user guide for the tables and
4     the panels that we interact with. Systems
5     might have something. Is there one guide? No.
6     But would there be pieces of guides, of the
7     back end piece? Some.
8  Q. I'm going to go back before September '05,
9     again, into our earlier era.
10            Before September '05 were managers
11    required to approve a nonexempt team member's
12    pay records or WebTime records?
13 A. WebTime records, yes.
14 Q. So prior to September '05, if a team member was
15    using WebTime, before they would get paid
16    exceptions on WebTime, they would have to be
17    approved by the manager, correct?
18 A. Correct.
19 Q. Now, what about those instances where nonexempt
20    team members were not using WebTime, did a
21    manager still have to approve the pay records?
22 A. Yes.
23 Q. How was that done if done outside WebTime?
24 A. If it was -- you know, the majority being done
25    on paper time cards, the time card was required

Page 223

1     to be signed by the team member and the manager
2     or their delegate.
3  Q. If a time card reflected just the standard
4     hours and not an exception, did it still have
5     to be signed by both the team member and the
6     manager?
7            MS. DRAKE: Objection to form.
8  A. Our guidance would have been yes. Our policy
9     would have been team member signs it, the
10    manager signs it, and then they put it in their
11    desk file.
12 Q. (By Mr. Hanson) So we should be able to see
13    for nonexempt team members who are using paper
14    time cards weekly signed submissions approved
15    by both the team member and the manager,
16    correct?
17           MS. DRAKE: Objection to form.
18 A. You would see the time card they had. Whether
19    it was submitted to us -- I mean, because they
20    would have actually a photocopy. If it was one
21    that came to us, they would keep a photocopy of
22    it, and we would get the actual time card.
23 Q. (By Mr. Hanson) But it would come to you only
24    if there was an exception?
25 A. Usually. Some managers didn't pay any

Page 224

1     attention. They signed all of their time cards
2     and would just shoot them in an envelope to us,
3     exception or not.
4  Q. But it wasn't your expectation to receive time
5     cards, weekly approved time cards, that didn't
6     contain an exception? You wouldn't do anything
7     with those?
8  A. Well, we scanned them all because we didn't
9     know. We didn't look for them. We threw them
10    into the scanner, and, you know, we recorded
11    the -- that there was no exceptions.
12 Q. It would be required for a manager to submit to
13    you a scannable paper time card that had an
14    exception before that exception would be
15    entered into payroll and paid, right?
16 A. Yes.
17 Q. So if you didn't receive a paper time card for
18    a given employee, they would just receive their
19    standard hours, correct?
20 A. Correct.
21 Q. We have been talking about identifying a group
22    of loan processors whose time was recorded but
23    not paid. And the assumption that I have heard
24    today is that it was because a manager failed
25    to give approval, correct?

Page 225

1  A. Prior to 2005, yes.
2  Q. But we can find that out because we have access
3     to WebTime going back -- well, really going
4     back to 1999, correct?
5  A. Correct.
6  Q. In an example of a nonexempt loan processor who
7     was not using WebTime, but instead was using a
8     paper time sheet, who wrote down overtime of
9     ten hours in a given week and the manager did
10    not approve it, failed to approve it, same
11    thing as happened to the 293, but instead of
12    failing to approve it on WebTime, they failed
13    to sign off on the paper time card, okay, how
14    are we going to find out whether that happened?
15           MS. DRAKE: Object to form.
16 A. It would have to be in the manager's desk file,
17    a copy of the time sheet. Now, the
18    requirements were four years that they were
19    supposed to retain those. So now that we're in
20    2008, I don't know that they would have
21    everything from 1/1/2003.
22 Q. (By Mr. Hanson) Well, I'm sure they got a
23    preservation letter from counsel that said to
24    keep them once the lawsuit was filed, so we
25    should be good.

Deposition Excerpts of Elise Reiser's Deposition

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA


IN RE:  WELLS FARGO LOAN
PROCESSOR OVERTIME PAY        MDL Docket No. 1841
LITIGATION



        THE 30(b)(6) DEPOSITION OF ELISE REISER,
on behalf of the Plaintiffs, between the hours
of eight o'clock in the forenoon and six o'clock
in the afternoon of Wednesday, March 12, 2008, at
the law offices of Spencer, Fane, Britt & Browne,
1000 Walnut, Suite 1400, in the City of Kansas
City, in the County of Jackson and State of
Missouri, before me,

                SAUNDRA A. TIPPINS, CCR
                        of
            JOHN M. BOWEN & ASSOCIATES,
                Shorthand Reporters,

court reporter, in a certain cause now
pending in the U.S. District Court of the
Northern District of California, in the WELLS
FARGO LOAN PROCESSOR OVERTIME PAY LITIGATION.



