# EXHIBIT D
# 2 of 2

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

In re:

WELLS FARGO HOME MORTGAGE OVERTIME PAY LITIGATION

MDL NO.: MDL-1770

THE DEPOSITION OF CHRISTINE MEUERS, VOLUME I, on behalf of the Plaintiffs, between the hours of eight o'clock in the forenoon and six o'clock in the afternoon of Monday, June 11, 2007, at the offices of Wells Fargo, 90 South 7th Street, in the City of Minneapolis, in the County of Hennepin and State of Minnesota, before me,

SAUNDRA A. TIPPINS, CCR
of
JOHN M. BOWEN & ASSOCIATES,
Shorthand Reporters,

court reporter, in a certain cause now pending in the U.S. District Court, Northern District of California, In re: Wells Fargo Home Mortgage Overtime Pay Litigation.

A p p e a r a n c e s

For the Plaintiffs:

STUEVE SIEGEL HANSON
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
By Mr. George Hanson

For the Defendant:

LITTLER MENDELSON
650 California Street, 20th Floor
San Francisco, California 94108
By Mr. Lindbergh Porter, Jr.

use those as functional job title here.
Q In Wells Fargo's corporate legal department, you don't use titles like vice president, president, executive vice president?
A No, not -- in fact, the general counsel is just sending out a memo asking anyone who has been using it, because it was a vestige of the old Wells Fargo, previous Wells Fargo department, that some of those people do use those items.
And we have just now adopted a policy that no one will use those titles, so I have never used a title other than the title I gave you.
Q Assistant general counsel?
A Yes.
Q However, for purposes of liability insurance that the company provides for officers and directors, you understand you are covered by such insurance?
A Yes.
Q Who is your employer?
A Wells Fargo & Company.
Q And what is the relationship between Wells

Fargo & Company to Wells Fargo Bank N.A.?
A Wells Fargo & Company is a financial services holding company, and it's the parent company of Wells Fargo Bank N.A.
Q So you are employed by the parent holding company of Wells Fargo Bank N.A.?
A Yes.
Q Wells Fargo Bank N.A. is a subsidiary of Wells Fargo & Company?
A Yes.
Q Is everyone in the legal department employed by Wells Fargo & Company?
A No.
Q Whom within the corporate legal department would be employed directly by the parent Wells Fargo & Company?
A It's easier to answer that in the converse. It's my understanding that anybody in the legal department who is in our California offices is employed by Wells Fargo Bank N.A.
Q And so anyone employed outside the California office is employed by Wells Fargo & Company?
A That's my understanding, but I don't know

that for a fact.
Q Okay, and that's perfectly fine if something is not certain to you. I appreciate your letting me know.
Understanding that that's your belief, what is your explanation for why there's that division?
A It is my understanding that it's a tax issue in California.
Q Wells Fargo & Company has its headquarters in California?
A Yes.
MR. PORTER: Ambiguous as to headquarters.
Q Wells Fargo Bank N.A. has its headquarters in California?
A It is a national bank.
Q Yes.
A The corporate offices of Wells Fargo & Company are in San Francisco, California.
Q Okay. The corporate offices of Wells Fargo & Company are in San Francisco, California. Similarly are the corporate offices of Wells Fargo Bank N.A. in San Francisco, California?

A Yes.
Q How long have you had the title of assistant general counsel?
A Since January 2000.
Q I take it that was the time that Norwest and Wells Fargo merged?
A No.
Q Okay. When was the merger?
A The merger was -- became effective in November 1998.
Q That date was not clear to everybody previously, but thank you for clarifying.
And you were employed with Norwest prior to the merger?
A I was.
Q We're going to get more deeply into your job history and experience here in a minute, but let me ask some background questions related to the deposition today.
First, have you given a deposition before?
A Yes, I have.
Q How many times?
A Twice.
Q And what were the circumstances?

Page 166

Q Generally you are?
A I think so.
Q Are you aware of litigation and settlement involving E-Loan?
A No.
Q How about litigation and settlement involving E-Trade Financial?
MR. PORTER: I object to the question and this line of questioning as being irrelevant and not reasonably calculated to lead to the discovery of relevant information, and as far as Ms. Meuers is concerned not our purpose in being here.
MR. HANSON: Are you going to instruct her not to answer?
MR. PORTER: No.
Q (By Mr. Hanson) Are you aware of litigation and settlement regarding GMAC Ditech?
A Generally.
Q Are you aware of litigation and settlement regarding Provident Bank & Home?
A I'm not sure about that one.
Q Are you aware of litigation and settlement involving Syntec?

Page 167

A Yes.
Q The loan officer litigation?
A I know I've read something about Syntec, but I don't --
Q Do you track or follow other mortgage lenders in the industry?
A Other members of my team do, but informally.
Q Have you spoken to anyone at any of the companies that I mentioned regarding the outcome of their litigation?
A Members of my team have. I have not personally.
Q What have they inquired of, or what's been discussed?
A I wasn't privy to those conversations.
Q They didn't report back to you what they've learned?
MR. PORTER: Objection, calls for Ms. Meuers to reveal attorney work product in the litigation.
Q (By Mr. Hanson) Well, we are now. Are the reports that you're getting back or the conversations that are being had from your group, did they take place since this

Page 168

litigation was initiated in I guess we'll use February of 2005?
A Some may have preceded that, but again I was not involved in those conversations.
MR. HANSON: Given the kind of the shortness of time now, I'm going to start reviewing my notes and making sure I pick up what I think is the most critical topic areas. I do believe that there is additional testimony that I might require, so I'm going to adjourn here in a minute, but I'm going to keep the deposition open.
I think we have privilege issues to very likely address. But if you want to take a very quick break, I can look at my notes and in the next 15 minutes finish up with some final questions.
(Recess).
Q (By Mr. Hanson) Just a couple of final questions for the moment.
Mr. Strother, the general counsel, he works out of the Wells Fargo headquarters in San Francisco, correct?
A Correct.
Q And Avid -- I can't pronounce her last

Page 169

name.
A Modjatabia.
Q Modjatabia, she works out of Wells Fargo's headquarters in San Francisco, correct?
A Correct, but she's no longer in that position.
Q Who is now?
A Actually Julie White just accepted that position.
Q Okay. So Ms. White is now the highest ranking --
A She's the director of HR.
Q So the highest ranking HR executive for the company?
A Correct.
Q And Ms. White, is she officing in San Francisco?
A She's in Des Moines. She'll be officing part time out of San Francisco for about a year.
Q Her predecessor, though, was in the corporate headquarters in San Francisco the whole time?
A Correct.
Q And John Stumph, does he office out of

7d426f92-85be-4269-a852-faabc400caa7

Page 170

corporate headquarters in San Francisco?
A Yes.
Q Ms. Meuers, I showed you a copy of earlier deposition exhibits from Mr. Cahalan's deposition. Exhibits 4, 5, 6 and 7 are the job descriptions that have been produced to us regarding the HMC position.
A Yes.
Q Do you know whether any other job descriptions exist for the HMC position other than the four that have been produced?
A No. Those would have been owned by comp, so if they produced them, these must be the ones.

MR. HANSON: I am going to just renew my request for the record that I did this in Des Moines back in September, and I didn't follow up, but I think there was testimony that there may be others for the different subcategories of Home Mortgage's or at least I got a representation that folks would look for them.

MR. PORTER: Job descriptions you mean?

Page 171

MR. HANSON: Job descriptions, and there was testimony these are available on the company Intranet.
Q (By Mr. Hanson) Is that accurate, that job descriptions are available on the company Intranet?
A Some are, yes.
Q Do you know if HMC job descriptions are available?
A I have never looked specifically.

MR. HANSON: Given the time, I'm going to conclude for now. I'm just going to continue my position that we may need to reconvene on several topics, not the least of which include what has been the subject of claimed privilege and instructions not to answer.

So I want to say we are going to conclude now, but I might need to see you again.

THE WITNESS: I'll look forward to it.

MR. HANSON: Thank you, Ms. Meuers.

MR. PORTER: It's important, I

Page 172

think, given what we understood to be the scope of this, and just not to be different, we've made our objections, and with respect to that, that the issue of the decision-makers, whether, who made it and where it emanated, we are prepared to stipulate to that or to identify that person as Ms. Meuers has, Cara Heiden and Mike Heid.

I say that without waving any privilege. And I say that in part to alert you to that, so whatever use you might want it make of that, I'm happy to talk about it.

MR. HANSON: Just my response to that, the final comments by Mr. Porter, in my view, and my position for the record is I can't accept a stipulation from counsel that is self-serving to his client's position when I'm not permitted to inquire as to the factual basis of the issue, which I have been unable to do because of certain instructions that have occurred during the deposition. That's my position.

MR. PORTER: I want to be clear

Page 173

about that. I presume that you're meaning our objections to attorney/client privilege, work product, et cetera, but the question was asked, who made the decision? And the answer was Cara Heiden, and Ms. Meuers gave you her basis for answering that. I'm adding to that.

MR. HANSON: My recollection is that I believe that's correct, but then I asked how do you know that, and I was told that's not accessible or that would not be permitted to be answered.

MR. PORTER: She answered that on the basis of how the decision-making process works at Wells Fargo, who has the authority because that is the basis of her information. I am telling you with a view toward going directly to the issue that we have who they are, and as I said, I offer that to you for whatever use you may wish to put it.

MR. HANSON: I appreciate you giving me the information, and I will take it for what it's worth.

Are you going to withdraw any of the

7d426f92-85be-4269-a852-faabc400caa7

# Deposition Excerpts of James Strother's Deposition

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE WELLS FARGO HOME MORTGAGE OVERTIME PAY LITIGATION

MDL Docket No. 1770

---

DEPOSITION OF JAMES M. STROTHER

San Francisco, California

Monday, June 18, 2007

Volume 1

Reported by:
DANA M. FREED
CSR No. 10602

JOB No. 3-67839

8b3a037c-e61d-42da-aef6-1e7c70b24a06

But I couldn't find anything else responsive to the subpoena.

MR. PORTER: And those are the documents that we assert the privilege concerning. Privileges.

MR. HANSON: Okay. Mr. Porter, we discussed last time, or you suggested to me that the privilege log was being prepared. Is that something that you have an anticipation of when that might be available?

MR. PORTER: This week.

MR. HANSON: This week, okay. That's -- I do think it's important that it's available prior to Monday. Frankly, prior to Friday, if at all possible.

MR. PORTER: Okay.

BY MR. HANSON:

Q You mentioned you talked to Mr. Otsuka who is sitting here today and Mr. Porter; correct?

A This morning, yes.

Q You met with them regarding your deposition for the first time this morning?

A Yes.

Q Okay. Did you speak with anyone else in preparation for your deposition this morning?

A No.

Q Did you speak with Christine Meuers?

A No.

Q Okay. Did you speak with anybody else?

A I mentioned to my wife that I was being deposed.

Q All right. Let's get your current job title, Mr. Strother.

A I am executive vice president and general counsel of Wells Fargo and Company.

Q Are you the highest-ranking legal officer for Wells Fargo and Company?

A Yes, I am.

Q I understand that Wells Fargo and Company is the holding company for the bank; is that correct?

A It is, yes.

Q And then the entity called Wells Fargo Bank National Association or Wells Fargo Bank N.A. is a wholly owned subsidiary of Wells Fargo and Company?

A Yes, it is.

Q Which entity employs you, Mr. Strother?

A Wells Fargo and Company.

Q Are you certain of that?

A No, I'm not because I'd have to look at a pay stub. But it may be I'm paid by Wells Fargo Bank N.A., I'm also an officer and director -- or an officer of that company as well, not a director.

Q In any event, you would also be the

highest-ranking legal officer for Wells Fargo Bank N.A.?

A That's correct.

Q Mrs. Meuers mentioned to me that she thought some of the legal department residing in California may have been employed by Wells Fargo Bank N.A. for tax purposes that she wasn't sure she fully understood. Is that possible?

A Yes, that's why I hesitated.

Q Okay. In any case, you're also an officer of Wells Fargo Bank N.A.?

A Correct.

Q What is your officer title?

A Executive vice president and general counsel.

Q So you hold the same title with both the holding company and with the Bank N.A.?

A Yes.

Q How long have you been executive vice-president and general counsel for Wells Fargo?

A Since January 1st, 2004.

Q Who was your predecessor in that position?

A Stanley Stroup, S-t-r-o-u-p.

Q Prior to January 1st, 2004, what was your job title?

A Deputy general counsel of Wells Fargo and

Company.

Q Similarly, were you deputy counsel or deputy general counsel for Wells Fargo Bank N.A.?

A No, I was not.

Q Okay. Why that distinction?

A Wells Fargo Bank N.A. didn't need to have a deputy general counsel, but....

Q Did Wells Fargo -- did Mr. Stroup also perform the function of deputy, of general counsel for Wells Fargo Bank N.A. while he was general counsel for Wells Fargo and Company?

A Yes.

Q Okay. And prior to deputy general counsel, what was your job title?

A I was executive vice-president and general counsel of Wells Fargo Home Mortgage, Inc.

Q Let me see if I got that right. Before your deputy general counsel position, you were executive vice-president and general counsel for Wells Fargo Home Mortgage, Inc.?

A That's correct.

