# EXHIBIT F

1  George A. Hanson, Esq.
   Norman E. Siegel, Esq.
2  Eric L. Dirks, Esq.
   Ashlea G. Schwarz, Esq.
3  STUEVE SIEGEL HANSON LLP
   460 Nichols Road, Suite 200
4  Kansas City, MO 64112
   816-714-7115 tel
5  816-714-7101 fax
   Email: hanson@stuevesiegel.com
6  Email: siegel@stuevesiegel.com
   Email: dirks@stuevesiegel.com
7  LEAD COUNSEL FOR PLAINTIFFS

8                    UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
9

10 In re:                               MDL-1841

11                                      DECLARATION OF GEORGE HANSON IN
                                        SUPPORT OF PLAINTIFFS' MEMORANDUM
12                                      IN OPPOSITION TO DEFENDANTS' MOTION
   WELLS FARGO LOAN PROCESSOR           TO STRIKE PLAINTIFFS' CONSOLIDATED
13 OVERTIME PAY LITIGATION              COMPLAINT, AND IN THE ALTERNATIVE,
                                        MOTION FOR LEAVE TO AMEND
14                                      COMPLAINT
   This document relates to ALL CASES
15                                                        REDACTED
                                        Date: April 14, 2008
16                                      Time: 2:00 P.M.
                                        Dept: 15
17                                      Judge: Hon. Marilyn Hall Patel

18
          I, George A. Hanson, declare as follows:
19
          1.     I am an attorney with the law firm of Stueve Siegel Hanson LLP, counsel of
20
   record to the Plaintiffs in this action. This declaration is based on my own personal knowledge
21
   and if called to testify I could and would testify to the matters stated herein.
22
          2.     Attached hereto as Exhibit A is a true and correct copy of Wells Fargo's August
23
   3, 2006 Opposition to Conditional Certification.
24
          3.     Attached hereto as Exhibit B is a true and correct copy of August 8, 2006 Request
25
   for Production of Documents.
26

27

28  DECLARATION OF GEORGE HANSON IN SUPPORT OF PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
    DEFENDANTS' MOTION TO STRIKE PLAINTIFFS' CONSOLIDATED COMPLAINT, AND IN THE ALTERNATIVE, MOTION
                              FOR LEAVE TO AMEND COMPLAINT
                                           1

1    4.    Attached hereto as Exhibit C is a true and correct copy of the August 11, 2007 e-

2    mail from Wells Fargo counsel to Plaintiffs' counsel.

3    5.

4

5    6.    Attached hereto as Exhibit E is a true and correct copy of an excerpt from the

6    Wells Fargo & Company Annual Report 2006.

7    I declare under penalty of perjury under the laws of the United States and pursuant to

8    28 U.S.C. § 1746 that the foregoing is true and correct.

9

10    Executed on this 9th day of April, 2008.

11                                    /s/ George A. Hanson

12                                George A. Hanson

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF GEORGE HANSON IN SUPPORT OF PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE PLAINTIFFS' CONSOLIDATED COMPLAINT, AND IN THE ALTERNATIVE, MOTION FOR LEAVE TO AMEND COMPLAINT

2

1

## CERTIFICATE OF SERVICE

2    The undersigned hereby certifies on the 9th day of April, 2008, I emailed the foregoing to

3    the following:

4          Denise K. Drake
           ddrake@spencerfane.com
5          Eric P. Kelly
           ekelly@spencerfane.com
6          Spencer Fane Britt & Browne
7          1000 Walnut, Suite 1400
           Kansas City, MO 64106
8          PH:    816-474-8100
           FAX:  816-474-3216
9

10        ATTORNEYS FOR DEFENDANT

11

12                              _____/s/ George A. Hanson_____
                                Attorney for Plaintiffs
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | | |
|---|---|---|
| **TRUDY BOWNE, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Case No. 06-2020 CM** |
| | ) | |
| **WELLS FARGO BANK, N.A.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

DEFENDANT'S SUGGESTIONS IN OPPOSITION
TO PLAINTIFFS' MOTION FOR CONDITIONAL
<u>DESIGNATION OF CASE AS AN FLSA COLLECTIVE ACTION</u>

This is not an exemption case. "Loan processors" at Wells Fargo Bank, N.A., are currently, and consistently have been, classified as **NONEXEMPT** employees pursuant to the requirements of the Fair Labor Standards Act. "Loan processors" at Wells Fargo are (and have been) required to accurately record all of their hours worked. "Loan processors" at Wells Fargo are (and have been) paid time and one-half for all hours worked over forty in a work week. In fact, Wells Fargo paid its "loan processors" more than $19.6 million in overtime compensation during 2003, 2004, and 2005. Thus, the one and only "decision, policy or plan" at issue in this case is wholly lawful -- there simply are no similarly-situated "victims" in need of rescuing here.

Perhaps in an attempt to avoid any scrutiny of the facts, Plaintiffs submit five brief and conclusory declarations. Those declarations are wrong as to the exemption, show no basis of personal knowledge for operations outside the Plaintiffs' offices, tell the Court nothing about Wells Fargo's operations, and fail to identify any legitimate class of similarly-situated individuals or anyone interested in joining this suit. On this slim record, Plaintiffs ask this Court to conditionally certify a class of thousands of generically-described, nonexempt, and overtime-paid "loan processors" working in approximately **2600 locations across 34 regions and several business**

lines, even though Plaintiffs worked in only a handful of offices in one region on one side of Wells

Fargo's mortgage business. Five conclusory declarations from the Plaintiffs is not enough to justify

sending notice to divisions, regions, and operations that have not in any way been implicated in this

litigation. *See Carlson v. Leprino Foods Co.*, No. 1:05-CV-798, 2006 WL 1851245 at *5 (W.D.

Mich. June 30, 2006) (denying conditional certification of nationwide class where "the factual

differences between the respective plants are so significant that they appropriately warrant trials in

separate fora dedicated to their own specific policies, plant organizations, time card systems, and the

like"); *England v. New Century Financial Corp.*, 370 F.Supp.2d 504, 511 (E.D. La. 2005) (loan

officers were not similarly situated due to "multitude of different managers at different geographical

locations across the country" and different facts at each location). Therefore, conditional

certification must be denied.

At most, this Court should limit any conditional certification to employees who worked in

the same area – geographic and functional – as Plaintiffs. Plaintiffs here all worked in the same

Wells Fargo region. Plaintiffs here only worked in retail branch offices. Plaintiffs here only worked

on prime and subprime loans. They have demonstrated no substantial allegations of any FLSA

violations outside of their areas. Thus, to the extent any certification is appropriate, it should be

limited to those loan processors who worked – as Plaintiffs did – in Wells Fargo's Region 10 retail

branch offices on prime and subprime loans.

"Every now and then it makes sense to take in a panoramic view of a litigation before

deciding how it can or should move forward." *Carlson v. Leprino Foods Co.*, No. 1:05-CV-798,

2006 WL 1851245, at *5 (W.D. Mich. June 30, 2006). To give the Court that panoramic view,

Wells Fargo has submitted 45 declarations from "loan processors" around the country demonstrating

that they work in different locations, doing different things, for different managers, in different sides

WA 863235.1

of Wells Fargo's business. They also demonstrate that, whatever Plaintiffs may have experienced, "loan processors" around the country knew they were entitled to overtime, knew they were required to record all their time worked, and were paid for their overtime worked.

Thus, while Plaintiffs attempt to broadly paint this case as a "one size fits all" corporate-wide exemption case, it is actually about six former employees who worked in six retail sales offices in Kansas and Iowa. The presence of these six plaintiffs from two states (Kansas and Iowa) is not a mere coincidence. Nor is it the result of some diabolical pay plan related to Wells Fargo "loan processors" across the country. These *individuals* are linked to each other through a separate case against Wells Fargo filed in Illinois (*Perry v. Wells Fargo Home Mortgage*), relating to time two of them spent working as "loan originators." George Hanson of Stueve Siegel Hanson Woody LLP represents Plaintiffs Bowne (Kansas) and Lovrien (Iowa) in that case.

It is that litigation and nothing else that ties these Plaintiffs together. As "loan processors," their status at Wells Fargo was clear – they were non-exempt employees. To the extent they claim they worked overtime but were not paid, their issues are local, not national, and conditional certification should be denied.

3

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................4

TABLE OF AUTHORITIES .........................................................................................6

ARGUMENT ..................................................................................................................8

I.     Plaintiffs Got It Wrong – This Is Not a One-Size-Fits-All Exemption Case......................8

   A. Wells Fargo Requires That Loan Processors Accurately Record All Hours
     Worked.  Indeed, Wells Fargo Paid Its Loan Processors More Than $19.6
     Million For Overtime Work In 2003, 2004, And 2005.....................................................9

   B. Even Plaintiffs Confirm They Were Eligible For And Were Paid Overtime
     Compensation. .............................................................................................................10

   C. Loan Processors Across The Country, In Various Regions And Divisions, Knew
     Their Positions Were Nonexempt; They Were Paid Overtime Compensation..............11

II.    Even Under the Most Lenient Standard, Wells Fargo Loan Processors Are Not
     Similarly Situated...........................................................................................................15

   A.   Employees in the Putative Class Plaintiffs Seek To Certify Are Not Similar. .............17

     1.   Different Roles, Responsibilities, and Reporting Structures. ...................................17

     2.   Different Compensation Arrangements. .................................................................20

   B.   Plaintiffs Never Worked in Wells Fargo's Operations Division. ...................................22

     1.   The Retail Sales and Operations Divisions Are Starkly Different, Serving
       Entirely Different Purposes in Different Locations With Different Management
       Structures, and Different Duties, and Different Requirements.......................................22

     2.   Loan Processors From Across The Country Within The Operations Divisions
       Have Consistently Received Overtime Compensation. ............................................23

   C.   Even Looking Exclusively At The Retail Side Of Wells Fargo's Mortgage
     Business, A Nationwide Class Is Inappropriate................................................................24

III.   A Collective Action Under These Circumstances Is Unmanageable and Unwarranted....25

   A.   Each Employee's Soon-To-Be-Alleged "Off-the-Clock" Claim Is Unique...................26

   B.   Each Employee's Claims Must Be Individually Litigated. ...........................................26

   C.   The Proposed Class is Unmanageable. ...........................................................................28

   D.   Denial of Certification Will Not Deny Any Substantive Rights....................................28

IV.    At Most, This Court Should Conditionally Certify A Very Narrow Collective Action,
     Encompassing Only The Three Areas In Region 10 Of The Retail Division Where
     Plaintiffs Worked (Excluding PMB). .............................................................................28

V.     Conditional Certification of a Nationwide Class, Particularly Under These
     Circumstances, Without Exacting Scrutiny, Violates Constitutional Guarantees of Due
     Process. ...........................................................................................................................30

VI.  The Temporal Scope of the Notice Is Improper. ................................................32

CONCLUSION....................................................................................................................33

CERTIFICATE OF SERVICE ...........................................................................................34

WA 863235.1

## TABLE OF AUTHORITIES

### Federal Cases

*Anderson v. Mount Clemens Pottery Co.*, 328 U.S. 680, 66 S.Ct. 1187 (1946) ........................... 27

*Armstrong v. Weichert Realtors*, No. 05-3120, 2006 WL 1455781 (D.N.J. May 19, 2006).. 10, 31

*Camper v. Home Quality Mgmt., Inc.*, 200 F.R.D. 516 (D. Md. 2000) ......................................... 8

*Carlson v. Leprino Foods Co.*, No. 1:05-CV-798, 2006 WL 1851245 (W.D. Mich. June 30, 2006) ................................................................................................................................. 25, 28

*Clark v. Dollar General Corp.*, Case No. 3:00-0729, 2001 WL 878887 (M.D.Tenn. 2001) ....... 29

*Compton v. Wells Fargo Fin. Assistance Okla., Inc.*, No . 04-0211(W.D. Okla. May 30, 2006) .. 8

*England v. New Century Financial Corp.*, 370 F.Supp.2d 504 (E.D. La. 2005) .......................... 16

*Garner v. Regis Corp.*, No. 03-5037, 2004 U.S. Dist. Lexis 29167 (W.D.Mo. 2004) ........... 29, 30

*Gieseke v. First Horizon Home Mortgage Corp.*, 408 F.Supp.2d 1164 (D. Kan 2006) ............... 30

*Hoffman-LaRoche Inc. v. Sperling*, 493 U.S. 165 (1989) ............................................................. 8

*Holt v. Rite Aid Corp.*, 333 F.Supp.2d 1265 (M.D. Alab. 2004) ...................................... 16, 25, 31

