1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3        BEFORE THE HONORABLE MARILYN HALL PATEL, JUDGE

4    --------------------------)
                               )
5    In Re:  Wells Fargo Home  )
     Mortgage Overtime Pay     )      MDL No. C 07-1841 (MHP)
6    Litigation.               )
                               )      San Francisco, California
7                              )      Monday, April 28, 2008
     --------------------------)         (32 pages)
8

9
                     TRANSCRIPT OF PROCEEDINGS
10

11   APPEARANCES:

12   For Plaintiffs:        Stueve, Helder, Siegel, LLP
                            460 Nichols Road
13                          Suite 200
                            Kansas City, Missouri 64112
14                    BY:   GEORGE ALLAN HANSON
                            ERIC LANDON DIRKS
15
     For Defendant:        SPENCER, FANE, BRITT & BROWNE, LLP
16                          1000 Walnut Street
                            Suite 1400
17                          Kansas City, Missouri 64106
                      BY:   DENISE K. DRAKE
18                          ERIC PAUL KELLY

19                          Winston & Strawn
                            101 California Street
20                          39th Floor
                            San Francisco, California 94111
21                    BY:   JOAN B. TUCKER FIFE
                            ROBERT SPAGAT
22

23

24

25

1  Monday, April 28, 2008

2                                                          (3:30 p.m.)

3         DEPUTY CLERK:  07-1841, In re: Wells Fargo Loan

4  Processor Overtime Pay Litigation.

5         THE COURT:  My I have your appearances, please?

6         MR. HANSON:  George Hanson and Eric Dirks for the

7  plaintiff.

8         MS. FIFE:  Joan B. Tucker Fife for the defendant,

9  Wells Fargo; and Denise Drake, also for Wells Fargo.

10         THE COURT:  Thank you.  Do you want to come on up here

11  along with Mr. Hanson?

12         First of all, with respect to the motion to amend,

13  motion to strike the amended consolidated complaint, etc., a

14  couple of questions:  First of all, what is Region 10?

15         MR. HANSON:  Region 10, Judge, is early in the first

16  filed case, the Bowne case, that we filed in the District of

17  Kansas.  After we filed our motion for FSLA certification, that

18  was the only claim in that case, we conferred with opposing

19  counsel, Denise Drake, and reached a compromise stipulation to

20  certify a limited class for purposes of an initial notice.

21  That stipulation was without prejudice to speak a wider class

22  if discovery and circumstances permitted, but in the interests

23  of getting out an early notice.

24         THE COURT:  Yes, I understand all of that.  Just

25  answer my question.  What is Region 10?

1          MR. HANSON:  Is a region consisting of Iowa, Missouri,

2    parts of Kansas.  It's a geographical region.

3          THE COURT:  I figured that, but I didn't know what

4    jurisdictions or states are in there.

5          MS. DRAKE:  On the retail side of the business.

6          THE COURT:  So is he correct?  It's Iowa, Kansas?

7    What else?

8          MS. DRAKE:  Missouri.

9          THE COURT:  Missouri.

10         MS. DRAKE:  There might be a little tiny piece of

11   Illinois in there, I believe.

12         MR. HANSON:  And a very small piece of Kansas, Kansas

13   City metropolitan area.  So there are dozens and dozens, I

14   believe, of regions.  This is just one of the many.

15         THE COURT:  How many regions are there?  Do you know?

16         MS. DRAKE:  I want to say there are 30-something.

17         THE COURT:  And in that case there have already been

18   what, 68 opt-ins?

19         MR. HANSON:  From the initial notice that went out to

20   I think 500, we had an initial number of 68 opt-ins, in the

21   Bowne case.

22         THE COURT:  And if we -- with a consolidated

23   complaint, is the problem talking about merging?  I mean, can

24   we really have a useful consolidated complaint in this case, do

25   you think?

1          MR. HANSON:  Yes, and I think for all of the reasons,

2     frankly, that were discussed in the earlier MDL.

3          THE COURT:  Well, that's a lot different.

4          MR. HANSON:  It is different, but this is an MDL.

5     Wells Fargo, when we filed the second case here in the Northern

6     District of California, Wells Fargo moved to have the cases

7     consolidated, which the panel did send to this court, where he

8     submitted --

9          THE COURT:  You can have cases related without being

10    consolidated also.  The question is whether -- and I guess in

11    this case, it really concerned me about how many people are

12    going to get essentially a soaked notice.

13         MR. HANSON:  No one, judge.

14         THE COURT:  No one at all?

15         MR. HANSON:  No one would get notice of an FSLA

16    collective that got it the first time.  We've defined our FSLA

17    class to exclude the individuals who have gotten noticed the

18    first time.

19         THE COURT:  So you've excluded region 10.

20         MR. HANSON:  That would be right.  From the FSLA class

21    that we're seeking to certify and consolidate the action, yes.