            A p p e a r a n c e s



        For the Plaintiffs:

                STUEVE SIEGEL HANSON
                460 Nichols Road, Suite 200
                Kansas City, Missouri  64112
                By Mr. George A. Hanson
                By Ms. Ashlea Schwarz

Page 30

1  Q  Who has made that decision?
2  A  Brad Blackwell.
3  Q  When was that decision made?
4  A  In January of 2007.
5  Q  So have any of the 293 loan processors who
6     should have been paid overtime but weren't,
7     have any of them been paid to date?
8  A  We've made the decision to pay them. We
9     have not paid them to date.
10 Q  Mr. Blackwell is -- I don't remember his
11    job title, but he is a VP in charge of the
12    Western Distributed Retail organization?
13 A  Yes.
14 Q  I've actually taken his deposition.
15 A  Oh, so you've met Brad.
16 Q  I had a nice chat. Were you -- did you
17    participate in that decision, or did you
18    participate in the process that led to the
19    decision to go ahead and pay those 293
20    their overtime?
21 A  I did.
22 Q  What was your role?
23 A  I participated in a conference call where
24    it was discussed, and Brad made the
25    decision that they should be paid.

Page 31

1  Q  Who else was on the conference call?
2  A  Jennifer Burrock-Friedrich, Phil Hall,
3     obviously Brad, Tim Grubb, and outside
4     counsel.
5  Q  Whom outside counsel?
6  A  Denise Drake, Eric Kelly and Mike and I'm
7     not -- Leach. I'm not sure -- I think
8     that's how you pronounced it.
9  Q  That's right. Ms. Jennifer
10    Burrock-Friedrich is whom? What's her
11    title?
12 A  She is an HR manager.
13 Q  And what was her role in this process?
14 A  Jennifer is an HR manager who supports the
15    Eastern Division of Distributed Retail
16    Sales.
17 Q  And Mr. Hall, what was his role in the
18    process?
19 A  Well, he leads the employee relations team.
20 Q  Was Mr. Hall the highest ranking HR manager
21    that was part of this decision-making
22    process?
23 A  Yes, he was, on the call.
24 Q  And I guess, was there anyone else involved
25    in the decision-making process not in the

Page 32

1     call?
2  A  Not that I'm aware of. Brad made the
3     decision. I mean, he made the decision on
4     the call, and it was a business decision.
5  Q  Okay. Just my question, though, is, do you
6     know whether any other human resources
7     managers were involved in the
8     decision-making process other than
9     Mr. Hall?
10 A  Not to my knowledge.
11 Q  Or I guess higher up than Mr. Hall?
12 A  Not to my knowledge.
13 Q  And do you know who Mr. Blackwell is? He
14    reports to -- is it Cara Heiden?
15 A  He currently reports to Susie Davis.
16 Q  And then Ms. Davis reports to Cara Heiden?
17 A  That's correct.
18 Q  Tim Grubb, what was his role?
19 A  He's an employment attorney.
20 Q  For Wells Fargo?
21 A  Yes.
22 Q  Who set up this conference call?
23 A  I don't recall.
24 Q  Were there --
25 A  It was more than a year ago. I don't

Page 33

1     remember who set it up.
2  Q  Well, you remember it was January of '07.
3     Do you remember the date?
4  A  I don't.
5  Q  Is there any way you could find out?
6  A  I am sure I could find out.
7  Q  Were there any documents exchanged or
8     distributed in advance with the conference
9     call?
10 A  I don't recall.
11 Q  Where is Ms. Friedrich?
12 A  Minneapolis.
13 Q  And where is Mr. Hall?
14 A  Des Moines.
15 Q  And where is Mr. Blackwell?
16 A  California.
17 Q  Where is Mr. Grubb?
18 A  California.
19 Q  And you are in?
20 A  Des Moines.
21 Q  Des Moines?
22 A  Yes.
23 Q  And then I assume outside counsel from
24    Kansas City?
25 A  Yes.

Page 38

1    decision to pay. We haven't made the
2    decision when or how to pay.
3  Q  Well, when are you going to make a decision
4    regarding when and how to pay?
5  A  When we have more understanding about this
6    particular litigation and the impacts to
7    it.
8  Q  And who's responsible for determining when
9    these individuals will be paid?
10  A  It would be a business decision.
11  Q  And who's responsible for that? Is it
12    Mr. Blackwell still?
13  A  I would say Mr. Blackwell, but I also think
14    that with him reporting to Susie Davis,
15    Susie Davis may or may not get involved.
16  Q  Do you know if Ms. Davis has been involved
17    to date?
18  A  Not that I'm aware of.
19  Q  So the phone conference in January of 2007
20    with Mr. Blackwell resulted in a decision
21    to pay the 293. And how was that
22    articulated? What was said?
23  A  I actually recall Brad saying if they
24    worked, we need to pay them.
25  Q  Okay.