Q When did you make a jump from EVP and general counsel of Wells Fargo Home Mortgage, Inc. to deputy general counsel?

A June 2001.

A Uh-huh.
Q I think we got back to June of 2001?
A Yeah.
Q And up to that point, you were EVP and general counsel of what was then Wells Fargo Home Mortgage, Inc.; correct?
A Yes.
Q Take me to the position prior.
A All right. It's hard doing it backwards. Prior to March of 1998, I was assistant general counsel of Norwest Corporation in Minneapolis. And that position goes back to 1989. And in that position, I was in the corporate law division, it was called, of Norwest Corporation and I was responsible for litigation, employment contracts, deposit products.
Q What was the last practice area you mentioned?
A Deposit products. Checking accounts, that sort of thing.
Q Okay. So while you were in the corporate law department of Norwest Corporation --
A Uh-huh, yes.
Q -- your responsibilities included litigation, employment, and deposit products?

A And contracts, correct.
Q And did, as assistant general counsel of the Norwest Corporation, did you report to the general counsel?
A Yes, I did.
Q Who was the general counsel of Norwest Corporation?
A Stanley Stroup who I mentioned before.
Q Okay. And then after the merger between Wells Fargo and Norwest, Mr. Stroup became the general counsel of the combined companies?
A Yes, he did.
Q When did that merger occur?
A November 1998.
Q Prior to the merger, was Norwest's corporate law department headquartered in Minneapolis?
A Yes.
Q And that's where Mr. Stroup worked?
A Yes.
Q Subsequent to the merger, where did Mr. Stroup work?
A He relocated to San Francisco.
Q So after the merger, the legal department of the combined companies became headquartered out here in San Francisco?

A Well, the counsel was out here, yes.
Q Did you move out to San Francisco after the merger?
A No, I moved out -- I was in Des Moines at the time of the merger as general counsel of the mortgage company. And then in June of 2001, I moved to San Francisco.
Q And that's when you assumed the duties of general counsel?
A Deputy general counsel.
Q Oh, I'm sorry.
Just then to summarize. You were in Des Moines as general counsel of Wells Fargo Home Mortgage, Inc.; correct?
A Yeah. Actually, Norwest Mortgage, Inc., for most of the time. But it's easier to think of it as Wells Fargo Home Mortgage, Inc. Same company.
Q Okay. In June of 2001 when you were promoted to deputy --
A Deputy general counsel.
Q -- deputy general counsel, you relocated to San Francisco; correct?
A Yes.
Q And you've officed out here since June of 2001?

A Yes.
Q How many lawyers are in your corporate law department, Mr. Strother, currently?
A About 250.
Q And how many different offices do they work out of?
A I don't know. 30 cities, I believe.
Q And who are your direct reports now?
A By name?
Q Let's start with how many do you have?
A 13.
Q Could you name them all?
A I think so.
Q Okay. Why don't just we quickly, here's what I'd like to know for each of your 13 direct reports. Their name, their practice area of responsibility, and where they're officing?
A Okay.
Q Okay?
A Gail Abel is my HR manager, so she manages HR responsibilities for my group, my 540 people in the group. And she is in San Francisco.
Susan Scolini.
Q I thought you were going to do this alphabetically with Abel start.

8b3a037c-e61d-42da-aef6-1e7c70b24a06

A No.
Q I was going to be very impressed.
Just real quick, is Ms. Abel a lawyer?
A No.
Q She handles handwritten HR function for you?
A My HR function, yes, for my group. What's called the legal group.
Susan Scolini is office manager in accounting, that kind of thing, for our group.
Marcy Rubin is a lawyer who heads up commercial lending legal support. She's located in San Francisco.
Bruce Corbridge heads up commercial lending, commercial real estate lending activities and capital market support. He's located in San Francisco.
John Wright, W-r-i-g-h-t, does bank regulatory work. He's located in San Francisco.
David Garfield heads up litigation, brokerage activities, loan workouts. He is in Minneapolis, Minnesota. Christine Meuers heads unemployment, corporate properties, intellectual property. She's in Minneapolis, Minnesota.
Craig Litsey heads up activities relating to certain cross enterprise risks, information security, business continuity, vendor management, deposit

products and trust activities. And he is in Minneapolis.
David Moskowitz, residential real estate lending. He is in Des Moines, Iowa.
Pat McFarland, consumer lending activities other than real estate. She is in Des Moines, Iowa.
Who am I forgetting?
Q I'm counting 10.
A I know.
Q And that's -- we might take a break here in 10 or 15 minutes, we can come back to it, but....
A I'll try to get you the rest.
Q Got 3 more?
A I think there's 3 more.
Oh, I'm sorry. Diane Lilly, government relations. She is in Minneapolis, Minnesota.
Q An attorney or not?
A She is not an attorney.
Q And she's in Minneapolis?
A Yes.
I seem to be missing two and I will think of them.
Q Okay.
A I could have brought a cheat sheet.
Q That's fine. That's not bad. 11 of 13.

And, you know, even if you have a chance to call back to the office, I just want to make sure I have a record on this.
A Okay.
Q I take it that Ms. Abel, Ms. -- and I can't even read my own writing now -- Scol --
A Scolini.
Q Scolini and Ms. Lilly are not attorneys?
A That's correct.
Q Are those the only 3 nonattorneys reporting to you?
A I think so.
Q You indicated you had 250 total attorneys in your corporate law department?
A Yes.
Q And 540 people total?
A Yes.
Q Of the 250 attorneys, how many work out of San Francisco?
A I think about 60.
Q And of the 540 people total, how many work out of San Francisco?
A I don't know. That would be probably proportionately the same, so maybe 120 or something.
Q Where is your office physically?

A 633 Folsom Street, San Francisco.
Q What's the name of the building?
A 633 Folsom Street.
Q Okay. Doesn't have a special name?
A No. If you saw it, you'd understand immediately.
Q And of the 60 attorneys roughly who work out of San Francisco, do they all work at 633 Folsom Street?
A Almost all of them do. There's a couple of other locations. 525 Market, 550 California.
Q Of the 250 lawyers in your department, are there any who work in California but not in San Francisco?
A Yes.
Q How many?
A I'm not sure. We have an office in Los Angeles and an office in Diamond Bar.
Q Diamond Bar?
A Diamond Bar, 2 words.
Q Where is that?
A Orange County here. East of Los Angeles, let's say. And I would say there's probably 25 lawyers or so in those two locations.
Q In those two locations combined?
A Yes.

8b3a037c-e61d-42da-aef6-1e7c70b24a06

Page 30

human resources executive with Wells Fargo Bank N.A.?
A No. Well, she is the head of HR for Wells Fargo and Company. And she would have the title of executive vice-president or she will next week.
Q I understand there's a transition happening --
A Yes.
Q -- with that job?
A There's a board meeting next week, so she'll be named an executive officer of the company.
Q And then Ms. White, as of next week, will become a peer of yours reporting in to Mr. Kovacevich?
A I think she reports to Mr. Stumpf.
Q Even after the, even after becoming EVP of Wells Fargo and Company?
A I believe that's right. I'll have to look, but I believe that's the way it is.
Q Okay. Who holds that position as of today?
A Well, Julie White does.
Q Okay.
A She just doesn't have the executive officer title, because that's a board-granted thing. And the board doesn't meet until next week.
Q Who was Ms. White's predecessor then?
A Avid Modjbatai, M-o-d-j-b-a-t-a-i, let's say.

Page 31

Just like it sounds.
Q Yeah, most people won't take a run at it. But Avid and -- could we just for short form say Avid?
A Yes.
Q Avid held the EVP title for human resources at Wells Fargo and Company just prior to Ms. White taking that position?
A Yes. Well, there was a little gap. Avid moved into a different job earlier this year. And I don't know if it was a month or two months ago.
Q Is she still with the company?
A Oh, yes.
Q What is her current title?
A She is, I'm not sure of her title. But she heads up our technology information group.
Q And did you know when Avid held the EVP position for Wells Fargo and Company, do you know who she reported to?
A I believe at the end she reported to Mr. Stumpf. I believe.
Q And what about before the end?
A She might have started reporting to Mr. Kovacevich, but I'd have to review the company records to determine that. But her predecessor had reported to Mr. Kovacevich.

Page 32

Q Avid's?
A Yes. And some time and I'll have to verify this if it's important. But she reported at the end to Mr. Stumpf. And I don't know if it was during the entire tenure that she did.
Q My only interest is to try to establish who is at the top of the organizational chart for human resources. And prior to Ms. White just assuming that position, it was Avid; correct?
A Yes, right.
Q Okay. And Avid held an exhaustive vice president title for Wells Fargo and Company; correct?
A Yes.
Q But she also has a responsibility for Wells Fargo Bank N.A.?
A Yes.
Q Does Ms. -- and I understand Avid officed here in San Francisco?
A Yes.
Q At 633 Folsom street?
A No, 420 Montgomery Street.
Q Where does Mr. Kovacevich work?
A Where's his office?
Q Yeah.

Page 33

A 420 Montgomery Street.
Q Are there any other office buildings in San Francisco at least where the seniormost Wells Fargo executives work?
A Yes.
Q Which are they?
A I couldn't tell you. 550 California has a management committee member or two. 525 Market Street. There are probably others. We have -- excuse me -- a large number of locations in San Francisco.
Q How long was Avid the highest-ranking HR executive in the company?
A I believe she started in that position around May of 2005. May or June of 2005.
Q And who was Avid's predecessor?
A Patricia Callahan.
Q Another Pat Callahan?
A Yes.
Q But not --
A No, this is spelled C-a-l-l-a-h-a-n. And it is a she.
Q Did Patricia Callahan hold the title EVP of human resources for Wells Fargo and Company?
A Yes, she did.
Q Do you know who she reported to?

# Deposition Excerpts of Patrick Cahalan's Deposition

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

In re:

WELLS FARGO HOME MORTGAGE OVERTIME PAY LITIGATION

MDL NO.: MDL-1770

THE DEPOSITION OF PAT CAHALAN, VOLUME II, on behalf of the Plaintiffs, between the hours of eight o'clock in the forenoon and six o'clock in the afternoon of Wednesday, September 20, 2006, at the offices of Wells Fargo, 7001 Westown Parkway, in the City of West Des Moines, in the County of Polk and State of Iowa, before me,

SAUNDRA A. TIPPINS, CCR
of
JOHN M. BOWEN & ASSOCIATES,
Shorthand Reporters,

court reporter, in a certain cause now pending in the U.S. District Court, Northern District of California, In re: Wells Fargo Home Mortgage Overtime Pay Litigation.

A p p e a r a n c e s

For the Plaintiffs:

STUEVE SIEGEL HANSON WOODY
330 West 47th Street
Kansas City, Missouri 64112
By Mr. George Hanson

For the Defendant:

LITTLER MENDELSON
650 California Street, 20th Floor
San Francisco, California 94108
By Mr. Lindbergh Porter, Jr.

Page 50

Q Okay. Do you know why, sir, the $2400 minimum was put in place?
A The $2400 was put into place as a result of some changes that were pending for FLSA regs. We looked at this in, I believe it was, August of 2004 and realized that the regs, the updated regs that were going to be published, included some specific provisions around financial services employees and the administrative exceptions test; based on consulting that employees provide to customers around complex financial products, that they could potentially qualify for the administrative exemption test but that they would -- that would require meeting the salary basis test.
So we decided that since we felt like we could satisfy the consulting aspect of those regs, that we would also put the minimum draw in place so that we could meet the salary basis test as well.
Q Okay. And do you know, sir, with respect to HMCs in California, are they considered by Wells Fargo Mortgage to be exempt employees?
A They are.
Q Okay. And do you know under which exemption they are considered to be exempt?
MR. PORTER: Just reserve our position that that's a legal question. It requires a legal analysis

Page 51

and legal answer.
Go ahead.
I didn't mean to interfere. She can read it back if you want.
THE DEPONENT: Can you read it back, please? I am sorry.
(Record read.)
THE DEPONENT: I believe it would be both the outside sales and the administrative exemption test.
Q (By Mr. McInerney) And that's in California?
A Yes.
Q And do you know, sir, who within Wells Fargo Mortgage makes the determination as to whether a particular position is considered to be exempt or not?
A The determination is ultimately made based on consultation with our legal department.
Q Okay. But other than the legal department, who is involved in the determination?
A The Compensation team would be involved in collecting the relevant facts around the job duties and would then bring that information to the legal department for consultation.
Q Are you involved in the process or have you been involved in the process of determining whether

Page 52

particular positions would be classified as exempt or nonexempt?
A Yes. To the extent that I've assisted in gathering relative facts around those duties, I have been involved.
Q Okay. And have you been involved, sir, in gathering facts and information with respect to HMCs in California?
A Yes.
Q Okay. And when have you done that; that is, gathered information regarding the activities of HMCs in California?
A We've -- we have monitored the -- the responsibilities of that position consistently, I believe, since my tenure with the company and maintained, you know, accurate collection of the responsibilities and the job description, and periodically updated that; although, the responsibilities have not significantly changed.
Q Okay. So the responsibilities haven't changed much since you joined Norwest back in '98, right?
A Correct.
Q And throughout the entire -- we are now, what, eight years, I guess? -- has the HMC position in California been considered exempt?