*Horne v. United Services Automobile Association*, 279 F.Supp.2d 1231 (M.D. Alab. 2003) ...... 16

*In re Wal Mart Employee Litigation*, 711 N.W.2d 694 (Wis.App. 2006) .................................... 26

*Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987) .......................................................... 26, 28

*McElmurry v. US Bank Nat'l Ass'n*, No. 04-642, 2004 WL 1675925 (D. Or. July 27, 2004) ..... 25

*Murray v. Stuckey's Inc.*, 939 F.2d 614 (8th Cir. 1991) .............................................................. 26

*Ray v. Motel 6 Operating, Ltd. Partnership*, No. 3-95-828, 1996 WL 938231 (D. Minn. 1996) 26

*Redman v. U.S. West Bus. Resources, Inc.*, 153 F.3d 691 (8th Cir. 1998) ................................... 32

*Reed v. Mobile County School System*, 246 F.Supp.2d 1227 (S.D. Ala. 2003) ........................... 16

*Rodgers v. CVS Pharmacy, Inc.*, 2006 WL 752831 (M.D.Fla. 2006) ......................................... 17

*Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180 (10th Cir. 2002) ................................ 31

*Saxton v. Title Max of Alab., Inc.*, No 2:04 CV 2579, 2006 WL 1321420 (N.D. Ala. May 4, 2006) .............................................................................................................................. 16

*Severtson v. Phillips Beverage Co.*, 137 F.R.D. 264 (D. Minn. 1991) ......................................... 8

*Sheffield v. Orius Corp.*, 211 F.R.D. 411 (D. Or. 2002) ............................................................. 25

*Singleton v. Wulff*, 428 U.S. 106 (1976) .................................................................................... 31

*State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408 (2004) ............................... 32

*Thiessen v. General Elec. Capital Corp.*, 267 F.3d 1095 (10th Cir. 2001) ............................. 8, 30

*Ulvin v. Northwestern Nat. Life Ins. Co.*, 141 F.R.D. 130 (D. Minn. 1991) ............................... 26

WA 863235.1

*Wertheim v. State of Arizona*, No. 92-453, 1993 WL 603552 (D.Ariz. 1993) .............................. 16

**Federal Statutes**

29 U.S.C. § 255(b) ........................................................................................................................32

**Other Authorities**

James M. Fraser, Note, *Opt-In Class Actions Under the FLSA, EPA, and ADEA: What Does It Mean to be "Similarly Situated"?*, 38 Suffolk U. L. Rev. 95, 121 (2004) ............................31

## ARGUMENT

Courts have the discretion to facilitate notice in a collective action, but sending notice is *not* **mandatory** and should only be done with **great caution**. *Hoffman-LaRoche Inc. v. Sperling*, 493 U.S. 165 (1989); *Camper v. Home Quality Mgmt., Inc.*, 200 F.R.D. 516, 519 (D. Md. 2000). The relevant inquiry is "whether this is an appropriate case in which to exercise discretion." *Camper*, 200 F.R.D. at 519. Courts should be mindful of their "responsibility to avoid the 'stirring up' of litigation through unwarranted solicitation." *Severtson v. Phillips Beverage Co.*, 137 F.R.D. 264, 266-67 (D. Minn. 1991).

The Tenth Circuit endorses the two-stage method for considering whether to certify a collective action. *See Thiessen v. General Elec. Capital Corp.*, 267 F.3d 1095, 1105 (10th Cir. 2001). At both stages, plaintiffs must demonstrate that the putative class members are similarly situated -- that is, plaintiffs "were together the victims of a *single* **decision, policy or plan.**" *Thiessen,* 267 F.3d at 1102 (emphasis added, citations omitted). As another District Court in the Tenth Circuit acknowledged, "conditional certification and notice approval are **not** perfunctory." *Compton v. Wells Fargo Fin. Assistance Okla., Inc.*, No . 04-0211, slip op. at 6 (Ex. 6) (W.D. Okla. May 30, 2006) (denying certification of an exemption / misclassification collective action).

## I.    Plaintiffs Got It Wrong – This Is Not a One-Size-Fits-All Exemption Case.

Plaintiffs want this case to be a one-size-fits-all exemption case. Plaintiffs go to great lengths to compare their situation to the "incorrect" treatment of loan originators as exempt employees. Plaintiffs assert that companies should know loan processors are nonexempt based on the clerical nature of their duties. Plaintiffs then allege that loan processors, *like those at Wells Fargo*, cannot meet any of the exemption tests. Based on these arguments, Plaintiffs seek to represent all of Wells Fargo's loan processors.

WA 863235.1

Plaintiffs got it wrong. There is no question that (1) "loan processors" at Wells Fargo, including Plaintiffs, are (and were) nonexempt, and (2) Wells Fargo appropriately paid its "loan processors" as nonexempt employees. Plaintiffs' personnel records demonstrate that they were classified as non-exempt employees. *See* Ex. 4 (showing all six plaintiffs' "FLSA Status" as "Non-exempt"). ***None of the Plaintiffs identify anyone at Wells Fargo who told them otherwise.*** *See* Plaintiffs' Declarations. But whatever plaintiffs did or were told locally, "loan processors" from around the country knew they were entitled to overtime, and Wells Fargo paid it.

### A.    Wells Fargo Requires That Loan Processors Accurately Record All Hours Worked. Indeed, Wells Fargo Paid Its Loan Processors More Than $19.6 Million For Overtime Work In 2003, 2004, And 2005.

Wells Fargo requires that all nonexempt employees, including loan processors, accurately record all hours worked. The Wells Fargo employee handbook states:

> In order to meet the needs of our customers and business, *you may occasionally need to work overtime* or on one of Wells Fargo's common holidays. Whether you receive overtime or holiday pay for this depends on whether your position is classified as exempt or nonexempt.
>          * * *
> If you're nonexempt, you receive overtime pay of 1 1/2 times your pay (including any shift differential), or "time-and a half," if you work more than 40 hours in a workweek. Paid Time Off and holidays are not counted as "work" hours for overtime purposes. *You must report all the hours you work*, and you need to get your supervisor's approval before you work any overtime ....

Ex. 10, Section 5.7 (emphasis added); *see also* Section 5.6. The policy further states:

> If you're a nonexempt team member, *you must fill out and submit timely, accurate timecards* (using Webtime online timesheets or another method if approved for your group) *in order to receive proper pay, including overtime.*

Ex. 10, Section 5.12 (emphasis added). *See also* Ex. 9 (2001 Handbook). The employee handbook is always available online. A hard copy is provided to new employees, which plaintiffs acknowledged receiving. *See* Exs. 11-16.

WA 863235.1

But Wells Fargo does not stop there. The importance of accurate time reporting is reiterated by managers and **annually** in nationwide employee training. *See, e.g.*, Ex. 43, ¶ 22; Ex. 18, ¶15. The Wells Fargo Code of Ethics and Business Conduct – which is part of the Handbook for Wells Fargo employees – requires all employees both to maintain accurate records and to check their pay vouchers for accuracy. Ex. 10, Appendix A, page 103-04. The required training in 2004 was explicit: "You are required to report any inaccuracies -- whether related to underpayment or overpayment – immediately." Ex. 5, p. 16. Plaintiffs Bowne, Anderson, Lovrien, and Hejlik completed the training containing this material. Ex. 7, ¶6.

Based on Wells Fargo's national policies, practices, and training, no loan processor should have been under any misimpression regarding the recording of, and payment for, all hours worked. Indeed, loan processors apparently understood Wells Fargo's pay system, as they were paid more than $19.6 million for overtime worked during 2003, 2004, and 2005. *See* Ex. 17, ¶¶4-5.

**B.      Even Plaintiffs Confirm They Were Eligible For And Were Paid Overtime Compensation.**

Referring to Plaintiffs' declarations, Plaintiffs' brief in support of conditional certification asserts: "Their statements are uniform – Wells Fargo did not pay its loan processors overtime, even though its loan processors customarily worked more than 40 hours per week." Yet, Plaintiff Lovrien admits she was paid overtime. Pl. Ex. 5, ¶7. Plaintiff Hejlik admits she was eligible for overtime pay when it was "pre-approved." Pl. Ex. 3, ¶6. And, Plaintiffs fail to show they have any personal knowledge of the experiences of others. *See Armstrong v. Weichert Realtors*, No. 05-3120, 2006 WL 1455781, at *1-2 (D.N.J. May 19, 2006) (denying class certification of loan officers where plaintiff failed to offer any evidence of personal knowledge or factual foundation for bald assertions about other loan officers). Although Plaintiffs "overreach" in several ways, the truth of the matter is that Plaintiffs acknowledge they were nonexempt – eligible for and paid overtime.

WA 863235.1

While Plaintiffs call themselves "loan processors," their actual titles at Wells Fargo were "mortgage loan specialists" (Bowne and Hesterberg) and "mortgage sales associates" (Anderson, Gering, Hejlik, & Lovrien).    Their personnel records are explicit in the classification of both positions as non-exempt employees. *See* Ex. 4. For simplicity, and because plaintiffs have done so, defendant will simply refer to them collectively as "loan processors," even though their duties markedly differ.

**C.    Loan Processors Across The Country, In Various Regions And Divisions, Knew Their Positions Were Nonexempt; They Were Paid Overtime Compensation.**

Loan processors across the country, in various regions and divisions, understood Wells Fargo's policy and practice of requiring nonexempt employees to accurately record all time worked. They complied and they were paid:

> **Cindy Mayfield** is a Wells Fargo loan processor or "mortgage loan specialist" for subprime loans in a retail office in *Spokane, Washington*, who started in 2002. She always understood she was entitled to overtime if she worked more than 40 hours in a workweek and was paid overtime when she worked more than 40 hours – as far back as 2002. Since she started at Wells Fargo, she has had annual training called the "**Code of Ethics and Business Conduct**" that including segments and testing on recording time worked.    Ex. 18, ¶¶ 2-5, 15.

> **Ryan Julian** works in *Clearwater, Florida* as a "mortgage sales associate" / loan processor in a retail branch office. He always understood that Wells Fargo required him to accurately record all hours worked, and he has been paid overtime when he worked more than 40 hours per week. Ex. 25, ¶¶2, 5, 7, and 9.

> **Paula Paglia** has worked as a loan processor in *Red Bank, New Jersey* since 1998. She always understood she was entitled to overtime and was required to accurately record her hours.  She has been paid overtime whenever she worked more than 40 hours in a week –most frequently in 2003. Ex. 8, ¶¶2, 10, 12-13, 15-16.

> **Charlynn Edwards**, a loan processor working with prime and jumbo loans since December 2002 in *Boulder, Colorado*, understood Wells Fargo's policy. She recorded all her hours and was paid overtime whenever she worked more than 40 hours in a work week, including an 8-month period in 2003 when she worked approximately 50 hours per week. Ex. 20, ¶¶ 3, 4, 7, 9, 22.

WA 863235.1

**Heather Christianson**, a prime loans processor in fulfillment centers in *Minneapolis, Minnesota,* and *Bedford, Texas,* understood Wells Fargo's policy and was paid overtime whenever she worked more than 40 hours per week. Ex. 53, ¶¶ 3-5, 7-8, 23.

**Leslie Bennett**, a loan processor working on prime and jumbo loans since September 2002 in *Hoffman Estates, Illinois,* and *Chicago, Illinois,* understood Wells Fargo's policy. She was paid overtime whenever she worked more than 40 hours per week. A Branch Manager, Customer Service Representative, and Home Mortgage Consultant told Bennett she must **record what you work.**" Ex. 22, ¶¶ 3, 4, 7, 9, 21, 22.

**George Cockayne**, a loan processor working two fulfillment centers in *West Des Moines, Iowa* since 2000, understood Wells Fargo's policy and was paid overtime whenever he worked more than 40 hours per week. The importance of accurate time reporting has been communicated to Cockayne and **is included in the ethics portion of annual required training.**" Ex. 43, ¶¶ 3-5, 7, 9, 22, 23.

**Heidi Fisher**, who has worked both as a "mortgage sales associate" and "loan processor" in *Minneapolis-St. Paul, Minnesota,* and *Cedar Rapids, Iowa,* since May 1998, understood Wells Fargo's policy. While she never worked more than 40 hours per week, she was **always** told to "make sure that [she] recorded ... hours that [she] worked." Ex. 24 ¶¶ 3, 4, 7, 9, 21, 22.

**Shilpa Bhalerao**, a loan processor on both prime and jumbo loans since February 2004 in *Schaumburg, Illinois* and *Chicago, Illinois,* understood Wells Fargo's policy and was paid for overtime whenever she worked more than 40 hours per week. Ex. 23, ¶¶ 3, 4, 7, 9.