22    We don't intend to serve notice on the same people again.

23         THE COURT:  You look surprised.

24         MS. FIFE:  The consolidated complaint seeks to certify

25    all team members of Wells Fargo Bank NA, throughout the

```
1    company, whoever was employed back to January 1st, 2003.

2            MR. HANSON:  The FSLA class specifically excludes

3    people who were already given notice.  There are two

4    separate --

5            THE COURT:  You would have to be very clear that it

6    does include.

7            MR. HANSON:  Correct and I think our complaint is

8    crystal year clear on that part.

9            MS. DRAKE:  I apologize I thought the complaint

10   excluded people who had actually opted into the ortho action.

11   I don't recall that it said it was going to exclude people who

12   had simply received notice in the other action.  But I could be

13   wrong.

14           MR. HANSON:  If the issue is avoiding that kind of

15   duplication, we would stipulate to that.  It was certainly our

16   intent.  Not to resend or to send notices to people who are

17   already in the case.

18           THE COURT:  Even though they did not opt-in.  They're

19   not going to get a second chance at this.

20           MR. HANSON:  The one distinction I would make though

21   is we are also seeking certification under section 17.200.  And

22   obviously you recall from the loan originator, Wells Fargo,

23   MDL, which I'm one of lead counsel on that case as well, that

24   was a litigated issue.  We did send notices out to an FSLA

25   class and a Rule 23 section 17.200 class.
```

1          And there's a similar approach being sought in this

2    case.

3          THE COURT:  Now, I guess what you have the problem

4    with in this case is that in -- there was no problem of filing

5    a consolidated complaint.  But that things got added to it that

6    you thought were not permitted by you know essentially the

7    agreement or the Court's order etc. correct.

8          MS. FIFE:  Yes, your Honor.  The case management

9    conference order that the Court issued described the powers of

10   lead counsel, the plaintiff's lead counsel, and one of those

11   powers and obligations was to file a consolidated complaint.

12   That order was entered last November.  It wasn't until

13   approximately a month ago on the eve of Wells Fargo filing

14   their motion to dismiss the 17.200 claims that the plaintiffs'

15   counsel alerted counsel for Wells Fargo that they intended to

16   file a consolidated complaint that had amendments.  They

17   acknowledged it.  And the following day, they filed the

18   consolidated complaints, termed a consolidated complaint.  But

19   it actually pleads that it is an amendment to the case, in very

20   significant ways.  First it expands the class from loan

21   processors to all Wells Fargo bank MA team members, nonexempt

22   team members throughout the country.

23         THE COURT:  And there's no question but that the loan

24   processors and the team members are nonexempt, correct?

25         MS. FIFE:  The way they've defined it is nonexempt,

1    yes, your Honor, there's no question.  The individuals they're

2    trying to represent are not exempt individuals.

3           THE COURT:  But who are team members?  What are their

4    various positions as opposed to the loan processors?

5           MS. FIFE:  Wells Fargo bank NA has a number of

6    different divisions and groups and business lines.  And

7    currently within that organization, there are approximately 383

8    separate job classifications for nonexempt team members.  If

9    you look at a current snapshot of the company right now, the

10   number of current nonexempt team members, according to their

11   definition, is approximately 87,000 people, so it includes the

12   tellers.

13          THE COURT:  This is what I want to know, what the

14   categories are.

15          MS. FIFE:  It would include anyone who works at any

16   Wells Fargo company, that's within the Wells Fargo Bank NA

17   structure, that's a nonexempt employee.

18          MR. HANSON:  And I can put maybe even a finer point on

19   it.  The critical document that was disclosed to us on

20   February 20th of 2008, just a few short weeks ago -- and I have

21   an extra copy for the Court, if you'd like just to view it.

22          MS. FIFE:  Your Honor, the document that's being

23   presented to the Court was attached to the -- some of the

24   pleadings that counsel for plaintiff filed.  The document has

25   been agreed to between both parties as being marked

1    confidential and subject to a protective order.  I would ask

2    that the Court, the transcript, to the extent that it relates

3    to that document, also be marked as confidential.

4         And I would also ask your Honor that -- we do have

5    written objections to the submission of that document into

6    evidence in this case, which I'd be happy to file as well.

7         MR. HANSON:  Well --

8         THE COURT:  First of all, explain to me -- I mean,

9    this talks about payroll process and various timelines and so

10   forth.  But these are very, very different kinds of jobs that

11   now you're attempting to lump in all in the -- you know in the

12   same class action.  I don't understand it.  I mean, we started

13   out with loan processors and that's where we were.  Now all of

14   a sudden we're going to have security guards?  Who certainly

15   have different jobs and probably maintain their hours in a

16   different fashion than the others.

17        MR. HANSON:  They don't.  And that's the critical

18   point of this document.  And I know they've marked it as

19   confidential and they may object to focusing on it, but, you

20   know, there are smoking guns in litigation and then there's a

21   bomb.  And this document constitutes a bomb.  Because what it

22   tells us is why we have supposedly nonexempt team members who

23   have overtime recorded but weren't being paid.  This is a very

24   unique case in that already today even at the preliminary stage

25   we know there were almost 600 loan processors who have recorded

1    overtime but simply never were paid.  And since we've been

2    pursuing this case, we've always been trying to find out two

3    questions:  The scope of, you know, who else might be out there

4    who similarly is owed overtime; and secondly, the cause.  And

5    this document answers both of those questions.