Page 39

1  A  I think it was that simple.
2      MS. DRAKE: I was actually
3    there, not that I want to testify.
4  Q  (By Mr. Hanson) Did anyone say when that may
5    occur or how that may occur?
6  A  No. And I think at that point there may
7    have been some -- I do recall some -- one
8    of the -- maybe Tim or one of the
9    employment attorneys talking to us about
10    that, so I don't think that's -- to me
11    that's attorney/client privileged
12    information.
13  Q  And that's, I guess, where we need to go
14    next. Did the attorneys provide legal
15    counsel or advice on the call?
16  A  Yes.
17  Q  And you mentioned Mr. Grubb as one of the
18    attorneys who provided legal counsel?
19  A  Yes.
20  Q  Is Mr. Grubb the Wells Fargo attorney
21    responsible for managing this litigation?
22  A  Yes.
23  Q  Did the Kansas City attorneys provide legal
24    counsel on that call?
25  A  I'm sure they did. I don't recall

Page 40

1    specifically.
2  Q  But it's your recollection that Mr. Grubb
3    made some specific recommendations?
4      MS. DRAKE: Objection, form.
5  Q  (By Mr. Hanson) And I want to respect the
6    privilege when it's asserted. I just need to
7    get the boundaries here defined.
8  A  It's my recollection that yes, he made some
9    recommendations.
10  Q  Recommendations regarding the process of
11    paying out the 293?
12      MS. DRAKE: Objection, now
13    attorney/client privilege.
14  Q  (By Mr. Hanson) I'm just -- okay. I want to
15    respect the privilege when it's asserted, even
16    if I don't necessarily agree that it should be
17    asserted.
18      MR. HANSON: What was my last
19    question?
20      (The reporter read back the
21    question: Recommendations regarding
22    the process of paying out the 293?).
23      MS. DRAKE: You're getting into
24    content and substance, and that would be
25    attorney/client privilege and not

Page 41

1    answerable.
2      MR. HANSON: You'll instruct the
3    witness not to answer that?
4      MS. DRAKE: Yes.
5  Q  (By Mr. Hanson) Have there been any subsequent
6    communications between the members of that
7    conference call since January of 2007 regarding
8    the issue of paying the 293?
9  A  Yes.
10  Q  When did those communications occur?
11  A  I don't recall when those communications
12    have occurred, but I know that I have had
13    conversations with attorneys about it.
14  Q  Have you had conversations with
15    Mr. Blackwell about it?
16  A  Not that I can recall. I haven't talked to
17    Brad in a while.
18  Q  Is it fair to say that the only decision
19    that's been made regarding the 293 is a
20    decision to pay? Is that correct?
21  A  I think that's fair to say.
22  Q  But when that may occur has not been
23    decided?
24  A  That's correct.
25  Q  It may be in a month or a year or longer?

b2472e9c-88f0-488f-9e1b-5d8cb6fc9fb8

Page 54

```
1       So my question is, did Wells Fargo
2   look to the paper time records or paper
3   time sheets to see whether individuals who
4   were recording time worked on time sheets
5   had any overtime recorded but not paid?
6   A  I'm not prepared to answer that.
7       (Recess).
8   Q  (By Mr. Hanson) ERS, do you know where they're
9       located?
10  A  Florida.
11  Q  Do you know who your main contact was with
12      for this project?
13  A  Not prepared to answer that.
14  Q  Do you know how much ERS was paid or
15      charged to do the investigation?
16  A  I'm not prepared to answer that.
17  Q  Do you know where in Florida ERS is
18      located?
19  A  No.
20  Q  Have you ever worked with them before?
21  A  No.
22  Q  Do you know how ERS came to your attention?
23  A  Not prepared to answer that.
24  Q  Do you know whether the ERS project is
25      done, concluded?
```

Page 55

```
1   A  To my knowledge yes.
2   Q  I'm going to move off the 31, topic 31.
3       Counsel and I have had a conversation off
4       the record about perhaps outside of the
5       deposition environment revisiting the
6       process for determining those individuals
7       covered by the stipulation, so I'm going to
8       continue with you, Ms. Drake, and move on
9       to other topics here with the witness.
10  A  Okay.
11  Q  Having said that, I'm going to return to
12      one final question on number 33, which is
13      the decision to pay or not pay the 293 loan
14      processors identified as being owed
15      overtime.
16      Ms. Reiser, was there any discussion
17      during the decision-making process about
18      not paying any of the 293 loan processors
19      because their limitations period to file a
20      lawsuit either was expiring or had expired?
21      MS. DRAKE:  I'm going to object
22      to the extent it calls for attorney/client
23      privileged information and instruct the
24      witness not to answer.
25  Q  (By Mr. Hanson) Other than from your counsel,
```