Page 53

A It has been.
Q And it's been considered by Wells Fargo Mortgage as exempt under both the outside sales exemption and the administrative exemption?
MR. PORTER: Again, we are maintaining our legal position that it calls for a legal question, and the hypothetical may be more complete or less complete.
THE DEPONENT: Can you repeat the question?
(Record read.)
THE DEPONENT: I believe that the exemption determination prior to 2005 was primarily based on the outside sales test.
Q (By Mr. McInerney) Okay. And after 2005, was it determined that the HMCs in California qualified as exempt, both under the outside sales exemption and the administrative sales exemption?
MR. PORTER: Same objections. Calls for a legal conclusion and analysis.
THE DEPONENT: We felt that with the addition of the salary basis -- with the addition of the draw to meet the salary basis test and the new regs that were published, that -- that we could meet the administrative test as well.
Q (By Mr. McInerney) Okay. And was that meeting the administrative test under the federal law,

fcc19bed-ab14-41fc-8213-c80ba2259ac9

Page 79

Q Okay. I have some documents. I have actually quite a few. I'm not going to show you necessarily all of these, but let me just ask some generic categories.
Did you review any job descriptions for HMC's?
A Since the last deposition?
Q Yes, since the last deposition.
A I have not reviewed them since the last deposition.
Q Did you review them prior to the last deposition?
A I don't recall. I may have.
Q When I show you the documents, I will ask if you are familiar with them, and we'll take it from there.
Did you have a chance to actually see a transcript of your deposition from the first go-round?
A I have not.
Q I will do my best not to replow old ground, but as Mr. Porter is well aware, it's inevitable that we're going to get into some of the same issues. And I will try to drill down and be more specific on topics

Page 80

that my co-counsel Mr. McInerny covered with broader strokes.
We have agreed with your counsel that there are, I think, six discreet topics that were identified in the deposition notice that you would be the company representative to speak to. You're aware of that?
A Yes.
Q And Mr. Porter and I have reconfirmed what those topics would be. They break down into really three general categories, the first being the classification of our class members, HMC's, and compliance with the FLSA; the second being compensation, how Wells Fargo goes about by policy and practice in paying Wells Fargo HMC's. And the third is kind of a standalone that talks about communications that Wells Fargo has had with members of our potential class.
So those are the three general categories. I'll tell you that topics one and two are going to be the bulk of what we talk about. I will ask you some questions

Page 81

at the end about the final topic.
Let's first take up issues related to compliance with the wage-an-hour laws and the classification of HMC's. And I'm using HMC as a term that's been explained to me from Wells Fargo means home mortgage consultant; is that correct?
A That's correct.
Q First let's talk just generally about the Fair Labor Standards Act. I take it that Wells Fargo acknowledges it is covered by the FLSA and is obligated to be in compliance with the FLSA's rules and regulations?
MR. PORTER: Object to the question as requiring or calling for a legal conclusion, and its vagueness and uncertainty. You may answer.
A My understanding is that we are subject to the regulation.
Q (By Mr. Hanson) Understanding that Wells Fargo is required to be in compliance with the FLSA, let's talk a little bit about how that compliance occurs.
Can you tell me, Mr. Cahalan, who or

Page 82

which department within the company is responsible for compliance with the FLSA?
A The Employment Law Group within our Corporate Legal Department would have accountability for that.
Q Now, one thing that was confusing, not intentionally, in the earlier deposition was all of these departments and subdepartments, so I'm going to go a little bit slow in making sure I get these titles right.
A Okay.
Q You mentioned something called the Employment Law Group, correct?
A Correct.
Q Which is part of the Corporate Law Department?
A Correct.
Q Describe to me what the Employment Law Group is.
A They are a group of attorneys that are available to assist each of the Wells Fargo business lines in dealing with any legal issues related to employee team member employment issues.

3401cd56-265b-4087-afe0-619256a32e8e

Page 87

the highest ranking lawyer within Wells Fargo?
A That's my understanding.
Q Do you know where Mr. Struther is located?
A I don't.
Q Do you know where the corporate law group has its headquarters?
A I very rarely work with anyone other than the employment law sections.
Q I take it it's not in this building.
A It's not.
Q And we are in -- where are we actually? It is a Wells Fargo facility in West Des Moines, but what are we called here?
A This is called home base for Wells Fargo Home Mortgage.
Q That's 17 --
A The address is 7001 Westowne Parkway in West Des Moines, Iowa.
Q And everyone housed in this facility is part of Wells Fargo Home Mortgage?
A There are other staff, such as technology staff, that would not be part of home mortgage. They are signed out to support mortgage and potentially some other

Page 88

specialty groups like that.
Q Then again this is where I don't want to rebuild the org chart that we painstakingly put together a few weeks ago. Wells Fargo Home Mortgage is part of a group called Wells Fargo Home Consumer Finance Group? Did I get that right?
A That's correct.
Q And the Home Consumer Finance Group is also based here in the Des Moines area, right?
A It is.
Q Is there a separate facility that kind of the rest of the Home Consumer Finance Group is housed in?
A There are several in the Des Moines area, whether in West Des Moines or in the actual city of Des Moines.
Q So Mr. Oman; is that right?
A Mark Oman is the group EVP for the Home and Consumer Finance Group.
Q He is the highest ranking executive for that group?
A He is.
Q And he resides and works here in Des Moines, correct?

Page 89

A He does. He is in another facility in West Des Moines.
Q And Ms. Hider is a direct report of Mr. Oman's?
A Cara Heiden.
Q Heiden, pardon me. She is the copresident of Wells Fargo Home Mortgage?
A That's correct.
Q Is she here in this facility?
A She would be, yes. She would office out of this building.
Q And then the gentleman we met back in San Francisco those weeks ago, Brad Blackwell, is one of her direct reports, correct?
A He is.
Q We're talking about responsibility for compliance with the FLSA, and you designated the Employment Law Group part of the Corporate Law Department as primarily responsible for compliance, correct?
A Correct.
Q But I take it not solely responsible for compliance? I mean, there are other departments or individuals that have responsibility or input into compliance

Page 90

decisions; is that correct?
A There are other groups that would provide inputs, data and information to the legal department for their decision-making.
Q Let's just talk about those other departments that would provide, whether it be data or information or input. Can you identify them for me?
A Primarily it would be the Human Resources Department.
Q All right, and then just to talk a little bit about how that department interfaces with the Corporate Law Department, human resources -- I am trying not to go back over what we did before.
I know Ms. White is the head of human resources for the Home Consumer Finance Group, correct?
A That's correct.
Q Do other groups within Wells Fargo Bank have their own equivalent to Ms. White, their own Human Resources Department heads?
A They do.
Q Do they report into a senior human resources executive at Wells Fargo Bank,

3401cd56-265b-4087-afe0-619256a32e8e

Page 91

the parent?
A The HR leads actually report into the business head, and then they would have what we would generally refer to as a dotted-line relationship to the corporate head of HR, but their straight line formal reporting relationship is to the head of their business.
Q So Ms. White has a formal relationship to Mr. Oman?
A Correct.
Q And a dotted-line reporting relationship to the corporate HR head, correct?
A Yes.
Q Who is the corporate HR head?
A That is Avid Modjtabai. On the spelling I think it is something close to M-O-D-J-T-A-B-A-I. The first name is Avid, A-V-I-D.
Q Is Avid a man or a woman?
A It's a woman.
Q I hope she would not be offended if I referred to her as Avid?
A I'm sure she's used to it.
Q So Avid is the highest ranking human

Page 92

resources executive within the company, correct?
A Correct.
Q Do you know who she reports into?
A I believe she reports into John Stumpf.
Q Do you understand that she is a peer, then, of Mr. Struther, the head of the corporate legal department?
A I believe that would be correct.
Q And Mr. Struther also reports into Mr. Stumpf?
A I don't know for sure.
Q Do you know if within the Human Resources Department -- and I'm going to just use the corporate Human Resources Department -- there is a designated subdivision or group specifically designated for responsibility related to wage-an-hour compliance? In other words, within the corporate legal department, you have the Employment Law Group, which has that responsibility. Within the Human Resources Department is there something similar?
A Similar again -- did you tell me what responsibility?

Page 93

Q For wage an hour compliance, not necessarily making the final decision about compliance, which you've suggested is the role of the Corporate Legal Department, but rather gathering the information, data, monitoring, what have you, that supports the compliance decisions made by the Corporate Legal Department.
A There is a Corporate Compensation Department that would depending on the scenario participate in the process in assisting and gathering information and feeding that information to the Employment Law Group.
Q So if the Employment Law Group needs data or needs information to help it make a compliance decision, is it fair to say they would look to the Corporate Compensation Department to get that information?
A That scenario would probably take place if we were dealing with a job that was used across the greater Wells Fargo Corp. So in those cases that would be true.
Q Can you give me an example of such a job?
A Let's say you had a job in the finance

Page 94

department, a financial analyst, kind of making this up, that is used in our credit card operation, our mortgage operation, our wholesale banking operation, our retail banking operation, that's used universally in that job.
If we had an issue on exception status with that job, likely the corporate comp team would lead the effort to gather data because it's not unique to any one business line.
Q I take it the Corporate Comp Department or Corporate Comp Team is not necessarily housed within Home Consumer Finance Group?
A No, it is not.
Q It is part of the corporate HR structure, I assume, reporting directly into Avid?
A Yes, that's true.
Q I understand from your first deposition that you are part of the compensation group, at least for Home Consumer Finance.
A For specifically Home and Consumer Finance.
Q Are you also part of the Corporate Compensation Department?
A No. That would be a separate group.

3401cd56-265b-4087-afe0-619256a32e8e

Page 155

to the line of questioning at being completely outside the scope of the notice and irrelevant to the HMC classification.
Q (By Mr. Hanson) I have very little on this subject, so we'll move through it quickly.
A I'm not sure if it's weekly or biweekly. It's probably one of those two.
Q But does it go through directly to the Payroll Department, the Web Time entries?
A I'm not sure how that interface occurs.
Q Where is the Payroll Department located that is responsible for distributing paychecks to distributed retail branch offices?
A The Payroll Department for Wells Fargo Corp, which handles payroll for all Wells Fargo team members, works out of Minneapolis.
Q You called it Wells Fargo Corp?
A The same Payroll Department services the entire company, not just mortgage but the entire company, is what I was trying to say.
Q So payroll is centralized in Minneapolis for the entire company, correct?

Page 156

A Yes, yes.
Q Is that Wells Fargo Bank?
A It would be all Wells Fargo entities, any Wells Fargo team member to be paid in the United States.
Q I have seen one W-2 and only one honestly issued to one of the distributed retail employees and it was -- it's from Wells Fargo Bank, N.A. Is that the company that would issue paychecks and payroll information like W-2's?
A There are several legal entities within the Wells Fargo company. All mortgage employees would be under Wells Fargo Bank, N.A.
Q Including HMC's?
A Correct.
Q And loan processors?
A Correct.
Q We've established that distributed retail HMC's are classified as exempt; centralized retail HMC's are classified as nonexempt, correct?
A Correct.
Q You've told us that it's been that way

Page 157

since you have been employed; is that correct?
A That's correct.
Q Do you know who made the decision to classify HMC's in those two ways?
A I'm sure that -- I don't know specifically.
Q What is your best understanding?
A I would expect that the decision was made by the Employment Law Group as they have and have had responsibility for that determination.
Q Do you know specifically when the decision was made to classify HMC's in that manner? And what I mean by that is the distributed retail HMC's as exempt and the centralized retail HMC as nonexempt.
A I don't know when that decision was made.
Q Do you know whether that decision has been reevaluated historically?
MR. PORTER: I'd instruct Mr. Cahalan to refrain from revealing the content of any discussion involving counsel for the Wells Fargo Home Mortgage Employment Law Group or Corporate Law Group or outside lawyers, et cetera.

Page 158

A I'm not sure I'd characterize the decision as being a decision that was made with both jobs on the table at the same time. I think the decisions -- I suspect decisions have been made for each job based on the merits of that individual job.
Q (By Mr. Hanson) Well, here's where my topic involves the reasons why HMC's were classified as exempt and what exemptions they qualify for. That's kind of nine generally, topic nine.
And what I'd like to know at this point is, when the decision was made and why the decision was made and what factors or what the reasons were that the company made the decision to employ HMC's in the way that it has. You know, some of that you might be able to answer; some of it you might not.
So I just need to find out what you can -- what you can answer because this is a 30(b)(6) topic that is something I'm entitled to know. So I'll just ask the question as parallelling the topic as closely as I can.
Why were HMC's in the distributed

3401cd56-265b-4087-afe0-619256a32e8e

Page 159

retail business unit, why were they classified as exempt?
A Well, the classification determination was again made by our corporate Employment Law Group. I could only provide my understanding of what the basis of that decision was.
MR. HANSON: That strikes me, Mr. Porter, that we are maybe not talking to ultimately the right person for this issue.
MR. PORTER: You could be identifying an area that we need to think about.
(Off the record).
Q (By Mr. Hanson) We had a discussion, Mr. Cahalan, which you heard that was off the record where Mr. Porter and I are discussing whether there may be an additional representative that would be appropriate to help fill in on this specific topic.
I'm going to go ahead and ask you some questions and have you do the best you can, and that might help us determine what we may need in addition to what you can

Page 160

provide.
It appears from the documents and some of our discussions that the initial decision to classify the retail distributed HMC's or its equivalent historically was made before the merger with Wells Fargo, correct?
A That's correct.
Q And it would have been made while the company was known as Norwest, correct?
A Correct.
Q And are you able to specifically tell me when that initial classification decision was made?
A I'm not able to put a date on that, no.
Q Can you put a ballpark, year or range of years, when you believe it was made or if you know it was made?
A My earliest knowledge of the exemption status for the job is 1994. I know it was exempt at that point, so I believe it was sometime before then. But to be more specific I would be guessing.
Q Did HMC's exist at Norwest with the equivalent job function prior to 1994?