**Tina Prinsloo**, a loan processor working with jumbo loans since 2000 in *Denver, Colorado,* understood Wells Fargo's policy. Prinsloo never worked more than 40 hours per week, but Prinsloo's Branch Manager reminded her **routinely** (since 2001) that she must record all overtime "even if [she] did not get approval or talked to manager before." Ex. 21, ¶¶ 3, 4, 7, 9, 21, 22.

**Toni Schaer**, a loan processor working on subprime loans in a *Fort Worth, Texas,* retail sales office since August 2002, understood Wells Fargo's policy and was paid overtime whenever she worked more than 40 hours per week. Schaer has worked approximately 42 hours per week since August 2002. Ex. 56, ¶¶ 3-5, 7, 9, 24.

**Kristen Poat** and **Amanda Turner**, loan processors in *Louisville, Kentucky,* since April 2001 and June 2003, respectively, understood Wells Fargo's policy to accurately record all hours worked. Poat and Turner each identified **three individuals** who reminded them of the importance of accurate time reporting over the course of their employment. Ex. 26, ¶¶ 3, 4, 12; Ex. 27, ¶¶ 3, 4, 12.

WA 863235.1

**Sandra Gust**, working prime loans as a loan processor in various *Minnesota* cities since 1998, understood Wells Fargo's policy and was paid for overtime whenever she worked more than 40 hours per week. Gust worked overtime during several periods since 1998. Ex. 28, ¶¶ 3-5, 7, 9, 22.

**Lorraine Edwards**, a prime loan processor since May 2001 in *Wayzata, Minnesota*, understood Wells Fargo's policy and was paid overtime whenever she worked more than 40 hours in a work week. Edwards says loan processors are reminded of the importance of accurate time reporting on a **daily basis**: "Daily when we fill out & complete our timecards, we are notified that we must be honest and record all time worked (or not), or we will be subject to penalties." Edwards also says she is reminded by her supervisors of this policy on an **"ongoing basis."** Ex. 29, ¶¶ 3, 4, 7, 9, 15, 21, 22.

**John Orr**, who worked as a loan processor on prime loans in *Overland Park, Kansas*, and *Kansas City, Missouri*, from April 2002 to September 2004, and **Beverley Fotovich**, who worked on prime loans as a loan processor in *Kansas City, Missouri*, since January 2003, each understood Wells Fargo's policy but **have never worked more than 40 hours per week**. Ex. 30, ¶¶ 3-5; Ex. 31, ¶¶ 3-5, 7.

**Anna Byrdak**, worked as a loan processor in Wells Fargo's *Schaumburg, Illinois*, and *Downers Grove, Illinois*, fulfillment centers on prime loans since March 2004. She understood Wells Fargo's policy and was paid overtime whenever she worked more than 40 hours per week. Byrdak typically worked between 45 and 47 hours per week during the months of May to September, as well as in December. Ex. 41, ¶¶ 3-5, 7, 9, 24.

**Amber Leatherman**, who worked as a loan processor in the *Schaumburg, Illinois*, and *Downers Grove, Illinois*, fulfillment centers on prime loans since July 2003, understood Wells Fargo's policy and was paid overtime whenever she worked more than 40 hours per week. Leatherman was reminded **"periodically"** by her Team Lead and Production Operations Manager of the importance of accurate time reporting. Ex. 42, ¶¶ 3-5, 7, 9, 23, 24.

**Neil Kristiansenn**, who has worked as a loan processor in **Private Mortgage Banking ("PMB")** for prime, jumbo, and renovation loans in a bank location in *Bloomington, Minnesota*, since June 2003, understood Wells Fargo's policy and was paid overtime whenever he worked more than 40 hours per week. Kristiansenn was told **"regularly"** and with **"on-going"** frequency to **record "all of your hours."** Ex. 47, ¶¶ 3-5, 7, 9-10, 23, 24.

**Teresa Dabney**, worked as a loan processor on prime loans in *Lee's Summit, Missouri*, from 1998 to January 2004. She understood Wells Fargo's policy, but **never worked more than 40 hours** per week, despite **working for one of "the highest producers** in the Kansas City area and during the refinance boom of 2003." Ex. 32, ¶¶ 2, 8.

WA 863235.1

**Jamie Brenaman,** a loan processor working with prime loans in *Omaha, Nebraska,* since August 2003, understood Wells Fargo's Policy but **never worked more than 40 hours per week.** Ms Brenaman was reminded of the importance of accurate time reporting by her Branch Manager. Ex. 33, ¶¶ 3-5, 7, 9, 21.

**Dyan Vlik,** a loan processor working on subprime loans in a fulfillment center in *Minneapolis, Minnesota,* since October 2004, understood Wells Fargo's policy, was paid overtime whenever she worked more than 40 hours per week, and was told with **"on-going"** frequency to accurately record her time spent working. Vlik typically worked between 41 and 42 hours per week since October 2004. Ex. 48, ¶¶ 3-5, 7, 9-10, 23, 24.

**Julia Jensen, Stacey Rocha,** and **John Shanks,** all of whom worked as loan processors in a fulfillment center in *Omaha, Nebraska,* since at least June 2001, understood Wells Fargo's pay policies, were paid overtime whenever they worked more than 40 hours per week. They were told by **numerous** Team Leads to accurately record their time spent working. Ex. 49, ¶¶ 3-5, 7, 8, 22; Ex. 50, ¶¶ 3-5, 7, 9, 23; Ex. 51, ¶¶ 3-5, 7, 8, 22.

**Stacey Wickersham,** a loan processor working with prime loans in a *Sioux Falls, South Dakota* fulfillment center since August 2002, understood Wells Fargo's policy and was paid overtime whenever she worked more than 40 hours per week. Wickersham was reminded with "emails from corporate" to **record all hours worked accurately.** Wickersham worked approximately 50 hours per week from September 2002 to November or December 2003, and approximately 40 hours per week since January 2004. Ex. 52, ¶¶ 3-5, 7, 9-10, 23, 24.

**Cynthia Mullins,** a loan processor handling subprime loans in *Omaha, Nebraska,* since March 2005, understood Wells Fargo's Policy, but never worked more than 40 hours per week. **Three different individuals** – a Branch Manager, loan processor, and Home Mortgage Consultant – told Mullins that she must "record all hours worked." Ex. 34, ¶¶ 3-5, 7, 9, 21.

**Oscar Cuesta** and **Amanda Walker,** from *Flower Mound, Texas,* worked as loan processors on prime loans since November 2002 and November 2004, respectively. They understood Wells Fargo's policy but **neither ever worked more than 40 hours** per week. Ex. 35, ¶¶ 3-5, 7, 9; Ex. 36, ¶¶ 3-5, 7, 9.

**Terri Kimble,** who has worked in *Minneapolis, Minnesota,* and *Austin, Texas,* since June 2001 as a loan processor in PMB, and **Jean Reynolds,** who worked as a loan processor in PMB in *Austin, Texas,* since December 2002, each understood Wells Fargo's policy and were paid overtime whenever they worked more than 40 hours per week. Ex. 37, ¶¶ 3-5, 7, 22; Ex. 38, ¶¶ 3-5, 7.

WA 863235.1

**Lori Malewiski**, a loan processor in a *Colorado Springs, Colorado*, retail sales office, has worked with subprime loans since June 2003. Malewiski understood Wells Fargo's policy and was paid overtime whenever she worked more than 40 hours per week. The importance of **accurate time reporting** was communicated to Malewiski by a Loan Officer, Sales Manager, and Area Manager. Ex. 40, ¶¶ 3-5, 7, 10, 23.

**Stacy Hudson**, a loan processor in a *Denver, Colorado*, worked at a fulfillment center on both prime and jumbo loans since November 1997. She understood Wells Fargo's policy and was paid overtime whenever she worked more than 40 hours per week. Ex. 39, ¶¶ 3-5, 7, 10, 24.

**Julie Hawkins**, who has worked as a loan processor in fulfillment centers in *St. Louis, Missouri*, and *West Des Moines, Iowa*, understood Wells Fargo's policy and was paid overtime whenever she worked more than 40 hours per week. Ex. 44, ¶¶ 3-5, 7, 8, 23.

**Kimberley McKeighan**, who worked as a loan processor on prime loans in a fulfillment center in *Overland Park, Kansas*, from August 2003 to March 2005, understood Wells Fargo's policy and was paid overtime whenever she worked more than 40 hours per week. The importance of accurate time reporting was communicated to McKeighan by **two different team leads** to whom she reported. McKeighan typically worked 48 to 50 hours per week in spring 2004 and 45 hours per week in fall 2004. Ex. 45, ¶¶ 3-7, 16, 18.

**Dalila Dollar**, who has worked with prime and jumbo loans as a loan processor in a fulfillment center in *Bedford, Texas*, since July 2002, understood Wells Fargo's policy and was paid overtime whenever she worked more than 40 hours per week. Dollar has worked from 40 to 52 hours per week from July 2002 to the present. Ex. 54, ¶¶ 3-5, 7-9, 23.

As shown above, there is no "one-size-fits-all" exemption issue here. Wells Fargo "loan processors" were classified, and paid, as nonexempt employees. Accordingly, Plaintiffs' attempt to avoid scrutiny by painting this case as an FLSA exemption case should be denied.

## II.    Even Under the Most Lenient Standard, Wells Fargo Loan Processors Are Not Similarly Situated.

To establish that the Wells Fargo loan processors are similarly situated, Plaintiffs must show that "some identifiable factual or legal nexus binds together the various claims of the class members in a way that hearing the claims together promotes judicial efficiency and comports with the broad remedial policies underlying the FLSA." *Wertheim v. State of Arizona*, No. 92-453, 1993 WL

WA 863235.1

603552, at *1 (D.Ariz. 1993); *see also Holt v. Rite Aid Corp.*, 333 F.Supp.2d 1265, 1275 (M.D.

Alab. 2004) (denying conditional certification where certification "will (not) partake of the economy

of scale envisioned by the FLSA collective action procedure").

As this is clearly not the one-size-fits-all exemption case Plaintiffs hoped it would be,

Plaintiffs likely will change their tune now in an attempt to classify the case as an "off-the-clock"

case. Off-the-clock cases, however, are particularly poorly suited for collective treatment, as off-the-

clock instructions are inherently local in nature, frequently varying with the particular supervisor

involved. *See England v. New Century Financial Corp.,* 370 F.Supp.2d 504, 511 (E.D. La. 2005)

(holding that loan officer claims were not similarly situated due to "multitude of different managers

at different geographical locations across the country" and different facts at each location); *Horne v.

United Services Automobile Association*, 279 F.Supp.2d 1231, 1237-38 (M.D. Alab. 2003) (denying

conditional certification because allegations that plaintiff was ordered to work off-the-clock came

from local supervisor); *Reed v. Mobile County School System*, 246 F.Supp.2d 1227, 1233 (S.D. Ala.

2003) (denying conditional certification in part because overtime violations can result from "the

failure of the employee ... to document the hours worked"). As one court aptly summarized: "The

**individualized analysis of overtime compensation** runs directly counter to 'the economy of scale

envisioned by' collective treatment of substantially similar employees under § 216(b) of the FLSA."

*Saxton v. Title Max of Alab., Inc.*, No 2:04 CV 2579, 2006 WL 1321420, at *3 (N.D. Ala. May 4,

2006) (citation omitted).

The only issue possibly at the heart of this case is the **highly individualized inquiry** into

each employee's hours worked (varying dramatically), timekeeping activities, knowledge of Wells

Fargo's policies and procedures, rationale for any failure to accurately report hours, unique

compensation arrangement, and reporting structure.

WA 863235.1

### A.    Employees in the Putative Class Plaintiffs Seek To Certify Are Not Similar.

The roles, responsibilities, and compensation for different loan processors vary dramatically based on division, product type, geographic location, management, and various individual arrangements. Even the compensation structure is different for different processors (within the proper confines of the FLSA).

"In determining whether employees are similarly situated, the court must consider whether the employees are similar with respect to their job requirements and pay provisions and the commonality of their claims." *Rodgers v. CVS Pharmacy, Inc.*, 2006 WL 752831, *5 (M.D.Fla. 2006) (citations omitted) (denying conditional certification in case alleging that managers shaved time from recorded hours). "Although the similarly situated standard is not a stringent one, a showing of similarity requires more than unsupported and generalized allegations." *Id.* In this case, Plaintiffs ignore reality by generically claiming that all Wells Fargo loan processors across the nation are "similarly situated."