6            So it is true that the case started with loan

7    processors.  But the loan processor title, the loan processor

8    job function has nothing to do with the issue of liability.

9    What created the liability in this case, and what only became

10   clear from this document, which is Wells Fargo's own

11   explanation as to what its standard hours policy is, what it

12   does, who it reaches, why it's unlawful and why they're

13   changing --

14           THE COURT:  Shouldn't you have filed a motion to

15   amend?  Which is apparently what you didn't do, which is how we

16   got to this motion to dismiss.

17           MR. HANSON:  And we have filed a motion to amend under

18   Rule 15, and I understand that that is a -- and their argument

19   that procedurally we should not have filed a consolidated

20   complaint without first seeking leave under Rule 15, I

21   understand that argument, but I also go back --

22           THE COURT:  So when have we scheduled the -- when have

23   you noticed the motion to amend for -- after the motion to

24   dismiss is decided?

25           MR. HANSON:  No, it was done as part of our response.

1    We moved in the alternative and anticipated that that issue

2    would be heard at the same time the motion to strike.

3    Obviously, they're merged.

4         But Judge, the case management order that was issued

5    in November of 2007 specifically instructs us as lead counsel

6    to file a consolidated complaint.  So it was our view -- and

7    that was language by the way that was added, jointly submitted

8    by the parties; as we do in our other MDL cases, we want to

9    file an operative single pleading.  Obviously, that operative

10   single pleading has to update and state the facts and the

11   discovery that are known as of the time it's filed.

12        That is simply what was done in this case.  We did not

13   view it as the type of pleading that would be under the purview

14   of Rule 15, since it was the initial operative pleading in the

15   consolidated complaint.

16        But even were it to be considered a requirement of

17   Rule 15, we would have understood that.  The parties' agreement

18   that we should file a consolidated complaint and your order

19   that gives us those duties, an obligation to file a

20   consolidated complaint, we certainly would believe Rule 15

21   would be satisfied.

22        THE COURT:  So your position now is that this action

23   should be amended to include all persons who were paid in a

24   certain manner.

25        MR. HANSON:  All persons that were subject to the

1   standard hours compensation policy as described in that

2   document.  Because that now clearly is the cause of the

3   noncompliance.  That is why certain, even though they're called

4   nonexempt, as the document itself says, they were treated as

5   salaried employees.  So your Honor, it is a type of

6   classification case where you have a class by Wells Fargo's own

7   definition that is uniformly subject to the same policy.  And

8   if you look at Page 7 of this document, there is a graphic

9   description of all the ways the standard hours policy violated

10  California law, also led to noncompliance under the FSLA.

11          I mean it says right on its face that --

12          THE COURT:  What is the heading on that page?

13          MR. HANSON:  It's Page 7.  It says, The catalyst for

14  identifying potential issues with our payroll process, and it

15  refers to another case.  It's Bates stamped 11481.

16          THE COURT:  I see it.  Well, has some of this already

17  been litigated then?

18          MR. HANSON:  Apparently there was a case in California

19  that was filed in the '02 timeframe that had a -- some of these

20  issues were implicated.  But it's certainly not all.  That suit

21  apparently was resolved back in the 2005 timeframe.

22          THE COURT:  And did that case involve team members,

23  qua team members?

24          MS. FIFE:  Your Honor, that case involves certain team

25  members who work for Wells Fargo Bank NA in the retail banking

1    group.  And the case resulted in a resolution, court-approved

2    settlement.  The settlement settled those claims of California

3    team members who were employed at anytime I think through the

4    end of '04, and the release was effective through November '05,

5    through that timeframe.

6            But it was a large number of California team members

7    who worked in the retail branch side of Wells Fargo Bank NA.

8    So it covers, your Honor, I think what you're getting to, it

9    covers and released the claims of a number of individuals that

10   the plaintiffs here are seeking to add to this class action.

11           MR. HANSON:  Judge, we don't know the scope, fully, of

12   the *Osinga* case or the scope of its release, whether it covers

13   a small portion of the potential class or not.  But obviously

14   that's something we'll explore.  And again, if there are valid

15   releases from other litigation, that would not be something we

16   would seek to represent.  But if you look at the document with

17   the bar chart, the number of individuals --

18           THE COURT:  And what page is that?

19           MR. HANSON:  That's on Page 4.

20           THE COURT:  Uh-huh.

21           MR. HANSON:  This breaks out specifically the number

22   of nonexempt team members, where they're employed, and the ones

23   that are part of the proposed *Osinga* class.  Now, this is our

24   only document at this point, but clearly even the *Osinga* class

25   as identified here is a subset of the overall potential class

1    of individuals who are subject to standard hours.