Page 56

```
1       was there any discussion about not paying any
2       of the 293 because the limitations period on
3       their claims was expiring or may have expired?
4   A  No.
5   Q  And as you've testified, it's the company's
6       position that those 293 individuals
7       approximately will be paid, correct?
8   A  Yes.
9   Q  Whether that is going to be soon or later,
10      the company is not going to take the
11      position that they're out of time; is that
12      correct?
13  A  Correct.
14  Q  Topic 32 is whether any Wells Fargo loan
15      processors employed out of fulfillment
16      centers were not paid recorded overtime.
17      Do you see that?
18  A  Yes.
19  Q  Do you know what a fulfillment center is?
20  A  Yes.
21  Q  And now I do, too.
22  A  Okay.
23  Q  I spent much of the morning engaged with
24      Mr. Hauer kind of on that issue.  Do you
25      know the answer to that question, whether
```

Page 57

```
1       any loan processors in fulfillment centers
2       had overtime recorded but who presently
3       have not been paid?
4   A  Yes, I know the answer.
5   Q  What is the answer?
6   A  There are some processors who were not paid
7       who recorded overtime.
8   Q  And how do you know that?
9   A  Because I know -- because I was informed by
10      counsel.
11  Q  Which counsel?
12  A  Eric Kelly.
13  Q  And when were you informed that?
14  A  I was informed of that yesterday.
15  Q  How many fall into this group?
16  A  Approximately 290.
17  Q  Is that just coincidently?
18  A  That's what I thought, too.  Yes,
19      seriously.
20  Q  We're talking about a different group than
21      the 293 identified as part of the
22      stipulation, right?
23  A  It's my understanding that there is
24      approximately 290 loan processors employed
25      out of fulfillment centers who may not have
```

Page 58

1    been paid who recorded overtime.
2 Q   You understand that the 293 that were
3    identified by ERS, that group excluded
4    fulfillment center loan processors?
5 A   I understand.
6 Q   So this is a new group, correct?
7 A   It's my understanding.
8 Q   We are now approaching 583, give or take?
9 A   Yes.
10 Q   Unpaid loan processors?
11 A   Yes.
12       MS. DRAKE:  Just to note for the
13    record, we believe that actually some of
14    the 293 were fulfillment center employees
15    possibly as opposed to retail employees,
16    but there's no way other than by address to
17    segregate out or what have you who those
18    individuals are or are.
19       MR. HANSON:  We can
20    cross-reference the lists to see if the
21    names repeat, right?
22       MS. DRAKE:  Exactly.
23 Q   (By Mr. Hanson) What was done to identify this
24    new group of 290 fulfillment center loan
25    processors?

Page 59

1 A   I'm not prepared to answer that.
2 Q   How was it discovered that there were
3    unpaid loan processors in fulfillment
4    centers?
5 A   I'm not prepared to answer that.
6 Q   You don't know the answer?
7 A   I don't know the answer.
8 Q   So you were just informed by your outside
9    counsel of the fact?
10 A   Yes.
11 Q   But you don't know how that was determined?
12 A   No.
13       MR. HANSON:  Do you want to --
14       MS. DRAKE:  ERS was engaged by
15    us.
16       MR. HANSON:  To do that other
17    step?
18       MS. DRAKE:  Right.  Once the
19    litigation continued to move forward and
20    move on, you know, we had to continue to
21    look and see what was out there.  And so we
22    asked for additional information, and
23    that's what we got.
24       But that 290 is really a rough number.
25    And I don't know if there's cross-over or

Page 60

1    not.  I am fairly certain they used only
2    Webtime records on that also.
3       MR. HANSON:  Denise, you tell me
4    how comfortable you are advancing just the
5    factual issues.  It's certainly appropriate
6    for -- it's not uncommon frankly for
7    outside counsel to be 30(b)(6) type
8    witnesses.  I'm not suggesting I will put
9    you under oath.  I will accept just the
10    basic fact just to move through the topics.
11    Is this something that was done recently?
12       MS. DRAKE:  I'm not sure when
13    the date was.  It was after you filed the
14    second lawsuit, as I recall.
15       MR. HANSON:  I don't want this
16    to be awkward between us on the record, and
17    I don't want to be in the position of
18    asking you questions, because I wouldn't
19    want you to ask me questions if the roles
20    were reversed, because you may not be as
21    nice as me.
22       Is that something you and I can talk
23    about off the record, getting information
24    about that and discovery on that?
25       MS. DRAKE:  Absolutely.