Page 161

A They did exist. I'm assuming the job function was quite similar, but that's several years before my tenure with the company so again I can't be -- I can't be positive about that.
Q Do you know who, understanding it was Norwest at the time, would have been involved or participated or made the decision that that job classification was appropriately deemed exempt?
A Who would have made the decision?
Q Yes.
A I'm assuming the Employment Law Group for Norwest would have made that decision.
Q You are assuming that because that's how it works currently, correct?
A Correct.
Q Do you have specific knowledge or have you been informed by anyone that would allow us to know that with certainty?
A About the original decision?
Q Right.
A I have not.
Q So I think it probably fair to say that the genesis of the decision that this job

Page 162

classification fell within an exempt category is something that you wouldn't be able to testify with any certainty at least as a company rep. Is that fair to say?
A Yes, it's fair to say that about the original decision, yes.
Q Now, just moving forward to the last five years where you have been employed by the company where we are in a post-merger environment, I am just going to focus on distributed retail sales for the moment, although I assume that the decision-makers for classified distributed retail HMC's as exempt would be the same as those who would make the decision to classify centralized retail HMC's as exempt; is that correct?
MR. PORTER: Don't speculate, Pat. Do you know?
A We would work with our Employment Law Group in the same way.
MR. PORTER: Why don't we do this so that we can get to the answer to this. Why don't we temporarily at least withdraw Mr. Cahalan as a representative on that question nine, and either he will be

This goes back to Norwest. Is that Wells Fargo's current policy, to update a job description if and when there's a material change in job duties?
A That's correct.
Q The format of this, it contains kind of -- it has some designated that I want to go through with you. There is a job title of home mortgage consultant. There is a designation called incumbent, and it refers to something called multiple. Do you know what that means?
A Yeah. It is simply intended to reflect that there is more than one team member in the job, more than one employee in the job.
Q I see, so incumbent if there were a single individual staffing that position, you put the person's name there?
A It may in fact just have a name.
Q Reports to and here, of course, is branch sales manager, correct?
A Correct.
Q The department reflected here is field?
A Yeah. That's an out-of-date term that at one time was probably used as a department

name for distributed retail sales.
Q Back in the Norwest days?
A Right.
Q Grade, and with the designation M/P. What does that mean?
A I'm not sure what that means. Those are not abbreviations or terms that we are still using, so I'm not sure what that is.
Q And then there is a designation under the Fair Labor Standards Act here that the designation is exempt?
A Correct.
Q And again while HR may have been responsible for the creation of this document, I assume the designation under that FLSA piece would ultimately have been the responsibility of the Legal Department as we've discussed?
A That's correct.
(The reporter marked Exhibit No. 5).
Q (By Mr. Hanson) I hand you what I've marked as Exhibit 5. And Mr. Cahalan, this is a job description also for home mortgage consultant, but this time it bears the Wells Fargo Home

Mortgage Company name. Do you see that?
A Yes.
Q The date is January 1 of 2000. And again I'm not sure we've pinpointed in time when the merger actually occurred, but it was at about this time, and maybe this was even before the formal merger occurred. Is that right?
A The merger was roughly at this time. I don't recall the date. I would be surprised if we would have produced a job description with a date that was actually before the merger.
Q In any case, do you believe that this would have been the first job description produced by Wells Fargo after the merger for the home mortgage consultant position?
A It likely is.
Q There are a couple of differences. One is the job numbers have changed. There's a number job code. Now it's 449058. Do you see that?
A Yes.
Q Do you recognize that as the current job code for a home mortgage consultant?

A I believe it is the current. That is our current coding methodology. The 449 is the series commonly used for the HMC jobs.
Q The job title is the same. The incumbent is the same. The reports to is the same. The department has changed to branch retail. And we've already talked about that. That really, that's the distributed branch retail department, correct?
A Correct.
Q The grade still remains MP. I suppose that still doesn't help clarify for you, does it?
A It does not.
Q And the FLSA status is exempt. Do you see that?
A Yes.
Q At the time of the transition from Norwest to Wells Fargo, do you know if there were a reevaluation or a -- I don't know how else to put it, but an initiative to look again at the different job codes since what you are now going to be classifying is essentially a new position within a new company, even though it has a historical

Page 199

precedent.

Do you know whether there was any attempt at this time to take a fresh look at whether in that box the word exempt or nonexempt should appear?

A I don't recall that at the time of the merger, that that topic was specifically reviewed.

Q If it was, you were not part of those discussions?

A That's correct.

Q But again the responsibility at this point for putting the exempt in that FLSA box would ultimately reside within the Corporate Legal Department?

A It would.

(The reporter marked Exhibit No. 6).

Q (By Mr. Hanson) I am handing you what I have marked as Exhibit 6. And if you could, just kind of keep them all lined up there, because I'm trying to see if this thing is evolving at all.

Exhibit 6 is another similar document. Do you see this is a job description from

Page 200

Wells Fargo for the same job code?

A Correct.

Q I could not find any differences in this whole document. I'm not saying there aren't any, but I could not see any except for a change in the date. Exhibit 5 is January 1, 2000, and Exhibit 6 bears the date of August 1st, 2002.

Do you have any knowledge of why on August 1st, 2002, the company put out a job description for home mortgage consultant?

A I don't remember any event off the top of my head that would have triggered the republication of that specific date.

Q To your knowledge what would cause the company to republish a job description? And I guess I understand that if something had changed that needed to be addressed and reflected in the change in job duties or a change in department or reporting, something like that.

But what would -- assuming that this is identical or virtually identical, can you give me any reasons why the company would republish it?

Page 201

A I would not expect -- I can't give any reasons as to why we would republish. I question whether it was actually published at this point or if it was not simply reviewed, resaved with a fresh date, and used for some other purpose.

Q How would we know whether it was formally reissued or whether as you are suggesting maybe it was printed out again and the date automatically defaulted to the date it was printed? I mean, in other words is there a repository somewhere where you have your formally issued job descriptions as updated and reviewed compiled?

A We have a place where job descriptions are saved, but it would not, I believe, include a record as to why each particular version was created.

Q One thing that is apparent from the documents we have been reviewing, these job descriptions, there is not a place for the individual employee to countersign or acknowledge receipt; is that correct?

A Correct.

Q In the personnel file that I have seen it

Page 202

does not appear that the job descriptions were made part of those personnel files. Is that correct?

A I don't know the answer to that for sure. I'm not aware that they are.

Q Do you know what efforts, if any, the company takes to make individual employees aware of this form of job description?

A The job descriptions today are published on our Intranet site that all team members have access to. We didn't have that type of technology at the time these job descriptions were created.

So I'm not sure how they might have been made available to team members.

Q Or if they were made available at all?

A Correct.

Q If this job description in Exhibit 6 was formally reevaluated and republished, would there be documents to suggest what process occurred?

A There may be, but I'm not -- I'm not -- I could not state with any confidence that there indeed are.

Q And this job code 449058, home mortgage

# Deposition Excerpts of Nichole Gering's Deposition

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In re WELLS FARGO LOAN PROCESSOR OVERTIME PAY LITIGATION | ) ) ) | MDL Docket 1841 VIDEOTAPE DEPOSITION OF NICOLE GERING |

THE VIDEOTAPE DEPOSITION OF NICOLE GERING, taken before Connie Overberg, Certified Shorthand Reporter and Notary Public of the State of Iowa, commencing at 9:06 a.m., Thursday, November 29, 2007, at 666 Walnut, Suite 2000, Mason City, Iowa.

A P P E A R A N C E S

Plaintiffs by: ERIC L. DIRKS
Attorney at Law
460 Nichols Road
Suite 200
Kansas City, MO 64112

Defendants by: DENISE K. DRAKE
Attorney at Law
9401 Indian Creek Parkway
Suite 700
Building 40
Overland Park, KS 66210

Videographer: Video Specialties, David Hellberg

Reported by: Connie Overberg, RPR, CSR

highlighter which should be your employee number. Those have been marked as Deposition Exhibit Number 22. As I glance through these -- I am sorry. I think I called them pay records. They are time records. As I glance through these time records, I see of a lot of 8's. Do you see that?
A. Yes, I do.
Q. Why are there 8's recorded repeatedly in these records?
A. I was told to record 8 hours per day and to have no overtime.
Q. And I don't see any time in or time out recordings for you in the records. How did you go about actually recording your time?
A. The computer. I believe it was Web time.
Q. Did you use Web time the entire time you were employed with Wells Fargo?
A. I believe so.
Q. And how was it that you recorded 8 hours on Web time?
A. I went in once every two weeks, filled out a time card, and sent it in.
Q. You said you were instructed to record 8 hours each day; is that right?
A. Yes. I did have some overtime, and it

was -- I didn't realize we weren't supposed to record it. I recorded it, and it was brought back to me by the branch manager's assistant, and I was told to change it, that overtime was not allowed.
Q. Who -- was it the branch manager's assistant who first instructed you not to record overtime?
A. That's correct.
Q. Who was that?
A. Jennifer Jorgenson.
Q. Do you remember approximately when in your employment that occurred?
A. That was early on. I don't recall exact dates.
Q. Was that when you were a receptionist still?
A. I believe so, yes.
Q. Did anyone else ever instruct you not to record overtime?
A. Not exactly, no.
Q. What do you mean not exactly?
A. Well, I didn't -- I guess I was a little upset at the time that Jennifer had done that, and I had discussed it with another HMC, and there was some similar things that were going on in their

sales meetings as well. They were coerced into trying to sign some documents, and they refused to do so in regards to, you know, not working overtime or not claiming overtime, so it was just understood in the department that you didn't record overtime.
Q. Okay. We have been using the term HMC for the record. Can you tell us what that is?
A. Home mortgage consultant.
Q. And you were not a home mortgage consultant, correct?
A. That's correct.
Q. What did a home mortgage consultant do?
A. That person took the incoming phone calls and applications and was ultimately the loan officer in charge of those files and the one that had to be in compliance with federal laws and guidelines.
Q. Who was the HMC with whom you spoke?
A. Kenneth Dodd.
Q. And did you speak with him shortly after you spoke with Jennifer Jorgenson?
A. Yes.
Q. Do you know about how long?
A. Five minutes. I was a little upset.
Q. Can you tell me if it was within the first month or the first couple of weeks when Jennifer

Jorgenson spoke with you?
A. I would say it was probably within the first -- I don't even recall. I really can't say an exact date. I would say probably within the first six months at least. I don't remember exact date.
Q. You recall being a receptionist --
A. Yes.
Q. -- when it happened?
A. You know, I think I was actually an associate at that point in time. I was because I was setting up my desk next to the HMC at the time. Yes, I was an associate.
Q. So that would have been some time around May of 2003 or after?
A. Yes.
Q. Was anyone else present when Jennifer Jorgenson spoke with you?
A. No.
Q. Did you ever hear Jennifer Jorgenson give those same instructions to anyone else?
A. No.
Q. Did you ever hear from anyone that Jennifer Jorgenson gave them those instructions?
A. No.
Q. And you think you spoke with Kenneth Dodd

Page 22

about five minutes after your conversation with Jennifer Jorgenson; is that fair?
A. That's correct.
Q. And what did you and Mr. Dodd discuss?
A. The fact that we were all working overtime and were unable to be compensated for it.
Q. Anything else?
A. No, not at the time. I can't recall.
Q. You mentioned that Mr. Dodd said something about being coerced into signing documents. What do you recall about Mr. Dodd's discussion in that regard?
A. I believe it was a very heated discussion, and in one of the sales meetings, they wanted all of the HMC's to sign this paperwork, and I believe Kenneth, I guess, threw a tizzy. I don't know how you want to word it. And they basically said that, you know, that the company was asking them to lie. He wasn't comfortable signing anything that was not the truth, and then suddenly it was all dropped, and nobody had to sign anything.
Q. Were you present for that meeting?
A. No. It was all just from his discussion.
Q. Do you know if you were even in the

Page 23

building when that meeting happened?
A. Yes. I should have been, yes.
Q. Did you hear the heated discussion or have any idea what was going on?
A. No.
Q. So other than Mr. Dodd's description of the discussion, you don't have any personal knowledge of it; is that right?
A. That's correct.
Q. Did Mr. Dodd say anything else with regard to the type of paperwork they were being asked to sign or anything along those lines?
A. I don't believe so.
Q. If you will look back at Deposition Exhibit 22 with me. Down in the left-hand corner sort of sideways there is a WF, and then some numbers. Do you see that?
A. No. What are you looking at?
Q. Right by your left hand. Just on top of them. Over to the very bottom. Point it out to her.
MS. DIRKS: Right here. See those?
THE WITNESS: I am so sorry.
Q. (By Ms. Drake) That's okay. There are a lot of numbers on there. Would you turn with me to