### 1.    Different Roles, Responsibilities, and Reporting Structures.

The roles, responsibilities, and reporting structures of Wells Fargo's "loan processors" differ. Some work side-by-side with loan officers in retail branch offices, taking applications and working directly with customers, while others work in "fulfillment centers" where the loan is "processed" for underwriting and closing. Some do marketing and sales work, while others work strictly on building a loan file for review by underwriting. They work with different products and clientele, and they function within different supervisory chains within Wells Fargo, in hundreds of different offices, with hundreds of different managers around the country. For example:

WA 863235.1

*Loan Processors Have Different Job Duties and Report to Different Positions:*

**Charlynn Edwards,** a loan processor in *Boulder, Colorado*, works closely with an assigned Home Mortgage Consultant in a retail sales office. She markets various mortgage loan offerings, takes customer applications, and manages a "pipeline" to ensure loans get closed. Edwards reports to a Branch Manager. Ex. 20, ¶¶ 2, 3, 10.

**Stacy Hudson,** a loan processor in *Denver, Colorado*, works in a fulfillment center, where "all [they] do is loan processing" for loan applications received from separate and distinct retail sales offices. Hudson has "level 1" authority to approve a mortgage loan application. Hudson does not work with an assigned Home Mortgage Consultant as "[t]here are not any sales employees who work out of her office." Hudson reports to a team lead. Ex. 39, ¶¶ 3, 9, 12, 19.

**Leslie Bennett,** in *Chicago, Illinois*, works in a retail sales office where she works closely with her assigned Home Mortgage Consultant, markets various mortgage loan offerings, and manages a customer database. Bennett reports to her Branch Manager. Ex. 22, ¶¶ 2, 3, 10.

**Amber Leatherman,** a *Downers Grove, Illinois*, loan processor, works in a fulfillment center, where there are no sales employees. She processes loan applications from retail sales offices in Illinois. Leatherman has authority to approve a mortgage loan application and does not work with an assigned Home Mortgage Consultant. Leatherman reports to her Team Lead. Ex. 42, ¶¶ 3, 9, 12, 13, 19.

**Heidi Fisher,** a loan processor in *Cedar Rapids, Iowa*, works in a retail sales office where she works closely with her assigned Home Mortgage Consultant and performs numerous sales-related tasks. As a loan processor, Fisher – who has worked as a loan processor and Home Mortgage Consultant – affirms that her mortgage sales associate duties differ from those of a mortgage loan specialist. Fisher reports to her Branch Manager. Ex. 24, ¶¶ 2, 3, 10.

**Teresa Dabney** is a loan processor in *Overland Park, Kansas*. Dabney works in a fulfillment center, where there are no sales employees. She processes loan applications from retail sales offices in Kansas and Missouri. Dabney previously worked in a branch office for several years. Dabney confirms that her duties at the fulfillment center differ from those at the branch office. For example, Dabney performed some marketing work at the branch office, but she does not do any marketing work at the fulfillment center and is not aware of anyone there who performs marketing work. Dabney reports to her Team Lead. Ex. 32, ¶¶ 3, 5, 14, 20.

**Lorraine Edwards,** a *Wayzata, Minnesota*, loan processor in a retail branch office, works closely with her assigned Home Mortgage Consultant in a retail sales office. Edwards performs numerous sales-related tasks – her duties as a "mortgage sales associate" differ from those of a loan processor/mortgage specialist. Edwards reports to a Branch Manager. Ex. 29, ¶¶ 2, 3, 10.

WA 863235.1

**Heather Christianson** works as a loan processor in *Bedford, Texas*, at a fulfillment center where there are no sales associates. Previously, Christianson worked as a loan processor in *Minneapolis, Minnesota*. As a loan processor, Christianson has authority to approve a mortgage loan application. Christianson does not work with an assigned Home Mortgage Consultant and her duties as a loan processor differ from those she had as a mortgage sales associate. In particular, while in Minneapolis, Christianson "did not approve or underwrite applications" or "verify employment, income, or assets of applicants." Ex. 53, ¶¶ 3, 8, 11, Supplement.

Even when employees share a job title of "mortgage sales associate" or "mortgage loan specialist," their duties and experiences quite often differ. For example:

**Charlynn Edwards**, a loan processor in *Boulder, Colorado*, takes customer applications, quotes interest rates, and locks interest rates for customers. Ex. 20, ¶ 10. **Leslie Bennett**, a loan processor in *Chicago, Illinois*, does not perform any of these duties. Ex. 22, ¶ 10.

**Sandra Gust's** duties as a loan processor in *Maple Grove, Minnesota* have varied depending upon the Home Mortgage Consultant to whom she has been assigned and the office in which she worked. Ex. 28, ¶ 10.

**Paula Paglia** in New Jersey has worked with nine different loan officers, and her duties varied depending on whom she worked with at the time. Ex. 8, ¶¶ 4, 6.

*Different Loan Processors Have Different Work Environments:*

**Ryan Julian** works in a retail sales office in *Clearwater, Florida*. Ex. 25, ¶9.

**Heather Christianson** works at a fulfillment center in *Bedford, Texas,* where there are no sales associates. Ex. 53, ¶¶ 3, 8.

**Brooke Waters** works out of her home in *Shawnee, Kansas*. Ex. 57, ¶¶ 2, 11.

**Gay Lynn Kielcheski's** duties, as a loan processor in PMB in *Boulder, Colorado*, have varied depending upon the Home Mortgage Consultant to whom she has been assigned **and** the office in which she worked. Ex. 58, ¶ 10.

*Different Loan Processors Handle Different Types Of Loans:*

**Julie Hawkins** works as a loan processor in a SDC fulfillment centers in *West Des Moines, Iowa*. Until January 2004, Hawkins worked as a loan processor in a SDC fulfillment center in *St. Louis, Missouri*. SDC, or "sales delivery connections," fulfillment centers process conventional prime loans. Ex. 44, ¶¶ 3, 9.

WA 863235.1

**Dori Benz-Voss** has worked on prime and subprime loans as a loan processor in MAPS, RALC, and EMNP fulfillment centers in *Iowa* and *North Carolina*. MAPS and EMNP, or "emerging markets national program," fulfillment centers process prime and home equity/refinance loans, while RALC centers process subprime loans. The duties of a loan processor for each product differ, in part, based on the type of product involved. Ex. 61, ¶¶ 3, 9.

**Mary Kay Blunck** works as a loan processor on "brokered out loans" in the BOCE fulfillment center in *West Des Moines, Iowa*. Until August 2005, Blunk worked as a loan processor for mortgage loan assumptions. For assumptions, loan processors answer the phone, send out customer applications, and conduct a preliminary analysis of the application. Loan processors for mortgage loan assumptions do not necessarily "process" loan applications. Blunck sent applications for mortgage loan assumptions to Alaska for underwriting. Within BOCE, or "brokered out center of excellence," fulfillment centers, loan processors only work to verify regulatory compliance with outside lenders. Loan processors in BOCE fulfillment centers do not "process" loan applications, as processing is completed by an outside lender. Ex. 62, ¶¶ 3, 8-9.

*Different Fulfillment Centers Do Things Different Ways:*

**Dori Benz-Voss** worked at three different types of fulfillment centers. She had authority to approve a mortgage loan application at only one of those locations. Benz-Voss confirms that the duties and responsibilities "are different at each processing site" due to product differences, underwriter conditioning, and practices common to the geographic area. Ex. 61, ¶ 9, 11.

In addition, Plaintiffs' own declarations demonstrate that they even recorded their time in different ways. Plaintiffs Bowne and Hesterberg (from the Overland Park retail office) claim that "Webtime" kept track of their hours, while Plaintiffs Gering and Hejlik (from Iowa retail offices) claim they was required to fill out time cards every two weeks. Lovrien (Iowa) claims she did not record time at all. At least one office also required loan processors to physically punch a time clock in addition to recording their time in Webtime. Ex. 8, ¶17. These practices obviously differ from office to office, making a nationwide class inappropriate.

### 2.    Different Compensation Arrangements.

The compensation schemes for loan processors are wholly distinct, with individualized commission plans available to many loan processors who work in retail branches but not to most

WA 863235.1

loan processors who work in fulfillment centers  Loan processors in fulfillment centers instead are eligible for production bonuses.  These differences have a significant effect on the working hours and pay of the putative class members.  How a loan processor is compensated turns on numerous factors, including the applicable management structure and individual arrangements negotiated between the processor and loan officer.  Here are just a few examples:

> **Shilpa Bhalerao**, a loan processor in *Chicago, Illinois*, does not receive any commission in addition to her hourly wages. Ex. 23, ¶¶ 6,8.

> In addition to her hourly wages, **Kelly Brand**, a loan processor in *Park Ridge, Illinois,* receives a **flat** commission based on **monthly** loan volume. Ex. 59, ¶¶ 6, 8.

> **Charlynn Edwards**, a loan processor in *Boulder, Colorado*, receives a **tiered** commission based on **monthly** loan volume, in addition to her hourly wages. Ex. 20, ¶¶ 6, 8.

> **Gay Lynn Kielcheski**, a loan processor in PMB in *Boulder, Colorado*, receives a **tiered** commission based on **quarterly** loan volume in addition to hourly wages. Ex. 58, ¶¶ 6, 8.

> **Sandra Gust**, a loan processor in *Maple Grove, Minnesota*, receives a commission of **$50.00** per funded loan in addition to her hourly wages. Ex. 28, ¶¶ 6, 8.

> **Paula Paglia** in *Red Bank, New Jersey*, has been paid differently depending on the loan officer, earning commissions measured by anywhere from two to four basis points for each loan closed. Ex. 8, ¶11.

> **Cindy Mayfield**, a loan processor in *Spokane, Washington*, is paid hourly wages plus an incentive of $250 if she has five loans close in a month and another $50 for each loan over five. Ex. 18, ¶2, 7.

> **Jody Hoehle**, a loan processor in *Maple Grove, Minnesota*, receives a commission of **$125.00** per funded loan in addition to her hourly wage. Ex. 60, ¶¶ 6, 8.

> **Toni Schaer**, a loan processor in *Fort Worth, Texas*, receives a **"bonus for funded units"** per month in addition to her hourly wage payments. Ex. 56, ¶¶ 6, 8.

> **Teresa Dabney**, a loan processor in the *Overland Park, Kansas* fulfillment center, does not receive any commission-based compensation, but she was paid an hourly wage plus a commission on each loan when she worked in a retail branch. Ex. 32, ¶¶ 6, 16.

WA 863235.1

**Julie Hawkins**, a loan processor in *Des Moines, Iowa*, is paid hourly wages, but also receives a "**department incentive**" if the fulfillment center meets its goal. Ex. 44, ¶ 6.

Plaintiffs' claims require an entirely individualized analysis based on the loan processors' many different roles, responsibilities, and reporting structures, as well as compensation schemes that differ from person to person. There simply is no similarity of compensation plans sufficient to justify the conditional certification of a collective action.

    **B.**    <u>Plaintiffs Never Worked in Wells Fargo's Operations Division.</u>

Wells Fargo divides its home mortgage loan business into two distinct units: (1) retail sales; and (2) operations. All six Plaintiffs worked *exclusively* in region 10 on the retail sales side of the business. None of the plaintiffs worked on the operations side of the business. None of the Plaintiffs' worked outside region 10. Indeed, the slight geographic difference between Plaintiffs (Kansas and Iowa) is not a coincidence or the result of some "nationwide" practice (as discussed, *supra*). Plaintiffs' experiences are individualized and isolated.

    **1.**    <u>The Retail Sales and Operations Divisions Are Starkly Different, Serving Entirely Different Purposes in Different Locations With Different Management Structures, Different Duties, and Different Requirements.</u>

Wells Fargo's retail sales and operations divisions serve entirely different roles, and not surprisingly, differ remarkably. First, within retail sales, home mortgage loans are sold and prepared for processing. In contrast, home mortgage loans are processed (only) in "fulfillment centers" scattered throughout the country.

Second, fulfillment centers are not located in storefront offices or banks where few people work together, as is the case for many retail sales locations. Rather, fulfillment centers are typically housed in large office buildings where many people work together. Wells Fargo uses different fulfillment centers to process different loan products from different parts of the country. *See* Ex. 19, ¶12; Ex. 3 (Map of Fulfillment Services, showing different sites).

22

Third, fulfillment centers have entirely different management hierarchies, processes, and performance incentives in comparison to the retail sales division. Production Operations Managers supervise the day-to-day operations of their respective fulfillment centers. *See, e.g.,* Ex. 32, ¶5, Ex. 42, ¶3, Ex. 50, ¶3, Ex. 61, ¶3. Loan processors in fulfillment centers report to team leads, who coordinate their tasks and efforts, *see, e.g.,* Ex. 32, ¶5, Ex. 42, ¶3, Ex. 45, ¶3, while those in retail officers report to a branch manager. *See, e.g.,* Ex. 23, ¶3; Ex. 34, ¶3.