2            And Judge, all we're doing at this point is trying to

3    identify the appropriate scope of the case.  This isn't a

4    decision to be made on the merits, obviously there's a lot of

5    investigation and discovery that needs to occur.  We need to

6    find out, you know, what did the *Osinga* case allege.  How broad

7    are its releases?  But the contemplation of the case management

8    order, our understanding of our duties as lead counsel, was to

9    file a consolidated complaint appropriately address the scope

10   of the case, given the facts we know of, when we knew them.

11           I am the first to acknowledge that the revelation of

12   this document coupled with some of the very recent testimony

13   we've had has expanded the potential scope of the case.  And

14   the scope of the case though is expanded only so far as Wells

15   Fargo's own policy of standard hours breaches.

16           So we now know that there's a single overarching

17   compensation plan to pay on standard hours which is a type of a

18   salary compensation system, rather than paid on hours actually

19   worked.

20           THE COURT:  Now, I saw some of the dates in here --

21   something that was stated on that page you just had, or

22   something shortly thereafter -- I think it was on the page

23   after the one about the *Osinga* case that you called my

24   attention to.

25           But is this what has triggered this January 1st, 2006

```
1   date?

2           MR. HANSON:  Right.  From this document, and from

3   the -- we've had a 30(b)(6) deposition taken.  From that very

4   preliminary discovery, it appears that, you know, through the

5   evaluation contained in this document, Wells Fargo realized

6   that this wasn't the way to pay nonexempt team members.  And

7   they started a new policy which they refer to as positive pay.

8   It's our understanding that January 1, 2006 is when the

9   positive pay policy was rolled out for nonexempt team members.

10  So the way we've defined the class, Judge, is to reach back and

11  cover nonexempt team members paid under standard hours.  It's

12  our understanding that that would cut off January 1, 2006.

13          I'd like some more discovery to make sure that that's

14  the case.  But that is what the initial discovery suggests.

15  Because after January 12006, you know what caused the -- again,

16  we know that there are 600 loan processors' overtime recorded

17  in Wells Fargo's system that haven't been paid.  What caused

18  that standard hours has since been changed to ensure that

19  everyone who records overtime in this system is now paid.  So

20  we understand there are remediation efforts taken in January

21  of '06.

22          THE COURT:  And not only that -- but also that it was

23  reported.  That the time was in -- the overtime was recorded in

24  fact.

25          MR. HANSON:  Right.  For the 600.
```

```
 1              THE COURT:  Because before that I thought some people
 2      weren't recordings necessarily.
 3              MR. HANSON:  That's right.  And we had some people
 4      recording overtime so they may record 55 hours in a week and
 5      get paid for 40.  And we had some people who didn't record time
 6      at all because they were paid again a salary.  What was called
 7      their standard hours.  But that apparently changed as of
 8      January 1 '06.  And apparently Wells Fargo now has a time
 9      keeping mechanism which does record all hours worked and which
10      does pay for all overtime worked.  That's what we understand.
11      So again, our class will not seek certification outside of the
12      standard hours era.
13              THE COURT:  And exclude those who may have --
14              MR. HANSON:  Validly released claims.
15              THE COURT:  Pursuant to the Osinga case.
16              MR. HANSON:  And frankly, that is something that
17      additional discovery will help us narrow and focus.  I need to
18      see the Osinga release, I need to see what claims it covered,
19      something I haven't been privy too.
20              THE COURT:  Where is that case?
21              MS. FIFE:  Santa Barbara County.  It's a public
22      document.
23              THE COURT:  State court?  Superior court?
24              MS. FIFE:  Yes.  It's a public document.  I'd be more
25      than happy to send Mr. Hanson a copy of --
```

```
1            THE COURT:  It's just a lot easier to get those

2    documents off of our system now than -- nationally now, it's

3    much easier.  The state system, it's hard to find those

4    documents sometimes.

5            MS. FIFE:  Your Honor, may I respond to a few of the

6    comments that Mr. Hanson has made?

7            THE COURT:  Yes.

8            MS. FIFE:  First, just the procedural posture.

9    Mr. Hanson's correct, that in his opposition to our motion to

10   strike, he requested motion for leave to amend.  But he has not

11   noticed that motion for a hearing.  And in fact, our reply to

12   his opposition brief was dated two days later because we had to

13   agree to a compressed schedule to try to get this case heard

14   quickly.

15           THE COURT:  Let me ask you this:  How different would

16   your briefing look if it were a motion to amend?

17           MS. FIFE:  Significantly different.  We would go

18   through the futility arguments, which is a basis for this court

19   to deny the motion for leave to amend.  We also would go

20   through the prejudice argument.  And right now, one of the

21   issues that Wells Fargo is facing is that tomorrow, our

22   opposition is due to the motion to certify the class of all

23   team members throughout the country.  So we would address

24   prejudice.

25           THE COURT:  Just based on this consolidated complaint.
```

1           MS. FIFE:  Just based on the consolidated complaint.

2           THE COURT:  Can't do that.

3           MR. HANSON:  And we've been in constant dialogue with

4    our opposing counsel.