Page 61

1       MR. HANSON:  We'll do it that
2    way.
3 Q   (By Mr. Hanson) So you've probably, Ms. Reiser,
4    told me everything you know about topic 32?
5 A   Yes.
6 Q   The rest I have an agreement in principle
7    to follow up with your counsel on.
8       I want to move to topic 23.
9    Twenty-three generally talks about claims
10    of wage-an-hour violations against Wells
11    Fargo within the last five years.  Okay?
12 A   Okay.
13 Q   Can you tell me whether -- I am going to
14    leave out lawsuits that I'm familiar with.
15       I'll list the ones that I'm familiar
16    with.  There's this one, which is on behalf
17    of loan processors.  There's another one
18    that my firm is involved with on behalf of
19    home mortgage consultants.  You're aware of
20    that?
21 A   Yes.
22 Q   Okay.  Other than those two, which are
23    brought by me and others, have there been
24    other court filings or legal claims made
25    through the judicial process against Wells

Page 90

1      delivery connection, I think.
2    Q  What does that mean?
3    A  It's just a method that Mortgage used to
4      process loans quickly.
5    Q  Just looking at the document, do you know
6      if you can search the ER database reports
7      by job or by position; for example, that
8      one says mortgage loan -- what does that
9      one say?
10   A  Mortgage loan specialist one is what this
11     one says. I've never searched it by
12     position. I'm not sure it can be searched
13     by position.
14   Q  It's a field that is populated, though,
15     correct?
16   A  It's a field that's populated, but it's not
17     one that -- when -- I'm thinking of the ER
18     database. I can't search on position.
19     That's not an option I have when I look at
20     the database, to search on position.
21   Q  You can search on type of complaint?
22   A  I can search on type of complaint.
23   Q  Do you know who was responsible for pulling
24     these particular reports like the one in
25     Exhibit 74?

Page 91

1    A  Yes. I asked an administrative assistant
2      to do that.
3    Q  What direction did you give the
4      administrative assistant?
5    A  To search on wage-an-hour and to -- once
6      she pulled up the wage-an-hour claims, to
7      look at the titles to see if they fit into
8      the mortgage loan specialist, mortgage
9      sales associate and mortgage sales
10     assistant title.
11   Q  You did include the mortgage sales
12     assistant title, too?
13   A  Yes.
14   Q  Okay.
15   A  But she searched on wage-an-hour.
16   Q  So all of the wage-an-hour ones came up,
17     and then it was a process of finding which
18     job descriptions were -- it was a process
19     of identifying the job descriptions that
20     are related to the loan processor position?
21   A  It was -- it was looking at the position of
22     the ones that came up.
23   Q  But you chose three different positions,
24     right?
25   A  Yes.

Page 92

1    Q  Mortgage loan specialist, mortgage
2      assistant and mortgage sales associate?
3    A  Yes.
4    Q  You chose those three because they
5      generally are within the loan processor
6      family?
7    A  Yes.
8    Q  How many were left in the stack?
9    A  I didn't even ask.
10   Q  What timeframes did you direct to be
11     searched?
12   A  I believe I had her search January '03
13     forward.
14        (Recess.)
15   Q  (By Mr. Hanson) Ms. Reiser, just looking back
16     at the exhibit we just marked, Exhibit 74?
17   A  Yes.
18   Q  When you instructed your administrative
19     assistant to pull the wage-an-hour
20     complaint and look to see what job
21     classification they arose out of, what
22     business group did you ask her to search?
23     In other words, what either business line
24     or business unit do these ER database
25     reports come out of?

Page 93

1    A  Home & Consumer Finance.
2    Q  The entire Home Consumer Finance Group?
3    A  Yes. I didn't tell her a business group.
4    Q  So that would be business lines in addition
5      to Distributed Retail?
6    A  Yes. I asked her to search on
7      wage-an-hour, and I asked her to look at
8      those three position titles.
9    Q  And the database is -- covers all of the
10     Home Consumer Finance Group employee
11     database?
12   A  Yes.
13   Q  Do you know whether the job titles that you
14     asked her to search, mortgage loan
15     specialist, mortgage sales associate and
16     mortgage assistant, whether those job
17     titles are used by business groups other
18     than Wells Fargo Home Mortgage?
19   A  I believe Todd Hauer says that they are
20     used by other business groups.
21   Q  Todd is not sure.
22   A  Okay. I thought he said that they might
23     be.
24   Q  He said they might be, but --
25   A  No, I'm not prepared to answer. I don't

b2472e9c-88f0-488f-9e1b-5d8cb6fc9fb8

Page 110

1  Q  And Wells Fargo Home Mortgage is a cost
2     center?
3  A  Uh-huh.
4  Q  So it could be any one of them that might
5     have absorbed $800,000, right?
6  A  Right. But when you asked me, I thought
7     that Frederick paid for that, to the best
8     of my knowledge.
9  Q  That's my question.
10 A  Yes.
11 Q  So the cost center that paid for the
12    $800,000 liability was the Frederick call
13    center or the Frederick fulfillment center
14    itself?
15 A  Well, and just to be clear, it was the
16    Frederick SDC fulfillment center.
17 Q  And there are other business lines in the
18    Frederick just physical facility, correct?
19 A  Yes.
20 Q  The next page describes the situation in
21    Frederick without mentioning Frederick by
22    name, correct?
23 A  Yes.
24 Q  And you've already told me about the
25    manager saying no overtime and how that was