Page 24

WF001288, please?
A. Okay.
Q. Do you see on that page it says type of hours, "O.T." in the middle of the page?
A. Uh-huh.
Q. And it appears that that was approximately May 17 of 2003. Would those have been overtime hours that you recorded?
A. I believe so.
Q. Does looking at this document refresh your memory at all with regard to the time period when maybe you had that discussion?
A. I believe it was May 17.
Q. Why did you record overtime on May 17?
A. I had worked overtime on that day.
Q. Until you had your discussion with Jennifer Jorgenson, was it your understanding you were eligible for overtime?
A. No. I don't believe. I don't think anybody thought that they were eligible for overtime. I don't recall.
Q. So before May 17 of 2003, why didn't you record any other overtime?
A. It was -- I don't know. Always just filled out the time card. It wasn't on a daily

Page 25

basis. It was just, you know, every two weeks before payday you went in and plugged some numbers in.
Q. And up to that point in time you had been acting as a receptionist; is that right?
A. Yes.
Q. Is it possible you just weren't working any overtime?
A. I was working. I wasn't working a lot, a whole lot of overtime. A little. There were files that needed to go out on a daily basis. It wasn't at that point.
Q. More sporadic?
A. That's correct.
Q. Do you have any way of knowing how much overtime you might have worked before May 17 of 2003?
A. I would probably -- it would be very hard to guess an exact figure, maybe half hour, 45 minutes, an hour. It varied.
Q. Okay. Did you ever receive training on Web time from anyone?
A. No.
Q. Other than talking to Kenneth Dodd, the HMC, and hearing about overtime from Jennifer

7cd95de7-a007-44ab-8fd6-50e806e2026b

# Deposition Excerpts of Jamie Hejlik's Deposition

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In re WELLS FARGO LOAN | ) | MDL Docket 1841 |
| PROCESSOR OVERTIME | ) | VIDEOTAPE DEPOSITION |
| PAY LITIGATION | ) | OF JAMIE HEJLIK |

THE VIDEOTAPE DEPOSITION OF JAMIE HEJLIK, taken before Connie Overberg, Certified Shorthand Reporter and Notary Public of the State of Iowa, commencing at 2:16 p.m., Wednesday, November 28, 2007, at the Holiday Inn, 2101 Southwest Fourth Street, Mason City, Iowa.

A P P E A R A N C E S

Plaintiffs by: ERIC L. DIRKS<br>Attorney at Law<br>460 Nichols Road<br>Suite 200<br>Kansas City, MO 64112

Defendants by: DENISE K. DRAKE<br>Attorney at Law<br>Suite 700<br>9401 Indian Creek Parkway<br>Building 40<br>Overland Park, KS 66210

Videographer: Fidelity Video Services<br>(Amy Cooper)

Reported by: Connie Overberg, RPR, CSR

Page 26

for you that your hours went down?
A. Probably in the winter 2005. Probably the first part of that year.
Q. First part of 2005?
A. Yes.
Q. January 2005?
A. Yes.
Q. You then mentioned that at times you would receive comp time for hours you worked; is that right?
A. Yes.
Q. And I understand that within your office people were encouraged to take the comp time. Do you recall being encouraged to take your comp time?
A. Yes.
Q. And did you?
A. Sometimes.
Q. When you say sometimes, can you give me an estimate of when you would take it?
A. If I had to take my son to the doctor, personal appointments, that's about all I could get away for.
Q. Did you ever have to run other errands during the day?
A. No.

Page 27

Q. Any shopping?
A. No.
Q. Driver's license renewal or any of those life things?
A. No.
Q. Then it says, for example, if I had 8 hours of overtime, I would receive 8 hours of comp time in hours. Do you see that?
A. Yes.
Q. Did you try to use those 8 hours of comp time hours?
A. When I could.
Q. Any idea how often you were able to?
A. No.
Q. Did you try to use them in the same week?
A. I don't know.
Q. Just kind of did it?
A. As I could.
Q. And then it also says that you were not paid a premium for overtime hours. Do you see that?
A. Yes.
Q. Were you ever paid a premium for overtime hours?
A. Only if preapproved, and I believe there was only one short period of time right when I

Page 28

started as a mortgage associate.
Q. If you will look at Paragraph 5, please, it says you were -- it says you were required to fill out time cards and have them completed over two weeks. Do you see that?
A. Yes.
Q. Did you complete the time cards?
A. Yes.
Q. Did you start using Web time at some point in time?
A. Yes.
Q. When was that?
A. Unsure.
Q. Did you have training on how to use Web time?
A. Yes.
Q. Do you remember who did the training?
A. No.
Q. Do you remember if it was someone from within your office or someone who came in from the outside?
A. I don't remember.
Q. In Paragraph 5, you say, "I was told to only record 8 hours per day, and to not record overtime hours." Do you see that?

Page 29

A. Yes.
Q. Who told you to only record 8 hours per day?
A. The mortgage loan officers.
Q. That would be the --
A. Mary Hackman Glenn and Abe Hackman.
Q. The Hackmans?
A. Yes.
Q. Did both of them tell you not to record more than 8 hours?
A. I don't recall if they both did.
Q. But you recall having a specific discussion at least with one of them?
A. Yes.
Q. What was it they said to you, he or she said to you?
A. I don't remember verbatim, but that we could only record 8 hours, and anything over that was considered comp time, and we were not approved for overtime.
Q. At the very beginning of your position as a mortgage sales associate, you mentioned that you did get paid for some overtime; is that right?
A. Yes.
Q. During that time period had the mortgage

ade0b12d-552b-4167-bed5-a52ac8c9d10f

# Deposition Excerpts of Amie Lovrien's Deposition

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In re WELLS FARGO LOAN PROCESSOR

OVERTIME PAY LITIGATION

This Document Relates to

Bowne v. Wells Fargo Home Mortgage

(transferred from D. Kan., No. 06-2020)

N.D. Cal., No. 07-4013 MHP

MDL Docket No. 1841

VIDEOTAPED DEPOSITION OF AMIE LOVRIEN

MARCH 14, 2008

4f2893dd-821d-4849-92d8-cb9921b2a718

eligible for overtime pay?
A. Yes.
Q. Who told you?
A. My manager, Julie Adam.
Q. Did anyone else tell you?
A. Not that I recall, no.
Q. What did Ms. Adam tell you precisely?
A. Told me that I was paid on a 40-hour workweek.
Q. Did she tell you -- is that as close as you can recall to her precise words?
A. Yes.
Q. When did she tell you that?
A. When I first started.
Q. When you first started as what?
A. When I first started as an HMC. And after that point, there was never a conversation on it.
Q. So she told you that when you started as an HMC in 2001?
A. Yes.
Q. Did she ever tell you that when you worked as a mortgage sales associate?
A. Not that I recall, no.
Q. I'm going to hand you what I have marked as Exhibit No. 82. And I will represent to you that

these are time records that were produced by Wells Fargo Home Mortgage in the course of this litigation.
And as you look down on those records, on this first page, if you go down to -- in the first column the employee ID column, you get down to No. 496112. Do you recognize that to be your employee ID number?
A. Yes.
Q. How did you record your time when you worked as a mortgage sales associate?
A. I didn't.
Q. The entire time?
A. Until it's about the beginning of '05 when I was told I needed to use -- I think it was called Web Time and go in and put in my eight hours.
Q. Who told you to, as you just stated, "go in and put in your eight hours"?
A. Julie Adam.
Q. Did anyone else tell you that?
A. We had a, I think, a secretary at the time, and she showed me how.
Q. Who was the secretary that showed you how to use Web Time?
A. Cindy Becker.

Q. Did either Ms. Adam or Ms. Becker tell you why they wanted you to start recording your time in Web Time?
A. No.
Q. Did they tell you to accurately record all of the time that you were working?
A. No.
Q. Did they tell you not to accurately record all of the time you were working?
A. I was told to put in eight hours.
Q. As you are looking at Exhibit No. 82, as I said -- or as you recognize your Employee ID Number. As you flip through these records, and you go to what is marked WF001249, and if you look towards the bottom part of the page, if you see the -- do you recognize the column that says hours?
A. Yes.
Q. And minutes?
A. Yes.
Q. Okay. And duration?
A. Yes.
Q. Okay. And if you see here about six rows up from the bottom there is one line that indicates hours of 11 and the corresponding duration of 11.
Can you explain to me why the records

would indicate you recorded 11 hours when you were told to put in only eight hours?
A. I was recording my hours at -- during that time. The only thing I can say is it may have been a trip to Des Moines when we got back late in the evening.
Q. You stated that you weren't recording your hours at that time; is that correct?
A. Yes.
Q. Was someone else recording your hours at that time?
A. Not to my knowledge.
Q. And you just stated that it may have been a trip to Des Moines. Can you --
A. Yes.
Q. -- explain to me what you mean by that?
A. We at different times during the year would have to travel to Des Moines for training or some type of meeting.
Q. And you don't believe that you would have actually recorded this time yourself at this time?
A. No, I know I wasn't recording anything.
Q. If you flip to the next page, WF001250, if you look basically half way down the chart, you see an entry for the end of the pay period of

# Deposition Excerpts of Brenda McMillian's Deposition

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

In re WELLS FARGO LOAN PROCESSOR OVERTIME PAY LITIGATION

MDL Docket No. 1841

This Document Relates to All Cases.

VIDEOTAPED DEPOSITION OF BRENDA McMILLIAN,

produced, sworn, and examined on Wednesday, the 19th day of December, 2007, commencing at 9:13 a.m. and concluding at 12:12 p.m., at the law offices of Stueve Siegel Hanson LLP, 460 Nichols Road, Suite 200, in the City of Kansas City, County of Jackson, State of Missouri, before:

ANN M. HAMILTON, RPR
Certified Court Reporter
of
JAY E. SUDDRETH & ASSOCIATES, INC.
Suite 100
10104 West 105th Street
Overland Park, Kansas 66212-5755

a Certified Shorthand Reporter within and for the State of Kansas and a Certified Court Reporter within and for the State of Missouri.

Taken on behalf of Defendant pursuant to Notice to Take Depositions.

Page 62

A. No. We worked out of a closet.
Q. What do you mean by "closet"?
A. They put desks in a closet and said, "That's your work space."
Q. How big was this closet?
A. About the size of this room here.
Q. And for the record would it be fair to say it's 20 by 15?
MR. DIRKS: You can answer.
A. Yes.
Q. (By Mr. Kelly) I'm just asking you to estimate based on looking around.
A. Yes.
Q. How many people worked in this office, or "closet," as you've called it?
A. One, two, three, four, five, six, seven, eight -- eight people.
Q. Who were those eight people that worked in that location?
A. Carmen Perez; Lisa Bing; Adrian Brown. It was various temps, various people.
Q. What do you mean by "various temps"?
A. Yeah, some temps would come and work for a couple of days and would leave because of the conditions. Some would move to get permanent

Page 63

employment, move to another position at Wells Fargo.
Q. Anybody else that you can remember that worked --
A. In that closet?
Q. If that's what you want to call it.
A. Felicia. I don't know -- I think Felicia's last name is Turner. Brandy, I can't remember her last name. Lamar, I don't know his last name either. Felicia, I think I gave you her name. I can't think of anyone else.
Q. How did you record your time when you worked as a mortgage loan specialist?
A. We had a online time card application.
Q. Would that be Web Time?
A. Yes.
Q. And did you start using Web Time when you first became a mortgage loan specialist in October of 2002?
A. No.
Q. When did you start using Web Time?
A. I don't recall the exact date, but it would have been sometime after that because I didn't have access to a computer. I did not have a computer, so I did not have a profile to actually be able to log in and do that.

Page 64

Q. Was that when you were in training?
A. It was during and after training.
Q. You said it was sometime after that. Are you able to estimate about how long it was before you started making entries into Web Time?
A. Maybe late November or December. Like I said, I can't remember. It just took awhile for them to get the profile set up and the desktop and everything.
Q. So it was sometime in the tail end of 2002 is what it sounds like?
A. Yes, uh-huh.
Q. Did you accurately record all of your hours worked in Web Time when you were a mortgage loan specialist?
A. Yes, I did. But I was also asked to back out time that was not pre-approved for overtime; in other words, to remove overtime hours.
Q. Who asked you to back out time?
A. Sarah Froedge and Sonya Moore.
Q. When did they tell you that?
A. Sarah Froedge from the beginning of employment to -- I think Sonya came on about April and May of 2003, she came on like early summer of 2003, she then became our supervisor, so then it was

Page 65

actually Sonya Moore. I went back and forth between Sonya Moore and Sarah Froedge at that time.
Q. And, understand, I'm trying to get at when precisely did they tell you to back out the time?
A. During that time we were at the height of the refi boom, so it was typical for any one of us that was processing to work an average of 10 hours a week, some worked more, but I didn't keep up with their time, and so we were -- with Sarah in the beginning up through the -- prior to that time Sonya starting, she would tell us exactly what she was going to approve and what she would not approve as overtime, and so we would have to take those hours out if she didn't approve them.
Q. But did she tell you what she was going to approve as overtime?
A. Yes.
Q. Before you worked it?
A. Nope. She just told us we had to get the work done. She gave us a deadline, and she told us what the volume was, and we had to get it done.
Q. So it sounds like based on what you just described that she did in fact tell you what she would approve before you actually worked all of that time; is that correct?