Fulfillment centers also have different human resources officers than the retail sales division. For example, the human resources consultant for Kansas and Iowa retail sales branches (until October 2005) was Kimberly Rund, while the human resources consultant for the fulfillment centers in the same area has been Michelle Schmitt. *See* Ex. 19, ¶13.

Finally, with few exceptions, loan processors at fulfillment centers have different duties, experiences, do not receive commission pay, and do not report to (or meaningfully work with) any sales personnel or home mortgage consultants. *See, e.g.,* Ex. 32, ¶5; Ex. 42, ¶¶8, 12a; Ex. 43, ¶¶6, 11a; and Ex. 53, ¶¶8, 11a-b.

        2.     **Loan Processors From Across The Country Within The Operations Divisions Have Consistently Received Overtime Compensation.**

Loan processors working in fulfillment centers of the operations division located in different regions throughout Wells Fargo's home mortgage sales business, demonstrate a consistent understanding of Wells Fargo's policy and practice of requiring loan processors, as nonexempt employees, to accurately record all time worked – and paying them overtime. *See, e.g.,* Ex. 39, ¶¶4-7, 23 (Colorado); Ex. 42, ¶¶4-7, 23 (Illinois); Ex. 43, ¶¶4-7, 23 (Iowa); Ex. 50, ¶¶4-7, 23; Ex. 61 ¶¶4-7, 23 (North Carolina and Iowa); Ex. 45, ¶¶4-5, 11, 16 (Kansas); Ex. 51, ¶¶4-7, 22 (Nebraska); Ex. 48, ¶¶4-7, 23 (Minnesota); Ex. 52, ¶¶4-7, 23 (South Dakota); Ex. 53, ¶¶4-7, 22-23 (Texas). **There is not one shred of evidence – or even a substantial allegation – that any improper**

        WA 863235.1

**activity is occurring in the fulfillment centers.** To the contrary, the evidence shows that Wells Fargo is in compliance with all FLSA requirements. No overly broad collective action, as requested by Plaintiffs, is appropriate.

> **C.    Even Looking Exclusively At The Retail Side Of Wells Fargo's Mortgage Business, A Nationwide Class Is Inappropriate.**

Wells Fargo's retail sales division is divided into approximately eight divisions, each with a different division manager. *See* Ex 19, ¶6; Ex. 1. Those divisions are divided into approximately thirty-four regions, each with a different regional manager. *See* Ex. 19, ¶7. Each region is divided into areas, with different area managers. Ex. 19, ¶7. Each area includes approximately three to six branches, with different branch managers running the offices, and each branch may include multiple locations. *See* Ex. 19, ¶7. **Under this decentralized reporting structure, there are approximately 2,600 work sites at issue located from Seattle to Miami and every place in-between.** *See* Ex. 19, ¶8.

Within this retail sales division, Wells Fargo employs different personnel to handle different types of mortgage loan products, including the processing of those products, within the retail division. The most common processing in the retail sales division involves prime and subprime loans. The Private Mortgage Banking (PMB) section of the retail division handles only prime loans for high net worth individuals. Ex. 19, ¶14.

On January 1, 2006, the PMB, prime, and subprime processors were divided into completely separate groups. This made sense because the personnel, systems, duties, requirements, and processes in place for the three different product groups were starkly distinct. Subprime loans are now divided into different geographic areas and are managed through a unit known as Home Credit Solutions or HCS. Prime loans are divided into different geographic areas and are managed through

WA 863235.1

a different unit. And, PMB is divided and managed separately from the other product lines. Ex. 19, ¶15-16.

None of the six Plaintiffs worked in PMB. There is no evidence showing any possible problem with the compensation for loan processors working in the PMB group. Plaintiffs are not similarly situated to the PMB employees. *Indeed, Plaintiffs exclusively processed prime and subprime loans out of six offices in three areas of one region on the retail side of Wells Fargo's business.* No person or unlawful practice outside those offices, areas, or region is implicated. Conditional certification is not appropriate.

**III.    A Collective Action Under These Circumstances Is Unmanageable and Unwarranted.**

The purpose of a collective action is to promote judicial efficiency by allowing common issues to be tried together. *See, e.g., Sheffield v. Orius Corp.*, 211 F.R.D. 411, 415 (D. Or. 2002). Collective actions may serve the interests of judicial economy where the Court is able to resolve key factual issues on a representative or collective basis, leaving only ancillary issues to be resolved with respect to each individual plaintiff. A collective action is entirely inappropriate, however, when, as here, **each and every material issue of fact must be considered, presented, and resolved on an individual basis.** *See Carlson v. Leprino Foods Co.*, No. 1:05-CV-798, 2006 WL 1851245, at *5, (W.D. Mich. June 30, 2006) (denying conditional certification of nationwide class where "the factual differences between the respective plants are so significant that they appropriately warrant trials in separate fora dedicated to their own specific policies, plant organizations, time card systems, and the like"); *McElmurry v. US Bank Nat'l Ass'n*, No. 04-642, 2004 WL 1675925, at *10 (D. Or. July 27, 2004) ("[A]n action dominated by issues particular to individual plaintiffs can not be administered efficiently because individual issues predominate over collective concerns."); *Holt v. Rite Aid Corp.*, 333 F.Supp.2d 1265, 1275 (M.D. Alab. 2004) (denying conditional certification where certification "will (not) partake of the economy of scale envisioned by the FLSA collective action procedure");

WA 863235.1

*see also Ulvin v. Northwestern Nat. Life Ins. Co.*, 141 F.R.D. 130, 131 (D. Minn. 1991) (denying certification where plan was implemented on a decentralized basis by local management).

### A.    Each Employee's Soon-To-Be-Alleged "Off-the-Clock" Claim is Unique.

There are no common issues to be tried in this case. This is not a case about a corporate-wide policy that must be determined legal or illegal, applicable or inapplicable. Indeed, the only way to find out whether, why, and how much any Wells Fargo employees worked off-the-clock (when Plaintiffs change the focus of this lawsuit) is to **ask each employee many different questions about their individual circumstances, and then test their answers with negating or corroborating documents and testimony.** There is no common issue of fact or law that a collective action would resolve. *See Ray v. Motel 6 Operating, Ltd. Partnership*, No. 3-95-828, 1996 WL 938231, at *4 (D. Minn. 1996) (due to variations among plaintiffs in amount of overtime worked, there was a "lack of commonality for damages"); *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 375 (D.N.J. 1987) (putative class members not similarly situated where "each individual class member must come forward in order to prove causation . . . and in each instance [defendant] has the possibility of raising any one of [its] several defenses.").

### B.    Each Employee's Claims Must Be Individually Litigated.

Wells Fargo must be provided the opportunity to test and rebut each Plaintiff's highly individualized claims − with documentary evidence and testimony from the current or former employee's supervisors, co-workers, family, and friends. *See, e.g., Murray v. Stuckey's Inc.*, 939 F.2d 614, 621 (8th Cir. 1991) (requiring each plaintiff to individually present evidence of unpaid overtime worked "where differing work situations make pattern evidence unpersuasive").[1]    Wells

---

[1] *See also In re Wal Mart Employee Litigation*, 711 N.W.2d 694, 698 (Wis.App. 2006) (denying certification of class, noting defendant's right to test weight and credibility of evidence by "examination of each and every member of the proposed class, but, also, their co-workers and supervisors, and, in some or many cases, their friends and family.").

WA 863235.1

Fargo is entitled to assert affirmative defenses with respect to each Plaintiff's highly individualized claims and to have these matters heard by jury – who will be called upon to make credibility determinations and, ultimately, decide how many hours were actually worked **by each employee**. Any suggestion by Plaintiffs that some alternative methods may be used is incorrect. The number of hours worked and the circumstances surrounding each person are too disparate to handle in a less onerous fashion if fairness plays any role in the judicial process. *See, e.g., Stuckey's Inc.*, 939 F.2d at 621 (citing *Anderson v. Mount Clemens Pottery Co.*, 328 U.S. 680, 66 S.Ct. 1187 (1946)). Indeed, loan processors worked vastly different amounts of hours at different weeks of the month, different times of the year, and in different years. For example:

> **Charlynn Edwards**, a loan processor working with prime and jumbo loans in *Boulder, Colorado*, worked an estimated 50 hours per week during an eight-month period in 2003. Otherwise she worked 40 hours per week. Ex. 20, ¶¶ 3, 9, 22.

> **Sandra Gust**, a prime loan processor in various cities, worked varying amounts of overtime during several varying periods since 1998. Ex. 28, ¶¶ 3, 9, 22.

> **Anna Byrdak**, a loan processor in *Schaumburg, Illinois,* and *Downers Grove, Illinois*, typically worked between 45 and 47 hours per week during the months of May to September, as well as in December. Ex. 41, ¶¶ 3, 24.

> **Teresa Dabney**, worked as a loan processor on prime loans in *Lee's Summit, Missouri*, from 1998 to January 2004. She understood Wells Fargo's policy, but never worked more than 40 hours per week, despite working for one of "the highest producers in the Kansas City area and during the refinance boom of 2003." Ex. 32, ¶¶ 2, 8.

> **Jamie Brenaman**, a loan processor in *Omaha, Nebraska*, never worked more than 40 hours per week.  Ex. 33, ¶¶ 3, 7.

> **Stacey Wickersham**, a loan processor working with prime loans in a fulfillment center in *Sioux Falls, South Dakota*, worked approximately 50 hours per week from September 2002 to November or December 2003, and approximately 40 hours per week since January 2004.  Ex. 52, ¶¶ 3, 24.

> **Cindy Mayfield**, a loan processor in *Spokane, Washington*, typically works overtime of 1-2 hours approximately every other week.  But last year, she worked approximately 43-44 hours per week, every other week. Ex. 18, ¶5.

There simply is no rhyme or reason to group disparate people together and try to force a consistent result on all of them.

### C.    The Proposed Class is Unmanageable.

As if the claims of the six Plaintiffs were not diverse enough, Plaintiffs want to invite thousands of current and former employees to join this action. To rebut any of these claims conceivably would require the testimony of *at least* five witnesses per current or former employee. Without doubt, a trial(s) would take an incredibly long time. Any benefit in having "common issues" explained only once to the jury would be lost. *See Lusardi v. Xerox Corp.*, 122 F.R.D. 463, 467 (D.N.J. 1988) ("Manageability of a jury trial in which there would be more than 1,300 separate trials would not be possible."). Plaintiffs' proposed class is unmanageable.

### D.    Denial of Certification Will Not Deny Any Substantive Rights.

No current or former employee will be denied any substantive rights if this Court denies Plaintiffs' motion. Certainly, those loan processors who were paid more than $19.6 million in overtime compensation during 2003, 2004, and 2005 have no worries. And, given the voluntary, opt-in nature of an FLSA collective action, any current or former employee is free to pursue whatever legal action he/she wishes, regardless of any ruling by this Court on the conditional certification issue. *See* Plaintiffs' Proposed Notice, ¶11.

### IV.    At Most, This Court Should Conditionally Certify A Very Narrow Collective Action, Encompassing Only The Three Areas In Region 10 Of The Retail Division Where Plaintiffs Worked (Excluding PMB).

As the six Plaintiffs have not shown that they are, in any way, similarly situated to one another or others, Plaintiffs' motion should be denied. "Justice will not be served by forcing multiple distinct factual scenarios onto a Procrustean Bed which aspires to a single plan or policy." *Carlson v. Leprino Foods Co.*, No. 1:05-CV-798, 2006 WL 1851245, at *5 (W.D. Mich. June 30, 2006). If the Court is inclined to consider an alternative to Plaintiff's overly broad, nationwide class

WA 863235.1

definition, Wells Fargo submits that the collective must be limited to the three areas where Plaintiffs

actually worked in region 10 of Wells Fargo's retail mortgage business (excluding PMB).

In *Garner v. Regis Corp.*, No. 03-5037, 2004 U.S. Dist. Lexis 29167 (W.D.Mo. 2004), the

plaintiffs claimed they were not paid for all hours worked. As in this case, the defendant had a

written policy requiring employees to accurately record their time. *Id.* at *7. The plaintiffs asked for

nationwide certification, claiming the written policy was not enforced and that productivity

requirements encouraged off-the-clock work and made FLSA violations "inevitable." *Id.* The court

rejected nationwide certification:

> ***Plaintiffs' allegations ... are not sufficient to warrant a nationwide
> class.*** The written corporate payment plan does not on its face
> encourage inappropriate behavior. ***Any inappropriate behavior rested
> on the interpretation and implementation of that plan by individual
> Regional Managers and Area Supervisors.***

*Id.* at *8 (emphasis added). The court certified a collective **only** where the plaintiffs had evidence

that a regional manager had instructed employees to work off the clock or approved of it. *Id.* at *9.