5           THE COURT:  Nobody ever talked to me about it.  Okay.

6           MR. HANSON:  Well.

7           THE COURT:  I'll tell you, with respect to this, we're

8    going to treat it as a motion to amend, and rather than fooling

9    around with this dismissal.  And you get your response to that

10   motion to amend in.  How much time do you need, let's keep it

11   as short as possible.  You get your reply in.  And we'll do

12   something about that, the class certification date.

13          MS. FIFE:  Your Honor if we could have a week to file

14   our opposition to the motion for leave to amend.  That would be

15   very helpful.

16          MR. HANSON:  A week is fine, and can we have some

17   clarification, too, because I guess I'm surprised to hear there

18   would be additional arguments raised.

19          THE COURT:  When you file a motion to amend, you know,

20   there are other arguments that are raised and -- that can be

21   raised on the dismissal motion.

22          MR. HANSON:  That may be, I'd liked some clarification

23   the parties won't raise the same argument again.  Because the

24   futility argument was raised as well as prejudice arguments at

25   length.  And in fact in the initially briefing on the motion to

1    strike, they made the argument that, you know, were this to be

2    considered a Rule 15 motion it would be considered futile.

3            THE COURT:  Did you make all the arguments you would

4    have made.

5            MS. FIFE:  No we have not your Honor.  And I'd be more

6    than happy to make certain that --

7            THE COURT:  Have it done in two weeks.  But -- it's a

8    much more orderly procedure, and that's what you should have

9    done.  It may be a good argument.  Just means putting things

10   off a little bit longer because obviously you've got a much

11   different case in terms of the numbers of people involved and

12   some of the issues, and I would like to know why they should

13   all be part of the same action.  Is it by virtue of this, and

14   is that sufficient (indicating document) even though there may

15   be a tremendous disparity in the nature of the job?  Because

16   generally under FLSA cases, we look at the categories of jobs.

17   We don't lump everybody together, like all nonexempt employees.

18           MR. HANSON:  Except when you treat every nonexempt

19   employee as salaried and pay them under a policy which Wells

20   Fargo admits they don't --

21           THE COURT:  That's what we're going to deal with then.

22   But let's do it the right way.

23           MR. HANSON:  And we have already told Wells Fargo that

24   to the extent more time is needed for the class certification,

25   issues, that those are certainly something we're willing to

```
1   accommodate.

2          THE COURT:  With respect to that, and then I did want

3   to get very briefly to the other motion, two weeks for you to

4   get in, what is that May 12th?

5          MS. FIFE:  Yes, your Honor.

6          THE COURT:  May 19th.  For you to file your reply.

7          MR. HANSON:  Certainly.

8          THE COURT:  And would be June 2nd at 2:00 o'clock.

9   When you come back here on June 2nd.  First of all, with

10  respect to the class certification motion, all dates, to the

11  extent that any have been set --

12         MR. HANSON:  We have a May 19th hearing now.

13         THE COURT:  Which is vacated.  And we'll take that up

14  at the June 2nd hearing.  Because obviously there's going to be

15  some other kinds of briefing.

16         I have one other question and then I want to go to the

17  17.200.  I've got other cases here waiting.

18         What is Wells Fargo and company?  Does that come from

19  this document or something else that you received in discovery

20  recently.

21         MR. HANSON:  It comes from discovery that we've

22  received recently.  But it also comes from an overall better

23  understanding of how Wells Fargo, the entity, is structured.

24  There's no question that the actual technical employer, for

25  purposes of issuing paychecks and -- is Wells Fargo Bank NA,
```

1    which we understand is a wholly-owned subsidiary of Wells Fargo

2    and Company, which is the parent.  So our --

3                THE COURT:  That should be no surprise.  All these

4    banks have holding companies.  And -- is Wells Fargo and

5    Company the holding company?

6                MS. FIFE:  It's my understanding it's the parent.  It

7    has not been served yet with a copy of the consolidated

8    complaint.

9                MR. HANSON:  That's right.

10                THE COURT:  Because you didn't get leave.  So it's not

11    a party.

12                MR. HANSON:  We wanted to see how this went before we

13    served Wells Fargo.

14                THE COURT:  I guess you know now.  So you'll have to

15    wait until the ruling with respect to the June 2nd.

16                MR. HANSON:  But I have no doubt they'll be happy to

17    accept service on behalf of Wells Fargo.

18                THE COURT:  Now, with respect to the 17.200 issues,

19    the managers from whom we have declarations are managers for

20    how many different regions?

21                MS. DRAKE:  It was a sprinkling of different regions.

22    They were around the country -- I think there were six or seven

23    different locations all over the country.

24                THE COURT:  And so are those managers' declarations

25    representative of what you'd get from other managers in other

1   parts of the country where you didn't get -- submit

2   declarations for?