Page 111

1     being interpreted, correct?
2  A  Yes.
3  Q  It says, We went back two full years to
4     current and former team members. Do you
5     see that?
6  A  Yes, I do.
7  Q  Why do you go back two years?
8  A  I think it was on advice of legal.
9  Q  Have you ever gone back more than two
10    years?
11 A  I'm not -- I am not prepared to answer.
12 Q  You don't know?
13 A  I'm not -- I'm not for sure. I don't know,
14    no.
15 Q  Is it the normal practice when there are
16    some reconciliation made for back wages
17    that you go back two years?
18 A  Each case is looked at individually with
19    its unique set of circumstances.
20 Q  So in some circumstances it may be more
21    than two years or it may be less than two
22    years?
23 A  I know for sure that it may be less than
24    two years. I don't know if -- I am not
25    prepared to answer if it would be more than

Page 112

1     two years. I don't know the answer to that
2     question.
3  Q  Down to the bottom of this page, it says
4     exemption status. And it says, The
5     exemption status of each position is
6     determined by Corporate Compensation and
7     Legal, based on the duties and
8     responsibilities of the position, in
9     accordance with the FLSA. Do you see that?
10 A  Yes, I do.
11 Q  Is that an accurate statement of policy?
12 A  I believe it is. Can I add to that?
13    Corporate Compensation and Legal would be
14    basing that on information that they
15    received from business managers on what the
16    duties and responsibilities of the
17    positions are.
18 Q  Based on, it says, based on the duties and
19    responsibilities of the position?
20 A  Right.
21 Q  So the business unit would have some
22    impact, too?
23 A  Yes.
24 Q  But Corporate Compensation and Legal
25    certainly have compliance responsibility

Page 113

1     with the FLSA?
2  A  Yes.
3  Q  Is this Exhibit 76 something that's
4     actually read over the telephone?
5  A  At one time it was -- that is how it was.
6     It was read. The reason I'm hesitating is
7     only because I see California in here, and
8     there was a time when we were doing an FLSA
9     training for managers specifically in
10    California and then other managers, because
11    the laws in California are different.
12 Q  Speaking of California, flip ahead to --
13    this may be two pages in, what's 10345.
14 A  Yes.
15 Q  There's a section on California regulation
16    for meal periods, and then the following
17    page is a California section on rest
18    periods?
19 A  Yes.
20 Q  Do you have an Employee Relations
21    individual designated for
22    California-related compliance issues, or is
23    that something any one of the managers or
24    consultants can handle?
25 A  I would say that it's something that any

Page 118

1    A   (Witness complies).  Yes.
2    Q   The third bullet point says, Managers
3        shouldn't need to communicate to team
4        members what overtime number they are
5        managing to.  I consider this a manager's
6        secret.  It is not necessary to over-share
7        with the team member.
8            Can you explain what is meant by that?
9    A   Sometimes managers have an overtime budget
10       that they're managing to, so in a P&L
11       statement, they're looking at the overtime
12       number, and they're supposed to be managing
13       and making sure that they're controlling
14       costs.
15           And there have been some managers that
16       have said, you know, I have to have X
17       amount of dollars in overtime or I can't go
18       X amount of dollars in overtime.  And it's
19       not necessary to communicate that to the
20       team member.
21   Q   Were you, Ms. Reiser, part of the payroll
22       process initiative that resulted in what's
23       called positive pay coming into effect
24       January of 2006?
25   A   No.

Page 119

1            MS. DRAKE:  Objection, asked and
2        answered.
3    A   No, I was not.
4    Q   (By Mr. Hanson) You weren't on the committee
5        involved in that?
6    A   No, I was not.
7    Q   So if I showed you the executive overview,
8        you would not be in a position to speak
9        informatively about that?
10   A   No, I would not.
11   Q   I'll save that for someone else.
12   A   Okay.
13           (The reporter marked Exhibit No.
14       77).
15   Q   (By Mr. Hanson) I hand you what's been marked
16       as Exhibit 77.  Do you recognize this document?
17   A   No.
18   Q   Have you seen it before?  This may be a
19       photocopy of I document that exists in a
20       different form.  It looks like it's got a
21       bar code on it.
22   A   Is it the old timecards?
23   Q   Is it the old timecards?
24   A   I don't know.  I told you I don't recognize
25       it.