2bb7cb5f-456b-4c71-9a92-fdf8d5cdf4af

Page 66

A. No, she did not. That's not what I said.
Q. Can you clarify what you meant by what you just said?
A. She would just tell us what -- like, you know, volumes of files would come in, and she would say, "Okay, these have to be completed by Friday," and that was it. She never said it has to be completed by Friday without overtime. She just said it had to be completed by Friday, and we would have to report into her every day and let her know what had been completed and what was still pending.
Q. So when did she actually tell you to back out the overtime that you had recorded?
A. When we would put our time in, when we would talk to her about it. We kept our updates -- like, for example, say, okay, 40 files got done today, we still have a thousand left. And she wanted to know why. So we gave her the details, what were some of the challenges as to why we did not complete more. And we would also, you know, record, okay, this is what time we started, what time we ended.
So all the time she realized up until the end of that day and even that week that we were working overtime. It was when we actually put it into

Page 67

the system and then she said, "I'm not going to approve that," we had to take out time. And, like I said, she would tell us what time she would approve.
Q. How often did you have that -- did she tell you to back out time?
A. That was regular.
Q. What do you mean by "regular"?
A. It was regular. It was standard throughout my time there at that Fulfillment Center up until the time that Sonya started. And, like I said, then it would rotate between Sonya and Sarah who we would have to go to about the overtime that was worked.
Q. And let me just ask what do you mean by "regular" or "standard"?
A. We worked a lot of overtime every week. We worked overtime every week.
Q. So in a given week when Sarah told you how much overtime she would approve, how much would she approve?
A. She never told us prior to. She would tell us after this time was not approved, "I'm not going to approve it." And then when we would continuously have conversation with her, or if she just wanted us to submit the time card so that she

Page 68

could send it forward she would say, "Okay, I'll approve these -- I'll approve three hours for this," or "I'll approve two hours for this."
Q. Did you ever seek approval to work overtime before working it?
A. No. I didn't think it was necessary because she would come through there and see that we were working.
Q. Who else was present during these conversations where you allege that Sarah Froedge instructed you to back out overtime entries?
A. Lisa Bing. And Sarah Froedge and I, we had those discussions quite a bit.
Q. Anybody else?
A. I discussed with who I thought at the time was a HR representative, Lori, she worked there, that I had not gotten overtime, and she said that she would talk to HR at corporate about it and get back to me, and nothing ever happened.
Q. Is that Lori Hooper?
A. Yes.
Q. And she was actually in HR at the Fulfillment Center?
A. That's what she said.
Q. So Miss Hooper was actually present for

Page 69

one of these conversations that you had with Sarah Froedge?
A. No. I had a separate conversation with Lori about not receiving overtime pay.
Q. When did that conversation take place?
A. Spring of 2003.
Q. And what did you -- do you recall that conversation? Excuse me. What do you recall precisely about that conversation?
A. I just told her that I had not gotten paid overtime. And she said that if I had put it in that Sarah -- you know, she just went through the process, what the process is. I put it in, submit it, and then Sarah would approve it, and then it would go to payroll, and that she would check with HR to see why I had not gotten paid the overtime.
Q. So is it fair to say based on that that Miss Hooper told you that you should be recording your hours accurately?
MR. DIRKS: Objection. Mischaracterizes testimony. You can answer.
A. Oh, she was -- wanted to assist with trying to determine why I did not get paid the overtime.
Q. (By Mr. Kelly) And your complaint to

Page 70

Miss Hooper, you said that occurred approximately in the spring of 2003; is that correct?
A. Yes.
Q. Was there any other conversations with Miss Hooper regarding your allegation that you were not being paid overtime?
A. No.
Q. So there was only a single conversation?
A. No. My complaints for not being paid overtime typically would take place with Sarah Froedge and Sonya Moore.
Q. Let me ask about your conversations on this point with Sonya Moore.
A. Uh-huh.
Q. You said that she came on in the summer of 2003; is that correct?
A. Yes.
Q. Okay. And did she ever tell you to back out overtime as you've suggested?
A. No. She told us pretty much what the new changes were going to be, and that was we were not going to get paid for any overtime. If there were time that we put down time and we said, "Sonya, this is what we worked," she said that, "I'm not going to approve it, do not put it in there, I'm not going to

Page 71

approve it," and that was it. That was what Sarah's policy was, we weren't going to get paid the overtime.
Q. And just so we're clear, did you have those conversations with Miss Moore before or after you had worked the time?
A. We had the conversations before and after.
Q. So Ms. Moore told you before you had worked the overtime that she wasn't going to approve any overtime; is that correct?
A. What she said was, "Do not put down any overtime unless you check with me first." So as we worked the overtime we would notify her daily, you know, what hours was worked, and then when it came time to submit your pay at the end of the week then it was the same routine, "I'm not going to approve the overtime."
Q. Who did Sarah Froedge report to?
A. I can't remember her name.
Q. Was it someone in Charlotte?
A. No.
Q. You don't recall who she reported to?
A. I can't remember -- I don't recall her name.
Q. Do you recall her position?

Page 72

A. I think she was district or maybe regional. I can't recall her name. But she did not work in Charlotte, I know that.
Q. Do you know where she worked?
A. No. Sometimes we had calls, like different types of calls for whatever reason, and there would be individuals on those calls from California and both Iowa.
Q. Do you recall any of the individuals that you believe were from California?
A. I don't recall.
Q. How do you know they were in California?
A. Because our calls were typically set up to accommodate those individuals in California, so there would be some times we'd have to work late. If the call was -- you know, they would schedule a call for 3:00 California time, then we would have to work late to accommodate their time zone.
Q. But you don't recall who any of those individuals were?
A. No.
Q. Who did Sonya Moore report to?
A. Sarah Froedge.
Q. Am I correct that Sarah Froedge had the title of production operations manager?

Page 73

A. That's correct.
Q. Okay. And Sonya Moore, was she a team leader, or what was her title?
A. She was a supervisor.
Q. You said you had these calls periodically. What were these calls about?
A. Employee meetings, meetings about -- what do you call the term -- documents that were missing in the closing or settlement statement that was related to processing. I forget. It was a term they called for it. It just totally skips my mind.
Q. What do you mean by employee meetings?
A. Like, for example, when they was rolling out a new process for how we would originate and process loan files, they would have all employee meetings to first introduce these are the changes that are going to take place, and then they would break it down into teams and regions, and then you would actually get on that call and go through the training via phone. And it was like a presentation like you would just go through the Power Point presentation and go through the training on those changes.
Q. So it sounds like these calls were related to processes and procedures and training and bringing you up to speed on new products or new

# Deposition Excerpts of Jason Moxness' Deposition

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

In re: WELLS FARGO LOAN PROCESSOR OVERTIME PAY LITIGATION )

This Document Relates to Bowne v. Wells Fargo Home Mortgage (transferred from D. Kan., No. 06-2020) N.D. Cal., No. 07-4013 MHP ) MDL Docket No. 1841

VIDEOTAPED DEPOSITION OF JASON MOXNESS,

produced, sworn, and examined on Friday, the 21st day of December, 2007, commencing at 9:48 a.m. and concluding at 11:46 a.m., at the law offices of SPENCER, FANE, BRITT & BROWNE, 40 Corporate Woods, in the City of Overland Park, County of Johnson, State of Kansas, before:

CHRISTINE M. MASSEY, CSR
Certified Shorthand Reporter
of
JAY E. SUDDRETH & ASSOCIATES, INC.
Suite 100
10104 West 105th Street
Overland Park, Kansas 66212-5755

a Certified Shorthand Reporter within and for the State of Kansas.

Taken on behalf of the Defendant pursuant to Notice to Take Depositions.

b1001a5c-7584-47e7-841c-87330fd5c36b

Q. Do you know what elements went into the expense calculations, what expenses were rolled into this calculation?
A. I don't. We were never qualified for that bonus as a new branch. From what I was told, anyway, it almost takes three to four years to get to a profitability level. So I really don't know what was all involved in what that NOI bonus was. Again, I did not qualify for it for the time period that I was there.
Q. Did you see it as your responsibility as branch manager to manage the expenses of the office?
A. Yes.
Q. Of at least the subprime side?
A. Yes.
Q. What expenses did you manage as branch manager?
A. A lot of it would be how we would generate leads. So if we were to do any advertising, would be the main expense. We did some radio ads for a while, which technically hit my branch expenses. Internet leads we might buy, any type of telemarketing leads that we would buy would be the main line items.

Q. Did you have any overhead-type expenses like rent, utilities, that sort of thing, that you were responsible for managing?
A. That was all pretty much driven down to us based on the amount of space that we occupied. Kevin Laffey, my area manager, would essentially assign what our percentage of the utilities and phone bills and rent would be, but it was nothing that I could control.
Q. What about payroll expense, was that something that you were responsible for managing?
A. Yes.
Q. How did you go about managing payroll expense?
A. Well, it was all -- it was pretty much driven by production, so there wasn't a lot of management to it. I'm speaking on the HMC side. When I first started, there was bonuses, signing bonuses to recruit that would be approved by my area manager, but again, it was an expense that Wells Fargo felt necessary to bring on top producers. And anybody with a salary would need to be approved by levels higher than myself.
Q. Did you have a say in new employee salaries?

A. A say from the standpoint of I would go to Kevin Laffey or Pat Verkamp saying, I've got this individual and we need, you know, to be in this salary range. But they made the ultimate decision or approval.
Q. We need to take a break to change our tape.
THE VIDEOGRAPHER: Off the record at 10:42. This concludes Videotape No. 1.
(A brief break was had.)
THE VIDEOGRAPHER: Back on record. Beginning Videotape No. 2 at 10:44.
Q. (By Mr. Boatright) When we stopped to change the tape, you were describing the compensation and the expense for HMCs?
A. Uh-huh.
Q. And the fact that you were involved in approving the salary, but it had to be approved by folks above you?
A. Yes.
Q. What involvement did you have for setting the compensation for loan processors?
A. I did not have any involvement in that. I mean, I'm assuming bonus structure or anything like that or...

Q. Or hourly rate or any of that?
A. No.
Q. Who hired your loan processors?
A. I would interview them, hire them, still the hiring decision that would have to be approved by Pat or Kevin, but it would be on my recommendation.
Q. Did you ever see in any of the numbers that were given to you an expense related with the compensation -- related to the compensation of your loan processors?
A. Yes.
Q. In what form would you see that?
A. It was part of my monthly or month-end commission review. I would -- it was kind of a complex system that Wells Fargo had, but everybody that was on -- under my management at our branch would show up on a screen, and I would have to approve and change accordingly the commissions that showed up on there. Primarily, it was very labor intensive from an HMC standpoint going over every loan that was done and what was -- where the profitability was on it. There was no changes that we made to a processor's -- you know, theirs would show up with the base salary, approve it, and go

b1001a5c-7584-47e7-841c-87330fd5c36b

Page 46

on.
Q. As a branch manager, did you do anything to try to manage that -- the payroll cost, the labor cost in your office?
A. No. As salaried employees, it is what it is. From an HMC standpoint, they, you know, look at it as an expense, the more we paid, that means, you know, the more production they brought in the door being 100 percent commission on that side.
Q. Did you have any responsibility for performance appraisals for the folks that worked in your area?
A. Yes.
Q. Is that something that was conducted on a regular basis?
A. It was a -- our performance appraisals was a yearly review as far as rating them, in writing, and, you know, what their annual production was. I did informal meetings on a monthly basis when we did the commissions. I would bring each of them in, go over what they did that month.
Q. For the HMCs?
A. Yes.
Q. Right?

Page 47

A. Yes.
Q. Did you have monthly meetings with your loan processors?
A. No.
Q. Why not?
A. They weren't commission driven.
Q. During the time that you were branch manager, were you involved in the termination of any employees?
A. Yes.
Q. Who?
A. Guy Clark, Teresa Gallagher. There was others that left voluntarily, but...
Q. Right. And I want to focus on involuntary departures.
A. Okay.
Q. Guy Clark and Teresa Gallagher?
A. Those are the only two that I know of.
Q. What role did you have in their departures?
A. I was actually the one that brought them in. It was based on lack of production.
Q. Did you need approval from anyone to terminate their employment?
A. Yes. I went to both Kevin Laffey and Pat

Page 48

Verkamp. They agreed based on production that it was not a fit.
Q. Do you know someone named Harry Brewer?
A. Yes.
Q. How do you know Harry Brewer?
A. Actually, I should say I don't know him personally. I understand he was the one that was hired after I left.
Q. You've not met him?
A. No.
Q. Who is Carrie Winter?
A. She was a manager on the conforming side. She managed the midtown office on State Line -- or Ward Parkway. I think it was on that side of the street.
Q. Did you as branch manager have any responsibility for setting schedules for individuals that worked for you?
A. No.
Q. Was there some understanding as -- between you and those employees as to any expectation of their hours worked?
A. Are you speaking of the processors or the HMCs?
Q. Either one. Both.