Likewise, in *Clark v. Dollar General Corp.*, Case No. 3:00-0729, 2001 WL 878887, at *5

(M.D.Tenn. 2001), the court denied nationwide certification where plaintiff identified employees in

only six districts in two states, stating:

> **allegations of violations in these seven stores are insufficient to prove a
> nationwide policy or practice.** The class of assistant store managers which
> Plaintiffs seek to represent contains individual employees who have worked at
> different stores, in different states, for different store, district, and regional managers,
> and most likely, in different working conditions. Moreover, the illegal overtime plan
> alleged by Plaintiffs is not necessarily carried out through central management.
> Defendant's official written policy dictates that overtime will be paid in compliance
> with the FLSA. Based on the evidence before the Court at this time, if an illegal
> scheme exists at all, it appears to be implemented on a **decentralized** level.

(emphasis added). Here, Plaintiffs' own declarations make clear – by their silence – that their claims

are local. Not one plaintiff identifies who told them they were not entitled to overtime or to record

less than all their hours worked.

WA 863235.1

In contrast, Wells Fargo's policy required accurate timekeeping and proper pay. Many loan processors acknowledge that they were told repeatedly to accurately record their time. *See, e.g.,* Ex. 21, ¶21 (reminded since 2001 to record all overtime "even if [she] did not get approval or talked to manager before"); Ex. 22, ¶21 (told by 3 different people to "record what you work."); Ex. 43, ¶22 (importance of accurate time reporting "is included in the ethics portion of annual required training."); Ex. 24, ¶21 (always told to "make sure that [she] recorded ... hours that [she] worked."); Ex. 29, ¶21 (reminded daily and on an "ongoing basis" to "accurately record my time"); Ex. 42, ¶23 (reminded "periodically" by Team Lead and Production Operations Manager); Ex. 40, ¶23 (importance of "reporting all time worked" communicated by a Loan Officer, Sales Manager, and Area Manager); Ex. 18, ¶10 (told since the beginning of employment "to record all of the time I spent working for Wells Fargo"). They did, in fact, keep this time, and they were paid more than $19.6 million in overtime compensation.

Plaintiffs' claims are isolated. Any variation from Wells Fargo's national policy and practice is necessarily the exclusive result of activity at a local level. To the extent this Court credits Plaintiffs' conclusory and speculative assertions, it should follow *Garner*'s well-reasoned lead -- limiting the class to the offices or areas where Plaintiffs actually worked.

## V.    Conditional Certification of a Nationwide Class, Particularly Under These Circumstances, Without Exacting Scrutiny, Violates Constitutional Guarantees of Due Process.

The Tenth Circuit Court and this Court have held that plaintiffs may prevail on motions for conditional certification under § 216(b) with "nothing more than substantial allegations that the putative class members were together the victims of a **single decision, policy, or plan**" or, at most, the presentation of "minimal evidence." *See Gieseke v. First Horizon Home Mortgage Corp.*, 408 F.Supp.2d 1164, 1166 (D. Kan 2006) (discussing *Thiessen*, 267 F.3d at 1102). As mentioned above, Plaintiffs' allegations have absolutely no relation to anything outside of their offices in region 10 on

the retail sales side of the business. Plaintiffs failed to demonstrate personal knowledge of any employees outside their own offices. *See Armstrong v. Weichert Realtors*, No. 05-3120, 2006 WL 1455781, at *1-2 (D.N.J. May 19, 2006) (denying class certification where plaintiff failed to offer any evidence of personal knowledge or factual foundation for assertions about other employees). Even under the lower scrutiny applied at the conditional certification level, there is no basis for "nationwide" certification.

Moreover, the Court should consider the evidence Wells Fargo has presented herein. People with personal knowledge wholly refute Plaintiffs' claims of a nationwide policy or practice. To ignore such evidence at this stage merely postpones the Court's consideration of such evidence until a decertification motion is filed. *See Holt v. Rite Aid Corp.*, 333 F.Supp.2d 1265, 1274 n.4 (M.D.Alab. 2004) (finding it appropriate to "carefully consider" defendant's evidence at stage one of the process, because if the court let the case proceed, it would have to consider it later: "Because the court has the evidence before it at stage one, the court will consider it."). In the meantime, Wells Fargo is forced to incur potentially hundreds of thousands of dollars in legal fees through discovery, defending against claims that should not have been solicited. Imposing this heavy burden on Wells Fargo by proceeding under such a lenient standard when evidence is available for the Court's review offends due process. *See Singleton v. Wulff*, 428 U.S. 106, 119-20 (1976); *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187 (10th Cir. 2002) (noting that due process requires opportunity to be heard at a meaningful time and in a meaningful manner). This Court should not, indeed it must not, sanction such results under these circumstances.

Indeed, "when courts apply less stringent certification standards to § 216(b) actions, employers are often subject to the expense of needless discovery and are more likely to be faced with blackmail suits." James M. Fraser, Note, *Opt-In Class Actions Under the FLSA, EPA, and ADEA:*

WA 863235.1

*What Does It Mean to be "Similarly Situated"?*, 38 Suffolk U. L. Rev. 95, 121 (2004). Respectfully, this Court is faced with such circumstances. Certification of a class with only generalized allegations would exponentially increase the costs of litigation and may force Wells Fargo into settlement, regardless of the merits of Plaintiffs' allegations. Accordingly, to comport with due process, scrutiny is required, even at this first stage, to ensure that Plaintiffs' motion and this Court's disposition are well-founded. *See State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2004) (noting that "exacting scrutiny" of punitive damages awards is required to ensure a basis in an "application of law").

## VI.    The Temporal Scope of the Notice Is Improper.

Wells Fargo objects to the Plaintiffs' proposed notice and believe it is premature to address the contents. Instead, the contents of the notice should be addressed only after the Court rules on the motion. Nevertheless, Wells Fargo will briefly address the biggest problem with the requested notice. Plaintiffs propose sending the notice to anyone who was a loan processor on or after January 17, 2003 – three years before the date the action was filed. This is overly broad in time.

Unlike Rule 23 class actions, there is no tolling of the statute of limitations in an FLSA collective action. *Redman v. U.S. West Bus. Resources, Inc.*, 153 F.3d 691, 695 (8th Cir. 1998). As a result, a plaintiff may only recover for the two years preceding the date the plaintiff joins the action by opting in. *Id.* (citing 29 U.S.C. § 255(b)). The recovery period may be extended to three years if the actions with respect to that employee are found to be willful. *Id.* Consequently, there is no justifiable basis for sending a notice to any former employee who left employment more than three years before the notice is issued. Plaintiffs' proposed date should be moved forward to no earlier than the date three years before the date the notice is to be issued.

WA 863235.1

## CONCLUSION

Wells Fargo's national corporate policy requires that all employees accurately record their time worked. During 2003, 2004, and 2005, Wells Fargo paid its "loan processors" more than $19.6 in overtime, demonstrating that Wells Fargo's national policy was implemented. The attached declarations show that dozens of employees, from different parts of the country, understood they were entitled to overtime, and they were paid overtime. Thus, to the extent Plaintiffs were not paid overtime, the problem was local, not national. Plaintiffs, and the thousands they generically seek to represent, were not victims of a "single decision, policy, or plan" – the showing Plaintiffs are required to make for conditional certification. Even among the six Plaintiffs, there is no similarity as to how they even recorded their time, and some Plaintiffs admit they were paid overtime. This Court should decline Plaintiffs' request to stir up and fish for thousands of dissimilar claims.

To the extent Plaintiffs have made any showing, it does not extend beyond Plaintiffs' offices or areas in region 10 of the retail sales division. **Not one Plaintiff ever worked in a fulfillment center, in PMB, outside region 10, or on the operations side of Wells Fargo's mortgage business.** Plaintiffs offered no evidence about any employees outside their own offices. This Court should deny Plaintiffs' motion for conditional designation of this case as a collective action. At a minimum, the Court should narrowly limit any such certification. There simply are not thousands of generically-described victims waiting to be properly compensated.

WA 863235.1

Respectfully submitted,

/s/ Michael C. Leitch
Denise K. Drake          KS 17384
ddrake@spencerfane.com
Michael C. Leitch        KS 19588
mleitch@spencerfane.com
Eric P. Kelly            KS 22503
ekelly@spencerfane.com
1000 Walnut, Suite 1400
Kansas City, MO 64106
TEL:      (816) 474-8100
FAX:      (816) 474-3216

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2006, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following:

George A. Hansen
Eric L. Dirks
Stueve Siegel Hanson Woody LLP
330 West 47th Street, Suite 250
Kansas City, MO 64112

ATTORNEYS FOR PLAINTIFFS

/s/ Michael C. Leitch
ATTORNEY FOR DEFENDANT

WA 863235.1

# EXHIBIT B

# THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| |
|---|
| TRUDY BOWNE, *et al.* individually, and on behalf of all others similarly situated. |
|                 Plaintiffs, |
| v. |
| WELLS FARGO HOME MORTGAGE, A DIVISION OF WELLS FARGO BANK, NATIONAL ASSOCIATION |
|                 Defendant. |

Case No.  06-2020 CM

## PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANT WELLS FARGO

Plaintiffs, by and through counsel, hereby propound upon Defendant Wells Fargo Home Mortgage, A Division of Wells Fargo Bank, National Association ("Wells Fargo") the following Requests For Production Of Documents pursuant to Rule 34 of the Federal Rules of Civil Procedure.

### INSTRUCTIONS AND DEFINITIONS

1.      You shall respond to each request from all sources and all information in your possession, custody, control or otherwise available, including information from any of your officers, directors, employees, agents, representatives, attorneys, investigators, or consultants, and information which is known by each of them.

2.      Each document request is considered continuing, and if you obtain information which renders your response to one of them incomplete or inaccurate, you are obligated to serve amended responses on the undersigned.

3.      If any document which is required to be produced or identified is claimed to be privileged, to constitute work product or to be otherwise confidential, state the grounds upon

1

which such privilege, work product or confidentiality is being asserted, and include a brief description of the document, identifying its author and persons receiving copies thereof.

4.      The terms **"record," "records," "document"** or **"documents"** shall refer to all records within the scope of F.R.C.P. 26. This includes but is not limited to writings and recorded materials, of any kind, that are or have been in your possession, control or custody, whether originals or copies. Such writings or recordings include but are not limited to: emails, contracts, bills of sale, agreements, promissory notes, documents, applications, file memoranda, correspondence, telegrams, forms, bank statements, tax invoices, files, books, pamphlets, circulars, transcripts, orders, bulletins, periodicals, letters, reports, advertisements, graphs, charts, plans, records, studies, logs, manuals, minutes, photographs or microfilm, diagrams, drawings or other visual materials, lists, working papers, rough drafts, research material, notes, papers, ledgers, journals or other books of account, computer print outs or discs or tapes, computer programs, intra and inter office memoranda, notebooks, desk calendars, diaries, statistical computations, confirmations, reports and/or summaries of interviews or conversations, reports and/or summaries of investigations, opinions or reports of consultants, statements or expressions of policy, appraisals, forecasts, of all natures and kinds whether handwritten, typed, printed, mimeographed, photocopied or otherwise reproduced, all tape recordings (whether for computer, audio or visual replay), models, or other manner of tangible things on which words, phrases, symbols, information or other matter are written, printed or recorded. If any document asked to be identified, described, or produced is not in your possession or subject to your control, give the reason therefore and its present location and the identity of the present custodian of the document and of any copy or summary thereof.

5.      **"Communication"** shall mean any or all transmittals of information, whether oral or reduced to writing, whether handwritten, typewritten, tape recorded, or produced by electronic

data processing, irrespective of how conveyed (e.g., telephone, telegram, telegraph, United States mail, private mail or courier service, facsimile transmittal, face to face contact), including but not limited to: inquiries, discussions, conversations, negotiations, agreements, understandings, meetings, telephone conversations, letters, notes, telegrams, advertisements, or other forms of verbal intercourse, whether oral or written.

6.    **"Relating to"** and **"regarding"** shall mean relating to, regarding, consisting of, referring to, reflecting, manifesting, prepared in connection with, describing, containing, attesting to, or being in any way legally, logically, or factually connected with the matter discussed, whether directly or indirectly.