3          MS. DRAKE:  Yes, your Honor, that would be

4   representative of what other managers would say, and in fact,

5   it's representative of even what the team members themselves

6   would say with regard to how the process worked.  The named

7   class representative for 17.200, Brenda McMillan, in fact in

8   her deposition -- and you have this testimony in front of you,

9   she actually did record hours worked.  She actually was paid

10  overtime.  She knew she was a nonexempt or hourly employee

11  while she was a loan processor.  And she had a local manager

12  who gave her instructions contrary to Wells Fargo's overall

13  requirements and policies.  But it was not anything that came

14  from --

15         THE COURT:  Because it was contrary to their policies,

16  did she get paid?

17         MS. DRAKE:  No, she actually recorded overtime

18  consistent with their policies.  The policy always has been

19  accurately record, review, and then until actually September 1

20  of 2005, manager approval was required for that amount to be

21  paid.

22         THE COURT:  Well, who trained these managers?

23         MS. DRAKE:  There were a variety it of different ways

24  that they were trained through documents, if you look at the

25  record, and you'll find I believe it's Exhibit 7 in our

1    submission, a web time training manual.  So when they went from

2    actually using paper time cards to using web time, there was a

3    training manual that walked folks through exactly how they were

4    to be handling this information.  And that all came out of the

5    Minnesota and Iowa Human Resources data services department.

6         THE COURT:  But where were various documents like this

7    produced?

8         MS. DRAKE:  Where were they produced?  They were

9    produced throughout the litigation.  Now, if we go back in time

10   to when the very first action was filed, there was no discovery

11   before plaintiffs filed their conditional certification papers.

12   It was a strategic decision on their part not to engage in any

13   formal exchange.  They wanted to get those papers on file in --

14        THE COURT:  What are you talking about?  This *Osinga*

15   case?

16        MS. DRAKE:  That particular document was disclosed as

17   part of a rolling production of documents after we received a

18   formal request for documents.

19        THE COURT:  Maybe my question wasn't clear.  Where do

20   these documents with respect to how nonexempt employees and how

21   they're going to be paid, hours recorded and instructions to

22   managers, all those kinds of things, where are those source

23   documents generated?  Where are they written?  Drafted?

24   Whatever you want to call it.

25        MS. DRAKE:  It depends on the document.  That

1    particular document that you're looking at there was created

2    out of Minnesota and Iowa.  The web time manual was created,

3    the Exhibit 7 that I was talking about, was created out of the

4    HRDS group, which is Minnesota and Iowa.  The only tie that we

5    have to California is wholly lawful decisions:  Pay people.  Or

6    geographic structures that happen to be located here or

7    entities that happen to be incorporated in California.

8            So the documents really are generated in wherever that

9    particular group was located, and the vast majority of the

10   groups are in Iowa and Minnesota.

11           THE COURT:  Were they ever brought back to -- where is

12   home office for these people?

13           MS. DRAKE:  For the loan processors, it would be in

14   Des Moines, Iowa.  They have all of their processes out of

15   there, and out of Minnesota.  You know, ultimately, it goes up

16   the chain to California.  But for the actual home and consumer

17   group, it's South Dakota, Minnesota, Iowa.  That's where really

18   the bulk of the group is located.

19           THE COURT:  What happens in California that doesn't

20   happen in, you know, in the headquarters and doesn't happen in

21   Iowa or Minnesota?

22           MS. DRAKE:  We believe nothing wrongful happened in

23   California.

24           THE COURT:  Well, what happens, whether it's wrongful

25   or not wrongful?  What happens?

1          MS. DRAKE:  In California, there are individuals up

2      the chain of command from the individuals who are located in

3      the midwestern states.  In California, there just weren't any

4      real communications that were coming and going, other than this

5      exhibit that we've been talking about, this PPI.  But the PPI

6      is all based on California wage law.  It is not based on Fair

7      Labor Standards Act law.  So for 17.200 purposes, it has no

8      bearing whatsoever.

9          The only decisions coming out of California happen to

10     be wholly lawful decisions.  If someone is working over 40

11     hours in a work week, we need to pay them.  That's the decision

12     that came from California.

13         THE COURT:  And was anything in writing provided to

14     the managers?

15         MS. DRAKE:  In writing we have the web time manual,

16     and there were a number of PowerPoint presentations that we

17     provided to the other side, produced to the side with regard to

18     how people needed to be instructed on recording overtime.  And

19     then we have all of the handbooks.  And the handbooks

20     specifically say, Must accurately record hours.  The handbook

21     also specifically describes what standard hours are and go

22     through all of this information.  And that's dating back at

23     least until 2001.

24         THE COURT:  Who checked to see if the managers

25     complied with their duties, did what they were supposed to

1  under these guidelines or whatever?

2          MS. DRAKE:  That was a localized function.  The

3  individuals who were responsible for making sure that the

4  managers complied was a localized function.  And actually it

5  goes back even to the team members.  I mean, we are not talking

6  about people who you know aren't smart individual.  These are

7  loan processors.  They're looking at complicated documents.

8  They're engaged in complicated work.  And they knew and were

9  instructed to and many of them did and in fact Brenda McMillan,

10 the named representative for this portion of the case, did in

11 fact complete time cards and wrote down her hours.  And did in

12 fact complete time on web time.  So that's, you know, that's

13 how it was policed.