Page 120

1    Q   That is what I want to know, frankly.
2    A   I don't recognize it.  I'm sorry.
3            MS. DRAKE:  I'll stipulate that
4        it is.
5    Q   (By Mr. Hanson) This is not something you
6        really dealt with?
7    A   No.
8    Q   This was produced to us on subsequent to
9        having Ms. Swanson here, so she's probably
10       more knowledgeable about it.  You can't
11       speak for it, but we now know what it is.
12   A   Yes.
13           (The reporter marked Exhibit No.
14       78).
15   Q   (By Mr. Hanson) This is Exhibit 78.  Similarly,
16       do you recognize this?
17   A   Well, I can read that it's a payroll
18       request, but no, I have never used one.
19   Q   Do you know if this is currently in effect?
20   A   I do not, although -- I don't know for
21       sure.  It was pulled off of Teamworks, it
22       looks like, on February 8th.
23   Q   I'm sure that's the date it was just
24       printed off.
25   A   I don't know.

Page 121

1    Q   What is Teamworks?
2    A   It's an intranet -- it's a Wells Fargo
3        intranet.
4    Q   And what's it --
5    A   It has all kinds of information on it.
6        It's -- for example, it has -- I could
7        access my payroll, my paycheck if I wanted
8        to on it.  I could look up my name.  I
9        could look up a name to get a phone number
10       for a team member.
11   Q   But just on the front page of this, it
12       says, Manager, use this form for one-time
13       adjustments to an employee's pay.  You
14       don't know if this form is currently in
15       effect?
16   A   I don't know.
17   Q   Or when it was?
18   A   No, I do not.
19           (The reporter marked Exhibit No.
20       79).
21   Q   (By Mr. Hanson) I only have one copy of this.
22       I have marked Exhibit 79.  Do you recognize
23       this?
24   A   I do.
25   Q   All right.  Tell me what this is.

Page 134

1    And I know that a lot of people did,
2    too, so they're not necessarily documents
3    that we can produce on that, but I can tell
4    you that that occurred.
5  Q  Anything else that you can specifically
6    identify?
7  A  Manager resources.  Not that I can think of
8    immediately.
9  Q  Let me get a little more specific.  The
10   problem that led to the 293 not being paid,
11   the system that was in place prior to
12   positive pay, which I think you've
13   identified would have automatically fixed
14   the problem, because you get paid
15   regardless of whether the manager approves
16   or doesn't approve, but requiring a manager
17   to approve a time sheet, if a team member,
18   nonexempt team member, submitted a time
19   sheet to a manager who just didn't do
20   anything, I mean, didn't disapprove it and
21   didn't erase it and replace it with
22   something less but just didn't -- just put
23   it in a desk drawer, didn't send it in,
24   didn't look at them, that still resulted in
25   team members getting paid, correct?

Page 135

1        MS. DRAKE:  Objection, beyond
2    the scope.
3  A  I don't know for sure.
4  Q  (By Mr. Hanson) It's fine if you don't.  I
5    think it probably is clear enough.
6        MS. DRAKE:  Ms. Swanson
7    addressed that.
8  Q  (By Mr. Hanson) Assume for me that that's the
9    case.
10 A  Okay.
11 Q  If there was no action by a manager, and
12   let's say we're in a Distributed Retail
13   branch and you have nonexempt team members,
14   like loan processors and maybe the
15   receptionist, the consumer sales rep, and
16   they are sometimes writing down 38 hours,
17   sometimes writing down 44 hours, sometimes
18   writing down 39 hours, sometimes writing
19   down 43 hours and the manager just doesn't
20   do anything, may be busy doing other
21   things, trying to sell loans and doing
22   whatever, that the team member, the
23   nonexempt team member got paid their
24   standard hours.
25 A  The 40 hours is what you're referring to as

Page 136

1    standard, correct?
2  Q  If they were designated as 40 as standard,
3    it would be 40.
4  A  Okay.
5  Q  So in that instance, the manager may not
6    even have a conscious thought that they are
7    not paying for all hours worked.  They may
8    just not be thinking about it in those
9    terms, thinking that the deal is they get
10   paid a standard hour, on a standard hourly
11   basis.
12       So my question is, where is it in
13   writing, whether it's in a policy or in a
14   handbook or in a training, that tells
15   managers they have to approve timecards on
16   a regular basis and submit them if there
17   are any exceptions?  Do you understand the
18   question?
19 A  I do.
20 Q  It's a different question than do you know
21   you should pay for hours worked.
22 A  Right.
23 Q  It's a mechanical question.
24 A  Right.
25 Q  Read, review, sign and submit all timecards