Page 49

A. HMCs we looked at as hundred percent sales commission people that we allowed them to come and go as they pleased, basically. Their income is driven on, you know, what they produce.
Q. What about the processors?
A. Processors, as well, did not have set hours. They were expected to work full-time, obviously.
Q. Was the work in your office fairly steady or did it seem to have peaks and valleys?
A. I'd say it was -- during the time period I was there, it was fairly steady.
Q. Were there --
A. It was a busy time in the mortgage industry.
Q. Were there typically times of the year or times of the month or times of the week that are busier than others?
A. Times of the month would definitely be the last, you know, week, week and a half is when a lot of the loans seem to close. There were sporadic times throughout the year. January is a slower time and July was also a slower time. But for the most part, our production was on the rise from the beginning. Seemed to be more every month.

b1001a5c-7584-47e7-841c-87330fd5c36b

they worked.
Q. Were you told that you had any responsibility with respect to Webtime?
A. No. That was managed by Jean Scheckenger, which is Pat Verkamp's assistant.
Q. Do you know how to spell Scheckenger?
A. I can -- it's like S-c-h-e-c-k-e-n-g-e-r.
Q. And what was your understanding of what Jean would be doing with that Webtime?
A. Passing it up to corporate. Jean was basically the manager of the processors. When there would be processor conference calls or processor offsite meetings, Jean would run those, so she was the one that tracked their time, the number of loans closed, and would manage their bonus, if there was one for a month.
Q. Jean is J-e-a-n?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. When you were first advised that your processors would begin using the Webtime in roughly the fall of 2002, were you told that you had any responsibility for reviewing the time or doing anything at all with the time?

A. No.
Q. When this was rolled out in the fall of 2002, were both Ms. Bowne and Ms. Hesterberg working for you at the time?
A. As much as I recall, yes.
Q. What conversation did you have with them about Webtime?
A. It was merely, "Please log on to Webtime and record the times, the hours that you're working."
Q. I know you've said that you didn't have any responsibility for reviewing that time, but did you ever review that time --
A. I.
Q. -- that they were recording?
A. I did not have access to Webtime, so I never saw what hours they were recording. It went right to Jean Scheckenger.
Q. So if I were to hand you a record of either Ms. Hesterberg's or Ms. Bowne's time entries, you wouldn't be able to tell me one way or another if those were accurate?
A. No.
Q. Is that correct?
A. Correct.

Q. When you had a conversation with Ms. Bowne and Ms. Hesterberg about Webtime, did you advise them one way or another as to whether their time entries should be accurate?
A. Yes. I encouraged accuracy on everything they did and honesty. You know, "Please record the exact hours that you worked," and they were both great employees and I trusted them. And they had no issues with that.
Q. Do they both work for you now?
A. No.
Q. Just Ms. Bowne?
A. Yes.
Q. And she works out in western Kansas?
A. Yeah, she moved this summer.
Q. What does she do for you out there?
A. She is more of an administrative help to us, helps with state licensing and secretarial items.
Q. Other than this time in the fall of 2002 when you were told about Webtime, did you have any other conversations with anyone in -- on the management side of the company about loan processors recording their time?
A. No.

Q. So from fall of 2002 until spring of 2004 -- is that when you left?
A. Uh-huh.
Q. -- you had no further discussions about recording time?
A. It really was never an issue. It was a pretty simple procedure that there wasn't any question about, whether or not we should or shouldn't or what's being recorded, so it was -- and everyone was compliant to those requests, so it never came up as an issue later.
Q. At any time while you were branch manager, did you have any discussions with anyone on the management side about overtime compensation for loan processors?
A. No.
Q. It was never discussed?
A. No.
Q. Did you ever have any discussions about overtime compensation with any of your loan processors?
A. No.
Q. I take it, then, none of your loan processors ever came to you and said, "Hey, why am I not getting overtime pay?"

**M:07-cv-01841-MHP** In Re Wells Fargo Loan Processor Overtime Pay Litigation
Marilyn H. Patel, presiding
**Date filed:** 07/02/2007
**Date of last filing:** 04/11/2008

# History

| Doc. No. | Dates | | Description |
|---|---|---|---|
| 44 | *Filed & Entered:* | 04/11/2008 | Reply to Opposition |
| | *Docket Text:* Reply to Opposition re [33] MOTION to Strike ..... *NOTICE OF MOTION AND MOTION TO STRIKE CONSOLIDATED COMPLAINT AND/OR PORTIONS OF CONSOLIDATED COMPLAINT PURSUANT TO FED. R. CIV. P. 15(a)(2) AND 12(f)* MOTION to Strike ..... *NOTICE OF MOTION AND MOTION TO STRIKE CONSOLIDATED COMPLAINT AND/OR PORTIONS OF CONSOLIDATED COMPLAINT PURSUANT TO FED. R. CIV. P. 15(a)(2) AND 12(f)* filed byWells Fargo Bank, Wells Fargo Home Mortgage. (Spagat, Robert) (Filed on 4/11/2008) | | |
| 45 | *Filed & Entered:* | 04/11/2008 | Declaration in Support |
| | *Docket Text:* Declaration of Denise K. Drake in Support of [44] Reply to Opposition, filed byWells Fargo Bank, Wells Fargo Home Mortgage. (Attachments: # (1) Exhibit 1, # (2) Exhibit 2, # (3) Exhibit 3, # (4) Exhibit 4, # (5) Exhibit 5, # (6) Exhibit 6, # (7) Exhibit 7, # (8) Exhibit 8) (Related document(s)[44]) (Spagat, Robert) (Filed on 4/11/2008) | | |
| 46 | *Filed & Entered:* | 04/11/2008 | Declaration in Support |
| | *Docket Text:* Declaration of Eric P. Kelly in Support of [44] Reply to Opposition, filed byWells Fargo Bank, Wells Fargo Home Mortgage. (Attachments: # (1) Exhibit 1, # (2) Exhibit 2, # (3) Exhibit 3, # (4) Exhibit 4)(Related document(s)[44]) (Spagat, Robert) (Filed on 4/11/2008) | | |
| 42 | *Filed & Entered:* | 04/09/2008 | Stipulation and Order |
| | *Docket Text:* STIPULATION AND ORDER to amend case management order and extend tolling agreement; Signed by Judge Marilyn Hall Patel on 4/8/2008. (awb, COURT-STAFF) (Filed on 4/9/2008) | | |
| 43 | *Filed & Entered:* | 04/09/2008 | Motion to Seal |
| | *Docket Text:* MOTION to Seal *Plaintiffs' Memorandum in Opposition to Defendants' Expedited Motion to Strike Plaintiffs' Consolidated Complaint, and in the Alternative, Motion for Leave to Amend Complaint* filed by Mary Basore, Brenda McMillan, Trudy Bowne. Motion Hearing set for 4/14/2008 02:00 PM in Courtroom 15, 18th Floor, San Francisco. (Hanson, George) (Filed on 4/9/2008) | | |
| 41 | *Filed & Entered:* | 04/07/2008 | Motion to Seal |
| | *Docket Text:* MOTION to Seal filed by Mary Basore, Brenda McMillan, Trudy Bowne. Motion Hearing set for 4/28/2008 02:00 PM in Courtroom 15, 18th Floor, San Francisco. (Hanson, George) (Filed on 4/7/2008) | | |
| 40 | *Filed & Entered:* | 04/04/2008 | Stipulation |
| | *Docket Text:* STIPULATION *of Extension of Time to Respond to Wells Fargo's Motion to Dismiss and [Proposed] Order* by Mary Basore, Brenda McMillan, Trudy Bowne. (Attachments: | | |

| | | |
|---|---|---|
| | # (1) Exhibit 1)(Dirks, Eric) (Filed on 4/4/2008) | |
| 38 | *Filed & Entered:* 04/01/2008 | Order |
| | *Docket Text:* ORDER granting plaintiffs' application for attorney Norman E. Siegal to appear pro hac vice; Signed by Judge Marilyn Hall Patel on 3/31/2008. (awb, COURT-STAFF) (Filed on 4/1/2008) | |
| 32 | *Filed & Entered:* 03/31/2008 | Notice (Other) |
| | *Docket Text:* NOTICE by Wells Fargo Bank, Wells Fargo Home Mortgage ..... *NOTICE OF ASSOCIATION OF COUNSEL* (Spagat, Robert) (Filed on 3/31/2008) | |
| 33 | *Filed & Entered:* 03/31/2008 | Motion to Strike |
| | *Docket Text:* MOTION to Strike ..... *NOTICE OF MOTION AND MOTION TO STRIKE CONSOLIDATED COMPLAINT AND/OR PORTIONS OF CONSOLIDATED COMPLAINT PURSUANT TO FED. R. CIV. P. 15(a)(2) AND 12(f)* filed by Wells Fargo Bank, Wells Fargo Home Mortgage. Motion Hearing set for 4/14/2008 02:00 PM in Courtroom 15, 18th Floor, San Francisco. (Spagat, Robert) (Filed on 3/31/2008) | |
| 34 | *Filed & Entered:* 03/31/2008 | Declaration in Support |
| | *Docket Text:* Declaration of ERIC P. KELLY in Support of [33] MOTION to Strike ..... *NOTICE OF MOTION AND MOTION TO STRIKE CONSOLIDATED COMPLAINT AND/OR PORTIONS OF CONSOLIDATED COMPLAINT PURSUANT TO FED. R. CIV. P. 15(a)(2) AND 12(f)* MOTION to Strike ..... *NOTICE OF MOTION AND MOTION TO STRIKE CONSOLIDATED COMPLAINT AND/OR PORTIONS OF CONSOLIDATED COMPLAINT PURSUANT TO FED. R. CIV. P. 15(a)(2) AND 12(f)* filed byWells Fargo Bank, Wells Fargo Home Mortgage. (Attachments: # (1) Exhibit 1)(Related document(s)[33]) (Spagat, Robert) (Filed on 3/31/2008) | |
| 35 | *Filed & Entered:* 03/31/2008 | Declaration in Support |
| | *Docket Text:* Declaration of MONIQUE NGO-BONNICI in Support of [33] MOTION to Strike ..... *NOTICE OF MOTION AND MOTION TO STRIKE CONSOLIDATED COMPLAINT AND/OR PORTIONS OF CONSOLIDATED COMPLAINT PURSUANT TO FED. R. CIV. P. 15 (a)(2) AND 12(f)* MOTION to Strike ..... *NOTICE OF MOTION AND MOTION TO STRIKE CONSOLIDATED COMPLAINT AND/OR PORTIONS OF CONSOLIDATED COMPLAINT PURSUANT TO FED. R. CIV. P. 15(a)(2) AND 12(f)* filed byWells Fargo Bank, Wells Fargo Home Mortgage. (Related document(s)[33]) (Spagat, Robert) (Filed on 3/31/2008) | |
| 36 | *Filed & Entered:* 03/31/2008 | Proposed Order |
| | *Docket Text:* Proposed Order re [33] MOTION to Strike ..... *NOTICE OF MOTION AND MOTION TO STRIKE CONSOLIDATED COMPLAINT AND/OR PORTIONS OF CONSOLIDATED COMPLAINT PURSUANT TO FED. R. CIV. P. 15(a)(2) AND 12(f)* MOTION to Strike ..... *NOTICE OF MOTION AND MOTION TO STRIKE CONSOLIDATED COMPLAINT AND/OR PORTIONS OF CONSOLIDATED COMPLAINT PURSUANT TO FED. R. CIV. P. 15(a)(2) AND 12(f)* by Wells Fargo Bank, Wells Fargo Home Mortgage. (Spagat, Robert) (Filed on 3/31/2008) | |
| 37 | *Filed & Entered:* 03/31/2008 | Stipulation |
| | *Docket Text:* STIPULATION *TO EXPEDITE BRIEFING AND HEARING ON DEFENDANTS' MOTION TO STRIKE PLAINTIFFS' CONSOLIDATED COMPLAINT* by Wells Fargo Bank, Wells Fargo Home Mortgage. (Spagat, Robert) (Filed on 3/31/2008) | |
| | *Filed:* 03/28/2008<br>*Entered:* 04/01/2008<br>*Terminated:* 04/01/2008 | Motion for Pro Hac Vice |