7.    The terms **"Defendant" "you" "your"** or **"Wells Fargo"** refer to Wells Fargo and all its divisions, as well as Well's Fargo's successors, predecessors, current or former officers, directors, assigns, agents, attorneys, subsidiaries, employees, contractors, representatives or any other person acting or purporting to act on its behalf.

8.    **"Representative"** means agent, attorney, and any other person(s) acting, or purporting to act, on behalf of the designated person.

9.    **"Relating to"** and **"regarding"** shall mean relating to, regarding, consisting of, referring to, reflecting, manifesting, prepared in connection with, describing, containing, attesting to, or being in any way legally, logically, or factually connected with the matter discussed, whether directly or indirectly.

10.    **"Loan processor"** includes anyone with duties that include the processing of loans, including, but not limited to "mortgage loan specialists" and "mortgage sales associates." "Loan processor" does not mean "loan originator" or "Home Mortgage Consultant."

11.   **"Person"** shall mean natural persons, groups of natural persons acting in a collegial capacity (e.g., a committee or board of directors), corporation, partnerships, associations, joint ventures, labor unions, and any other incorporated or unincorporated business, governmental, public or social entity.

12.   **"Personnel files"** shall mean those documents, whether stored in physical form such as in paper files or electronically such as on computer disk or hard drive, which in any way reflect the employment history, employment status, work assignments, compensation, supervisory relationships, promotion, reassignment, disciplining, and termination, for whatever reason, of the individual for which they are requested. Any request for personnel files encompasses all files maintained at all locations that collectively reflect the employment history of the named individual, including files maintained at locations other than Defendant's facilities where Plaintiffs were employed, and including all documents which have been kept in such files at any time.

13.   **"Statement"** shall mean any recording of the words, voice, or images of a witness contacted by Defendant regarding the above-captioned action, whether recorded on paper in the form of notes or reports, audiotape, videotape, computer disk or hard drive, stenographically, or by any other written, electronic or visual means, of the witness' answers to questions posed by Defendant, its agents, attorneys, or representatives relating to any matter referred to by Plaintiffs in Plaintiffs' Complaint, by Defendant in Defendant's Answer to Plaintiffs' Complaint, or occurring through Defendant's investigation, motions or discovery in this matter.

14.   The term **"relationship"** shall mean a contractual relationship between a worker and Defendant.   This term shall not necessarily indicate nor exclude the existence of an employee relationship.

15.    The term "**conduct**" means any act of commission, omission, or action or inaction.

16.    Any other words used in these discovery requests are defined according to standard American use, as shown in a dictionary of the English language.

## REQUESTS FOR PRODUCTION

**REQUEST NO. 1.**    The personnel files for all individuals, including current Plaintiffs, employed by Wells Fargo as loan processors from January 2003 to the present. This includes, but is not limited to all time records, compensation records and the job description for each person.

**RESPONSE:**

**REQUEST NO. 2.**    Any and all records that reflect the names, addresses and telephone numbers of all loan processors employed by Wells Fargo from January 2003 through the present.

**RESPONSE:**

**REQUEST NO. 3.**    Any and all employee handbooks, manuals or other documents describing Wells Fargo's personnel policies and procedures in effect for loan processors from January 2003 through the present.

**RESPONSE:**

**REQUEST NO. 4.**    Any and all employment contracts or written agreements entered into between Wells Fargo and its loan processors, including current Plaintiffs, from January 2003 through the present.

**RESPONSE:**

**REQUEST NO. 5.**   Any and all records describing Wells Fargo's compensation policies and procedures for loan processors in effect from January 2003 through the present.
   **RESPONSE:**

**REQUEST NO. 6.**   Any and all records relating to Defendants' method(s) for calculating hours worked by hourly employees, during the period of January 2003 to present, including but not limited to all policies, procedures and/or emails to Plaintiffs, managers, or any other individual regarding Wells Fargo's time keeping procedures.
   **RESPONSE:**

**REQUEST NO. 7.**   Any and all records relating to policies, procedures, directives, communications, including emails, regarding timekeeping, including but not limited to, employee complaints that they were losing time, communications to managers about potential problems with the time systems, or any other communication or documents related thereto.
   **RESPONSE:**

**REQUEST NO. 8.**   Any and all records relating to the implementation and/or administration of the compensation plan for loan processors in effect from January 2003 through the present, including, but not limited to, any records regarding or relating to rates of payment, recording hours, payroll percentages, staffing levels, overtime, and earning commission.
   **RESPONSE:**

**REQUEST NO. 9.**    Any and all records of, or regarding, communications (including but not limited to any correspondence, notes, email correspondence or recorded voicemail messages) to, from, between or among any loan processor and/or Wells Fargo regarding or relating to the subject matter of this litigation.

**RESPONSE:**

**REQUEST NO. 10.**    Any and all records relating to complaints or investigations of wage and hour law violations or retaliation (including claims of failure to pay minimum wage, failure to pay overtime or retaliation in violation of the FLSA) alleged to have been committed by Wells Fargo, its employees or agents, in the last five years.

**RESPONSE:**

**REQUEST NO. 11.**    Any and All records evidencing any communication to, with, or from third-parties (including but not limited to any shareholder, financial analyst, market analyst, financial institution, news reporter or HR Consultant) regarding or relating to this litigation.

**RESPONSE:**

**REQUEST NO. 12.**    Any and all records that constitute or reflect organizational charts and/or the management structure of Wells Fargo.

**RESPONSE:**

**REQUEST NO. 13.** Wells Fargo's articles of incorporation, bylaws or other documents which reflect the corporate structure of Wells Fargo, including any of its parents, subsidiaries, divisions or other affiliates.

**RESPONSE:**

**REQUEST NO. 14.** Any and all records that reflect or evidence the number of hours worked, on both a daily and weekly basis, by Plaintiffs and all other loan processors employed by Wells Fargo from January 2003 until the present.

**RESPONSE:**

**REQUEST NO. 15.** Any and all records regarding or relating to any requirement that overtime hours worked by loan processors must be approved or pre-approved.

**RESPONSE:**

**REQUEST NO. 16.** Any and all records regarding or relating to any steps Wells Fargo has taken to preserve relevant records, including but not limited to e-mail and other electronic communication, since the beginning of this litigation.

**RESPONSE:**

**REQUEST NO. 17.** Any and all records that relate to or support any of Wells Fargo's Defenses asserted in its Answer.

**RESPONSE:**

**REQUEST NO. 18.**  Any and all insurance agreements that may be used by Wells Fargo or any of its individual officers, managers or directors to satisfy part or all of a judgment which may be entered in this action, or which may used to indemnify reimbursed payments made to satisfy any judgment in this action.

**RESPONSE:**


**REQUEST NO. 19.**  Any and all records identified, relied upon, used or referenced in response to Plaintiffs' First Set of Interrogatories.

**RESPONSE:**


**REQUEST NO. 20.**  Any and all records and/or communications related to the gathering of declarations obtained from Defendant's current and/or former employees.  This should include records related to any and all phone calls, personal visits, emails, memos or other documents sent to class members or management, as well as all postings on the company intranet.

**RESPONSE:**


**REQUEST NO. 21.**  Any and all records that describe efforts made by Wells Fargo to ensure that loan processors were paid correctly under the Fair Labor Standards Act.

**RESPONSE:**

Dated:  August 8, 2006

                              STUEVE SIEGEL HANSON WOODY LLP

                              _____

                              George A. Hanson          KS #15805
                              Eric L. Dirks             D. Kan. #77996
                              330 West 47th Street, Suite 250
                              Kansas City, Missouri, 64112
                              Telephone:    (816) 714-7100
                              Facsimile:    (816) 714-7101

## CERTIFICATE OF SERVICE

I hereby certify that on this _____ 4ᵀᴴ _____ day of August, I served the original plus one copy of the foregoing by first class United States mail, postage prepaid, and a copy by email to the following:

Denise K. Drake
ddrake@spencerfane.com
Michael C. Leitch
mleitch@spencerfane.com
Eric P. Kelly
ekelly@spencerfane.com
Spencer Fane Britt & Browne
1000 Walnut, Suite 1400
Kansas City, MO 64106
PH:    816-474-8100
FAX:  816-474-3216

**ATTORNEYS FOR DEFENDANT**

_____
An Attorney for Plaintiff

# EXHIBIT C

**From:** Drake, Denise K. [mailto:DDrake@spencerfane.com]
**Sent:** Friday, August 11, 2006 8:00 PM
**To:** Hanson, George; Dirks, Eric
**Cc:** Leitch, Michael
**Subject:** Confirmation - Please.

George & Eric:  Thanks for talking this afternoon.  I want to confirm the scope of the conditional certification agreement we discussed, before I talk with our client.  I want to make sure there are no misunderstandings if we are able to get approval.

You said that you would agree to limit this case to "mortgage sales associates" and "mortgage loan specialists" (levels 1, 2 and 3) who worked in retail branches (not fulfillment/operations centers) in "Region 10" (Iowa, Missouri, and Johnson County, Kansas).

You will not agree to be precluded from seeking to expand the class if you discover evidence of unpaid overtime in other regions and a reasonable level of similarity exists between the current class and any proposed addition to that class.  We would determine our position on any such proposed expansion if / when the issue came up.

I assume any Private Mortgage Banking loan processors (any titles) would be excluded, but we did not discuss this point.  Please let me know your thoughts re same.

If the parties reach a final agreement with regard to conditional certification, you will withdraw the pending motion and discovery.  The parties will work to draft an agreed notice to be sent to the Region 10 employees, including the overtime payment limitation language we discussed.

Please confirm that this accurately reflects our discussion / agreement.  We will then present it to our client (hopefully tomorrow or Sunday afternoon).

Denise K. Drake
Spencer Fane Britt & Browne LLP
1000 Walnut, Suite 1400
Kansas City, MO 64106
Work 816-292-8210 or 1-800-526-6529
Mobile 816-550-7557
Home 913-851-9093
Other 573-372-5669
Fax 816-474-3216
ddrake@spencerfane.com
www.spencerfane.com

# EXHIBIT D

# REDACTED

# EXHIBIT E



The Next Stage®

# One team. Pulling together…



Wells Fargo & Company Annual Report 2006

**2  To Our Owners**
Building a culture of collaboration—
instinctively putting what's best for the
customer first—is the key to outstanding
financial performance. Dick Kovacevich
and John Stumpf explain how we're doing.

**10  One Team. Pulling Together.
For Customers.**
Our customers come to us every day
with financial problems they can't solve,
financial questions they can't answer,
financial needs they expect us to satisfy.
Eleven stories show how we do it.

**24  One Team. Pulling Together.
For Communities.**
We pull together as one Wells Fargo to
make our communities better places
to live and work. In financial capital alone,
we gave over $100 million to nonprofits
nationally for the first time.

**31  Board of Directors, Senior Leaders**

**34  Financial Review**

**66  Controls and Procedures**

**68  Financial Statements**

**120  Report of Independent Registered
Public Accounting Firm**

**123  Stock Performance**

**124  Stockholder Information**

Which Measures Really Matter?
2006 Update *(inside back cover)*

## Wells Fargo & Company (NYSE: WFC)

We're a diversified financial services company
helping satisfy all our customers' financial
needs—and helping them succeed financially
—through banking, insurance, investments,
mortgage loans and consumer finance.

Our corporate headquarters is in San Francisco,
but we're decentralized so all Wells Fargo "con-
venience points"—stores, regional commercial
banking centers, ATMs, *Wells Fargo Phone Bank*℠
centers, internet—are headquarters for satisfy-
ing all our customers' financial needs
and helping them succeed financially.

## Aaa, AAA

Wells Fargo Bank, N.A. is the only bank in the
U.S., and one of only two worldwide, to have
the highest credit rating from both Moody's
Investors Service, "Aaa," and Standard & Poor's
Ratings Service, "AAA."

**Assets:** $482 billion
(5th among U.S. peers)

**Market value of stock:** $120 billion
(4th among U.S. peers)

*Fortune 500:* Profit, 17th; Market cap, 18th

**Team members:** 158,000
(one of U.S.'s 40 largest private employers)

**Stores:** 6,000+

## Reputation

*Barron's*
World's 12th most-admired company

*CRO Magazine*
Among 50 top corporate citizens

*BusinessWeek*
Among 10 most generous corporate givers

*DiversityInc.*
Among top 50 companies for diversity

*Forbes*
Among top 25 U.S. companies in composite
ranking of revenue, profits, assets and market
value

*Fortune*
USA's "Most Admired" Large Bank

*KeyNote WebExcellence*
No. 2 full-service online broker

*Luxury Institute*
Among top 10 brands for wealth management

*Moody's Investors Service*
*S&P Ratings Services*
Highest credit ratings (Wells Fargo Bank, N.A.)