14         Team members also could call into Human Resources.  If

15 they felt they had not been paid appropriately.  And Human

16 Resources being located in Des Moines, Miss Elise Reiser is one

17 of the individuals who -- we have her deposition testimony in

18 the record -- they would call in and say, I'm not sure this is

19 correct. I think I need to be paid more time.  And then that

20 would be corrected.

21         THE COURT:  Who do they call in to?

22         MS. DRAKE:  The payroll department.  There's an 800

23 number that goes to the Des Moines, Iowa area.

24         THE COURT:  And how did -- who's responsibility was it

25 to make sure that managers understood their duties or that team

```
1   members understood their duties.

2           MS. DRAKE:  There was training from the human

3   resources department that was put out to the managers, and that

4   all emanated from the Des Moines, Iowa and Minnesota area for

5   this particular group of individuals.

6           THE COURT:  Do you want to respond to any of this?

7           MR. HANSON:  All of it, or at least the most pertinent

8   parts.

9           THE COURT:  Briefly.

10          MR. HANSON:  You asked the right question, which is:

11  Where does the standard hours come from?  That is the only

12  issue for purposes of the application of 17.200.  Standard

13  hours is the compensation policy.  And the issue under 17.200

14  is, did some or part of it emanate from California?  And the

15  answer is of course yes.

16          I think Miss Drake acknowledges that this document is

17  a California document in that it's the executive summary that

18  was prepared by a steering committee which was chaired by the

19  highest hanking HR manager, Avid -- I don't know if I can

20  pronounce the last name -- Avid M. who resided in corporate

21  headquarters in California.  And it was presented to the then

22  CEO and president of Wells Fargo, who's Dick Covacevich.  And

23  that -- was, at the time.

24          And so the decision to reevaluate standard hours was

25  made in California.  That's a matter of record.
```

1          So we know that there was knowledge of at least what

2     we consider to be an unlawful policy in California; and the

3     authority to change it came from California.

4          Now, that leaves a couple of questions unanswered,

5     which is why we have noticed up a deposition solely on the

6     issue of where was standards hours created, where was it

7     implemented, who created it, who had the decision to modify it,

8     why wasn't it modified until 2006.  And, frankly, where did it

9     come from to start with?  Wells Fargo today is a merger between

10    Norwest, which is a Minneapolis-based company, and Wells Fargo,

11    which has always been a San Francisco-based company.  Wells

12    Fargo Company started standard hours.  Who made a decision

13    after the merger that standard hours paying nonexempt team

14    members on a salary --

15          THE COURT:  When was the merger?

16          MR. HANSON:  1998.  So I have a notice on each of

17    those topics, which I think are really important to illuminate

18    these issues.  Unfortunately, we've been told that that notice

19    won't be honored at this point.  I'm hoping to work out the

20    production of that witness.  But it's a very focused, very

21    discrete issue.

22          We certainly agree that these are issues that are

23    important and they are facts that need to be developed.  But

24    even on the record as of now, the limited record, it's clear

25    that the standard hours policy was implemented out of

1    California.  At least to the extent that it took the president

2    of Wells Fargo Bank in California to say, That's enough, we

3    need to change, and go to something compliant.

4         THE COURT:  Now, with respect to this document, as a

5    result of this, do these changes, these changes apply across

6    the country?  Or just in California?

7         MS. DRAKE:  The changes that were decided on would and

8    did apply across the country.  But here's really the crux of

9    this document and why it's sort of a red herring in this

10   particular issue:

11        To the extent that any decisions were made in

12   California based on this document, those were decisions,

13   Number 1, to come into compliance with what California law was;

14   and, Number 2, to go ahead and apply it across the nation.

15   That's a lawful decision.  That's a decision to try to be a

16   little bit more protective.

17        If you look at the Department of Labor Wage and Hour

18   opinions, which their 17.200 claim is based on, Fair Labor

19   Standards Act, not on the underlying California law, but on the

20   Fair Labor Standards Act, you'll see that the Department of

21   Labor does not agree with many of the conclusions that were

22   drawn, from *Osinga* and from the California Department's

23   decision with regard to how time must be recorded.  There are

24   2007 and 2008 decisions, in fact, opinion letters from the

25   Department of Labor, saying that you can have a system where a

1  company assumes something and then the team members, in order

2  to keep accurate records, will submit some sort of an

3  exception.  There's a 2007 Department of Labor opinion letter

4  where they allow a company to assume that all of their team

5  members took a 30-minute break, and to automatically deduct 30

6  minutes of the day from all team members unless the team member

7  comes forward and says, I didn't take a lunch or I didn't take

8  lunch as long as I should have, so therefore change my time.

9            THE COURT:  But to the extent -- I mean, this motion

10  that's here before us today has to do with 17.200.