Page 137

1    that have an exception or deviation from
2    standard hours.
3  A  Right.  And I did review the 2001 handbook,
4    and I can't -- it may say it in the
5    handbook.  I can't tell you absolutely.
6    But it may say it in the handbook that they
7    have a responsibility to review the time
8    records.
9        And I don't know what it said online
10   in those cases.  I don't know what it says
11   online.
12 Q  And if it's not already covered, I may ask
13   your counsel or follow up with a more
14   specific request.  But that's what I'm
15   going to look for now.  I understand what
16   the policy in the handbook says.  I'm not
17   looking for the more mechanical --
18 A  Instructions.
19 Q  -- instructions.
20 A  Yes.
21 Q  On just mechanically how you make sure that
22   there's not an error like the one that
23   occurred.
24 A  I understand what you're saying.
25 Q  Can you point to, just as you sit here now,

Page 138

1  can you identify any training document or
2  any policy that would have been provided to
3  managers regarding the mechanics of
4  reviewing and submitting time sheets?
5          MS. DRAKE: Objection, asked and
6  answered.
7  A  And I wouldn't -- I'm not prepared to
8  answer that. There may be. I don't know
9  of them.
10 Q  (By Mr. Hanson) But it's something that we can
11    look for and produce if it exists?
12 A  We can look for it.
13 Q  Hopefully we can look for it, find it and
14    produce it, if it exists.
15       Topic 30, During the course of this
16    litigation, 42 declarations that were
17    submitted by Wells Fargo from nonexempt
18    team members in the Home Consumer Finance
19    Group, most of them loan processors,
20    whether mortgage sales associates or
21    mortgage loan specialists, were you
22    involved in the process of gathering these
23    declarations or helping the lawyers get the
24    declarations from the team members?
25          MS. DRAKE: Objection, form and

Page 139

1  beyond the scope.
2  A  I may have connected them with the right HR
3  person, and other than that, no.
4  Q  (By Mr. Hanson) Do you recall that this project
5  was undertaken?
6  A  Yes.
7  Q  Do you know how the 42 who ultimately
8  signed declarations, how were they
9  selected?
10         MS. DRAKE: Objection, form and
11 beyond the scope.
12         MR. HANSON: It's topic 30.
13         MS. DRAKE: But that's one that
14 we objected to and said we were not going
15 to produce a person on that.
16         MR. HANSON: You just flat out
17 objected?
18         MS. DRAKE: Yes.
19         MR. HANSON: On what basis?
20         MS. DRAKE: Work product and a
21 variety of others that we set out and sent.
22         MR. HANSON: It's one thing to
23 object and another one to stand on the
24 objection. Is the witness going to speak
25 to that topic? I don't want to waste our

Page 140

1  time if she's not.
2          MS. DRAKE: I don't think she
3  has any knowledge about it.
4          MR. HANSON: She wasn't prepared
5  to speak on that topic?
6          MS. DRAKE: Right.
7          MR. HANSON: Let me just test
8  her personal knowledge, knowing that
9  it's --
10         MS. DRAKE: It's beyond the
11 scope, and it's her personal knowledge.
12 Sure.
13         MR. HANSON: I'm not saying it's
14 beyond the scope. It's within the scope of
15 an objection that I disagree with, but
16 that's not Ms. Reiser's issue.
17 Q  (By Mr. Hanson) What was the process, to your
18    knowledge, of selecting individuals for
19    participation in this declaration project?
20 A  My knowledge, I don't -- the only thing I
21    remember, and I don't recall any details,
22    is again it was in conversations with, I
23    believe, Tim Grubb, so one of our
24    attorneys, just that we were going to be
25    reaching out and what states we were going

Page 141

1  to be reaching out to.
2          And other than that, I don't recall
3  any other details.
4  Q  Do you know how many individuals were
5  interviewed?
6  A  No, I do not.
7  Q  Total?
8  A  No, I do not.
9  Q  Do you know how many declarations were
10    obtained but not submitted?
11 A  No, I do not.
12 Q  Have you told me everything you know about
13    this particular issue?
14 A  As far as I know, yes.
15 Q  Topic 27 identifies communications among
16    Wells Fargo management regarding failures
17    in compliance with wage-an-hour laws or
18    internal policies with regard to loan
19    processors. Do you see that?
20 A  Yes, I do.
21 Q  Can we acknowledge that at least with
22    regard to the 293 we've identified, there
23    was a failure of compliance in that
24    instance?
25 A  Yes.

Deposition Excerpts of Christine Meuers' Deposition