| | | |
|---|---|---|
| 39 | *Docket Text:* MOTION for Admission of Attorney Norman E. Siegel Pro Hac Vice (Filing fee $ 210.00, receipt number 34611017542) filed by Mary Basore, Brenda McMillan, Trudy Bowne, Kristen Andersen, Elishia Hesterberg, Amie Lovrien, Jamie Hejlik, Nicole Gering. (gba, COURT STAFF) (Filed on 3/28/2008) | |
| 30 | *Filed & Entered:* 03/21/2008 | Notice (Other) |
| | *Docket Text:* NOTICE by Wells Fargo Bank, Wells Fargo Home Mortgage *of Constitutional Challenge to Cal. Bus. & Prof. Code 17200 et seq.* (Kelly, Eric) (Filed on 3/21/2008) | |
| 31 | *Filed & Entered:* 03/21/2008 | Amended Complaint |
| | *Docket Text:* AMENDED COMPLAINT *Consolidated* against Wells Fargo Bank, Wells Fargo Home Mortgage. Filed byMary Basore, Brenda McMillan, Trudy Bowne. (Hanson, George) (Filed on 3/21/2008) | |
| 24 | *Filed & Entered:* 03/20/2008<br>*Terminated:* 04/09/2008 | Motion for Leave to File Excess Pages |
| | *Docket Text:* MOTION for Leave to File Excess Pages , *Unopposed Administrative Motion and Stipulation to Exceed Page Limits* filed by Wells Fargo Bank, Wells Fargo Home Mortgage. (Kelly, Eric) (Filed on 3/20/2008) | |
| 25 | *Filed & Entered:* 03/20/2008 | Stipulation |
| | *Docket Text:* STIPULATION re [24] MOTION for Leave to File Excess Pages , *Unopposed Administrative Motion and Stipulation to Exceed Page Limits Stipulation and Proposed Order* by Wells Fargo Bank, Wells Fargo Home Mortgage. (Kelly, Eric) (Filed on 3/20/2008) | |
| 26 | *Filed & Entered:* 03/20/2008 | Motion to Dismiss |
| | *Docket Text:* MOTION to Dismiss *Plaintiffs' 17200 Claims, Notice of Motion to Dismiss Plaintiffs' 17200 Claims, and Memorandum of Points and Authorities in Support* filed by Wells Fargo Bank, Wells Fargo Home Mortgage. Motion Hearing set for 4/28/2008 02:00 PM in Courtroom 15, 18th Floor, San Francisco. (Kelly, Eric) (Filed on 3/20/2008) | |
| 27 | *Filed & Entered:* 03/20/2008 | Declaration in Support |
| | *Docket Text:* Declaration of Eric P. Kelly in Support of [26] MOTION to Dismiss *Plaintiffs' 17200 Claims, Notice of Motion to Dismiss Plaintiffs' 17200 Claims, and Memorandum of Points and Authorities in Support with Supporting Exhibits* filed byWells Fargo Bank, Wells Fargo Home Mortgage. (Attachments: # (1) Exhibit 1, # (2) Exhibit 2, # (3) Exhibit 3, # (4) Exhibit 4, # (5) Exhibit 5, # (6) Exhibit 6, # (7) Exhibit 7, # (8) Exhibit 8, # (9) Exhibit 9, # (10) Exhibit 10, # (11) Exhibit 11, # (12) Exhibit 12, # (13) Exhibit 13, # (14) Exhibit 14, # (15) Exhibit 15, # (16) Exhibit 16, # (17) Exhibit 17, # (18) Exhibit 18, # (19) Exhibit 19)(Related document(s)[26]) (Kelly, Eric) (Filed on 3/20/2008) | |
| 28 | *Filed & Entered:* 03/20/2008 | Declaration in Support |
| | *Docket Text:* Declaration of Elise Reiser in Support of [26] MOTION to Dismiss *Plaintiffs' 17200 Claims, Notice of Motion to Dismiss Plaintiffs' 17200 Claims, and Memorandum of Points and Authorities in Support with Supporting Exhibits* filed byWells Fargo Bank, Wells Fargo Home Mortgage. (Attachments: # (1) Exhibit 1, # (2) Exhibit 2, # (3) Exhibit 3, # (4) Exhibit 4, # (5) Exhibit 5, # (6) Exhibit 6, # (7) Exhibit 7, # (8) Exhibit 8, # (9) Exhibit 9)(Related document (s)[26]) (Kelly, Eric) (Filed on 3/20/2008) | |
| 29 | *Filed & Entered:* 03/20/2008 | Declaration in Support |
| | *Docket Text:* Declaration of Teresa Swanson in Support of [26] MOTION to Dismiss *Plaintiffs' 17200 Claims, Notice of Motion to Dismiss Plaintiffs' 17200 Claims, and Memorandum of Points and Authorities in Support* filed byWells Fargo Bank, Wells Fargo Home Mortgage. (Related | |

| | | |
|---|---|---|
| | document(s)[26]) (Kelly, Eric) (Filed on 3/20/2008) | |
| 21 | *Filed & Entered:* 02/28/2008 | Order |
| | *Docket Text:* ORDER granting plaintiffs' application for attorney Ashlea Gayle Schwarz to appear pro hac vice; Signed by Judge Marilyn Hall Patel on 2/28/2008. (awb, COURT-STAFF) (Filed on 2/28/2008) | |
| 22 | *Filed:* 02/22/2008<br>*Entered:* 03/01/2008<br>*Terminated:* 02/22/2008 | Motion for Pro Hac Vice |
| | *Docket Text:* MOTION for Admission of Attorney Ashlea Gayle Schwarz Pro Hac Vice (Filing fee $ 210.00, receipt number 34611016162) filed by Mary Basore, Brenda McMillan, Trudy Bowne, Kristen Andersen, Elishia Hesterberg, Amie Lovrien, Jamie Hejlik, Nicole Gering. (gba, COURT STAFF) (Filed on 2/22/2008) | |
| 23 | *Filed:* 02/22/2008<br>*Entered:* 03/01/2008 | Received Order |
| | *Docket Text:* Received Order re [22] MOTION for leave to appear in Pro Hac Vice (Filing fee $ 210.00, receipt number 34611016162.) by Mary Basore, Brenda McMillan, Trudy Bowne, Kristen Andersen, Elishia Hesterberg, Amie Lovrien, Jamie Hejlik, Nicole Gering. (gba, COURT STAFF) (Filed on 2/22/2008) (gba, COURT STAFF). | |
| 18 | *Filed & Entered:* 02/05/2008 | Stipulation |
| | *Docket Text:* *** **FILED IN ERROR. PLEASE SEE DOCKET #[19].** *** STIPULATION re [15] Stipulation, [12] Terminate Deadlines and Hearings, Case Management Scheduling Order *to Amend Case Management Order for 17200 Issues* by Wells Fargo Bank, Wells Fargo Home Mortgage. (Kelly, Eric) (Filed on 2/5/2008) Modified on 2/5/2008 (ewn, COURT STAFF). | |
| 19 | *Filed & Entered:* 02/05/2008 | Amended Document |
| | *Docket Text:* AMENDED DOCUMENT by Wells Fargo Bank, Wells Fargo Home Mortgage. Amendment to [18] Stipulation *CORRECTION OF DOCKET #[18].*. (Kelly, Eric) (Filed on 2/5/2008) | |
| 20 | *Filed & Entered:* 02/05/2008 | Notice (Other) |
| | *Docket Text:* NOTICE by Wells Fargo Bank, Wells Fargo Home Mortgage *of Intent to File Motion to Dismiss 17200 Claims Pursuant To Stipulation Of The Parties [Doc. 19]* (Kelly, Eric) (Filed on 2/5/2008) | |
| 17 | *Filed & Entered:* 02/02/2008 | Stipulation |
| | *Docket Text:* STIPULATION re [15] Stipulation, [12] Terminate Deadlines and Hearings, Case Management Scheduling Order, [14] Stipulation and Order *to Amend Case Management Order for Certification Issues* by Wells Fargo Bank, Wells Fargo Home Mortgage. (Kelly, Eric) (Filed on 2/2/2008) | |
| 16 | *Filed & Entered:* 01/08/2008 | Notice (Other) |
| | *Docket Text:* NOTICE by Wells Fargo Bank, Wells Fargo Home Mortgage *of Intent to File Motion to Dismiss 17200 Claims Pursuant To Stipulation Of The Parties [Doc. 15]* (Kelly, Eric) (Filed on 1/8/2008) | |
| 15 | *Filed & Entered:* 12/31/2007 | Stipulation |
| | *Docket Text:* STIPULATION re [12] Terminate Deadlines and Hearings, Case Management Scheduling Order *to Amend Case Management Order for 17200 Issues* by Wells Fargo Bank, | |

| | | |
|---|---|---|
| | Wells Fargo Home Mortgage. (Kelly, Eric) (Filed on 12/31/2007) | |
| 14 | *Filed & Entered:* 12/18/2007 | Stipulation and Order |
| | *Docket Text:* STIPULATION AND ORDER re TOLLING AGREEMENT: Signed by Judge Marilyn Hall Patel on 12/17/2007. (awb, COURT-STAFF) (Filed on 12/18/2007) | |
| 13 | *Filed & Entered:* 12/12/2007 | Stipulation |
| | *Docket Text:* STIPULATION *Tolling Agreement* by Mary Basore, Trudy Bowne. (Dirks, Eric) (Filed on 12/12/2007) | |
| 12 | *Filed & Entered:* 11/13/2007 | Terminate Deadlines and Hearings |
| | *Docket Text:* AMENDED CASE MANAGEMENT SCHEDULING ORDER; Signed by Judge Marilyn Hall Patel on 11/9/2007. (awb, COURT-STAFF) (Filed on 11/13/2007) | |
| 11 | *Filed & Entered:* 11/08/2007 | Proposed Order |
| | *Docket Text:* Proposed Order *Case Management Order* by Mary Basore, Trudy Bowne. (Dirks, Eric) (Filed on 11/8/2007) | |
| 10 | *Filed & Entered:* 11/06/2007 | Terminate Deadlines and Hearings |
| | *Docket Text:* Minute Entry: Further Case Management Conference held on 11/5/2007 before Hon. Marilyn Hall Patel (Date Filed: 11/6/2007). Non exempt hourly employees; Tolling agreement, protective order entered; Preservation order to be submitted; 17200 Discovery to be completed by 12/31/08, with 17200 motions to be heard 2:00 pm on 2/25/2008; Class Cert Discovery to be completed by 1/31/08, with Class Cert motions to be heard 2:00 pm on 4/21/2008; Amended CMC order to be submitted; (Court Reporter Katherine Powell.) (awb, COURT-STAFF) (Date Filed: 11/6/2007) | |
| 9 | *Filed & Entered:* 11/05/2007 | Notice (Other) |
| | *Docket Text:* NOTICE by Wells Fargo Bank, Wells Fargo Home Mortgage *of Appearance of Joan B. Tucker Fife as Counsel* (Kelly, Eric) (Filed on 11/5/2007) | |
| 8 | *Filed & Entered:* 10/26/2007 | Proposed Order |
| | *Docket Text:* Proposed Order re [5] Proposed Order, [2] Status Report, [7] Clerk's Notice *for Case Management, Protective Order, and Removing 11/5/07 Conference from Calendar* by Wells Fargo Bank, Wells Fargo Home Mortgage. (Kelly, Eric) (Filed on 10/26/2007) | |
| 7 | *Filed & Entered:* 09/19/2007 | Clerk's Notice |
| | *Docket Text:* CLERK'S NOTICE: Case Management Conference set for 11/5/2007 03:00 PM before the Hon. Marilyn Hall Patel; Joint Case Management Statement due by 10/26/2007. (awb, COURT-STAFF) (Filed on 9/19/2007) | |
| 6 | *Filed & Entered:* 09/17/2007 | Notice (Other) |
| | *Docket Text:* NOTICE by Mary Basore *[of filing of Barbara Powell's Consent to Become a Party Plaintiff]* (Hanson, George) (Filed on 9/17/2007) | |
| 4 | *Filed & Entered:* 09/05/2007 | Stipulation |
| | *Docket Text:* STIPULATION *Tolling Agreement* by Mary Basore, Trudy Bowne. (Dirks, Eric) (Filed on 9/5/2007) | |
| 5 | *Filed & Entered:* 09/05/2007 | Proposed Order |
| | *Docket Text:* Proposed Order *Stipulated Protective Order* by Mary Basore, Trudy Bowne. (Dirks, Eric) (Filed on 9/5/2007) | |
| | *Filed & Entered:* 08/06/2007 | Clerk's Notice |

| | | | |
|---|---|---|---|
| 3 | *Docket Text:* CLERK'S NOTICE Advising Counsel of Receipt of the case Trudy Bowne, et al. -v- Wells Fargo Home Mortgage from the District of Kansas. (sv, COURT STAFF) (Filed on 8/6/2007) | | |
| 2 | *Filed & Entered:* | 07/23/2007 | Status Report |
| | *Docket Text:* STATUS REPORT *[Joint Report of the Parties and [Proposed] Case Management Order* by Mary Basore. (Dirks, Eric) (Filed on 7/23/2007) | | |
| -- | *Filed:*<br>*Entered:* | 07/02/2007<br>07/09/2007 | Case Referred to ECF |
| | *Docket Text:* CASE DESIGNATED for Electronic Filing. (gba, COURT STAFF) (Filed on 7/2/2007) | | |
| 1 | *Filed:*<br>*Entered:* | 07/02/2007<br>07/09/2007 | Order |
| | *Docket Text:* TRANSFER ORDER from Judicial Panel on Multi District Litigation, pursuant to 28 U.S.C. 1407, that the action is transferred to the Northern District of California creating MDL No. M 07-1841. (gba, COURT STAFF) (Filed on 7/2/2007) Additional attachment(s) added on 7/9/2007 (gba, COURT STAFF). | | |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/12/2008 16:35:05 | | | |
| **PACER Login:** | ms0981 | **Client Code:** | 250056.00016-14499 |
| **Description:** | History/Documents | **Search Criteria:** | M:07-cv-01841-MHP |
| **Billable Pages:** | 5 | **Cost:** | 0.40 |