*Working Mother*
Among 100 best companies

## Our Market Leadership

#1  retail mortgage originator*

#1  mortgage servicer*

#1  small business lender

#1  small business lender in low-to-
moderate income neighborhoods

#1  insurance broker owned by bank
holding company (world's 5th-largest insur-
ance broker)

#1  agricultural lender

#1  financial services provider to
middle-market businesses across
our banking states

#1  commercial real estate broker

#2  home equity lender

#2  debit card issuer

#2  bank auto lender

#3  ATM network

#4  deposits

\* *Inside Mortgage Finance*

## Our Earnings Diversity
*historical averages, near future year expectations*



- Community Banking ......................... **33%**
- Home Mortgage/Home Equity ............... **19%**
- Investments & Insurance ..................... **16%**
- Specialized Lending* ......................... **16%**
- Wholesale Banking/Commercial Real Estate .... **9%**
- Consumer Finance ........................... **7%**

\* *Credit cards, student loans, asset-based lending, equipment finance,
structured finance, correspondent banking, etc.*

© 2007 Wells Fargo & Company. All rights reserved.

# ...for customers.

Financial services is a team sport, especially in a company as large and diverse as Wells Fargo. We have 80+ businesses. Hundreds of products. 158,000 team members. 6,000+ stores. Our customers don't expect any of us to know everything about everything. What they do expect is that—quickly and easily—they can find the right team member through their preferred channel (store, ATM, phone, internet) to answer their question, provide value-added advice, solve their financial problem or satisfy their financial need. To do that, every Wells Fargo team member has to be customer-focused. Responding immediately to the customer's need. Knowing who on our team can best satisfy that need. Committing to follow up with the customer by a specific time. When the customer's satisfied, everyone gets the credit. In this report, we show you how we do it: One team. One Wells Fargo. Pulling together. For customers.



*Richard M. Kovacevich, Chairman and CEO (right);*
*John G. Stumpf, President and COO*

# To Our Owners,

**Again this year, our talented team—158,000 strong and pulling together for our customers—achieved outstanding results, among the best not just in financial services but all industries.**

**Among Our Achievements:**

- Diluted earnings per share, a record $2.49, up 11 percent.
- Net income, a record $8.5 billion, up 11 percent.
- Revenue, a record $35.7 billion—the most important measure of success in our industry—rose 8 percent, up 12 percent in businesses other than Wells Fargo Home Mortgage.
- The quarterly cash dividend on our common stock increased almost 8 percent to 28 cents a share—the 19th consecutive year our dividend has increased and 13th-largest dividend payout of any U.S. public company. Since 1989, our dividend has increased at a compound annual growth rate of 15 percent.

- Return on equity—19.65 percent (after-tax profit for every shareholder dollar)—and return on assets of 1.75 percent (after-tax profit for every $100 of assets).
- Our stock split two for one—our company's eighth stock split in 47 years.
- Our stock price reached a record-high close of $36.81 on October 18, 2006.
- Total return on our stock this year, including reinvested dividends, was 17 percent, exceeding the S&P 500®— and the total market value of our company rose 14 percent to $120 billion.

2

# Double-Digit Annual Compound Growth—for 20 Years

| Years | EPS | Revenue | WFC Total Return | S&P 500 Total Return |
|-------|-----|---------|------------------|----------------------|
| 5 | 21% | 11% | 14% | 6% |
| 10 | 13 | 10 | 15 | 8 |
| 15 | 18 | 12 | 18 | 11 |
| 20 | 14 | 12 | 21 | 12 |

**Long-Term Results**

Although 2006 was another very successful year, it certainly wasn't the first. As shown in the chart above, we've been achieving annual, double-digit increases in revenue, earnings per share, and total stockholder return over the past 20, 15, 10 and five years. The past 20 years our annual compound growth rate in earnings per share was 14 percent; our annual compound rate in revenue 12 percent. Our total annual compound stockholder return of 14 percent the past five years was more than double the S&P 500—and at 15 percent almost double for the past 10 years. We far outpaced the S&P 500 the past 15 and 20 years with total annual compound shareholder returns of 18 percent and 21 percent, respectively—periods with almost every economic cycle and economic condition a financial institution can experience.

**Full Horsepower**

This outstanding short- and long-term performance was driven by the full horsepower of our more than 80 businesses—diversified across virtually all of financial services. Among their achievements:

- Community Banking—record profit of $5.5 billion. Our retail banking team had record core product "solutions" (sales) of 18.7 million, up 17 percent. Sales in our banking stores have grown at an average compound rate of 14 percent the last five years. Our measures of how effectively we welcome our customers in our stores, how quickly our teller lines move, and how loyal our customers are to us all improved by double digits.

- For the eighth consecutive year, our cross-sell reached record highs—5.2 products per retail banking household (up from 3.2 in 1998), and 6.0 per Wholesale Banking customer. One of every five of our customers buys eight or more products from Wells Fargo.

- For the fourth consecutive year we're the United States' No. 1 lender to small businesses (loans less than $100,000) and No. 1 lender to small businesses in low-to-moderate income neighborhoods. Nationwide, our small business loans grew 30 percent. Products ("solutions") sold to our business banking customers in our stores were up 26 percent. Net business checking accounts rose 4.3 percent. Our average business banking customer now has 3.3 products with us (3.0 last year).

- For the 14th consecutive year we were the nation's No. 1 retail mortgage originator. We're very disciplined in home mortgage lending—we don't make option adjustable-rate mortgages or negative amortizing mortgages. Our owned home mortgage servicing (administering the monthly payments of your home loan) reached $1.37 trillion, the largest in our industry—up 38 percent—and mortgage originations were up 9 percent to $398 billion.

- Our National Home Equity Group portfolio rose to $79 billion, up 10 percent.

- Wholesale Banking, for the eighth consecutive year, achieved record net income, $2.1 billion, up 17 percent—with strong double-digit growth in revenue and loans across its businesses. We acquired commercial real estate investment advisor Secured Capital Corp. (Los Angeles), multifamily real estate financier Reilly Mortgage (Virginia), investment banker Barrington Associates (Los Angeles), accounts receivable purchasers Commerce Funding (Virginia), Evergreen Funding (Texas), and insurance agencies in California, Indiana and West Virginia.

- Wells Fargo Financial—our consumer finance business—earned a record $865 million and grew average receivables secured by real estate, by 25 percent and auto finance receivables by 29 percent.

**One Team. Pulling Together. For Customers.**

Despite our superior financial performance and the outstanding efforts of our great team, we have a lot of work to do—especially in the quality of our customer service. We've said in previous annual reports that "Customer service…is the one area in which we continue to be only about average compared with our peers." We've made significant progress, but we still have more to do. We survey hundreds of thousands of our retail banking customers a year—served through all our channels—to find out what they think of the quality of our service. Our customer loyalty scores rose 32 percent the last two years. Customer perceptions of how long they have to wait in our teller lines and how satisfied they are with how we welcome them have improved 44 percent in that time. This year, Wells Fargo Home Mortgage was ranked among the top five in its industry for

3

# Our Performance
## Double-digit growth: net income and earnings per share

| $ in millions, except per share amounts | 2006 | 2005 | Change |
|---|---|---|---|
| **FOR THE YEAR** | | | |
| Net income | $  8,482 | $  7,671 | 11% |
| Diluted earnings per common share | 2.49 | 2.25 | 11 |
| Profitability ratios: | | | |
| Net income to average total assets (ROA) | 1.75% | 1.72% | 2 |
| Net income to average stockholders' equity (ROE) | 19.65 | 19.59 | — |
| Efficiency ratio [1] | 58.1 | 57.7 | 1 |
| Total revenue | $ 35,691 | $ 32,949 | 8 |
| Dividends declared per common share | 1.08 | 1.00 | 8 |
| Average common shares outstanding | 3,368.3 | 3,372.5 | — |
| Diluted average common shares outstanding | 3,410.1 | 3,410.9 | — |
| Average loans | $306,911 | $296,106 | 4 |
| Average assets | 486,023 | 445,790 | 9 |
| Average core deposits [2] | 260,022 | 242,754 | 7 |
| Average retail core deposits [3] | 213,818 | 201,867 | 6 |
| Net interest margin | 4.83% | 4.86% | (1) |
| **AT YEAR END** | | | |
| Securities available for sale | $ 42,629 | $ 41,834 | 2 |
| Loans | 319,116 | 310,837 | 3 |
| Allowance for loan losses | 3,764 | 3,871 | (3) |
| Goodwill | 11,275 | 10,787 | 5 |
| Assets | 481,996 | 481,741 | — |
| Core deposits [2] | 270,224 | 253,341 | 7 |
| Stockholders' equity | 45,876 | 40,660 | 13 |
| Tier 1 capital | 36,808 | 31,724 | 16 |
| Total capital | 51,427 | 44,687 | 15 |
| Capital ratios: | | | |
| Stockholders' equity to assets | 9.52% | 8.44% | 13 |
| Risk-based capital | | | |
| Tier 1 capital | 8.95 | 8.26 | 8 |
| Total capital | 12.50 | 11.64 | 7 |
| Tier 1 leverage | 7.89 | 6.99 | 13 |
| Book value per common share | $  13.58 | $  12.12 | 12 |
| Team members (active, full-time equivalent) | 158,000 | 153,500 | 3 |

1 The efficiency ratio is noninterest expense divided by total revenue (net interest income and noninterest income).
2 Core deposits are noninterest-bearing deposits, interest-bearing checking, savings certificates, and market rate and other savings.
3 Retail core deposits are total core deposits excluding Wholesale Banking core deposits and retail mortgage escrow deposits.

4



"What we want to instill is a culture of collaboration that instinctively and naturally puts what is best for the *customer* first—and then deliver it."

customer satisfaction with the way we originate and service their mortgages. In Wholesale Banking, our customer satisfaction scores were among the highest in our industry and have risen the last four years—with more than eight of 10 customers rating their total experience with us "above average" to "excellent." Our own team members—whose attitudes are the leading indicator of customer attitudes—tell us they're satisfied and happy in their work by a ratio of seven to one, in the top quartile, about four times the national average for all workers.

So, what keeps us from being known as absolutely off-the-charts great in providing a superior customer experience each time, every time? The fault lies not with our team members. They try to give their all for our customers every minute of every day. They try to do what's right for our customers so we can satisfy all their financial needs.

### The Cost of Complexity

We've concluded that the problem lies not just with the growing demands of customers for more simplicity in their lives, but in the complexity of our organization. A lack of consistency across our business lines in some processes and systems prevents us from always asking, "How will this look to the customer?" Simple or complex? Easy or time-consuming? Friendly or formal? Intuitive or confusing? As a diversified financial services company, more than just a bank, we have more than 80 businesses. That's a great advantage. We can offer customers more value and convenience —and give them a better deal for bringing us more and preferably all of their business. We can build relationships that last a lifetime. We can drive more revenue through our large, fixed-cost distribution network. We can diversify our risk and revenue sources and thus achieve consistent double-digit earnings growth. We can offer our team members lots of career opportunities within a large, growing, dynamic company.

Being so large and diverse, however, also can be a disadvantage. Complexity can have a hidden cost. Presenting ourselves to our customers as 80+ *different* Wells Fargos can sometimes make it difficult for our customers to do business with us. So, in many ways, our most formidable competitor is...ourselves. As Pogo in the comics used to say, "We have met the enemy, and they is us."

Customers aren't waiting for companies such as ours to raise the bar on service quality. They're raising it themselves. We're No. 1 in our industry in the average number of products per customer, but with that leadership comes a responsibility. The more business our customers give us, the more they expect from us.

### "One Wells Fargo"

To make it easier for our customers to do business with us, we're changing the way we think and act—as one company, not 80+ separate businesses. Among ourselves, we call this way of thinking and acting "one Wells Fargo." We're asking ourselves, "What are the most significant ways we can present ourselves to our customers as *one* company?" We want our customers to see us as one organization not separately as a bank, a mortgage company, a consumer finance company, a commercial/corporate bank, a wealth management company or an insurance company. Likewise, we must see each customer not just as a bank customer, a mortgage customer, a consumer finance customer, a commercial customer, an investment customer or an insurance customer, but as a Wells Fargo customer.

It's not enough to make sure we incent all our businesses financially to work well together or partner effectively. The self-interest of our separate businesses is not enough, because from the start it leaves the most important person out of the equation: the customer! What we want to instill is a culture of collaboration that instinctively and naturally puts what is best for the *customer* first—and then deliver it.

### Examining Our Processes

To think and act instinctively as "one Wells Fargo," we're systematically examining the major processes inside our company that are most important to make it easier for our customers to do business with us.