11            MS. DRAKE:  Correct.

12            THE COURT:  And its application.  And so what you're

13  saying, at least with respect to what happened after -- well,

14  whatever date, this is a June 2005 date.  And when this new

15  system was going into effect in 2006, that the decisions with

16  respect to the policy were made in California, and while it

17  stemmed from a California case, it really is applying the

18  17.200 law, right?  And it's applied 17.200 law across the

19  country, really, if in fact this particular initiative as it's

20  referred to does in fact satisfy 17.200.  And it comes out of a

21  lawsuit in California.  Satisfying 17.200.  That's what it

22  does, right?

23            MS. DRAKE:  We would respectfully disagree with regard

24  to the application nationwide being --

25            THE COURT:  But have applied it nationwide.  You said

1    this system was now being applied nationwide.

2              MS. DRAKE:  Correct.

3              THE COURT:  Now I have another question.  We have to

4    move along.  And my question is:  The policy that preceded this

5    was in some kind of a document somewhere.  What law was that

6    based on; where was that developed?

7              MS. DRAKE:  Teresa Swanson in her 30(b)(6) deposition

8    is in the Human Resources data services department, and she

9    testified about how the time card system was used at Norwest

10    for loan processors.  And the time card system was based on

11    standard hours and based on exception pay.  That if a team

12    member worked under standard hours or over standard hours, they

13    needed to submit an exception.  The manager would approve it.

14    It would then be sent in.  It would be bar-coded and the pay

15    would either be deducted from or added to, depending on what

16    the exception was.  That was a Norwest policy.  She testified

17    about that.  And that is the policy that then was incorporated

18    into web time, and that all came from Des Moines and

19    Minneapolis.

20              THE COURT:  After the merger, did Wells Fargo adopt

21    that policy?

22              MS. DRAKE:  Well, the merge -- actually, Norwest was

23    the larger of the two, and Norwest is the entity that employed

24    the loan processors.  So it wasn't an adoption so much.  It was

25    Norwest that was the larger of the entities.  And it's just

1    that policy just continued forward.  And that policy is not

2    illegal under the Fair Labor Standards Act.

3           THE COURT:  Well, that's not my question.  My question

4    is, you know, what, if anything -- where was this policy

5    adopted, initiated, adopted, and what happened with the merger,

6    what did Wells Fargo do, if anything, in connection with this

7    policy?  Did it do anything?  Or it just sort of slid into it

8    and took all of these employees of Norwest under its umbrella?

9           MS. DRAKE:  There is no evidence that there were any

10   decision with regard to the continuation of this policy other

11   than it was already in place and it was continuing.  And it

12   really was Norwest who had Wells Fargo slide in under it.

13          The name Wells Fargo is a better brand for the

14   business.  And so they adopted that name.  It was a merger, but

15   it was really Norwest that was calling the shots with regard to

16   this from Minneapolis and from Iowa, and that's what Teresa

17   Swanson testified to in her 30(b)(6).

18          THE COURT:  I'll give you a couple of minutes.

19          MR. HANSON:  I won't need a couple of minutes.  All

20   we're asking for is the opportunity to test what Miss Drake is

21   representing to be the case.  Because what Miss Swanson

22   testified to in her deposition in no way supports the idea that

23   this was a Norwest only decision without any input from the

24   partner, Wells Fargo in California.  That's why I issued a

25   30(b)(6) on these exact topics.  All we need to do is take the

```
1    deposition.  Then we'll know.  There is not a record on where

2    did it come from.

3          THE COURT:  Okay.  Let's get that deposition taken.

4    When can it be -- have you designated somebody?

5          MR. HANSON:  We've sent out the notice.

6          MS. DRAKE:  We have not designated anyone yet.  I

7    don't believe the notice has been filed at this point in time.

8          MR. HANSON:  Well, we served on you.

9          MS. DRAKE:  You sent it to us.  I didn't know if it

10   was officially served and filed.

11         MR. HANSON:  We can do it today.

12         THE COURT:  Before you leave here today select a date

13   and then you'll have to find out, I guess, who the person is,

14   that's going to have to be designated and let's get that

15   deposition taken.

16         Do you think that can be done in the next 30 days?

17         MR. HANSON:  Sure.

18         MS. DRAKE:  I believe so, yes.

19         THE COURT:  Then do it.  And we will see you on

20   June 2nd.

21         MR. HANSON:  Thank you, Judge.

22         MS. DRAKE:  Thank you, your Honor.

23         (Adjourned)

24                           oOo

25
```

1

2                    CERTIFICATE OF REPORTER

3

4          I, Connie Kuhl, Official Reporter for the United

5  States Court, Northern District of California, hereby certify

6  that the foregoing proceedings in Case No. MDL 07-1841 (MHP),

7  In re: Wells Fargo Loan Processor Overtime Pay Litigation, were

8  reported by me, a certified shorthand reporter, and were

9  thereafter transcribed under my direction into typewriting;

10  that the foregoing is a true record of said proceedings as

11  bound by me at the time of filing.

12          The validity of the reporter's certification of said

13  transcript may be void upon disassembly and/or removal from the

14  court file.

15

16          _____

17                    Connie Kuhl, RMR, CRR

18                    Wednesday, May 14, 2008

19

20

21

22

23

24

25